**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **ERIC BROWN, et al.,** | * | **CRIMINAL NO. WDQ 09-cr-0183** |
| | * | |
| **Defendant** | * | |
| | * | |

***********

**GOVERNMENT'S CONSOLIDATED OPPOSITION TO**
**DEFENDANTS'S PRETRIAL MOTIONS**

## TABLE OF CONTENTS


I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A. MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE . . . . . . . . . . . . .9

1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

a. Brown, Olivis and Edison Have Standing to Challenge the Interception of Only the Brown, Williams and Glasscho Phones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

b. The Affidavits for the Target Cellphones Provided Ample Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

c. The Affidavits Established Necessity and Exhaustion . . . . . . . . 15

d. Continued Wire Interception Was Justified . . . . . . . . . . . . . . . . . 21

e. The Goals of the Investigation Were Attainable . . . . . . . . . . . . . 22

f. Investigators Acted in Good Faith . . . . . . . . . . . . . . . . . . . . . . . . 24

B. MOTION TO SUPPRESS EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1. Prisoners Have No Reasonable Expectation of Privacy in a Prison Cell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2. The Defendants Lack Standing to Challenge Searches of Locations to Which They Have No Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3. Investigators Had Probable Cause to Search the East Belvedere Street Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

4. Investigators Had Probable Cause to Search the South Highland Street Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C. MOTION TO SUPPRESS STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1. Statements Made By Randolph Edison Are Admissible . . . . . . . . . . . . . 32

a. Edison Was Lawfully Arrested . . . . . . . . . . . . . . . . . . . . . . . . . . 33

b. Edison's Confession Was Voluntary . . . . . . . . . . . . . . . . . . . . . . 33

2. Statements Made By Brown and Olivis Are Admissible . . . . . . . . . . . . 35

D. MOTION FOR DISCLOSURE PURSUANT TO RULE 12 . . . . . . . . . . . . . . . . 38

E. MOTION FOR DISCLOSURE OF RULE 404(b) AND 609 EVIDENCE . . . . 38

F. MOTION FOR DISCLOSURE PURSUANT TO RULE 801(d)(2)(e) . . . . . . . . 40

G. MOTION FOR DISCLOSURE OF AND ACCESS TO CONFIDENTIAL INFORMANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

H. MOTION FOR DISCLOSURE OF PRESENTENCE REPORT . . . . . . . . . . . . 45

I. MOTION TO REQUIRE THE GOVERNMENT TO CONFIRM WITNESS BACKGROUNDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

J. MOTION FOR SEVERANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

K. MOTION FOR BILL OF PARTICULARS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

L. MOTION TO STRIKE ALIASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

M. MOTION TO PRECLUDE ANY MENTION OF THE TERMS OF COOPERATORS PLEA AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

N. MOTION FOR PRESERVATION OF LAW ENFORCEMENT NOTES . . . . . 51

O. MOTION FOR INDIVIDUAL AND ATTORNEY VOIR DIRE . . . . . . . . . . . . 51

P. MOTION OF PEREMPTORY CHALLENGES . . . . . . . . . . . . . . . . . . . . . . . . . 51

IV. CONCLUSIO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **ERIC BROWN, et al.,** | * | **CRIMINAL NO. WDQ 09-cr-0183** |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S CONSOLIDATED OPPOSITION TO**
**DEFENDANTS'S PRETRIAL MOTIONS**

The United States of America, by and through its counsel, Rod J. Rosenstein, United States Attorney for the District of Maryland, James T. Wallner and Clinton J. Fuchs, Assistant United States Attorneys for said District, respectfully submits this Consolidated Opposition to Defendants's Pretrial Motions, and in support, submits the following:

## I. INTRODUCTION

On April 8, 2009, Eric Brown, Ray Olivis, Randolph Edison, Rainbow Williams, and 21 other members and associates of the Black Guerilla Family ("BGF") gang were indicted on federal drug trafficking charges in two related cases, *United States v. Eric Brown, et al.* WDQ 09-183, and *United States v. Kevin Glasscho,et al.*, WDQ 09-184. On April 7, 2010, Todd Duncan and 11 other BGF members and associates were indicted in a third related case, *United States v. Todd Duncan, et al.,* WDQ 10-169.

In June 2010, Brown, Olivis, Edison, Williams, Davenport and 10 others gang members from the three earlier BGF cases were charged in a superceding federal racketeering indictment with: (1) conspiracy to participate in a racketeering enterprise between 2006 and 2010; (2)

conspiracy to distribute and possess with the intent to distribute heroin; and (3) conspiracy to commit money laundering. *United States v. Eric Brown, et al.*, WDQ 09-183. In the superceding indictment Edison was also charged with interference with interstate commerce through robbery and use of a firearm in furtherance of a crime of violence. Williams was also charged with possession of ammunition by a prohibited person. Of the 15 defendants charged in the racketeering indictment Brown, Olivis, Edison, Williams, and three others remain. Brown, Olivis, Edison, and Williams are set for trial on May 2, 2011; the remainder of the Defendants are set for trial in late 2011.

To date, the Defendants have filed substantive motions or moved to adopt motions filed by their co-defendants. Accordingly, each motion will be deemed to be adopted by each Defendant. The following motions are currently pending: (1) motion to suppress electronic surveillance[1]; (2) motion to suppress evidence and statements[2]; (3) motion for disclosure pursuant to Rule 12[3]; (4) motion for disclosure pursuant to Federal Rule of Evidence 404(b) and 609[4]; (5) motion for disclosure of statements pursuant to Federal Rule of Evidence 801(d)(2)(e)[5];

---

[1] Motion to Suppress Electronic Surveillance, filed by Ray Olivis, paper number 381.

[2] Motion to Suppress Statements and Evidence, filed by Kimberly McIntosh, paper number 365; Motion to Suppress Statements, filed by Randolph Edison, paper number 373.

[3] Motion for Disclosure Pursuant to Rule 12, filed by Ray Olivis, paper number 355.

[4] Motion for Disclosure Pursuant to Rule 404(b) and 609, filed by Ray Olivis, paper number 356; Request for 404(b) Disclosure, filed by Kimberly McIntosh, paper number 362.

[5] Motion for Disclosure of Statements Intended To Be Used Pursuant to Rule 801(d)(2)(e), filed by Ray Olivis, paper number 357; Motion for Disclosure of all Co-Conspirator Statements, filed by James Harried, paper number 375.

(6) request for disclosure of and access to informants[6]; (7) motion for access to witnesses pretrial services and presentence reports[7]; (8) motion to require the Government to review witness backgrounds[8]; (9); motion for severance[9]; (10) motion for a bill of particulars[10]; (11) motion to strike aliases and surplusage[11]; (12) restrictions on use of plea and cooperation agreements[12]; (13) preservation of law enforcement notes[13]; (14) motion for individual and attorney voir dire[14]; and (15) motion for additional peremptory challenges[15].

---

[6] Motion to Reveal the Identity of the Informants and the Basis of Their Reliability, filed by Kimberly McIntosh, paper number 363; Motion for Disclosure of and Access to Confidential Informants, filed by James Harried, paper number 375.

[7] Motion for Access to Witnesses' Pretrial Services and Presentence Reports, filed by James Harried, paper number 375.

[8] Motion to Require the Government to Require Prosecution to Review and Confirm Witness Backgrounds, filed by Ray Olivis, paper number 358.

[9] Motion for Severance of Counts and Defendants, filed by Ray Olivis, paper number 354; Motion for Severance of Cases, Counts and Defendants, filed by James Harried, paper number 375; Motion for Relief from Prejudicial Joinder and to Sever, filed by Randolph Edison, paper number 372.

[10] Motion for Bill of Particulars, filed by James Harried, paper number 375; Request for Bill of Particulars, filed by Kimberly McIntosh, paper number 361.

[11] Motion to Strike Alias and Surplusage, filed by Kimberly McIntosh, paper number 367.

[12] Motion for Restriction on Use of Plea and Cooperation Agreements, filed by James Harried, paper number 375.

[13] Motion for Preservation of Law Enforcement Notes, filed by James Harried, paper number 375.

[14] Motion for Individual and Attorney Voir Dire, filed by James Harried, paper number 375.

[15] Motion for Additional Peremptory Challenges, filed by James Harried, paper number 375.

This Consolidated Opposition to the Defendants' pretrial motions is offered as a response to those motions only as they apply to Brown, Olivis, Edison and Williams.

## II. BACKGROUND

In September 2008, the Drug Enforcement Administration ("DEA") and Baltimore Police Department ("BPD") began an investigation of the Black Guerilla Family ("BGF"), a violent, nation-wide prison gang active within the Maryland Correctional System and on the streets of Baltimore City. Between February and April 2009, investigators conducted wire surveillance on phones used by: (1) Eric Brown, the leader of BGF in Maryland (at the time serving a state sentence in a Maryland prison facility), Rainbow Williams (one of Brown's key lieutenants); (3) Kevin Glasscho, a BGF associate and major source of supply of narcotics to the gang; and (4) Tyrone Dow, an associate of Glasscho. On April 15, 2009, Brown, Olivis, Edison (a senior BGF leader), Williams and the other named Defendants were arrested on federal drug trafficking charges. At the same time, search warrants were executed at 13 locations in and around Baltimore City, and 16 jail cells at prison facilities throughout the state. In the course of these searches, investigators recovered approximately 500 grams of heroin, firearms, drug paraphernalia and packaging material, BGF literature and hundreds of documents and photographs linking the defendants to each other and to BGF. Subsequent to his arrest, Edison agreed to talk to investigators, admitting that he was a member of BGF and that the BGF was engaged in, among other things, narcotics trafficking in and out of the prison system.

As the investigation continued, law enforcement agents identified additional high-ranking BGF members and associates active in Baltimore City. Between February and April 2010, investigators conducted wire surveillance on phones used by Todd Duncan (the city-wide leader

of BGF) and several other senior gang-members. On April 12, 2010, Duncan and others were arrested on drug trafficking charges. Concurrently with those arrests, investigators executed search warrants at 11 locations in and around Baltimore City. In the course of these searches, investigators recovered, among other things, firearms, quantities of narcotics, gang records and correspondence, and gang propaganda materials.

Based on evidence gathered over the course of this investigation, investigators have learned that the BGF is a nationwide, historically prison-based gang operating in prison facilities and major cities throughout the United States. Founded in California in the 1960s, BGF was brought to Maryland by Ray Olivis (referred to by fellow members as the "Hodari" or founder) in the mid 1990s, and quickly became the most powerful gang in the Maryland Correctional System. Over time, BGF spread to the streets of Baltimore, and BGF members, both in and out of the prison system, became actively engaged in drug trafficking, money laundering, extortion, bribery and acts of violence.

Based on information gathered from confidential sources, cooperating witnesses and wire surveillance of the target subjects, investigators have learned that the BGF is a highly organized and structured enterprise led by a group of senior gang members, known collectively as the "Supreme Bush," who are responsible for directing the gang's criminal activities. Reflecting the gang's paramilitary nature, the "Supreme Bush" includes a Supreme Commander (or "Gayeedi"), Lieutenant Commander and Ministers of Justice, Defense, Finance, Intelligence and Education. Within each correctional institution and neighborhood of Baltimore City in which BGF has established a presence, members are led by a "Bubble Regime." Each "Bubble Regime" mirrors the structure of the "Supreme Bush" and so includes a Commander, Lieutenant

Commander and various ministers. The commander of each of these “Bubble Regimes” is appointed by, and reports to, the “Supreme Bush.”

In order to maintain control of the organization, BGF leaders require members (who refer to each other as “comrades”) to pay membership dues, learn gang doctrine and abide by the gang’s code of conduct. Members who fail to follow the dictates of BGF leaders are "sanctioned."

Incarcerated BGF members are actively engaged in smuggling narcotics and other contraband into prison facilities throughout the state. Through violence and intimidation and with the cooperation of corrupt prison guards, BGF members exercise virtually unchallenged control over the prison system’s black market economy and regularly extort “protection” money from non-BGF inmates.

On the streets of Baltimore BGF is increasingly active and is now an important player in the local drug trade. The proceeds of all of these operations, both in and out of the prison system are used to further the gang’s ongoing operations.

Among the senior leaders of BGF in Maryland were Brown, the Supreme Leader (or “Gayeedi”) of the BGF in the state of Maryland (incarcerated for the period of the conspiracy); Olivis (also incarcerated), the founder of BGF in Maryland, Edison, one of the original founding members and gang’s first “Gayeedi,” and Williams one of Brown’s top lieutenants on the streets of Baltimore.

## III. ARGUMENT

### A. MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE

The Defendants have moved to suppress the products of the electronic surveillance conducted in this case arguing that: (1) the affidavit did not establish probable cause; (2) the affidavit failed to establish that normal investigative procedures had or would fail, appeared unlikely to proceed or would create undue risk to law enforcement; (3) the wiretap was not terminated upon attainment of the stated objectives; and (4) the affidavit states overly broad goals.[16] For the following reasons, Defendants' motion should be denied.

#### 1. Background

Over the course of the first phase of the BGF investigation, investigators sought authorization to intercept the telephone calls of, among others, Brown, Williams and Kevin Glasscho (a source of supply of narcotics for BGF). On February 20, 2009, the Honorable J. Frederick Motz of the United States District Court for the District of Maryland authorized the interception of a phone believed to be used by Eric Brown (the "Brown Cellphone"). That interception began on February 20, 2009 and continued until April 16, 2009. On March 10, 2009, Judge Motz authorized interception of a cellphone used by Rainbow Williams (the "Williams Cellphone") and interception was conducted between March 10, 2009 and April 16, 2009. On March 13, 2009, Judge Motz authorized interception of three cellphones used by Glasscho (the "Glasscho Cellphones"). That interception began on March 13, 2009 and continued until April 16, 2009. On March 31, 2010, the Honorable Wanda K. Heard, Judge of Circuit Court for Baltimore City authorized interception of a cellphone used by Tyrone Dow, an

---

[16] Motion to Suppress Electronic Surveillance, filed by Ray Olivis, paper number 381.

associate of Glasscho. Interception began on March 31 and ended on April 16, 2009.

In the second phase of the BGF investigation, investigators sought authorization to intercept the telephone calls of Todd Duncan, Duconze Chambers, Lamont Crooks and Kimberly McIntosh. On February 8, 2010, Judge Motz authorized the interception of a phone used by BGF member Duconze Chambers (the "Chambers Cellphone"). Interception was conducted between February 8, 2010 and April 7, 2010. On March 1, 2010, Judge Motz authorized the interception of cellphones used by Todd Duncan (the "Duncan Cellphones"). Interception of the Duncan Cellphones began on March 1, 2010 and continued until April 7, 2010. On March 15, 2010, Judge Motz authorized the interception of a phone used by Lamont Crooks (the "Crooks Cellphone"). Interception of the Crooks cellphone began on that day and continued until April 12, 2010. Finally, on April 6, 2010, Judge Motz authorized interception of a cellphone used by Kimberly McIntosh (the "McIntosh Cellphone"). Interception of the McIntosh cellphone continued until April 12, 2010.

During the course of these interceptions Brown was intercepted over the Brown, Williams and Glasscho Cellphones. Olivis was intercepted over the Brown and Williams Cellphones and Edison was intercepted over the Brown Cellphone. Neither Brown, Williams, Olivis nor Edison were intercepted over the Chambers, Duncan, Crooks or McIntosh cellphones.

**2. Argument**

**a. Brown, Olivis, Williams and Edison Have Standing to Challenge the Interception of Only the Brown, Williams and Glasscho Phones**

Under the federal wiretap statute, 18 U.S.C. § 2518(10)(a), only "aggrieved persons" may move to suppress the fruits of a wire interception. Pursuant to § 2510(11), an "aggrieved person" is a person who was a party to any intercepted wire, oral or electronic communications.

As Brown, Olivis, Williams and Edison were intercepted only over the Brown, Williams and Glasscho cellphones, they may only challenge the interception of those telephone lines.

**b. The Affidavits for the Target Cellphones Provided Ample Probable Cause**

Under the federal wiretap statute, 18 U.S.C. § 2518(3)(a), authorization of wire interception requires a showing that there is probable cause to believe: (1) that an individual is committing, has committed, or is about to commit a particular offense enumerated in § 2516 (in this case, narcotics trafficking); and (2) that there is probable cause to believe that communications concerning that offense will be intercepted. As with any warrant, the Court must determine from the totality of the circumstances that probable cause existed. *See Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

In the case at hand, the affidavits in support of interception (and continued interception) of the Brown, Williams and Glasscho Cellphones (collectively, the "Target Cellphones") all provided ample probable cause to support issuance of the wiretap authorization. *See* Affidavit in Support of Application for Authorization to Intercept Wire Communication Over Eric Brown's Cellphone, attached hereto as Exhibit 1 (hereafter, the "Brown Affidavit"); Affidavit in Support of Application for Continued Authorization to Intercept Wire Communication Over Eric Brown's Cellphone, attached hereto as Exhibit 2 (hereafter the "Brown Extension Affidavit); Affidavit in Support of Application for Authorization to Intercept Wire Communication Over Rainbow Williams's Cellphone, attached hereto as Exhibit 3 (hereafter, the "Williams Affidavit); Affidavit in Support of Application for Continued Authorization to Intercept Wire Communication Over Rainbow Williams's Cellphone, attached hereto as Exhibit 4 (hereafter "Williams Extension Affidavit"); Affidavit in Support of Application for Authorization to

Intercept Wire Communications Over Kevin Glasscho's Cellphones, attached hereto as Exhibit 5 (hereafter, the "Glasscho Affidavit"); and Affidavit in Support of Continued Authorization to Intercept Wire Communication Over Kevin Glasscho's Cellphone, attached hereto as Exhibit 4 (hereafter, the Glasscho Extension Affidavit). Accordingly, the issuance of the Court's orders to intercept those orders was proper.

With respect to the interception of the Brown Cellphone, the Brown Affidavit and the Brown Extension Affidavit provide evidence gathered from confidential informants and intercepted jail-house phone calls indicating that Brown was using his contraband prison cellphone to discuss the organization of BGF and to coordinate the smuggling of contraband (possibly narcotics) into Maryland prison facilities. Specifically, the Brown Affidavit reports that investigators had been informed by a known, reliable, confidential informant (referred to as CS1) that Brown was a high-ranking BGF member, that the BGF was engaged in narcotics trafficking throughout the state, and that Brown was using the Brown Cellphone (from inside of the Maryland Transition Center, "MTC"), to coordinate BGF activities, to include narcotics trafficking. *See* Ex. 1 at ¶¶ 21-25. A second confidential informant (referred to as "CS2"), a concerned citizen whose information was corroborated and proved reliable, reported that Brown was a BGF member and that he was using the Brown Cellphone, in prison. *Id* at ¶¶ 33-34. A third confidential informant (referred to as CS5), who was compensated for his/her assistance and whose information proved reliable, reported that Brown was a high-ranking BGF member who was using the Brown Cellphone to assist Olivis in coordinating BGF activities. *Id* at ¶ 38.

In addition to the information provided by confidential informants, in November 2008, investigators intercepted a call between Brown and fellow gang member Thomas Bailey over a

recorded prison phone in which Brown and Bailey discuss their participation in BGF and arranged for the smuggling of contraband to Bailey at the North Branch Correctional Institute. Ex. 1 at ¶ 47-50. In December 2008, Bailey again contacted Brown on the Brown Cellphone and discussed Brown's authorship of the "Black Book" (a BGF propaganda piece which recounts, among other things, the history of the gang, lesson plans for members and a declaration of the gangs aims and purposes). *Id* at ¶ 57-58. Borrowing the cellphone from Brown, Olivis entered the conversation in order to provide "inspiration" to Bailey. *Id* . In response, Bailey told Olivis that he was honored to be speaking to one of the founders of the gang. *Id.*

In the Brown Extension Affidavit (which incorporated the Brown Affidavit) the Government reported that Brown had been intercepted on the Brown Cellphone, among other things: (1) arranging to have his wife, Deitra Davenport, deliver contraband to Williams, which investigators believe, Williams was to smuggle into Brown at MTC, Brown Extension Affidavit, ¶ 22-24; (2) questioning Department of Corrections ("DOC") employee Takevia Smith as to whether Smith was reporting infractions by inmates to other Correctional Officers, *Id* at ¶¶ 25-26; (3) asking Smith when she would be able to smuggle contraband to Brown, *Id*; (4) confirming that Williams had arranged to have contraband smuggled to Brown via a corrupt DOC employee, *Id* at ¶ 28; (5) discussing with fellow gang member Marlow Bates, Brown's attempts to have Williams smuggle contraband to Brown through the prison visiting room, *Id* at ¶ 36; and discussing with federal inmate Melvin Glibert, Brown's success in smuggling cellphones into MTC; *Id* at ¶ 44.

Similarly, the Williams Affidavit (which incorporated the Brown Affidavit) offered evidence provided by confidential informants and calls intercepted over the Brown Cellphone,

that indicated that Williams was a high-ranking BGF member engaged in bribery and smuggling of contraband into Brown at MTC. Specifically, the Brown Affidavit reported that CS1 had identified Williams as a violent gang member who had committed multiple assaults on behalf of the gang while incarcerated (for a state murder conviction). Ex. 1 at, ¶ 27. CS1 further reported that Williams was loyal to, and took orders from, Eric Brown. *Id.* CS3 reported that Williams was one of the leaders of BGF and that while incarcerated at a correctional facility in Hagerstown, Maryland, Williams was responsible for smuggling heroin into the facility on behalf of gang members. *Id* at ¶¶ 35-36.

Additionally, in an intercepted conversation over the Brown and Williams Cellphones, Brown was overheard arranging to have his wife, Deitra Davenport, deliver contraband to Williams. Ex. 3 at ¶ 18-20. The next day Williams contacted Brown from the Williams Cellphone and confirmed that he had delivered the contraband to a corrupt prison guard who was responsible for delivering the contraband to Brown. *Id* at ¶ 21.

In the Williams Extension Affidavit, the Government reported that Williams had been intercepted over the Williams cellphone, among other things: (1) discussing the need for BGF to retaliate for a recent shooting of BGF members, Williams Extension Affidavit, ¶ 21; (2) discussing whether a fellow gang member was cooperating with law enforcement, *Id* at ¶ 25; and (3) discussing whether an individual known as "Greazy" should be attacked by BGF members. *Id* at ¶ 26-27.

Finally, with respect to the Glasscho Cellphones, the Glasscho Affidavit offered information from confidential informants and intercepted telephone calls which indicated that Glasscho was a source of supply of narcotics to BGF members. Indeed, CS1 (identified above),

reported that Glasscho had joined BGF while incarcerated and had successfully arranged to have large quantities of heroin smuggled into state correctional facilities on behalf of gang members. Ex. 5 at ¶ 17.

In an intercepted call from Brown to the first Glasscho Cellphone, Brown and Glasscho discussed the fact that Glasscho had spent the previous day distributing narcotics to his customers throughout Baltimore City. *Id* at ¶ 23. In that call Glasscho also referenced the fact that his wife, Cassandra Adams, had been smuggling narcotics, on his behalf, to customers in Maryland prison facilities. *Id.* In a recorded conversation between Brown, Glasscho and a third associate known as “Shakey” over Glasscho’s second cellphone, Glasscho told “Shakey” that he had no narcotcis for sale, but that he and “Shakey” should meet face-to-face to discuss future transactions. *Id* at ¶ 25-27. At the end of the conversation Glasscho promised to meet “Shakey” that week, in person, in order to discuss a possible drug sale. *Id* at ¶ 27.

In the Glasscho Extension Affidavit, the Government reported that Glasscho had been intercepted over the Glasscho cellphone discussing, among other things, the smuggling of narcotics into Maryland prison facilities and narcotics trafficking in Baltimore City. Ex. 4, ¶¶ 30, 31, 33-34, 36.

Given the above, as well as the additional information provided in the affidavits, the Brown, Williams and Glasscho Affidavits and Extension Affidavits clearly provided ample probable cause to support the issuance and continuance of the wiretaps.

**c. The Affidavits Established Exhaustion and Necessity**

In addition to requiring a showing of probable cause, § 2518 also requires the Government to demonstrate that “normal investigative procedures have been tried and have

failed or reasonably appear to be unlikely to succeed if tried, or to be too dangerous." 18 U.S.C. § 2518(3)(c). The purpose of 18 U.S.C. § 2518(3)(c) is to ensure that the relatively intrusive device of wiretapping is "not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). As the Fourth Circuit has repeatedly held, however, "the burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion,' ... that does not 'hamper unduly the investigative powers of law enforcement agents.'" *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994) (citations omitted); *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995); *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir.1977). The Fourth Circuit has expressly recognized that reading the "necessity" requirement in an "overly restrictive manner" would unduly harm the ability of law enforcement agents to use this "necessary tool of law enforcement." *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir. 1988). Among other things, the Fourth Circuit has found that although the government may not use mere conclusory statements about the use of other investigative techniques to justify a wiretap, the government is not required to show that other methods have been "wholly unsuccessful" or that it has exhausted "*all* possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (citations omitted) (emphasis in original). *See also United States v. Carneiro*, 861 F.2d 1171, 1178 (9th Cir. 1988) (finding that the fact that DEA could have taken different or some additional steps in its investigation did not demonstrate that the district court abused its discretion in upholding the wiretap order); *Clerkley*, 556 F.2d at 222; *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989) (law enforcement official not required to exhaust all

conceivable investigative procedures before seeking wiretap); *United States v. Bankston*, 182 F.3d 296, 306 (9th Cir. 1999) (exhaustion of every conceivable investigative option need not be shown), *rev'd on other grounds by Cleveland v. United States*, 529 U.S. 1017 (2000); *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (wiretap necessary to learn full extent of drug operation despite attainment of degree of success with traditional investigative methods). Although a wiretap should not be used routinely as a first step in criminal investigations, the case law is clear that a wiretap likewise need not be the last resort. *United States v. Smith*, 893 F.2d 1573, 1589 (9th Cir. 1990). In sum, the government is required simply to provide to the issuing judge facts that show that wiretapping the target telephones in conjunction with the investigation is "reasonable." *Smith*, 31 F.3d at 1298. In reviewing a judge's finding that the government has adequately shown the necessity of using a wiretap, courts should give the issuing judge's decision "considerable deference." *Id.*

Courts have found that a proper showing of exhaustion can be more easily made in complex cases, such as this one, where the goal of wiretapping certain telephones is to identify those people who are "higher up" in a particular organization and who otherwise could not be identified. Indeed, courts have expressly recognized that due to the nature of certain criminal organizations, informants are often unable to have contact with the individuals who are at the highest levels of the organization, therefore making wiretaps necessary. *Clerkley*, 556 F.2d at 714; *United States v. Vargas*, 116 F.3d 195, 197 (7th Cir. 1997); *see also Leavis*, 853 F.2d at 221 (noting that in that case, sufficient information was provided to the court which allowed the court to determine that the confidential informant would be unable to give information regarding the upper levels of the conspiracy). Moreover, courts have recognized that because informants often

are subject to easy impeachment at trial, the government must often obtain corroborative evidence through wiretaps. *United States v. Kelley*, 140 F.3d 596, 605-06 (5th Cir. 1998). Likewise, courts have recognized that other investigative techniques, such as questioning persons involved in the conspiracy, often results in alerting the conspirators to the existence of an investigation, which could jeopardize both the ongoing investigation and the lives of informants and undercover officers. *United States v. Killingsworth*, 117 F.3d 1159, 1164 (10th Cir. 1997); *Kelley*, 140 F.3d at 596.

Here, the Defendants argue that the Government's applications for wire interception failed to offer sufficient showings of necessity and exhaustion. An examination of the relevant affidavits, however, makes clear that the Government described specific investigative techniques that had been attempted and explanations why certain techniques in this case, would be insufficient, alone, to achieve the goals of the investigation. Indeed, in each affidavit, the Government detailed the use or the problems associated with the use of: (1) prior electronic surveillance; (2) confidential informants; (3) undercover officers; (4) physical surveillance; (5) toll record analysis; (6) grand jury testimony; (7) search warrants; (8) arrests of suspects; and (9) trash runs.

In the Williams Affidavit, the Government noted that although the Brown and Williams shared some contacts, each had many more that were not shared. Ex. 3 at ¶ 23(a). As a result, interception of the Brown or Williams phones, alone, would not have allowed investigators to identify the full scope of the conspiracy.

Additionally, the Brown and Williams affidavits all reported that although confidential informants had been used as part of the investigation, none of the informants had knowledge of,

or were in a position to make contact with all members of BGF. Ex. 1 at, ¶ 75(a); Ex. 3 at ¶ 23(c). None of the informants were in a position to make controlled purchases of narcotics from Brown, Williams, Glasscho or other high-ranking BGF members and none could identify all of the gang's sources of supply of narcotics. *Id.* The Glasscho affidavit reported that only one confidential informant was able to provide information about Glasscho and that informant could provide historical information. Ex. 5 at ¶ 33(c). Finally, the Government reported that many of the informants were reluctant, if not unwilling, to testify at trial given the significant safety risks such public cooperation would entail. Ex. 1 at, ¶ ¶ 75(a); Ex. 3 at ¶ 23(c).

The affidavits further argued that undercover officers could gather only limited information about high-ranking gang members or gang activities. Ex. 1 at, ¶ 75(b); Ex. 3 at, ¶ 23(d); Ex. 5, ¶ 33(d). Although undercover officers could make small purchases of narcotics from street-level distributors, given Brown's and Williams's positions as high-ranking members of BGF and Glasscho's position as a significant source of supply of narcotics, an undercover officer would have difficulty gaining access to any of these individuals (particularly given Brown's incarceration at the time of this investigation). *Id.* Additionally, it would be highly unlikely that Brown, Williams or Glasscho would speak freely about gang activities with someone unassociated with the gang. *Id.* Finally, given the violent nature of BGF, the danger to the safety of any undercover officer would be extreme. *Id.*

With respect to physical surveillance, the affidavits noted that the Target Subjects were extremely surveillance conscious and that Brown was incarcerated at the time of the investigation. Ex. 1 at ¶ 75(c); Ex. 3 at ¶ 23(e); Ex. 5 at ¶ 33(e). As a result, surveillance was unlikely to succeed and might expose the fact of the investigation. *Id.* Accordingly, the ability

of the investigators to surveil Brown, Williams, Glasscho and the other members of the gang was limited.

With respect to toll record analysis, the affidavits explained that such analysis provided limited useful information given the fact that cellular phones can be purchased without providing any subscriber information and that even assuming such information, the actual user of the telephone and the contents of any conversation will remain unknown. Ex. 1 at ¶ 75(d); Ex. 3 at ¶ 23(f); Ex. 5 at ¶ 33(f). As a result, toll record analysis offered a valuable tool, but one that, alone, could not achieve the goals of the investigation.

The affidavits further explained that a grand jury investigation or interviews of witnesses would be unable to accomplish the goals of the investigation. Ex. 1 at ¶ 75(e); Ex. 3 at ¶ 23(g); Ex. 5 at ¶ 33(g). Specifically, the affidavits noted that witnesses had not yet been identified but that when they were, such witnesses would likely face prosecution themselves. *Id.* Moreover, the issuance of grand jury subpoenas to potential witnesses would obviously alert the targets of the investigation to the existence of the investigation. *Id.*

The affidavits also reported that the investigation had not yet established probable cause to search locations identified with the Target Subjects, and that even if searches were executed, they would provide limited information about the full scope of the conspiracy and the identification of the members of the conspiracy. Ex. 1 at ¶ 75(f); Ex. 3 at ¶ 23(h); Ex. 5 at ¶ 33(h). As well, execution of these warrants would obviously alert the Target Subjects to the fact of the investigation. *Id.* Similarly, trash runs would yield limited evidence about the larger conspiracy and, again, would disclose the fact of the investigation. Ex. 1 at ¶ 75(h); Ex. 3 at ¶ 23(j); Ex. 5 at ¶ 33(j)

Finally, the affidavits noted that Brown and others of the Target Subjects were already incarcerated and were conducting the affairs of the gang from prison. Accordingly, the utility of arresting Brown, Glasscho or Williams would likely have no effect on the operations of the organization. Ex. 1 at ¶ 75(g); Ex. 3 at ¶ 23(i); Ex. 5 at ¶ 33(j). Given the lengthy criminal histories of many of the Target Subjects and the fact that arrestees would be incarcerated with their co-conspirators, investigators are not optimistic that arresting any of the target subjects would lead to valuable cooperation. *Id.*

In the Brown, Williams and Glasshco Extension Affidavits, the Government reiterated each of these same concerns. *See* Ex. 2 at ¶ 56; Ex. 4 at ¶ 44.

Therefore, given that the Brown, Williams and Glasscho affidavits each provided specific examples of investigative techniques that had been tried, and explained why others, alone, would not achieve the stated goals of the investigation, the Government met its required showing of necessity and exhaustion under § 2518.

**d. Continued Wire Interception Was Justified**

The Brown, Williams and Glasscho Affidavits each reported that there was probable cause to believe that wire interception of the target cellphones would reveal, among other things: (1) the nature, extent and methods of operation of the racketeering and narcotics trafficking activities of the Target Subjects; (2) the identities of the Target Subjects, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities, including the sources of supply of the controlled substances, as well as the distributors and purchasers of such controlled substances; (3) the quantities and types of controlled substances involved in this conspiracy; and (4) the degree of participation and roles of all co-conspirators in this conspiracy.

Ex. 1 at ¶ 11; Ex. 3 at ¶ 11; Ex. 5 at ¶ 11. As noted in each Court report for each telephone line, the Government continued to make progress towards the goals of the investigation, but, given the size and scope of the conspiracy, had failed to fully identify all co-conspirators, all narcotics sources of supply and the degree of participation and the role of each co-conspirator (among other things). As a result, the Court authorized continued interception of the Target Telephones.

**e. The Goals of the Investigation Were Attainable**

Related to their argument that the Government failed to show necessity and exhaustion, the Defendants argue that the Government set unattainable goals for the investigation in order to justify continued wire interception. The Defendants' argument appears to be that by targeting a large and complex organization, the Government's goals of identifying the members of the organization and their participation in unlawful activities were impossible to achieve, and, therefore, the Government was effectively asking to conduct wire interception in perpetuity.

The Defendant's position, however, would seem to apply to the investigation of any large, complex organization. According to the Defendants, it is impossible to identify all of the members and activities of a large group of co-conspirators and, therefore, wire interception in such a context should not be allowed. Taken to its logical conclusion, wire interception would not be permitted in any large scale investigation, precisely where such a technique is most useful.

In the case at hand, the goals of the investigation could be, and were, in large part, attained. The Brown, Williams and Glasscho affidavits asserted that there was probable cause to believe that Brown, Olivis, Williams and others were engaged in racketeering, violent crimes in aid of racketeering, drug trafficking and use of a communication facility in furtherance of drug

trafficking. The Affidavits further alleged that interception of the Target Cellphones would reveal, among other things, the nature, extent and methods of operation of the racketeering and drug trafficking activities of Brown, Olivis, Williams and the other Target Subjects as well as the identities of the Target Subjects' co-conspirators and the degree of participation of each co-conspirator. As the affidavits pointed out, BGF is a highly organized and structured entity with a clearly defined organizational scheme. Leadership positions in the gang are clearly defined, membership in the organization is closely controlled and discipline among members is energetically enforced. As a result, the BGF is a clearly defined entity with clearly identified leaders (with specific responsibilities), a finite (though large) number of members, and a certain number of high level sources of supply of narcotics which provided the gang with narcotics to sell.

Given the clearly defined and finite nature of the organization, the goals of the investigation were clearly attainable. Indeed, after less than two months of interception of a total six phones, the Government was able to demonstrate that BGF was an enterprise engaged in, among other things, drug trafficking, money laundering and extortion within the Maryland correctional system and in Baltimore City. The wire interception identified: (1) the means by which BGF operated within the Maryland prison system; (2) the head of the enterprise (Brown); (3) its founder and senior leader (Olivis); (4) a top lieutenant (Williams); (5) senior gang members (including Edison); and (6) an outside sources of supply of narcotics (Glasscho). Far from the futile and unending investigation described by the Defendants, the Government articulated clear and achievable goals with respect to a defined (if large) organization and, achieved many of those goals in relatively short order.

**f. Investigators Acted in Good Faith**

Even assuming that a search warrant is not supported by probable cause, evidence obtained as a result of such a search need not be suppressed if investigating agents acted in good faith. *See United States v. Leon*, 468 U.S. 897, 923 (1984). The Fourth Circuit and other courts have recognized that the *Leon* exception applies equally in the context of a wiretap. *See United States v. Brewer*, 204 Fed. Appx. 205, 208 (4th Cir. 2006) ("Even if Brewer is correct that the affidavits did not set forth adequate probable cause, or that the exhaustion requirements . . . had not been met, the affiants were entitled to rely on the facially valid wiretap orders pursuant to the good faith exception of *United States v. Leon* . . . "); *United States v. Moore*, 41 F.3d 370, 376-77 (8th Cir. 1995) (applying *Leon* good faith reasoning to wiretap context); *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985) (applying good faith analysis in wiretap context); *United States v. Ambrosio*, 898 F. Supp. 177, 187 (S.D.N.Y. 1995) (same, citing cases and noting some conflict among the courts). Given this, even if the Court disagrees with the Government's assertion that the wiretap orders were properly authorized, certainly the agents' reliance on the wiretap orders was reasonable. The wiretap applications and orders were facially valid, provided information establishing that the Brown, Williams and Glasscho Cellphones were being used in furtherance of drug activity, and offered considerable information about why other investigative techniques would not be successful. Any reasonable officer or agent would have relied on an order issued under such an affidavit, and the *Leon* doctrine, therefore, applies to this case.

**B. MOTION TO SUPPRESS EVIDENCE**

In April 2009 and 2010, investigators executed search warrants issued by the Magistrate

Judge James Bredar of the United States District Court at 23 locations in and around Baltimore City as well as jail cells of prisoners throughout the Department of Corrections. At the trial scheduled to being May 2, 2011, the Government intends to introduce evidence seized from: (1) 1113 East Belvedere Street, Apartment C, Baltimore, Maryland (an address associated with Williams)[17]; (2) 600 South Highland Street, Baltimore, Maryland (an address associated with BGF member Tomeka Harris and Williams)[18]; (3) 3908 Norfolk Avenue, Baltimore, Maryland (an address associated with Kevin Glasscho)[19]; (4) 1120 Homewood Avenue, Baltimore, Maryland (an address associated with Kimberly McIntosh[20]; (5) 1501 Division Street, Baltimore, Maryland (the workplace of Kimberly McIntosh)[21]; and (6) 5305B Valiquet Road, Baltimore, Maryland (an address associated with Todd Duncan)[22]. The Government also intends to introduce evidence seized from the jail cells of BGF members Eric Brown, Ray Olivis, and Jonathan Braverman.[23]

---

[17] Pursuant to the search of this address, investigators recovered, among other things, BGF related literature, correspondence and pistol ammunition.

[18] Pursuant to the search of this address, investigators recovered, among other things, BGF related paperwork, correspondence and financial records.

[19] Pursuant to the search of this address, investigators recovered, among other things, more than 200 grams of heroin and narcotics packaging materials.

[20] Pursuant to the search of this address, investigators recovered, among other things, marijuana, heroin and voluminous quantities of BGF related paperwork and correspondence.

[21] Pursuant to the search of this address, investigators recovered, among other things, a bulletproof vest and BGF related paperwork.

[22] Pursuant to the search of this address, investigators recovered, among other things a 9mm pistol, a bulletproof vest, heroin and drug packaging materials.

[23] Pursuant to the search of this address, investigators recovered, among other things, BGF paperwork and photographs.

The Defendants have moved to suppress the evidence seized pursuant to these searches arguing that the affidavits in support of the search warrants failed to demonstrate sufficient probable cause to support the issuance of the warrants.[19]

**1. Prisoners Have No Reasonable Expectation of Privacy in a Prison Cell**

In order to challenge the search of a location, a defendant must demonstrate that he has a "legitimate expectation of privacy" in the places or objects searched or seized. *Rakas v. Illinois,* 439 U.S. 128, 143 (1978). To establish the legitimacy of this privacy interest, the person must not only exhibit "an actual (subjective) expectation of privacy in the item or place searched," *Katz v. United States,* 389 U.S. 347, 353 (1967), but must also prove that "society is prepared to accept that expectation as objectively reasonable." *California v. Greenwood*, 486 U.S. 35, 40 (1988). Additionally, "Fourth Amendment rights are . . . personal rights," which co-defendants "lack standing to assert vicariously." *United States v. Taylor,* 857 F.3d 210, 214 (4th Cir. 1988).

A prisoner has no reasonable expectation of privacy in his prison cell entitling him to Fourth Amendment protection. *Hudson v. Palmer,* 468 U.S. 517, 526-527 (1984); *United States v. Jeffus*, 22 F.3d 554, 559 (4th Cir. 1994). The need to maintain prison security and discipline provides the basis for dispensing with the warrant and probable cause requirements when searching a prisoner's cell. *Block v. Rutherford,* 468 U.S. 576 (1984).

Here, investigators searched the cells of Brown, Olivis and Braverman. As prisoners have no expectation of privacy in their cells neither Brown nor Olivis may challenge these searches. As neither Williams nor Edison may vicariously assert Brown's or Olivis's Fourth Amendment

[19]Motion to Suppress Statements and Evidence, filed by Kimberly McIntosh, paper number 365.

rights, both defendants, likewise, are barred from challenging those searches.

**2. The Defendants Lack Standing to Challenge Searches of Locations To Which They Had No Connection**

As noted above, in order to challenge a search, a defendant must demonstrate that he has a "legitimate expectation of privacy" in the places or objects searched or seized. *Rakas,* 439 U.S. at 143. As well, defendants lack standing to vicariously assert the rights of their co-defendants. *Taylor,* 857 F.3d at 214. Here, neither Brown, Olivis nor Edison had a direct connection to the six addresses listed above. As a result, they have no legitimate expectation of privacy in those locations and, therefore, lack standing to challenge those searches.

Williams had no connection to the Norfolk Avenue, Homewood Avenue, Division Street, or Valiquet Road addresses and, therefore, lacks standing to challenge the searches of those locations. However as Williams resided at the East Belvedere address and was observed visiting the South Highland Street address, the Government assumes he has standing to challenge those searches. The issue, therefore, is whether the affidavits in support of the applications for search warrants for those locations contained sufficient probable cause to support the issuance of the warrants.

**3. Investigators Had Probable Cause to Search the East Belvedere Street Address**

The Fourth Amendment protects against unreasonable searches and seizures through its requirement that search warrants issue only upon a showing of probable cause. *See United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2004). Although not reducible to a precise definition or set of legal rules, the Supreme Court has held that probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S.

690, 696 (1996). Where the issuance of a search warrant is based, in part, on an informant's hearsay, it is necessary to consider the "totality of the circumstances" set forth in the in the affidavit, including "the veracity and basis of knowledge of persons supplying hearsay information." *Illinois v. Gates,* 462 U.S. 213, 238 (1983).

In recognition of the fluid and particularized nature of probable cause, our Circuit has held that a magistrate or commissioner's decision to issue a search warrant is entitled to great deference. *Hodge,* 354 F.3d at 309. Indeed, the duty of a reviewing court is "simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *See id* (quoting *Illinois v. Gates,* 462 U.S. 213, 238-239 (1983)).

Additionally, even where the court ultimately finds a warrant to be invalid, the fruits of the search conducted pursuant to that warrant should not be suppressed "unless a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Bynum,* 293 F.3d 192, 195 (4th Cir.2002) (quoting *United States v. Leon,* 468 U.S. 897 (1984)). As the Supreme Court explained in *Leon*, "the deterrence purpose of the exclusionary rule is not achieved through the suppression of evidence obtained by "an officer acting with objective good faith within the scope of a search warrant issued by a magistrate." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir.2004) (quoting *Leon*, 468 U.S. at 920, 104 S.Ct. 3405). Accordingly, under *Leon*'s "good faith" exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" *Id*. (quoting *Leon*, 468 U.S. at 922, 104 S.Ct. 3405).).

In the case at hand, the Government provided ample probable cause to support the

issuance of the warrant to search the East Belvedere address. *See* Affidavit in Support of April 2009 Search Warrants, attached hereto as Exhibit 6 (hereafter the "2009 Affidavit"). Specifically, the 2009 Affidavit reported that a confidential source had told investigators that Williams was one of Eric Brown's key lieutenants responsible for coordinating BGF's drug trafficking. Ex. 6, ¶ 28. A second confidential source reported that Williams was responsible for committing multiple acts of violence on behalf of the gang. *Id* at ¶ 36.

The 2009 Affidavit also provided summaries of intercepted phone calls involving or discussing Williams which indicated that Williams was involved in smuggling contraband into BGF members at Maryland correctional facilities, coordinating gang activities and participating in drug trafficking. Specifically, the 2009 Affidavit documented a series of intercepted calls between Williams and other BGF members, including Brown, in which Williams: (1) discussed smuggling contraband into Brown at MTC, Ex. 6 at ¶¶ 30(b) - (d), 31; (2) discussed mediating a dispute among gang members, *Id* at ¶ 44(a); (3) discussed being accused of ordering the unauthorized attack of two BGF members and the possible retribution he would face from the BGF leadership, *Id* at ¶ 37(d)(6); (4) discussed authorizing an attack on a individual known as "Greazy," *Id* at ¶ 44(d); and (5) negotiated the purchase of a quantity of narcotics from an individual known as "Jimmy," *Id* at ¶ 44(f).

The Government further reported that Motor Vehicle Administration and parole and probation records indicated that Williams resided at the East Belvedere address, and Williams was overheard in recorded in phone calls, telling his associates that he lived at that address. *Id* at ¶ 45. Finally, the Government reported that gang members often keep gang records, membership lists, and gang propaganda materials in their homes, *Id* at Ex. 1, and that drug traffickers,

likewise, often keep narcotics, proceeds, and financial records in their homes. *Id* at Ex. 2. Given this, the Government offered sufficient probable cause that Williams was involved in gang activity and narcotics trafficking and that evidence of these crimes would be found at the East Belvedere address.

Additionally, even assuming, *arguendo*, that the 2009 Affidavit lacked sufficient probable cause, the investigators reliance on the warrant was entirely reasonable. Indeed, there is no argument from the Defendants that the warrant was facially invalid, that the Federal Magistrate Judge abandoned his neutral role or that the 2009 Affidavit was so lacking in probable cause as to make reliance upon it was entirely unreasonable. Therefore, even assuming that the 2009 Affidavit lacked probable cause, the Defendants' motion should be denied pursuant to the "Good Faith" exception articulated in *Leon.* 468 U.S. 897.

**4. Investigators Has Probable Cause to Search the South Highland Street Address**

Evidence gathered as part of the Government's investigation indicated that the South Highland Street address was the residence of Tomeka Harris, an associate of Williams and Eric Brown and the wife of Vernon Harris, an incarcerated BGF member. 2009 Affidavit, ¶ 49. On March 13, 2009, Williams was observed entering the apartment and Williams received a parking ticket outside of the apartment on the same day.

Assuming Williams has standing to challenge the search of the South Highland Street address, his connection to the location also supports the proposition that the Government offered sufficient probable cause to support the issuance of the warrant. As noted above, confidential informants reported that Williams was a violent BGF member engaged in narcotics trafficking, and intercepted phone calls revealed the Williams was indeed coordinating gang activities and

engaged in narcotics trafficking. As gang members and narcotics traffickers often keep contraband, correspondence, records, proceeds and paraphernalia in their homes, or the homes of their associates, there was probable cause to believe that evidence of Williams's participation in racketeering and drug trafficking would be found at the address.

Additionally, the 2009 Affidavit offered probable cause to believe that Harris resided at the residence[20] and that she was involved in contraband smuggling and money laundering on behalf of the gang. Specifically, the 2009 Affidavit reported that Harris was intercepted in phone calls to Eric Brown discussing: (1) Harris's use of pre-paid debit cards to facilitate the collection and transfer of the proceeds of the gang's activities, Ex. 6 at ¶ 49; (2) Harris's operation of a club frequented by BGF members (including Williams) and Brown's assistance in legal difficulties involving the club, *Id* at ¶ 49(a); (2) Harris's ability to establish fraudulent corporate entities on behalf of BGF, *Id;* (3) Harris's romantic relationship with Brown, *Id* at ¶ 49(b)-(c); (4) Brown's ability to control BGF members within MTC, *Id* at ¶ 49(d); and (5) Harris's plan to smuggle contraband into Brown through a corrupt jail guard, *Id* at ¶ 49(e). In a call to Rainbow Williams, Harris was intercepted discussing Ray Olivis's transfer to another facility in the DOC and the opportunities Olivis would have to "get things done faster." *Id* at ¶ 45(e). Investigators believe that Harris and Williams were discussing Olivis's participation in BGF activities, including, control of the black market prison economy.

As Harris's phone was registered to the Highland Street address and insofar as gang members and associates often keep membership lists, correspondence, financial documents and

[20] The 2009 Affidavit reported that a phone used by Harris was subscribed to the South Highland Street address.

other document related to gang activities in their homes, or the homes of their associates, there was probable cause to believe that evidence of BGF activities would be found at the Highland Street address.

Additionally, as above, even assuming, *arguendo*, that the 2009 Affidavit lacked sufficient probable cause, the investigators reliance on the warrant in searching the Highland Street address was entirely reasonable. Again, there is no argument from the Defendants that the warrant was facially invalid, that the Federal Magistrate Judge abandoned his neutral role or that the 2009 Affidavit was so lacking in probable cause as to make reliance upon it was entirely unreasonable. Therefore, even assuming that the warrant was defective, the Defendants' motion should be denied pursuant to the "Good Faith" exception articulated in *Leon.* 468 U.S. 897.

## C. MOTION TO SUPPRESS STATEMENTS

In the course of the investigation of BGF, Edison, Brown and Olivis each gave statements inculpating themselves in the charged crimes. Edison has moved specifically to suppress his statements, Brown and Olivis have moved generally to suppress any statements.[21]

### 1. Statements Made By Randolph Edison are Admissible

On April 22, 2009, Randolph Edison was arrested by agents and task force officers of the DEA. Edison was verbally advised of his *Miranda* rights, acknowledged that he understood those rights and agreed to speak with the investigators. Edison then admitted to being a member of BGF, admitted that BGF members were engaged in narcotics trafficking and admitted to participating in an attempted commercial robbery (charged in Count Four of the Superceding

[21]Motion to Suppress Statements and Evidence, filed by Kimberly McIntosh, paper number 365; Motion to Suppress Statements, filed by Randolph Edison, paper number 373.

Indictment).

Edison has moved to suppress his post-arrest statements arguing generally that his custodial interrogation was conducted in violation of his Fourth and Fifth Amendment rights. Although Edison's motion does not articulate specifically how his interrogation violated the Fourth and Fifth Amendments, the Government assumes Edison is arguing that he was subject to an unlawful arrest in violation of the Fourth Amendment and that his confession and waiver of his *Miranda* rights were involuntary.

**a. Edison's Was Arrested Pursuant to a Bench Warrant**

On April 8, 2009, Edison was indicted along with 13 other members and associates of BGF in a three count indictment which charged Edison with drug trafficking, commercial robbery and the use of a firearm in furtherance of the commercial robbery. *United States v. Eric Brown, et al.,* WDQ 09-183. A bench warrant was issued by the District Court and on April 22, 2009, Edison was arrested and taken into custody. As Edison was arrested pursuant to a warrant issued upon his indictment, and insofar as there is no allegation that the indictment or warrant were defective, Edison's arrest conformed with the requirements of the Fourth Amendment.

**b. Edison's Confession Was Voluntary**

Statements made to law enforcement must comply with the requirements of *Miranda* and the Due Process clause of the Fifth Amendment Statements. *Colorado v. Connelly*, 479 U.S. 157 (1986)*; Miranda v. Arizaona,* 384 U.S. 436 (1966). Where *Miranda* rights have been waived, the analysis of the voluntariness of the *Miranda* waiver and the voluntariness of the statements under the Due Process Clause is the same. *United States v. Christobal*, 293 F.3d 134 (4th Cir. 2002).

As the Supreme Court held in *Moran v. Burbine,* a defendant may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Burbine*, 475 U.S. 412, 421 (1986). In order to be knowing and intelligent, the waiver must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Christobal* ,293 F.3d at 139-140. The test for determining whether a statement is voluntary under *Miranda*, "is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." *Id* at 140, (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987). To make this determination, courts must consider the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. *Pelton*, 835 F.2d at 1071.

Coercive police activity is a necessary predicate to a finding that a *Miranda* waiver was involuntary. *Connelly*, 479 U.S. at 167. Such coercion has been found where the suspect was subjected to severe physical abuse, *see Brown v. Mississippi*, 297 U.S. 278 (1936), held incommunicado and questioned for over 36 hours without sleep or rest, *see Ashcraft v. Tennessee*, 322 U.S. 143 (1944), given "truth serums," *see Townsend v. Sain*, 372 U.S. 293 (1963), or threatened with a loaded gun while wounded, *see Beecher v. Alabama*, 389 U.S. 35 (1967). A deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary. *Christobal*, 293 F.3d at 141 (waiver given after the suspect had been shot multiple times, undergone emergency surgery and given pain killers and narcotics found to be voluntary). "While mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never

conclude the due process inquiry." *Connelly*, 479 U.S. at 165.

Here, Edison was 51 years old at the time of his arrest and had considerable experience with the criminal justice system (having been previously convicted of, among other things, Second Degree Murder, Assault, and various drug trafficking offenses). Edison was arrested at approximately 8:30am on April 22, 2009, and immediately taken to the offices of the Drug Enforcement Administration in Baltimore City and placed in an interview room. At 9:30am, in the presence of several DEA agents, Edison was verbally advised of his *Miranda* rights. Edison acknowledged that he understood his rights and agreed to speak with the investigators. At no time before, during or after his interview was Edison threatened with violence, particular charges or a particular sentence. Nor was Edison offered leniency for speaking to the investigators. Edison did not appear intoxicated, disoriented or fearful of the investigators and he did not appear to have any difficulty speaking English, understanding the interviewers or making himself understood. At no time before, during or after the interview, did Edison ask to end the interview or request the assistance of counsel.

In all, there is no evidence, of any kind, indicating coercion on the part of law enforcement. Nor is there any indication that Edison lacked a full awareness of his rights or the consequences of waiving those rights. Accordingly, Edison's waiver of his *Miranda* rights was voluntary and his motion to suppress his post-arrest statements should be denied.

**2. Statements Made By Eric Brown and Ray Olivis Are Admissible**

On several occasions in February 2009, Brown was interviewed by members of the DOC Intelligence Unit while he was incarcerated at MTC. On February 13, 2009, Brown told DOC officers that BGF and Bloods members at MTC were beginning to have a dialogue. On February

17, 2009, Brown was asked to provide a list of all BGF members at MTC. Brown said that BGF would provide the names of 12 affiliates but that he was not admitting that they were members. On February 20, 2009, Brown told DOC officers that his goal was to have all African-American gangs at MTC join together and that BGF and the Crips gang were already aligned. On February 24, 2009, Brown was again asked to provide a list of BGF members at MTC. Brown told the officers that he would need to talk to other members of the BGF leadership but that he was reluctant to do so out of a concern that the DOC would use the information against BGF members.

On February 8, 2011, Brown and Olivis approached Captain Phil Smith of the DOC Intelligence Unit in the general population area of MCAC and asked about their pending federal case. Brown admitted to Smith that he was involved in smuggling contraband into the DOC and that he had corrupted some corrections officer, but explained that he was not the largest drug dealer in MTC. Brown further explained that although he was leader of BGF at MTC, he was not the state-wide leader of the gang. Olivis told Smith that he did not agree with everything that BGF members had done and that everyone named in the federal indictment were not BGF members. When Smith explained to Olivis that some individuals were considered affiliated to BGF and that this was sufficient for legal purposes, Olivis responded “then everyone is J” (meaning everyone is a member of BGF).

Statements obtained from a defendant during custodial interrogation are presumptively compelled in violation of the Fifth Amendment, unless the government shows that law enforcement officers adequately informed the defendant of his *Miranda* rights and obtained a waiver of those rights. *United States v. Cardwell*, 433 F.3d 378, 388-89 (4th Cir.2005). To

determine whether a defendant was in custody for purposes of *Miranda* where the defendant is already incarcerated, the court must determine whether there is "an added imposition on his freedom of movement." *United States v. Conley*, 779 F.2d 970, 973 (4th Cir.1985) (citing *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir.1978)). In doing so, the district court must consider "whether the inmate was subjected to more than the usual restraint on a prisoner's liberty to depart." *Conley*, 779 F.2d at 973. In determining whether an inmate was in custody during an interrogation, the district court should look to "the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted on him...." *Cervantes,* 589 F.2d at 428.

With respect to the statements listed above, neither Brown nor Olivis, at any time, was subjected to a custodial interrogation and, therefore, *Miranda* rights did not attach. In February 2009, Brown was interviewed by DOC officers as part of a discussion between DOC officers and suspected gang leaders about gang activities within the prison. Brown was summoned to the meeting, however, Brown was in no way retrained, threatened, coerced or prevented from ending the meeting. Indeed, as noted above, Brown declined to provide the assistance requested by the DOC.

With respect to the February 2011 statements, Brown and Olivis approached Captain Smith in the general population area of MCAC, asked if they could speak with him, and then began questioning him about their upcoming trial. Brown's and Olivis's statements were not in response to any questions by Captain Smith and Captain Smith, in no way, threatened the two men, or encouraged them to inculpate themselves. Accordingly, the statements made in that

conversation were, in no way, the product of a custodial interrogation and, therefore, are admissible.

**D. MOTION FOR DISCLOSURE PURSUANT TO RULE 12**

The Defendants have moved, pursuant to Federal Rule of Criminal Procedure 12, for an order directing the Government to provide notice of its intent to use any evidence that may be subject to a motion to suppress.[22] Specifically, the Defendants seek the production of: (1) any statements or admissions of conduct by the Defendant; (2) items recovered pursuant to a search by Government agents; (3) any recordings made pursuant to wiretaps; (4) a recordings made pursuant to consensual recordings; (5) any pre-trial identification; (6) any evidence obtained in violation of federal, state or local law or agency regulation; (7) any perjured grand jury testimony; (8) any other information or materials that may fall under Rule 12.

Discovery in this case is complete with the exception of *Jencks* materials which will be provided a week in advance of trial. Accordingly, the Defendant's have received or will receive prior to trial, the materials requested in their motion. Accordingly, the Defendants's motion should be denied as moot.

**E. MOTION FOR DISCLOSURE OF RULE 404(b) AND 609 EVIDENCE**

The Defendants have moved, pursuant to Federal Rules of Evidence 404(b) and 609, for an order requiring the Government to disclose its intention to use evidence of crimes, wrongs or acts allegedly committed by the Defendant or any unindicted co-conspirator.[23]

---

[22] Motion for Disclosure Pursuant to Rule 12, filed by Ray Olivis, paper number 355.

[23] Motion for Disclosure Pursuant to Rule 404(b) and 609, filed by Ray Olivis, paper number 356; Request for 404(b) Disclosure, filed by Kimberly McIntosh, paper number 362.

Rule 404(b) provides that: "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 609 provides that:

> (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
>
> (2) evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness.

With respect to Rule 609 evidence, the Government has already produced evidence relating to the Defendants' prior convictions. Evidence relating to the prior convictions, if any, of the witnesses, will be provided with *Jencks* and *Giglio* materials a week prior to trial.

With respect to Rule 404(b) evidence, the Government does not expect to introduce any such evidence at trial. The Government notes however, that the Fourth Circuit has held that "the mere fact that evidence involves activities occurring before the charged time frame of the conspiracy does not automatically transform that evidence into 'other crimes evidence.'" *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994). Indeed, "evidence of uncharged conduct is not considered 'other crimes' evidence if it arose out of the same series of transactions as the charged offense or if it is necessary to complete the story of the crime on trial." *Id.* Accordingly, the Government reserves the right to present evidence of conduct by the BGF that predates the conspiracy to the extent that conduct arose out of the same series of transactions charged in the Superceding Indictment.

## F. MOTION FOR DISCLOSURE PURSUANT TO RULE 801(D)(2)(E)

Defendants have moved to compel the Government to identify, disclose and produce to the Defendants: (1) the written, recorded and oral statements of any co-defendant or co-conspirator (indicted or unindicted) that the Government intends to offer against the Defendants pursuant to Rule 801(d)(2)(E); (2) any statements made by any co-conspirators whether or not the Government intends to offer the statements at trial; (3) the evidentiary basis upon which the Government will seek to introduce any statements by the Defendants or their co-conspirators.[24]

The Government has provided to the Defendants all written and recorded statements and the substance of all oral statements made by the Defendants as required by Rule 16. Pursuant to the Discovery Agreement in this case, the Government will provide the Defendants all *Jencks* materials a week prior to trial.

Although the Defendant seeks disclosure of all co-conspirator statements (whether or not the Government intends to introduce such statements at trial), neither Rule 16, the Jencks Act, nor the relevant caselaw imposes such a requirement. Indeed, in *United States v. Roberts*, the Fourth Circuit squarely addressed the issue, holding that the Government was not required to disclose co-conspirators statements it intended to offer at trial beyond what was required in the Jencks Act. *Roberts*, 811 F.2d 257, 258 (4th Cir. 1987). The Jencks Act, in turn, requires disclosure only of written or recorded statements of co-conspirator witnesses. 18 U.S.C. § 3500.

With respect to the Defendants' request for the evidentiary basis upon which the Government will seek to introduce those statements, at present the Government intends to offer

---

[24] Motion for Disclosure of Statements Intended To Be Used Pursuant to Rule 801(d)(2)(e), filed by Ray Olivis, paper number 357; Motion for Disclosure of all Co-Conspirator Statements, filed by James Harried, paper number 375.

the post arrest statements of Randolph Edison, and statements made by Eric Brown and Ray Olivis to Department of Corrections Employees in 2009 and 2011 pursuant to Rule 801(d)(2)(A). All other evidence of statements by the Defendants or their co-conspirators will be offered pursuant to Rule 801(d)(2)(e).

To the extent that the Defendants seek a determination of admissibility of the 801(d)(2)(e) statements prior to trial, the Government submits that, given the volume of statements made by the Defendants and their co-conspirators (principally in the form of intercepted telephone calls), a pretrial determination of the admissibility of each statement would entail much of the same evidence that will be offered at trial. Given this and the length of time such an examination would require, the Government believes the issue is best addressed during trial.

## G. MOTION FOR DISCLOSURE OF AND ACCESS TO CONFIDENTIAL INFORMANTS

Defendants have further moved for disclosure of, and access to, confidential informants who were active participants in the crimes charged.[25] For the following reasons, Defendants' motions should be denied.

In *United States v. Roviaro*, the Supreme Court held that under certain circumstances, the Government can withhold from disclosure the identity of confidential informants in order to further the public's interest in effective law enforcement. *Roviario,* 353 U.S. 53, 59 (1957). According to the Court, "the privilege recognizes the obligation of citizens to communicate their

---

[25] Motion to Reveal the Identity of the Informants and the Basis of Their Reliability, filed by Kimberly McIntosh, paper number 363; Motion for Disclosure of and Access to Confidential Informants, filed by James Harried, paper number 375.

knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id* at 59. As the Fourth Circuit noted in *McLawhorn v. State of North Carolina*,

> law enforcement officers dealing with a large number of crimes, especially in the area of the narcotics traffic, must depend upon informants to furnish information concerning criminal activities; privileged communications of this nature must be encouraged if law enforcement officers are to be held to the task of solving and prosecuting crime; if the identity of the informant must be routinely disclosed undoubtedly such sources of information would disappear almost immediately.

*McLawhorn*, 484 F.2d 1, 4 (4th Cir. 1973).

This privilege, however, is a qualified one, and where the disclosure of an informer's identity, or of the contents of his communication, is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro,* 353 U.S. at 61. In making that determination, Courts must weigh the competing interests of the public and the defendant in light of the particular circumstances of each case. As the Court held in *Roviaro*:

> No fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id* at 62.

In order to justify disclosure, a defendant must come forward with something more than speculation as to the usefulness of such disclosure and disclosure is not required despite the fact that a criminal defendant may have no other means of determining what relevant information the informant possesses. *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir. 1985). Indeed,

disclosure is only required after a court has determined that the informer's testimony is highly relevant. *Id*. One of the most important factors to be considered is the materiality of the evidence to the defendant's particular defense. *Id.*

In making this determination, the Fourth Circuit has drawn a distinction between informants who are "participants" in a criminal transaction, and those that are "mere tipsters." *United States v. Price*, 783 F.2d 1132, 1138 (4th Cir. 1986). Where the informant is an actual participant in the crime charged, particularly where the informant helped to initiate the criminal act, disclosure will likely be required. *See e.g. Roviaro,* 353 U.S. at 64-65 (disclosure required where the informant set up the drug purchase later charged and was the sole witness to its execution); *Price,* 732 F.2d at 1139 (disclosure required where the informant set up and participated in negotiations for the illicit sale of a truckload of meat which formed the basis of the charge against the defendant); *McLawhorn,* 484 F.2d at 6-8 (disclosure required where the informant set up and participated in the drug transaction for which the defendant was later charged). As the Circuit Court held in *Price,* "one of the factors tending to show that the prosecution is not entitled to withhold from the accused information as to the identity of an informant is the qualification of the informant to testify directly concerning the very transaction constituting the crime." *Price*, 783 F.2d at 1138.

On the other hand, disclosure is not required where the informant "is neither a participant in the offenses, nor helps set up its commission, but is a mere tipster who only supplies a lead to law investigating and enforcement officers." *Price* 783 F.2d at 1138*; see also United States v. Mabry,* 953 F.2d 127, 131-132 (4th Cir. 1992) (disclosure not required where the informant introduced the defendant to undercover law enforcement officers but did not witness the drug

transaction later charged); *United States v. Brinkman*, 739 F.2d 977, 981 (4th Cir.1984) (disclosure not required where the informant introduced the defendant to an undercover law enforcement officer posing as a hitman). Where an informant merely provides information that furnishes probable cause for a search and seizure, disclosure is generally not be required. *See e.g. United States v. Gray,* 47 F.3d 1359, 1365 (4th Cir. 1995) (disclosure not required where the informant provided information used to establish probable cause for a search warrant); *United States v. Poms*, 484 F.2d 919. 922-923 (disclosure not required where informant provided information utilized in a *Terry* stop); *United States v. Fisher,* 440 F.2d 654, 656 (4th Cir. 1971). In such cases, the identity of a tipster would not be essential in preparing the defense of the accused and, therefore, the public interest in protecting such informants weighs heavily in favor of nondisclosure. *Price,* 783 F.2d at 1138.

In the case at hand, the confidential informants, if any, that actively participated with, Brown, Olivis, Williams and Edison in the crimes charged or actively participated in overt acts of the conspiracy that will be offered at trial, will be disclosed, along with *Jencks* materials, a week prior to trial. Insofar as those confidential informants who have not actively participated in acts committed by Brown, Olivis, Williams and Edison or acts that will be presented at trial, can provide no material evidence about the participation of those Defendants in the conspiracy nor can they assist in any defense offered by the Defendants.

Additionally, given the violent nature of BGF (Edison, in particular, was intercepted attempting to organize the killing of a suspected cooperator) and in light of the extensive criminal histories of the conspirators, the Government has serious concerns about the safety of any confidential informants, should their identity be disclosed. Accordingly, disclosure of and

access to all the confidential informants utilized in this case should be limited to those directly related to the evidence presented at trial and disclosure of these informants should delayed until a week before trial.

## H. MOTION FOR DISCLOSURE OF PRESENTENCE REPORT

The Defendants have moved for an order directing the Government to provide the Defendants with any pretrial services reports and presentence reports relating to Government witnesses and co-conspirators.[26] As noted above the Government will provide all *Giglio* materials, including criminal histories, in whatever format available, a week prior to trial.

## I. MOTION TO REQUIRE THE GOVERNMENT TO CONFIRM WITNESS BACKGROUNDS

The Defendants have further moved for an order directing the Government to verify that it is has properly, adequately and thoroughly vetted its prospective law enforcement witnesses and that the Government has provided all *Brady* and *Giglio* materials.[26]

The Government can confirm that it has and will comply with the requirements of *Brady* and *Giglio* and that the Government understands that its obligations to produce such materials is ongoing. Accordingly, all *Brady* or *Giglio* materials will be produced by the Government in advance of trial.

## J. MOTION FOR SEVERANCE

Pursuant to Federal Rule of Criminal Procedure 8(b) and 14, the Defendants have moved

---

[26] Motion for Access to Witnesses' Pretrial Services and Presentence Reports, filed by James Harried, paper number 375.

[26] Motion to Require the Government to Require Prosecution to Review and Confirm Witness Backgrounds, filed by Ray Olivis, paper number 358.

for relief from prejudicial joinder.[27]

Under Rule 8(b), defendants may be charged together in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 14 provides that "if the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

It is well established that, "defendants who are charged in the same criminal conspiracy should be tried together." *Zafiro v. United States*, 506 U.S. 534 (1993); *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir.1983); *United States v. Brugman,* 655 F.2d 540, 542 (4th Cir. 1981) ("individuals indicted together should be tried together.") Severance should be granted only if a defendant can demonstrate that a "substantial degree of prejudice" amounting to fundamental unfairness would result from a joint trial. *United States v. Shuford*, 454 F.2d 772, 775-76 (4th Cir. 1971). Severance should not be granted merely because "a separate trial would offer a better chance of acquittal." *United States v. Reavis,* 48 F.3d 763, 767 (4th Cir. 1995).

In the case at hand, Brown, Olivis, Edison and Williams have been charged with, among other things, participating in a racketeering and drug conspiracy. The evidence at trial will show that Brown, Olivis, Williams and Edison were not simply all members of the same criminal organization, but that these four men actively conspired with each other to commit the predicate

---

[27] Motion for Severance of Counts and Defendants, filed by Ray Olivis, paper number 354; Motion for Severance of Cases, Counts and Defendants, filed by James Harried, paper number 375; Motion for Relief from Prejudicial Joinder and to Sever, filed by Randolph Edison, paper number 372.

acts listed in the indictment. Specifically, the evidence will show that Brown and Olivis were senior leaders of BGF (Brown as the Supreme Leader and Olivis as founder and elder statesman) who jointly directed the operations of the gang while incarcerated together at MTC. Indeed, intercepted conversations over Brown's contraband prison cell-phone indicate that Brown and Olivis shared the Brown Cellphone in directing the activities of gang members outside of the prison system. Similarly, employees of the DOC will testify that Brown and Olivis were often together and were acknowledged to be the leaders of the gang. Similarly, as noted above, an employee of the DOC will testify that Olivis and Brown complained to him about their prosecution by the Government.

Williams, who was not incarcerated during the period of the conspiracy charged, served as one of Brown's high-ranking lieutenants. As demonstrated by intercepted phone conversations between Brown, Olivis and Williams, Williams was responsible for directing gang activity outside of the DOC on Brown's and Olivis's behalf. Indeed, in one conversation, Olivis held a conference call with senior gang members, including Williams, and chastised them for their lack of discipline and organization. In another conversation Brown criticized Williams for organizing a large open-aired meeting of BGF members in Druid Hill Park, which drew the attention of law enforcement.

Edison, one of the founding members of BGF, was previously incarcerated with, and was a close associate of, Olivis. Edison, who was not incarcerated during the period of the conspiracy, was intercepted in a phone conversation with Brown and Olivis discussing his participation in a foiled commercial robbery. Over the course of the conversation, Edison explained to Olivis that he believed one of the participants in the attempted robbery was a

government informant and that the gang needed to have the informant killed.

Given the above, it is clear that Brown, Olivis, William and Edison were actively engaged, with each other, in the conduct of the conspiracy. Beyond arguing generally that different "quanta of evidence" will be arrayed against each Defendant and that there is a risk that certain Defendants will be tarred based on conduct committed by other Defendants, none of the Defendants have articulated how a joint trial will substantially prejudice their defense. Given the presumption that co-defendants should be tried together, absent such a showing, Defendants's motion should be denied.

## K. MOTION FOR BILL OF PARTICULARS

Defendants have filed motions pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure for a bill of particulars.[28] Specifically, these motions seek information detailing: (1) the racketeering acts to which any of the conspirators agreed; (2) the names, addresses and telephone numbers of unindicted conspirators; (3) the roles played by each named and unnamed conspirator; (4) statements made by, concerning or attributable to the Defendants; (5) the time and place of gang meetings attended by the Defendants; (6) the names of gang members present at gang meetings attended by the Defendants; (7) any monies collected as part of the enterprise; and (8) what records were kept by the gang .

Rule 7(f) of the Federal Rules of Criminal Procedure permits the trial court to direct the filing of a bill of particulars bill of particulars in order to: "[1] enable a defendant to obtain sufficient information on the nature of the charge against him so that he may prepare for trial, [2]

---

[28] Motion for Bill of Particulars, filed by James Harried, paper number 375; Request for Bill of Particulars, filed by Kimberly McIntosh, paper number 361.

minimize the danger of surprise at trial, and [3] enable him to plead his acquittal or conviction in bar of another prosecution for the same offense." *United States v. Schembari*, 484 F.2d 931, 934-35 (4th Cir. 1973) (citation omitted). "A bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 405 (4th Cir. 1985). Rather, a bill of particulars "merely amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial." *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) (citations omitted).

In the case at hand, the Superceding Indictment conforms with the requirements of Rule 7(c). Specifically, the indictment provides the charges against each Defendant, the dates of the alleged conspiracy, and lists 75 overt acts committed in furtherance of the conspiracy.

Moreover, the Government has already provided much of the information requested by the Defendants. Indeed, the Government has already produced thousands of pages of documentary evidence, hundreds of hours of intercepted phone calls and access to physical evidence seized pursuant to the investigation. With the exception of *Jencks* materials, the Defendants are in possession of, or have been put on notice of much of the evidence the Government will offer at trial.

Therefore, insofar as the Defendants seek information beyond the requirements of Rule 7(c), or have already received the information they require, Defendants's motion for a bill of particulars should be denied.

**L. MOTION TO STRIKE ALIASES**

The Defendants have moved to strike the aliases included in the Supereceding

Indictment.[29] As the Fourth Circuit has held, however, if the Government intends to introduce evidence of an alias and "the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment, the inclusion of the alias in the indictment is both relevant and permissible, and a pretrial motion to strike should not be granted." *United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir. 1976). Here the Government expects to use the Defendants' aliases in order to identify the Defendant's in connection with the acts charged in the indictment. Accordingly, the Defendants' motion should be denied.

## M. MOTION TO PRECLUDE ANY MENTION OF THE TERMS OF COOPERATORS PLEA AGREEMENTS

The Defendants have moved to preclude the Government from discussing in opening statements or eliciting from witnesses during direct examinations, the terms of the plea and cooperation agreement between the Government and the witness.[30]

As the Fourth Circuit held in *United States v. Henderson*, the Government is permitted to "introduce the terms of [the cooperator's] plea bargain during the government's case in chief." *Henderson*, 717 F.2d 135, 138 (4th Cir.1983). As the Court held in *United States v. Collins,*

> [p]resenting evidence on a witness' obligation to testify truthfully pursuant to an agreement with the government and arguing that this gives the witness a strong motivation to tell the truth is not, by itself, improper vouching.... Use of the 'truthfulness' portions of [a plea agreement] becomes impermissible vouching only when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony.

---

[29] Motion to Strike Alias and Surplusage, filed by Kimberly McIntosh, paper number 367.

[30] Motion for Restriction on Use of Plea and Cooperation Agreements, filed by James Harried, paper number 375.

*Collins*, 415 F.3d 304, 308 (4th Cir. 2005).

Given the relevant caselaw, the Government should not be precluded from presenting evidence of the terms of the cooperators' plea agreements, including provisions of those agreements requiring the cooperator to tell the truth. Accordingly, Defendants's motion should be denied.

**N. MOTION FOR PRESERVATION OF LAW ENFORCEMENT NOTES**

The Defendants have further moved to require law enforcement officers to preserve the notes of their interviews and activities.[31] The Government believes that any notes taken by law enforcement officers, to the extent that any such notes exist, have been and will be preserved.

**O. MOTION FOR INDIVIDUAL AND ATTORNEY VOIR DIRE**

The Defendants have moved to request that the Court conduct individual voir dire of potential jurors and that attorney voir dire be permitted.[31] The Government believes that the conduct of jury voir dire should be left to the discretion of the Court.

**P. MOTION FOR PEREMPTORY CHALLENGES**

The Defendants have moved pursuant to Rule 24(b), that they be permitted more than 10 peremptory challenges.[32] As above, the Government believes that the conduct of jury voir dire should be left to the discretion of the Court.

---

[31] Motion for Preservation of Law Enforcement Notes, filed by James Harried, paper number 375.

[31] Motion for Individual and Attorney Voir Dire, filed by James Harried, paper number 375.

[32] Motion for Additional Peremptory Challenges, filed by James Harried, paper number 375.

## IV. CONCLUSION

Therefore, for the reasons stated above, the Defendants' motions should be denied.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:_________/s/__________________
James T. Wallner
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

**CERTIFICATE OF SERVICE**

This is to certify that on this 13th day of April, 2011, a copy of the foregoing Consolidated Motions Response was filed via ECF.

_______/s/_____________________________
James T. Wallner
Assistant United States Attorney