**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING OVER THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (410) 206-6980 AND BEARING IMSI #310410216356569 AND THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (410) 361-0046 AND BEARING IMSI #316010011580887 | * * * * * * * * * * * * | SEALED<br><br>Misc. No. ________ |

*************

**AFFIDAVIT IN SUPPORT OF APPLICATION**
**FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS**

WILLIAM NICKOLES, a Detective with the Baltimore Police Department and a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, states:

**INTRODUCTION**

1. I am an "investigative or law enforcement officer[s] ... of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am a Detective with the Baltimore Police Department and have been so employed since 1992. I have been deputized as a Task Force Officer with the DEA for approximately nine (9) years. I am currently assigned to the DEA's Special

Investigations Group (DEA SIG), which investigates large-scale narcotics trafficking organizations in the Baltimore area. During my time as a law enforcement officer, I have participated in numerous investigations of unlawful drug distribution involving the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, narcotics proceeds, and narcotics paraphernalia. I have reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and money laundering. I have examined records consisting in part of buyers and seller's lists, and pay/owe ledgers. I have interviewed drug dealers, users and confidential informants and have discussed with them the lifestyles, appearance and habits of drug dealers and users. Through training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded

communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

3. I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications occurring over the cellular telephone assigned call number **(410) 206-6980** and bearing international mobile subscriber identity ("IMSI") #310410216356569 ("TARGET CELLPHONE #1"), subscribed to Deitra Davenport at 5637 Utrecht Rd, Baltimore, Maryland and used by ERIC BROWN, a/k/a "Dee Brown," a/k/a "E," a/k/a "EB," with service provided by AT&T, and the cellular telephone assigned call number **(410) 361-0046**[1] and bearing IMSI #316010011580887 ("TARGET CELLPHONE #2"), subscribed to Charlene Pearson at 3 Norham Ct Apt I, Baltimore, Maryland and used by GREGORY FITZGERALD, a/k/a "Joe," with service provided by Sprint/Nextel, including through the use of Sprint/Nextel's Direct Connect/Dispatch Services (collectively, the "TARGET CELLPHONES").

---

1 As more fully described below, on or about January 27, 2009, shortly after GREGORY FITZGERALD was arrested on drug charges and then released on bail, FITZGERALD changed the call number of TARGET CELLPHONE #2 from (410) 361-0114 to (410) 361-0046. The IMSI number of that phone remained the same.

4. There is probable cause that the TARGET SUBJECTS and others known and unknown are committing the following offenses enumerated in 18 U.S.C. § 2516:

a. 18 U.S.C. § 1962 (RICO) by conducting the affairs of an "enterprise," as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact, although not a legal entity, to wit, the named interceptees and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity consisting of acts involving murder, in violation of Maryland Code, Criminal Law §§ 2-202, 2-204, and 2-205 and the Common Law of Maryland punishable pursuant to Maryland Code, Criminal Law §§ 1-201, 1-202; extortion, in violation of Maryland Code, Criminal Law § 3-701; and the violations of federal law set forth in (b) and (c) below;

b. 21 U.S.C. §§ 841 and 846 (narcotics trafficking); and

c. 21 U.S.C. § 843 (use of communication facility); and

d. 18 U.S.C. § 1959 (violent crimes in aid of racketeering).[2]

2 Although not a predicate offense under 18 U.S.C. § 2516, there is probable cause to believe that the subjects of this investigation have aided and abetted and are aiding and abetting

5. I respectfully submit that there is probable cause to believe that these offenses have been committed, are being committed, and will continue to be committed by persons who are the subjects of this investigation, including, among others: ERIC BROWN, a/k/a "Dee Brown," a/k/a "E," a/k/a "EB," GREGORY FITZGERALD, a/k/a "Joe," THOMAS BAILEY, a/k/a "Fat Face," a/k/a "Corey," RAY OLIVIS, a/k/a "Ronnie Hargrove," a/k/a "Uncle Ray," a/k/a "Unc," a/k/a "Ray Ray," RAINBOW WILLIAMS, AUSTIN ROBERTS, a/k/a "Yellow," HASSAN WASHINGTON, ANTHONY BRUCE, a/k/a "Silk," a/k/a "Soldier," KEVIN DUDLEY, a/k/a "Kev-Bo," DARYL MOORE, a/k/a "Nutty Bar," ROBERT NEDD, a/k/a "Pizza," GENE LNU, DEITRA DAVENPORT, a/k/a "Sister D," KIM MCINTOSH, a/k/a "Bonita Kim," RANDY TERRY, RICH MCDONALD, REGGIE KING, a/k/a "Lord Shabazz," RODNEY RUSSELL, RODNEY LEE-EL, SHAWN WYCHE, MALIK RAHEEM, TYRONE ISSAC POWELL, CURTIS LNU, a/k/a "Curt," TYSHAWNA LNU, DEMETRE COUSER, ASHLEY SCARROW, a/k/a "Ashley Sparrow," ANGELA JOHNSON, ALFRED JOHNSON, a/k/a "Tater," MARK WILLIAMS, SEDRENA WILLIAMS, ERNEST RILEY, MICHAEL ROSS, ANTWAN PEAKS, JOHNATHAN BRAVERMAN, SEDRENA FINLEY, and others as yet unidentified (the "TARGET SUBJECTS"). The requested Order is sought for a period of time until the requested interceptions fully reveal the identity of and manner in which the TARGET SUBJECTS engage in the above-described offenses, or for a period of thirty (30) days,

---

those substantive offenses, in violation of 18 U.S.C. § 2.

whichever occurs first, pursuant to Title 18, United States Code, Section 2518(5). Pursuant to Section 2518(5) of Title 18, United States Code, it is further requested that the 30-day period be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days from the date of this Court's Order.

6. The instant investigation is being conducted by the DEA and the Baltimore Police Department (BPD). I have personally participated in this investigation and make this affidavit based on my personal participation in this investigation and based on reports made to me by other law enforcement agents, as well as confidential informants discussed in more detail below. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom other law enforcement officers or I have spoken or whose reports I have read and reviewed. Such statements are reported in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or

information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

7. As more fully described in Section II of this affidavit, in developing the evidence needed to prosecute the above-described federal offenses, normal investigative procedures have either been tried to no avail, reasonably appear unlikely to meet with success if tried, or are too dangerous to employ.

8. Because this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching the conclusion that orders should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications.

**SUBJECTS AND OFFENSES**

9. Based upon my knowledge of the facts and circumstances of the present investigation, it is alleged that there is probable cause to believe that the TARGET SUBJECTS and others as yet unknown, have committed, are committing, and will continue to commit the following offenses enumerated in 18 U.S.C. § 2516:

a. 18 U.S.C. § 1962 (RICO) by conducting the affairs of an "enterprise," as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact, although not a legal entity, to wit, the named interceptees and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity consisting of acts involving murder, in violation of Maryland Code, Criminal Law §§ 2-202, 2-204, and 2-205 and the Common Law of Maryland punishable pursuant to Maryland Code, Criminal Law §§ 1-201, 1-202; extortion, in violation of Maryland Code, Criminal Law § 3-701; and the violations of federal law set forth in (b) and (c) below;

b. 21 U.S.C. §§ 841 and 846 (narcotics trafficking); and

c. 21 U.S.C. § 843 (use of communication facility); and

d. 18 U.S.C. § 1959 (violent crimes in aid of racketeering).[3]

---

3 As mentioned above, although not a predicate offense under 18 U.S.C. § 2516, there is also probable cause to believe that the subjects of this investigation have aided and abetted and are aiding and abetting those substantive offenses, in violation of 18 U.S.C. § 2.

**THE DESIGNATED CELLULAR TELEPHONES**

10. There is probable cause to believe that the TARGET CELLPHONES will be used during the period of interception applied for herein by the TARGET SUBJECTS and others as yet unknown, in order to accomplish, to discuss, and to commit the offenses described above.

11. There is probable cause to believe that these communications will reveal: (i) the nature, extent and methods of operation of the racketeering and narcotics trafficking activities of the TARGET SUBJECTS and others as yet unknown or unidentified; (ii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities, including the sources of supply of the controlled substances, as well as the distributors and purchasers of such controlled substances; (iii) the quantities and types of controlled substances involved in this conspiracy; (iv) the degree of participation and roles of all co-conspirators in this conspiracy; (v) the addresses and telephone numbers of all participants, so that the location of any criminal activity related to or resulting from this conspiracy to distribute controlled substances can be determined; (vi) all details about the manner of shipment or movement of controlled substances; (vii) methods of eluding law enforcement

detection; (viii) the nature and scope of the drug activity; (ix) the locations of contraband and of items used in furtherance of those activities, including the location of all "stash" houses at which these controlled substances are stored; (x) the location and source of resources used to finance this illegal activity, and the location, movement and disposition of proceeds from this illicit drug activity; (xi) the times, dates, and locations of meetings at which persons involved in this conspiracy pick up drugs, exchange money, and meet to discuss the progress of the drug trafficking operation; (xii) the existence and locations of records of the drug trafficking operation; (xiii) the identification of communication devices or telephone instruments used by the TARGET SUBJECTS and others yet unknown, to further their illegal activities; and (xiv) other evidence necessary for the successful prosecution of the above-described participants and others as yet unknown. In addition, these wire communications are expected to constitute admissible evidence of the commission of the offenses described above.

12. I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack. The cellular

telephone system divides the Baltimore metropolitan area into many small coverage areas, which are called "cells." As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed. The service provider for this phone is considered a personal communication service provider (PCS). It is requested that the authorization apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones assigned to the above-referenced IMSI numbers of the TARGET CELLPHONES, and to any other IMSI numbers assigned to the telephone number of the TARGET CELLPHONES within the 30-day period.

13. In connection with the telecommunication companies which provide service for the TARGET CELLPHONES, all interceptions over the TARGET CELLPHONES will automatically be routed to Baltimore, Maryland, regardless of where the telephone calls are placed to or from. During the requested electronic surveillance, all monitoring will be performed in Baltimore, Maryland, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including Special Agents of the DEA, officers of the BPD, and government employees or individuals operating under a contract with the government, who

will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

14. Because of the mobility of portable cellular telephones -- which are mobile interception devices -- authorization is requested pursuant to Title 18, United States Code, Section 2518(3) for authorization to intercept communications both within the District of Maryland, and, in the event the TARGET CELLPHONES are transferred outside the territorial jurisdiction of this Court, in any other jurisdiction within the United States. In addition, it is requested that background conversations in the vicinity of the TARGET CELLPHONES while they are off the hook or otherwise in use, also be permitted to be intercepted.

**PRIOR APPLICATIONS**

15. A check of wire and electronic surveillance files maintained by the DEA, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Immigration and Customs Enforcement, and the BPD was completed on or about February 3, 2009. Based on these reviews, I have been informed that there are no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS or over the TARGET CELLPHONES.

## I. THERE IS PROBABLE CAUSE TO BELIEVE THAT THE TARGET SUBJECTS, AND OTHERS AS YET UNKNOWN, WILL USE THE TARGET CELLPHONES IN FURTHERANCE OF THE DESIGNATED CRIMES

### A. OVERVIEW

16. As set forth in further detail below, since September 2008 DEA SIG has been conducting an investigation of the "Black Guerilla Family" (BGF), a violent gang that operates in prison facilities and major cities throughout the United States, including in Baltimore, Maryland. BGF is believed to be attempting to take over the illegal drug trade at multiple locations in Baltimore, Maryland and is committing drug-related acts of violence and extortion schemes as part of its efforts to expand its influence from inside the prison walls to the streets of Baltimore. As more fully described below, some of the identified leaders and members of BGF in Maryland include the following:

a. ERIC BROWN, a/k/a "Dee Brown," a/k/a "E," has been identified as one of the leaders of BGF who is in command of day-to-day operations in the State of Maryland. BROWN is currently incarcerated at the Maryland Training Center (MTC) in Baltimore, Maryland. BROWN has a 1992 conviction for possession with intent to distribute a controlled substance and two 1990 convictions for unlawful manufacture of controlled substances.

b. GREGORY FITZGERALD, a/k/a "Joe," has been identified as one of the leaders of BGF who is responsible for coordinating drug shipments in Maryland. FITZGERALD has a 1989 conviction for murder; convictions in 1986 and 1988 for handgun violations; and a 1985 conviction for possession of a controlled substance. He also was arrested in January 2009 for possession with intent to distribute a controlled substance, which is pending. FITZGERALD is presently on a $500,000 bail for that charge. According to the reports from this arrest, on January 23, 2009, Fitzgerald was observed conducting a drug transaction and was a passenger in a vehicle that was stopped, and found to contain approximately thirteen ounces of suspected cocaine.

c. THOMAS BAILEY, a/k/a "Fat Face," a/k/a "Corey," has been identified as one of the leaders of BGF, who is incarcerated and responsible for the day-to-day operations inside of North Branch Correctional Institution (NBCI) in Cumberland, Maryland. BAILEY has a 1997 conviction for possession with intent to distribute a controlled substance; a 1998 conviction for murder; and a 1999 conviction for assault.

d. RAY OLIVIS, a/k/a "Ronnie Hargrove," a/k/a "Uncle Ray," a/k/a "Unc," a/k/a "Ray Ray," has been identified as one of the founding members and leaders of the BGF movement in Maryland. OLIVIS is currently incarcerated at MTC in Baltimore,

Maryland and is serving a five year sentence. OLIVIS has a 1979 conviction for assault, a 1987 conviction for robbery with a deadly weapon, a 1990 conviction for felony theft, a 2001 conviction for burglary, a 2004 conviction for possession with intent to distribute a controlled substance, and a 2007 conviction for being a felon in possession of a firearm.

e. RAINBOW WILLIAMS has been identified as one of the leaders of BGF, who handles the day-to-day drug distribution network and works directly for Fitzgerald. WILLIAMS has a 1998 conviction for murder.

f. AUSTIN ROBERTS, a/k/a "Yellow," has been identified as one of the leaders of BGF who assists Fitzgerald in coordinating drug shipments in Maryland. ROBERTS has a 1992 conviction for assault, battery, and resisting arrest; a 1993 conviction for possession of controlled substances; a 1993 conviction for possession of marijuana; and a 1994 conviction for felony possession of cocaine.

g. HASSAN WASHINGTON has been identified as an individual capable of recruiting individuals to smuggle drugs into NBCI for BGF, and Bailey, in particular.

h. ANTHONY BRUCE, a/k/a "Silk," a/k/a "Soldier," has been identified as a high ranking member of BGF, who is also incarcerated at NBCI. BRUCE has a 1987 conviction for handgun

possession and two 1987 convictions for robbery with a deadly weapon.

B. **INFORMATION PROVIDED BY CONFIDENTIAL SOURCES**

1. **CS1**

17. During a series of debriefings between late November 2008 and January 2009, a reliable confidential informant (CS1)[4] who is incarcerated at NBCI and is a member of BGF, advised me and other investigators that BGF is a nationwide prison gang with a presence in every correctional institution in the country. CS1 related that he/she has been in various prisons throughout the country and at each institution there has been a faction of BGF. CS1 related that BGF is violent both inside and outside prison, but that historically BGF has not been well-organized outside of prison. CS1 stated that currently, BGF is attempting to change this within Baltimore, Maryland by becoming more organized and effective on the streets.

**BGF Leadership**

18. CS1 explained that within the prisons, BGF has a group of individuals who are in leadership roles/positions of authority and that this leadership group is known as the "Supreme

4 CS1 has been cooperating with law enforcement for one year in the hopes of receiving a reduced sentence. The information provided by CS1 has consistently proven reliable and has been corroborated by independent investigation. Information provided by CS1 has led to the recovery of five weapons.

Bush." All members who are not in the Supreme Bush are considered "members" of the Bush or Mansion. The only place Bush members hold rank is within the correctional system; once a Bush member is back out on the streets, he or she is considered a regular BGF member.

19. CS1 stated that the BGF leaders at NBCI include KEVIN DUDLEY, the "Gyeedi," or Commander, of BGF for all of Maryland, who has reporting responsibilities to national BGF leaders[5]; DARYL MOORE, the "Minister of Justice" for BGF throughout the entire Maryland correctional system[6]; and THOMAS BAILEY and ROBERT NEDD, who are considered to be Lieutenant Commanders.[7] CS1 related that although there are numerous other BGF members at NBCI, these individuals are the main "shot callers" for BGF at the jail.

20. CS1 reported that BGF leaders at other Maryland prisons include RANDY TERRY, incarcerated at Roxbury Correctional Institution (Roxbury), who is considered to be a Commander; RICH MCDONALD, incarcerated at Eastern Correctional Institution (ECI), who is considered to be a Commander; RODNEY RUSSELL, a/k/a "Ronnie Russell," incarcerated at Western Correctional

---

5 KEVIN DUDLEY has a 1985 conviction for murder.

6 DARRYL MOORE has a 1989 conviction for murder.

7 ROBERT NEDD has a 1988 conviction for assault with intent to murder.

Institution (WCI), who is considered to be a Lieutenant Commander; RODNEY LEE-EL, incarcerated at JCI Annex Prison (Annex), who is considered to be a Lieutenant Commander; and ERIC BROWN, incarcerated at MTC.

21. CS1 reported that ERIC BROWN, who is incarcerated at MTC and is due to be released in late 2009 or early 2010, is coordinating and organizing BGF's activities on the streets. CS1 reported that BROWN has a cellphone inside the prison, which BROWN uses to communicate with BGF members outside of the prison. As described below, BROWN's cellphone was later determined to be TARGET CELLPHONE #1.

22. CS1 stated that KIM MCINTOSH, a close associate of NEDD, is helping to oversee the day-to-day operations of BGF on the streets of Baltimore.

**Drug-Trafficking**

23. CS1 stated that drug trafficking both inside and outside of prison is the primary means by which BGF makes money and is a significant part of BGF's activities on the streets of Baltimore. CS1 stated that all the murders associated with BGF are related to its drug-trafficking activities.

24. CS1 explained that BGF will sell any drugs, but primarily trafficks in cocaine and heroin. According to CS1, BROWN is coordinating sales of cocaine and heroin on the streets

of Baltimore, from inside prison. CS1 said that BROWN's key lieutenants on the streets for drug-trafficking activities include RAINBOW WILLIAMS, GREGORY FITZGERALD, a/k/a "Joe," and AUSTIN ROBERTS, a/k/a "Yellow."

25. CS1 further advised that THOMAS BAILEY is a close associate of BROWN and that BAILEY is currently coordinating with BGF members outside of prison, including FITZGERALD, to smuggle heroin into NBCI, where BAILEY is currently incarcerated. CS1 advised that a test-run to smuggle the heroin into the prison was scheduled to take place sometime in early 2009. According to CS1, the "horse," or transporter of the heroin, will be a female and the test-run will involve some type of small object, such as a piece of candy. The test-run is intended to evaluate how the corrections personnel react or if they are paying attention. CS1 stated that most likely the "horse" will be making both the test-run delivery and the actual heroin delivery to ANTHONY BRUCE, a/k/a "Silk," a/k/a "Soldier," who is incarcerated at NBCI.

<u>Acts of Violence/Extortion</u>

26. CS1 stated that BGF is extremely violent, both inside and outside prison facilities, and is responsible for numerous crimes of violence and related crimes, including robbery, extortion, and murder for hire.

27. BGF leadership employs "Death Angels" or hitmen to carry out murders on its behalf. CS1 related that only certain people know the identity of each "Death Angel." CS1 advised that BGF will employ others to act as hitmen who may or may not be "Death Angels." According to CS1, there are enough violent members of BGF to carry out murders. CS1 identified Joe Fitzgerald, later identified as GREGORY FITZGERALD, a/k/a "Joe," a BGF member who was recently released from prison, as someone who has killed people in the past - including multiple stabbings on behalf of BGF while in prison - and is likely to do so in the future. CS1 advised that RAINBOW WILLIAMS is also an extremely violent BGF member. According to CS1, WILLIAMS has committed multiple murders, including numerous assaults/stabbings while in prison. CS1 stated that both FITZGERALD and WILLIAMS are loyal to, and take orders from, BROWN.

28. CS1 related that there was a recent assault/stabbing of Bloods members which took place at NBCI on December 28, 2008. CS1 explained that sometime prior to December 28, 2008, members of a Bloods gang set had stabbed two BGF leaders at the Maryland Correctional Institution at Jessup, Maryland. That information was corroborated by corrections officials. Following those attacks, one of the BGF leaders and two of the Bloods members were transferred to NBCI. The BGF

leader conferred with MOORE, who then ordered the December 28 attack on the Bloods members. That incident was captured on videotape.

**The "Black Book"**

29. CS1 reported that ERIC BROWN had recently published "The Black Book - Empowering Black Families and Communities" (hereinafter the "Black Book"). According to CS1, BROWN is distributing the book in order to disseminate BGF doctrine. CS1 stated that it is against the rules of BGF to have published the "Black Book" but that BROWN is able to do things like this in Maryland because he has the support of the other high-ranking members of BGF throughout the Maryland Department of Corrections system. CS1 stated that the Black Book is a ploy by BROWN to make himself and BGF in Maryland look as if they are a legitimate organization and not involved in criminal activity, whereas CS1 advised that BROWN is a drug trafficker and that BGF funds its operations primarily by selling drugs.

30. CS1 stated that BROWN is making money from the publishing of the Black Book and that all of BROWN's money is handled by BROWN's wife or girlfriend, DEITRA DAVENPORT, who is also involved with BGF operations.

31. Law enforcement has obtained a copy of the Black Book, whose author is listed as "La Eusi Jamaa (The Black

Family)." The Black Book was reportedly published by "DeeDat Publishing Company" trading as Harambee Jamaa Inc., which, as more fully described below, is owned or operated by DEITRA DAVENPORT. The corporate officers listed for Harambee Jamaa Inc. are ERIC BROWN, president, and DEITRA DAVENPORT, secretary. An order form in the book indicates that the price is $15 for "prisoners" and $20 for "non-inmates."

32. CS1 related that BGF will soon be promulgating a new membership oath and that it is supposed to be written in red. CS1 is uncertain when the oath will be circulated.

2. CS2

33. In January 2009, a reliable confidential informant (CS2)[8] advised me and other investigators that ERIC BROWN recently wrote a book called "The Black Book - Empowering Black Families and Communities." Although BROWN is the author of the book, the author is listed as "La Eusi Jamaa (The Black Family)." CS2 stated that BROWN has a close relationship with one or more employees of the Maryland of Department of Corrections and that

---

8 CS2 is a concerned citizen who has been cooperating with law enforcement for three months. CS2 knows many members of BGF and has had discussions with BGF members about the gang's operations. CS2 has provided law enforcement with copies of BGF letters and photos of active BGF members. The information provided by CS2 has proven reliable and has been corroborated by independent investigation.

BROWN has a contraband cellphone in jail. As described below, that cellphone was later determined to be TARGET CELLPHONE #1.

34. CS2 further advised that several guards with the Department of Corrections are assisting BGF members in smuggling drugs, weapons, and cellphones into the Baltimore City Detention Center. These guards are also assisting BGF members with an extortion scheme under which BGF offers "protection" while in jail to newly arrested persons who are not BGF members. In exchange for this "protection," an arrested person is required to pay money to BGF. Specifically, BGF supplies the person to be protected with a credit card number of a prepaid credit card (sometimes referred to as a "green dot" card), and the person to be protected is required to have family members or friends place money onto the card when periodically directed to do so by BGF. The credit card is held by one of the corrections officers who are assisting BGF or by BGF members on the street. The credit card is then used to pay for items for BGF members. If the newly arrested inmate does not agree to pay for the "protection," then he or she is targeted for violent crimes while in prison.

3. <u>CS3</u>

35. In late January 2009, a reliable confidential informant (CS3)[9] advised me and other investigators that RAINBOW

---

9 CS3 has been a registered DEA informant for 18 months. CS3 initially began cooperating in the hopes of receiving a reduced

WILLIAMS is one of the leaders of BGF. CS3 stated that he/she first met WILLIAMS in March 2004 while incarcerated in the Hagerstown Correctional Facility. WILLIAMS identified himself as a member of BGF. CS3 stated that while in the company of WILLIAMS, he/she personally saw WILLIAMS in the possession of a quantity of heroin. According to CS3, heroin was the drug of choice which was distributed by inmates at the facility, often under the control of members of BGF. CS3 stated that WILLIAMS was one of the individuals who orchestrated the smuggling of heroin into the prison. Once the heroin was passed off to an inmate from a civilian, it would be transported to an unnamed individual who worked in the kitchen area of the facility. WILLIAMS would then inspect the package of heroin and then direct the distribution to other inmates. CS3 stated that the inmates would take the gram of heroin and mix it with a multi-vitamin. The scrambled heroin would then be placed into small paper packages for sale. A typical quantity of heroin smuggled into the prison would be between 1-10 grams. CS3 said that at that time, one gram of heroin could net a profit of $800-$1400 per

---

sentence and is now a paid informant. During that time, the information provided by CS3 has consistently proven reliable and has been corroborated by independent investigation. Information provided by CS3 has led to the arrests of approximately 10 individuals for drug offenses and violent crimes and the seizure of over 100 grams of crack cocaine and 100 grams of heroin and approximately 10 firearms.

gram in prison. CS3 advised that WILLIAMS tried to stay away from handling the heroin to avoid being caught and charged. After the heroin was distributed, WILLIAMS would receive the profits from the sales. CS3's most recent contact with WILLIAMS was in or about 2004 when they were incarcerated at Hagerstown.

36. Prior to being released from prison, CS3 was approached by WILLIAMS. WILLIAMS asked CS3 to assist WILLIAMS in having heroin smuggled into the prison system following CS3's release. After being asked several times by WILLIAMS for CS3's contact number, CS3 provided a number which was not active. Ultimately, CS3 and WILLIAMS lost contact with each other.

4. CS4

37. In January 2009, a reliable confidential informant (CS4)[10] advised DEA that BGF members are distributing cocaine, crack cocaine, and marijuana through open-air drug markets in the vicinity of Guilford Avenue and 23rd Street, in Baltimore. CS4, who is a close associate of one or more BGF members, has identified specific BGF members selling at that location and has personally observed such transactions. Law enforcement has conducted surveillance at that location and has observed drug-

---

10 CS4 has been cooperating with law enforcement since in or about 1977 and is a paid informant. Information provided by CS4 has led to the seizure of large amounts of cocaine, heroin, marijuana and over 10 firearms. The information provided by CS4 has proven reliable and has been corroborated by independent investigation.

related activity by the individuals identified by CS4.[11] CS4 also reported that a BGF member known as "Din-Din" was recently robbed at gunpoint and pistol-whipped by rival drug dealers in the vicinity of Greenmount Avenue and 27th Street. CS4 added that BGF members have met to discuss how BGF will respond to this incident.

5. CS5

38. During a series of debriefings over the past several months, a confidential informant (CS5)[12] who is an incarcerated BGF member has advised officials at the WCI that "Uncle Ray" or "Ray Ray" - later identified as RAY OLIVIS - is a high-ranking member and one of the founders of BGF in Maryland. CS5 reported that "Uncle Ray," who is incarcerated at MTC, is coordinating BGF operations throughout the Maryland correctional system by utilizing a contraband cellphone bearing call number (443) 310-9570. That cellphone number has been corroborated by intercepted jail calls. CS5 identified ERIC BROWN and GENE LNU

---

11 Law enforcement has not taken steps to arrest these individuals at this time because such actions would risk compromising CS4's safety and because, as more fully set forth below, arresting these individuals would not yield significant information about the full scope of the conspiracy.

12 CS5 has recently begun cooperating with law enforcement and has provided ongoing information on BGF members. CS5 has been compensated for his/her information by prison officials. The information provided by CS5 has proven reliable and has been corroborated by independent investigation.

as two other high-ranking BGF members who are assisting "Uncle Ray" in coordinating BGF operations. CS5 identified TARGET CELLPHONE #1 as the cellphone number for ERIC BROWN and (443) 980-6157 as the cellphone number for GENE LNU and said that both cellphones are being used to conduct BGF business. According to corrections officials RAY OLIVIS is scheduled to be released from prison in December 2009 from the Maryland Training Center.

C. **USE OF THE TARGET CELLPHONES IN FURTHERANCE OF THE SUBJECT OFFENSES**[13]

39. On or about November 10, 2008, an outgoing call was placed over a recorded telephone line at NBCI from THOMAS BAILEY to (410) 365-8152. Although this number is identified on the NBCI prison call list as that of SHAWN BEASLEY, the person who answered the phone was a female, later identified as TYSHAWNA LNU. During the beginning of the conversation, BAILEY explained to TYSHAWNA LNU that he was going to allow his "best friend" to call her. Based on my training and experience, BAILEY was telling TYSHAWNA LNU that he wanted her to arrange three-way calls with the "friend"; such calls are in violation of prison regulations. BAILEY then instructed TYSHAWNA LNU to call Hassan [a reference to HASSAN WASHINGTON] at telephone number (410) 227-8819. The call went unanswered.

---

13 The calls referenced herein that were recorded over prison telephone lines were recorded pursuant to prison policy and were obtained by DEA pursuant to subpoena.

40. A few minutes later, BAILEY again instructed TYSHAWNA LNU to call Hassan [a reference to HASSAN WASHINGTON] at (410) 227-8819. This call was answered. During the ensuing conversation, BAILEY said, "Soldier [a reference to ANTHONY BRUCE, a/k/a "Silk," a/k/a "Soldier"] should be calling you in a minute, right." WASHINGTON asked, "Who?" BAILEY answered, "Soldier Silk. Cause he said uh, he supposed to have almost everything together, man, on this end, man [a reference to being prepared to accept a smuggled package of controlled substances into NBCI]. So I guess when he call you, man, so far I ain't got nothing else together but he supposed to have something else together." WASHINGTON responded, "Alright, well whenever he call me I'll just go ahead and holler at (inaudible).... Alright, whenever he call me I'll just go holler at the horse [a reference to the individual who would be smuggling the drugs into NBCI] and get it done." BAILEY responded, "Alright." BAILEY then asked how things were going for WASHINGTON, and WASHINGTON said everything was fine. BAILEY then explained that he has Joe's [a reference to GREGORY FITZGERALD, a/k/a "Joe"] number and that as soon as he speaks with Joe he would send Joe to meet with WASHINGTON. At the conclusion of the conversation, WASHINGTON acknowledged that he would be waiting to hear from Joe.

41. BAILEY then returned to having a conversation with TYSHAWNA LNU. At this time BAILEY explained that his "best friend" goes by the name of "Silk" or "Soldier" and said that he (Silk or Soldier) would be the person calling her. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY is describing BRUCE, a/k/a "Silk" or "Soldier" as an individual who can speak on his behalf (BAILEY's) behalf when he (BAILEY) is unavailable.

42. On or about November 14, 2008, an outgoing call was placed from a recorded telephone line at NBCI to (410) 365-8152. At the beginning of the conversation, TYSHAWNA LNU explained that she has been upset since her boyfriend had just been murdered near Clinton and Robb Street. BAILEY briefly consoled her and then asked her to make a call to Joe [a reference to GREGORY FITZGERALD, a/k/a "Joe"] at (410) 361-0114, the predecessor number of TARGET CELLPHONE #2.[14] This call went to voicemail. BAILEY left a voicemail message identifying himself as "Fat Face." BAILEY added that the next time he called FITZGERALD it would be from the same number. Based on my training and experience and on other information developed during

14 As more fully described below, on or about January 27, 2009, shortly after GREGORY FITZGERALD was arrested on drug charges and then released on bail, FITZGERALD changed the call number of TARGET CELLPHONE #2 from (410) 361-0114 to (410) 361-0046. The IMSI number of that phone remained the same.

this investigation, including other intercepted calls, I believe that in this call, BAILEY was advising FITZGERALD of the number of the third party (TYSHAWNA LNU) that BAILEY was going to use to make three-way telephones call to him (FITZGERALD).

43. On or about November 18, 2008, an outgoing call was placed from a recorded telephone line at NBCI to (410) 365-8152. TYSHAWNA LNU answered, and BAILEY instructed her to place a three-way call to Joe [a reference to GREGORY FITZGERALD, a/k/a "Joe"] at (410) 361-0114, the predecessor number of TARGET CELLPHONE #2. The call was answered, and BAILEY and FITZGERALD greeted each other. FITZGERALD explained that at the current time he was hanging out at North Avenue and Castle Street. FITZGERALD explained that he was in the company of several persons, including "Man," a/k/a "Red Man." FITZGERALD then handed the phone to "Man" so "Man" could speak with BAILEY. BAILEY asked, "What's up, Man?" "Man" responded, "Shit, trying to live and shit." BAILEY explained that he is currently incarcerated at NBCI, "the worst jail in the world." "Man" asked him how he was doing. BAILEY responded, "I'm doing bad man. Trying to find a broad man. So I can take care of this business man, the same business [a reference to BAILEY's continued involvement in narcotics trafficking and his attempts to locate an individual willing to smuggle drugs into NBCI and continue his

drug trafficking behavior]. You know?" "Man" then responded, "Alright, I'll see what I can do." BAILEY continued, "That's, that's what's needed." "Man" then provided BAILEY with telephone numbers (443) 934-8971 and (410) 522-4455 as his contact information.

44. "Man" then handed the phone back to FITZGERALD. BAILEY explained to FITZGERALD that he and Silk are now being housed on the same tier. BAILEY explained that he had gotten FITZGERALD's telephone number through Silk. The two then discussed "Little Bobby" and "Swan," associates of theirs who are incarcerated in Virginia. FITZGERALD then asked, "What's happening though?" BAILEY responded, "Nothing man, we need a girl [a reference to a female willing to smuggle drugs into NBCI, at various times referred to by members of the organization as a horse] man." FITZGERALD then said, "You all need a girl [female courier of drugs and/or other contraband]?" BAILEY confirmed, "Yeah, bad." FITZGERALD said, "I might could find one too, boy." BAILEY continued, "Man, that's what we need. I'm talking about, hey you hear me? ... It's like the coldest winter ever up here man." FITZGERALD responded, "I feel you yo, everybody saying that up there. You know what I mean? Even up Hagerstown." BAILEY continued, "Not like up here yo. Man they talking about ain't nobody doing nothing [a reference to BAILEY's inability to

smuggle drugs and distribute drugs in NBCI]. I'm talking about not one person."

45. The conversation then returned to the length of time BAILEY is going to be housed at NBCI. BAILEY then continued, "Man, we doing bad too. We ain't got nothing but like $500." FITZGERALD responded, "The thing is getting somebody up there [a reference to the horse]. You understand what I'm saying?" BAILEY went on to describe how there is a van service that transports visitors to the different correctional facilities. BAILEY said, "We got somebody that will go in there. We got, we need somebody to come up here. That's the whole thing. We need somebody willing to come up here." FITZGERALD acknowledged the problem and said, "The thing is trying to get somebody to come all the way up there." BAILEY continued, "All we need is that one [female courier of drugs and/or other contraband], all we need is somebody.... We need a trooper man. You know we gonna pay like each way.... Hopefully money will be the motivator." FITZGERALD explained that he may have a girl he can talk to about making the trip to NBCI. BAILEY continued, "Man don't might holler at her man, see what she say. We definitely trying, we doing bad, sure enough." The conversation then switched back to the conditions at NBCI.

46. A short time later BAILEY explained that he had talked with Hassan [a reference to HASSAN WASHINGTON]. BAILEY explained that WASHINGTON "got that money for us, right." FITZGERALD responded, "Yeah." BAILEY continued, "Whenever, whenever we ready. We ain't ready till we get a girl [a reference to the horse], man." FITZGERALD assured BAILEY, "I'm definitely going to check on that tomorrow." FITZGERALD then explained that he was in Las Vegas last weekend, to which BAILEY said he had seen the pictures. BAILEY then asked, "What's up with Yellow [a reference to AUSTIN ROBERTS] anyway?" FITZGERALD answered, "He alright. You know that's who I fuck with." BAILEY responded, "Yeah man, that should be real good then." FITZGERALD continued, "Yeah that's who I'm fucking with man. Right now I'm going through a little change with him. Not me and him but something we just got our hands on [a reference to expanding the organization's efforts to smuggle and/or distribute various types of controlled substance and not limiting it to one particular drug]." BAILEY told FITZGERALD that he had been trying to reach Yellow so they could talk. As the conversation continued FITZGERALD stated, "I been talking to E [a reference to ERIC BROWN]." BAILEY then asked, "You got his number? I need that, I'm trying to call him tonight." FITZGERALD then gave BAILEY the telephone number (410) 206-6980, TARGET CELLPHONE #1, as the

contact number for BROWN. A short time later BAILEY asked when was the best time to reach BROWN. FITZGERALD explained that BROWN is on the phone all night. After the conversation with FITZGERALD ended, BAILEY instructed TYSHAWNA LNU to call BROWN at TARGET CELLPHONE #1. The call did not connect and the conversation ended. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY is attempting to contact BROWN, BAILEY's superior in BGF, via TARGET CELLPHONE #1 to obtain the status of the on-going BGF criminal conspriacy.

47. On or about November 18, 2008, just a few minutes after the end of the previous conversation, an outgoing call was placed from a recorded telephone line at NBCI to (410) 365-8152. TYSHAWNA LNU answered, and BAILEY instructed her to place a three-way call to "E" [a reference to ERIC BROWN] at TARGET CELLPHONE #1. BROWN answered the call. BAILEY and BROWN greeted each other, and BROWN explained that he was currently on the other line with "Comrade Doc" from Roxbury [an apparent reference to Roxbury Correctional Institution]. BROWN then put the three of them together on a conference call. BAILEY explained that he had gotten BROWN's telephone number from Joe [a reference to GREGORY FITZGERALD]. BROWN asked, "What's happening man?"

BAILEY answered, "Man, ain't nothing man. Rustling man, trying to get this together [a reference to his on-going efforts to further the BGF criminal enterprise in NBCI], man. You know what I mean? Goodness gracious, you put a burden on me, man." BAILEY went on to explain that "Pizza" [a reference to ROBERT NEDD] is in population now and is doing a lot of crazy stuff. BAILEY stated, "I need some political recourse with this dude, man. I'm trying to work with him [a reference to BAILEY attempting to persuade ROBERT NEDD to follow the BGF protocols] without ramming him [a reference to harming ROBERT NEDD for his failure to comply], right?" BROWN responded, "Right, right, right, he hard, ain't he man?" BAILEY said, "He got this utopia thing man, which don't exist."

48. BROWN asked, "You get a copy of the book [a reference to the Black Book which, as described above, is a BGF manual]?" BAILEY answered, "Nah." BROWN went on, "Well we gotta mail you one tonight then. I'm going to tell the misses [a reference to DEITRA DAVENPORT, BROWN's wife or girlfriend] to take one to work tomorrow and mail you one tomorrow." BAILEY inquired whether or not BROWN had been moved. BROWN continued, "All I gotta do is bounce man, you know? You hear me? Man it don't get better than you and you know, you and that crew, man. I mentioned you uh, in, in the book [a reference to the Black

Book]. You understand what I'm saying? I mentioned the struggle [a reference to BGF's continued efforts against the establishment]. You know what I mean? You know, I'm just so proud of you, man, and Nutty [a reference to DARYL MOORE, a/k/a "Nutty Bar"], man, and how you built me up. It carries me and how much I learned from you all. You know what I mean?" BAILEY responded, "Yeah, yeah." BROWN continued, "I just think how much I learned from you. How sharp you is. Because you got that guerrilla thing [a reference to BAILEY's anti-social criminal behavior] on lock, a lot of people don't get to know about your brains. You understand what I'm saying?" BAILEY responded, "Right, right, right." BAILEY went on to explain that Joe [a reference to GREGORY FITZGERALD] was out there with "Man," light skinned man. BAILEY said, "Joe put a whole lot of foot work in for me, man. You know what I mean?" BROWN responded, "Yeah, yeah of course, of course man. Cause when he used to travel with that kind of cake [a reference to a large amount of drug proceeds] right. I'm keeping records. You understand what I'm saying?" BAILEY went on, "Right now man, I'm short of a girl. I need, you know, I need somebody to work the post office for me and carry some mail [smuggle drugs and/or other contraband to BAILEY at NBCI]." BROWN responded, "Right, right." BAILEY asked, "You got somebody with that type of interest?" BROWN

stated, "Okay, okay, okay, okay, I'll get on top of that, I'll get on top of that. That's not a problem." BROWN then explained that he does not want BAILEY to get mad if he makes a bad pick when he gets the girl. BAILEY stated, "I can't afford that right now. I'm in a tough situation." BROWN assured him, "I understand, I understand. I'm going to help you as much as I can." BROWN explained that he would look around for a trustworthy friend. BAILEY said, "It's a gamble anyway. You know what I mean?" BAILEY even explained that his mother had offered to be the girl [courier] coming to the prison but that he had declined the offer.

49. The conversation then shifted to the BGF organization's future plans. BROWN said, "Listen, man, we on the verge of big things, man." BAILEY explained, "Alright man, uh you know what I mean? You already know man, I'm a solid soldier. Whatever you need, whatever you need me to do man, I'm there, man." BROWN explained, "OK, this positive movement that we are embarking upon now, right, is moving at a rapid pace, right. It's happening on almost every location [all prisons and other locations where BGF is active]." BAILEY explained that they needed to be brought up to speed. BROWN stated, "Revolution is the only solution brother." BAILEY made it known that whatever direction BROWN says it is going is fine because right now BROWN

has the reins [is the leader of BGF in Maryland]. BROWN went on to explain that the book [Black Book] is full of lessons and study guides [lessons and related materials to help new members learn the history and ways of BGF] to which BAILEY replied, "Alright, I'm waiting on it man." BROWN went on to explain that the study guides are used to teach the lessons and that BROWN will have a book sent to BAILEY personally. The book sent to BAILEY will have something the others do not have, which is the test along with the answer keys. BROWN stated that each section should be taught as a class and that this is happening everywhere [all prisons and other locations where BGF is active]. BROWN said he does not want anyone to get left behind.

50. Toward the end of the conversation BROWN asked, "What is it you need me to do for you personally?" BAILEY answered, "I need a girl [female courier], man. I need the girl." BROWN responded, "Is that it?" BAILEY answered, "That's it." BROWN confirmed, "You sure?" BAILEY explained, "Right now I need the girl. That's the most important thing man. You know what I mean?" BROWN assured BAILEY, "OK, so what I'll do, I'll get on top of the girl." As the conversation came to an end, BROWN made it clear that BAILEY needed to keep in constant contact with BROWN. BAILEY stated, "I need the girl, man. Once I get the girl, man, everything, everything." BROWN acknowledged

his problem, "Man I've been in that situation before man. I know where you're coming from, then everything will fall into place. I got you, man." Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BROWN and BAILEY are discussing the problems associated with finding a horse to smuggle drugs into correctional facilities. BROWN also assures BAILEY that once a satisfactory method of smuggling drugs into the facility is accomplished, the situation will improve.

51. On or about November 22, 2008, an outgoing call was placed from a recorded telephone line at NBCI to (410) 365-8152. TYSHAWNA LNU answered, and ANTHONY BRUCE, a/k/a "Silk," a/k/a "Soldier" - who had placed the call using BAILEY's inmate identification number - instructed TYSHAWNA to place a three-way call to Joe [a reference to GREGORY FITZGERALD, a/k/a "Joe"] at (410) 361-0114, the predecessor number of TARGET CELLPHONE #2. During the ensuing conversation, BRUCE asked if FITZGERALD enjoyed himself in Las Vegas. FITZGERALD said that he and Yellow [a reference to AUSTIN ROBERTS] had a good time. FITZGERALD said that "Fat Face" [a reference to THOMAS BAILEY] had hollered at him recently about getting them a girl but FITZGERALD thought that their visits were only at night. BRUCE corrected FITZGERALD and said that the visits are in the daytime. FITZGERALD then

said that he knew of a girl from North Avenue whom he would ask. BRUCE told FITZGERALD, "I want you to come see him, right. Cause it really ain't right to rap, right. These things terrible yo, for real." FITZGERALD responded, "Yeah I know. That's what I'm saying. When he was talking to me on the phone, you know what I mean?" BRUCE continued, "Yeah I'm saying he got his visits so you might want to come see him. Just rap to him for a minute right. That'll be the safest way." BRUCE continued, "I say what's up with you though?" FITZGERALD responded, "Ain't nothing man. I just been chillin. Trying, you know what I mean? It's crazy man. It'll be alright for a minute then shit just go crazy [a reference to the typical operational problems associated with trafficking of drugs (i.e. law enforcement intervention, and supply or payment problems)]." As the conversation continued, BRUCE asked if FITZGERALD had seen Hassan [a reference to HASSAN WASHINGTON]. FITZGERALD responded, "No, I ain't seen Hassan." BRUCE continued, "He got some money of ours too, right. He been still doing it [a reference to HASAN WASHINGTON's continued efforts to traffic drugs on behalf of BGF] for us. I want, I know what type of mind you is right. I know how you is and how, how cautious you and Yellow is so I want, I want to put him with you [a reference to BRUCE attempting to link HASAN WASHINGTON with FITZGERALD and ROBERTS to enhance BGF's drug trafficking

enterprise], alright?" FITZGERALD responded, "Right." BRUCE continued, "You know what type of dude he is. He a good, he a good man, right." The conversation continued and FITZGERALD asked what address BRUCE had for him. BRUCE stated, "Oh, Norham Court, yo." FITZGERALD then said, "Nah, nah, nah keep that to yourself [do not reveal that address to anyone]. You keep that to yourself, you keep that to yourself." FITZGERALD told BRUCE to use only the Collington Avenue address [a reference to FITZGERALD's family address]. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BRUCE, who, on occasion, speaks for BAILEY is attempting to consolidate and expand the BGF drug trafficking enterprise.

52. On or about December 12, 2008, an outgoing call was placed over a recorded telephone line at Roxbury Correctional Institution from inmate MALIK RAHEEM[15] to ERIC BROWN - listed on the jail's telephone log as "Eric Bowie" - at TARGET CELLPHONE #1. During this conversation, RAHEEM consistently addressed BROWN as "sir." RAHEEM asked BROWN how RAHEEM could take part in writing a portion of the second Black Book. BROWN told RAHEEM to put things together and send them to BROWN at the P.O. Box.

15 MALIK RAHEEM has convictions in 1985 and 1989 for robbery with a deadly weapon.

BROWN said that "they" make sure he gets everything sent to the P.O. Box. BROWN explained that they are still promoting and pushing the first Black Book. RAHEEM responded, "Oh, yes sir, and we doing it on this location as well." RAHEEM went on to explain that they are teaching the book and holding meetings every week. BROWN went on to explain that there is basically a rank structure within the BGF organization that needs to be followed. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BROWN is stressing to a subordinate in BGF the need to follow the BGF protocols.

53. On or about December 18, 2008, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to TYSHAWNA LNU at (410) 365-8152. During the conversation, BAILEY had TYSHAWNA LNU make a three-way call to ERIC BROWN, a/k/a "E," at TARGET CELLPHONE #1. The call went to voicemail. BAILEY left the following message: "Hey yo this Corey. I'm going to be out here till like 9:30 man so try to call me back while I'm out here. Let me know something. Talk to you." A few minutes later the call disconnected. Shortly thereafter, BAILEY then made a return call to TYSHAWNA LNU. During the conversation BAILEY had TYSHAWNA LNU make a three-way call to CURTIS LNU,

a/k/a "Curt," at (443) 224-7224. BAILEY asked CURTIS LNU how things were going with him and his brother. CURTIS explained that his brother was back to his old ways. CURTIS then made a conference call to his brother SHAWN, who later identified himself as SHAWN WYCHE with a telephone number of (410) 908-7240. BAILEY explained that things were tough at NBCI and said that he needed a "broad [a reference to the horse]." BAILEY stressed that he needed CURTIS to get on top of that situation [find him a female courier of drugs and/or other contraband]. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY is exhausting all of his resources to obtain a horse to smuggle drugs into NBCI.

54. On or about December 20, 2008, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to (443) 372-5478, a number listed on NBCI prison call logs as that of Demetre Couser, identified on prison call logs as BAILEY's cousin. During that call, BAILEY directed a female to place a three-way call to Joe [a reference to GREGORY FITZGERALD, a/k/a "Joe"] at (410) 361-0114, the predecessor number of TARGET CELLPHONE #2. During the ensuing conversation, FITZGERALD explained that a "dude" he hangs out with had just taken care of something for the person's cousin down at the Annex [a prison

facility in Baltimore]. FITZGERALD explained that this unknown person wanted FITZGERALD to be involved in getting things [drugs and/or other contraband] into the Annex. FITZGERALD said, "He wanted me to drop it [drugs and/or other contraband] off to the dude's people and I'm telling them that if they wait to the last minute to do shit then I ain't doing nothing unless my uncle getting one of them [drugs and/or other contraband]. You know what I mean? Yeah I ain't doing shit. You know what I mean? Cause they didn't tell him what was going on until the end. You know what I mean? I said, look slim, done already took care of that for them. But I was telling them, yo I ain't doing shit unless he getting one [drugs and/or other contraband]. You know what I mean? I'll leave that shit where it's at. I'll let his homeboys take care of it." BAILEY then asked, "Which one of your uncles is down there anyway?" FITZGERALD answered, "The one who used to be on death row." Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, FITZGERALD is explaining to BAILEY about his recent efforts to supply a group of individual, who were attempting to smuggle drugs into the Annex. FITZGERALD explained that it's not a problem to smuggle drugs into the Annex, but because of the last minute nature of the transaction, FITZGERALD required a portion

of the smuggle drugs to be provided to relative, who used to be on death row.

55. On or about December 20, 2008, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to (443) 372-5478, a number listed on NBCI prison call logs as that of Demetre Couser, identified on prison call logs as BAILEY's cousin. During that call, BAILEY directed a female to place a three-way call to ERIC BROWN at TARGET CELLPHONE #1. During the ensuing conversation, BAILEY and BROWN discussed the Black Book which, as more fully described above, is a BGF manual for gang members. BAILEY explained to BROWN that at NBCI, prisoners have to sign for the books they receive and that the only books inmates are allowed to have are ones that are sent directly from the book company. BROWN replied, "They is coming from the company." Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY was explaining that he believed the reason he had not yet received the Black Book was that the book had not been sent directly from a publisher, but BROWN was reassuring BAILEY that the Black Book would be coming directly from a publishing company. Based on other information developed during this investigation, and as more fully described above, the Black Book was published by

DeeDat Publishing Company trading as Harambee Jamaa Inc., a purported book publisher operated by DEITRA DAVENPORT, BROWN's wife or girlfriend.

56. On or about December 25, 2008, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to (443) 372-5478, a number listed on NBCI prison call logs as that of Demetre Couser, identified on prison call logs as BAILEY's cousin. During that call, BAILEY directed a female to place a three-way call to SHAWN WYCHE. During that conversation, BAILEY asked, "You find a broad [a reference to a female courier of drugs and/or other contraband], man?" WYCHE responded, "I been told you that I had one." BAILEY explained that he needed her information so he could put her on his visiting list. WYCHE explained, "I know the information. I just don't know the address she got on her ID. I know her name and all that, yo." The two continued to discuss the fact that BAILEY needed to have the girl's full information so that he could put her on the visiting list. WYCHE explained that the only thing he needed was the girl's address off of her ID. BAILEY agreed and stated that when WYCHE comes to visit him then WYCHE can bring the girl [female courier] along. BAILEY explained, "That way, you know what I mean? When she come down too, I can have the dude holler at her. Let her know what's going on." Based on my training and

experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY and WYCHE are discussing the introduction and arrangements for the horse to meet the individual BAILEY has obtained to receive the smuggled drugs into NBCI.

57. On or about December 25, 2008, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to ERIC BROWN at TARGET CELLPHONE #1, a number listed on NBCI prison call logs as that of "Dee Brown," identified on prison call logs as a friend of BAILEY's. During that call, BAILEY asked if BROWN had ever "hollered at Rudy [a reference to a BGF criminal assoicate] about that Silk situation." BROWN explained that he had talked things over with Ray Ray [a reference to Uncle Ray OLIVIAS]. BAILEY said that he would have "Silk" [a reference to ANTHONY BRUCE] contact BROWN directly. BROWN disagreed with that and said that "Silk" should not call him, but rather should call "Unc" [another reference to RAY OLIVIS, a/k/a "Ronnie Hargrove," a/k/a "Uncle Ray," a/k/a "Unc," a/k/a "Ray Ray"] at (443) 310-9570. BAILEY and BROWN then continued to discuss the fact that BAILEY had not received the Black Book. BROWN explained that his wife would send BAILEY another copy. BROWN explained that he is currently being housed at "the pen" [a reference to MTC]. BAILEY went on to explain

that he really needs the Black Book, because all he had at that time was the tests and the answer keys. BAILEY said he wanted to begin the teaching of the Black Book to BGF members by the first of the year. BROWN stated that the book has a structure. BAILEY stated, "That's what I try to do, teach them about the family structure."

58. BROWN then told BAILEY to hold on, at which time "Uncle Ray," later identified as RAY OLIVIS, a/k/a "Ronnie Hargrove," a/k/a "Uncle Ray," a/k/a "Unc," a/k/a "Ray Ray," one of the founding members of BGF in Maryland, got on the phone. Uncle Ray stated that he likes to talk with "comrades" [a term used to describe BGF members] and give them "inspiration." BAILEY said, "Our fire burn eternally and it burn forever, man." Uncle Ray asked BAILEY how long he has been "jay" [a member of BGF], and BAILEY said since 2001. The two then discussed how comrades who stay with "jay" know the struggle. Uncle Ray inquired how things have been going with the Black Book. BAILEY explained that he has not received it as of yet but he is waiting on it. Uncle Ray stated that "Jaama" [a reference to BGF] is spreading throughout the prison system. BAILEY said that he was honored to speak with one of the founding fathers. Uncle Ray said that the comrades need to keep struggling in the right direction. At the end of the conversation, BROWN got back on the

phone. BAILEY expressed great gratitude to BROWN, explaining that BROWN has given him more than his biological father. BROWN said he really wants BAILEY home from prison. BROWN went on to explain that he is currently trying to establish a fund which would be used as a retainer for BGF members' cases with a lawyer whom he did not identify. BAILEY agreed that this would make things easier for the organization. BROWN said that he wants to give the lawyer $10,000 to use as a retainer for ten people. However, BROWN and BAILEY will handle BAILEY's case personally. BROWN said that he should be released from prison in late 2009. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY and other high ranking member of BGF are discussing the proliferation of the BGF criminal enterprise in the Maryland Division of Corrections and elsewhere.

59. On or about December 27, 2008, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to Meachie Couser, a/k/a "Demetre Couser," at (443) 739-0288. During that call, BAILEY provided a female with the cellphone number of (410) 908-7240 for SHAWN WYCHE and asked the female to call WYCHE and get the information for the "girl" [a reference to the female courier of drugs and/or other

contraband]. BAILEY also asked the female to contact ERIC BROWN at TARGET CELLPHONE #1 and have BROWN send the Black Book to either inmate Antonio Rogers (Inmate #345251) or Kurnell Cornish (Inmate #313933). Approximately ten minutes later, BAILEY again called the female and asked whether she had spoken to WYCHE. She said she had not but would make the call. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY was instructing Couser to contact WYCHE to obtain information for the horse that WYCHE was recruiting, and provide Couser with the names and inmate numbers of recipents of the black book being sent by BROWN through DEITRA DAVENPORT.

60. On or about December 28, 2008, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to GREGORY FITZGERALD, a/k/a "Joe," at (410) 361-0114, the predecessor number of TARGET CELLPHONE #2. BAILEY placed the predecessor number for TARGET CELLPHONE #2 on his call list, which enables him to contact TARGET CELLPHONE #2 without the need of a third party. During this call, FITZGERALD asked what has been happening with BAILEY. BAILEY said, "I'm trying to catch up with my man. Get this information about this broad [a reference to the female courier] he's supposed to have for me. You ain't never get the broad [female courier] for us?" FITZGERALD

responded, "Hell no." BAILEY then said, "You ain't been looking; man." FITZGERALD responded, "I'm telling you, they playing games. As a matter of fact I'm getting ready to call one right now." Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY explains to FITZGERALD that he is waiting on a BGF criminal associate, WYCHE, to provide the identify of the horse, and then inquires of FITZGERALD whether he has been able to identify another individual capable of smuggling drugs (i.e. another horse) into NBCI.

61. On or about December 31, 2008, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to HASSAN WASHINGTON at (410) 227-8819. During this call, BAILEY asked, "You ever find that girl [a reference to the female courier] for us?" WASHINGTON replied, "Hell no." BAILEY asked, "Did I ever give you Joe new number?" WASHINGTON replied that he already had the number and added that he and FITZGERALD had been together recently. WASHINGTON went on to explain that he has talked to two separate females about traveling to NBCI [a reference to having the females act as couriers of drugs and/or other contraband]. BAILEY told him, "Just stay on it, man." WASHINGTON said that he even spoke with a female from Greenmount

and Barcley Street but that neither she nor her friends were willing to take the risk traveling to the facility. BAILEY explained, "I'm scared my god damn self." Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY contacts a BGF criminal associate, HASAN WASHINGTON regarding his efforts in locating a horse. WASHINGTON confirmed that he spoke with two separate females, but both were concerned about being discovered by law enforcement. BAILEY then instructed WASHINGTON to continue his efforts.

62. On or about December 31, 2008, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to Meachie Couser a/k/a, Demetre Couser at (443) 739-0288. During that call, BAILEY asked a female if she had spoken to SHAWN WYCHE, and she said no. BAILEY reiterated to the female that it was important for her to get in touch with WYCHE. The female then called WYCHE on another telephone and asked whether WYCHE had the information [a reference to the female courier of drugs and/or other contraband] that "Corey" [a reference to BAILEY] needed. BAILEY stated, "Tell him yo I need him more than ever. This, this some serious stuff." BAILEY then instructed the female to call WYCHE on a three-way call. During that call, BAILEY told WYCHE, "I need you more than ever, yo." WYCHE

explained that the girl's name [a reference to the female courier of drugs and/or other contraband] is Yzette Jackson with an address of 927 Valley Street, Baltimore, Maryland 21202. BAILEY said that he would put her on "D's" list [a reference to the visitor log for an unknown inmate in NBCI]. BAILEY asked, "How much she want?" WYCHE asked, "Who paying for her?" BAILEY said, "I'm trying to figure all that out now. So I'm trying to get everything in order." WYCHE stated, "If you paying for it, nothing." BAILEY continued, "It's for me. I got like $500 home." WYCHE confirmed that if BAILEY was paying, then it would not cost him anything. BAILEY explained, "I'll constantly need her, though." WYCHE told BAILEY that he would bring the girl when he comes to visit BAILEY. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, WYCHE confirms to BAILEY that he has located a female, Yzette Jackson, to act as a horse. BAILEY then discusses with WYCHE the need for an on-going relationship with the horse and the compensation to the horse for her services.

63. On or about January 5, 2009, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to HASSAN WASHINGTON at (410) 227-8819. During this call, BAILEY asked, "You find a broad [a reference to the female courier]?"

WASHINGTON replied, "Yeah I got one for you." WASHINGTON explained that the information for the female [a reference to the female's identifying information] was currently in his car and that he could not get to it at the time. WASHINGTON instructed BAILEY to call him on Wednesday and he would have the information. BAILEY confirmed that either he or Silk [a reference to ANTHONY BRUCE] would call. BAILEY explained that he would work out the logistics on getting the female to NBCI. BAILEY said, "We gotta work all that out." WASHINGTON responded, "Yeah you all gonna have to…and she wanted to come through one time just like on a dry run and look at the spot [make a test-run at bringing drugs and/or other contraband into NBCI]." BAILEY responded, "There's no doubt about that." WASHINGTON continued, "Yeah, so, but she definitely on it. I ain't know specifically what you gonna pay for the trip. But I told her probably bout something like two [a reference to $200]." BAILEY asked, "She say that was cool?" WASHINGTON answered, "Yeah." BAILEY went on, "For real all we got is what you got. I'm talking about between me and yours all we got is what you got yo, that's it." WASHINGTON responded, "OK, well, we'll work it out." Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, WASHINGTON confirmed that he had also located

a horse for BAILEY, but did not have the information immediately at his disposal. BAILEY then told WASHINGTON to expect a phone call on Wednesday from either him or BRUCE and to have the information at that time. BAILEY and WASHINGTON then discuss the logistic associated with using a new horse and the need for a "test run."

64. On or about January 6, 2009, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to ERIC BROWN at TARGET CELLPHONE #1, a number listed on NBCI prison call logs as that of "Dee Brown," identified on prison call logs as a friend of BAILEY's. During that call, BAILEY said that with his name being in the Black Book, he had additional pressure on him. BAILEY told BROWN that after reading the book, the only thing he would criticize is that the book missed the mark in explaining the need for black nationalism in this day and time. BAILEY said, "It's hard to promote black nationalism when you have a black man in the White House." BROWN reassured BAILEY that people will understand after they go through the classes. BROWN added that there would be a second Black Book written and that he expects a chapter out of each jail. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BAILEY and BROWN are discussing the damage done to

their movement by the election of President Barack Obama, and their continued efforts to indoctrinate incarcerated African American males in the BGF movement.

65. On or about January 7, 2009, an outgoing call was placed from THOMAS BAILEY over a recorded telephone line at NBCI to HASSAN WASHINGTON at (410) 227-8819. During this call, WASHINGTON provided BAILEY with the name of Ashley Scarrow of 2613 W. Fayette Street, Baltimore, Maryland 21223, as a female willing to travel to NBCI and smuggle items into the prison. BAILEY told WASHINGTON that he would let WASHINGTON know once Scarrow was approved on the visiting list. According to prison officials at NBCI, on January 12, 2009, a female by the name of Ashley Sparrow, 2613 W. Fayette Street, Baltimore, Maryland 21223, was added to the visitor list for an inmate at NBCI identified as Michael Henry. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that this call is the follow-up call discussed by BAILEY and WASHINGTON during their last conversation. (January 7, 2009 was a Wednesday), During the call WASHINGTON provides the identifying information for the horse WASHINGTON had located.

66. On or about January 18, 2009, an outgoing call was placed from BRUCE over a recorded telephone line at NBCI to

TYSHAWNA LNU at (410) 365-8152. During the conversation, BRUCE had TYSHAWNA LNU make a three-way call to GREGORY FITZGERALD a/k/a/ "JOE," at TARGET CELLPHONE #2. During the conversation BRUCE asked, …"You got the information for me or you want to send it to me"? FITZGERALD asked, "What information"? BRUCE responded, "About the female, the girl (a reference to the horse)". FITZGERALD advised that currently he did not have the information however once he, FITZGERALD obtained the persons name he would send that information by mail to BRUCE. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BRUCE was inquiring about the identity of the female courier or "horse" so BRUCE could have her name put on the visitors list.

67. On or about February 2, 2009, an outgoing call was placed from BRUCE over a recorded telephone line at NBCI to TYSHAWNA LNU at (410) 365-8152. During the conversation, BRUCE had TYSHAWNA LNU make a three-way call to an individual identified as SCOTT. During the conversation BRUCE told SCOTT, …"I got a phone number I'm going to give you right. My man, my man got…He gonna come up and see me right, but they need a ride right. So, I'm gonna make, try to get it before hand, try to see if I can set her (a reference to the horse) with you on Sunday.

You can bring her up here for me. . She ain't doing nothing, she just coming to talk" (a reference to conducting a dry smuggling run attempt). SCOTT advised that he wasn't sure about his work schedule, therefore he may not be able to travel to NBCI on Sunday. SCOTT asked BRUCE whether the van service still travels to the correctional institutions. BRUCE advised, "…The money's not a problem right. But I'm just trying to get her up here and talk to somebody". BRUCE explained that it is difficult to continue to make telephone calls and that is the reason he, BRUCE needs to arrange the transportation and visits ahead of time. SCOTT ultimately instructed BRUCE to call him back without using a three way call. BRUCE then returned to speaking with TARGET SUBJECT TYSHAWNA LNU ultimately asking her if she was willing to drive the "horse" to NBCI. TYSHAWNA LNU advised that she would consider making the trip. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, BRUCE was attempting to arrange for the transportation of the "horse" to NBCI for the purpose of smuggling drugs into the facility.

D. <u>Arrest of GREGORY FITZGERALD</u>

68. On or about January 23, 2009, Detectives from the Baltimore Police Department were conducting surveillance at the

Best Inn Motel, located at 6500 Frankford Avenue. This location has been the focus of numerous prior narcotics-related investigations. At approximately 8:30 p.m., the detectives observed a 2003 gold GMC Yukon bearing Maryland registration 18273M9 pull onto the lot and park near the front door of the motel. The detectives observed that the Yukon was occupied by two males, later identified as TYRONE ISSAC POWELL (the driver) and GREGORY FITZGERALD (the front seat passenger). The detectives observed FITZGERALD exit the vehicle and run toward the front of the motel, and meet with an unidentified male, who had been observed waiting by the front door prior to the arrival of POWELL and FITZGERALD. Detectives then observed FITZGERALD and the unidentified male engage in a hand-to-hand transaction, in which FITZGERALD received items from the unidentified male and in exchange handed the unidentified male an unknown amount of U.S. currency. FITZGERALD then immediately ran back to the GMC Yukon and entered the vehicle. Based on these observations and their training and experience in narcotics enforcement, the detectives believed they had witnessed a drug transaction.

69. Accordingly, the detectives followed the Yukon from the parking lot. As the vehicle approached the 6100 block of Frankford Avenue, the detectives activated the emergency lights on their vehicle. Upon activating the emergency lights,

one of the detectives observed POWELL reach into the console area of the Yukon. Once the Yukon finally stopped, detectives approached the vehicle and spoke with POWELL and FITZGERALD. The detectives advised the occupants that they were conducting a drug investigation. After advising POWELL and FITZGERALD of their Miranda rights, which they both stated they understood, one of the detectives asked if either person had any drugs or weapons in the vehicle. POWELL stated, "No, it's my truck, check." A search of the vehicle yielded six plastic bags, each containing a white powder substance which the detectives believed to be cocaine. The detectives estimated that the total amount was thirteen ounces of cocaine. Both POWELL and FITZGERALD were then placed under arrest. Neither POWELL nor FITZGERALD made any statements or agreed to cooperate with law enforcement.

70. On or about January 24, 2009, FITZGERALD was released on $500,000 bail. On or about January 27, 2009, FITZGERALD requested that Sprint/Nextel change the telephone number for TARGET CELLPHONE #2 from (410) 361-0114 to a new number, and Sprint/Nextel assigned TARGET CELLPHONE #2 the call number (410) 361-0046. The IMSI number of that phone remained the same. Based on my training and experience in drug-trafficking investigations, I know that drug traffickers frequently change their cellphone numbers to evade law

enforcement detection and/or to interfere with law enforcement investigations.

71. On or about January 29, 2009, after FITZGERALD's arrest and release, an outgoing call was placed from BAILEY over a recorded telephone line at NBCI to TYSHAWNA LNU at (410) 365-8152. During the conversation, BAILEY had TYSHAWNA LNU make a three-way call to FITZGERALD, at TARGET CELLPHONE #2. During the conversation BAILEY asked FITZGERALD what had happened to his telephone. FITZGERALD explained that the police had arrested him and that he was currently out on a $500,000 bail. FITZGERALD said, " Me and the dude was together right. He had, he had twelve joints in his car. I ain't talking about what you been asking for" (referring to heroin). BAILEY responded, "I know, that wouldn't make sense to have what I'm looking for". FITZGERALD continued, "He had twelve of the opposite in there. I'm talking about onions though" (a reference to ounces of cocaine). BAILEY then responded, "I know…It's either you talking about that or you talking about whole one, whole ones. You can't be talking about what I be wanting" (a reference to heroin). FITZGERALD went on to explain that the person he was arrested with is someone that BAILEY does not know. FITZGERALD explained that the person (a reference to a source of supply) that BAILEY is waiting on should be arriving in town the following day. FITZGERALD assured BAILEY

that when "yo" (a reference to the source of supply) comes to Baltimore that FITZGERALD will speak with him regarding the shipment of drugs to BAILEY. Prior to the call concluding, FITZGERALD provided BAILEY with his new cellular telephone number, TARGET CELLPHONE #2. Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, FITZGERALD was advising BAILEY that he had recently been arrested in a vehicle which contained twelve ounces of cocaine and because of that arrest he had obtained a new cellular telephone. Additionally, when FITZGERALD and BAILEY discuss "yo" they are referring to TARGET SUBJECT AUSTIN ROBERTS who often spends his time on the eastern shore of Maryland.

**E. Pen Register/Toll Analysis for the TARGET CELLPHONES**

**TARGET CELLPHONE #1**

72. The DEA obtained a pen register on TARGET CELLPHONE #1 beginning on or about December 19, 2008, which remains active. Based on an analysis of the pen register and toll records for TARGET CELLPHONE #1, I have learned the following:

a. During the period from on or about December 22, 2008 through on or about February 16, 2009, TARGET CELLPHONE #1 made and received approximately 13,471 calls, an average of

241 calls per day. The majority of these calls, approximately 11,670, were under one minute. Based on my training and experience, this unusually high volume of incoming and outgoing calls, along with their brief duration, is consistent with telephone use by narcotics traffickers.

b. TARGET CELLPHONE #1 made calls to, and received calls from, telephone numbers that are known to be associated with or involved in narcotics-trafficking, including calls to and from other TARGET SUBJECTS, as specified below:

(1) On December 25, 2008, TARGET CELLPHONE #1 made or received one call to or from telephone number (443) 414-0627, subscribed to Dwayne Flowers at 2119 Homewood Avenue, Baltimore, Maryland and utilized by TARGET SUBJECT AUSTIN ROBERTS. ROBERTS has been identified as a drug partner of FITZGERALD and as an active member of BGF. Beginning in December 2008 and continuing to the present, DEA agents have been conducting surveillance of ROBERTS. On December 17, 2008, ROBERTS was observed to conduct a drug transaction with two individuals. These individuals were arrested after a foot pursuit and found to be in possession of approximately 191 grams of cocaine. During the debriefing of one of these arrestees, he/she provided (443) 414-0627 as the contact number for ROBERTS. During the course of their surveillance, agents were able to

identify a residence, 2417 E. Fayette Street, Baltimore, Maryland, that ROBERTS frequents. A utilities check for that residence revealed service in the name of TARGET SUBJECT ANGELA JOHNSON. Pen register records indicate that activity on (443) 414-0627 ceased on or about January 8, 2009 and that activity on a new number subscribed to by ANGELA JOHNSON at 2417 E. Fayette Street, Baltimore, Maryland - (443) 413-1179 - began on or about January 8, 2009, the same day ROBERTS stopped using (443) 414-0627. As more fully described below, pen register records for TARGET CELLPHONE #2 indicate that TARGET CELLPHONE #2 began to contact telephone number (443) 413-1179 beginning on January 8, 2009, the day ROBERTS stopped using (443) 414-0627, and has contacted that number as recently as January 11, 2009. Investigators believe based on their training and experience that cellphone number (443) 413-1179 is the replacement cellphone for (443) 414-0627 and that ROBERTS is currently using (443) 413-1179 to continue his drug distribution. During the course of their surveillances investigators observed ROBERTS coming in and out of the residence carrying items that, based on their training and experience, they believed to contain controlled substances. Therefore, 2417 E. Fayette Street, Baltimore, Maryland is believed to be a stash house for ROBERTS's drug distribution. On February 2, 2009, law enforcement received information from

corrections officials that ALFRED JOHNSON, a/k/a "Tater," is an active member of BGF. In or about 2007, ALFRED JOHNSON was incarcerated at MCTC and is currently being housed at the Jessup Annex. According to corrections officials, while at MCTC ALFRED JOHNSON was the main heroin supplier for BGF within MCTC. ALFRED JOHNSON coordinated the smuggling of the heroin into the facility and orchestrated the distribution inside of the facility by other BGF members. Corrections officials advised that ALFRED JOHNSON was never caught with heroin in his possession. A review of public record databases revealed that ALFRED JOHNSON utilized 2417 E. Fayette Street, Baltimore, Maryland as his residence prior to his arrest. This address is still listed as ALFRED JOHNSON's current residence even though he is incarcerated in Jessup, Maryland. Further investigation revealed that ANGELA JOHNSON is the sister of ALFRED JOHNSON. Corrections officials advised that ALFRED JOHNSON and several other members of BGF were sending money orders out of prison to ANGELA JOHNSON. These money orders were the result of proceeds gained as a result of the sale of illegal items inside of the prison by BGF members. Ultimately, ANGELA JOHNSON would arrange for family members of the BGF members who were sending the money orders to receive those money orders.

(2) During the period between on or about December 25, 2008 and on or about February 4, 2009, TARGET CELLPHONE #1 made or received approximately 18 calls to or from telephone number (213) 346-9480, subscribed to the LA County Sheriff's Department, 441 Bauchet Street, Los Angeles, California, which is believed to be an inmate-accessible telephone in a correctional facility in Los Angeles County. The most recent such call occurred on or about February 4, 2009. Law enforcement has learned that the BGF was established in the prison system in California. As a result, I believe, based upon my training and experience, that BROWN is attempting to contact other members of BGF who are currently incarcerated in Los Angeles, California. Furthermore, law enforcement has learned that telephone number (213) 346-9480 has been in contact with target phone numbers in 14 DEA investigations. These separate investigations in part have involved the distribution of kilogram quantities of cocaine and large quantities of marijuana. One of the most recent investigations involves TARGET SUBJECT AUSTIN ROBERTS. A review of toll records for ROBERTS's telephone has revealed contact with that same number, (213) 346-9480.

(3) During the period from on or about December 22, 2008, through on or about February 12, 2009, TARGET CELLPHONE #1 made or received 328 calls with telephone number

(410) 302-9866, subscribed to Raymond Robinson, 707 Belgian Avenue, Baltimore, Maryland and utilized by TARGET SUBJECT RAINBOW WILLIAMS. The most recent such call occurred on or about February 12, 2009. As more fully described above, WILLIAMS has been identified by CS1 as a drug trafficker, an underling of TARGET SUBJECT GREGORY FITZGERALD, and a loyal follower of ERIC BROWN and BGF. CS1 stated that FITZGERALD is responsible for handling the shipments of drugs that come into the Baltimore area for BGF and in turn WILLIAMS is responsible for the local distribution of the drugs. During the course of this investigation investigators have had the opportunity to review controlled and recorded prison calls from the Roxbury Correctional Institution involving RAINBOW WILLIAMS and members of BGF. During at least one of these conversations WILLIAMS, while speaking on (410) 302-9866, is heard answering a second telephone in the background. When the caller inquired about the telephone heard in the background, WILLIAMS explained that he has three telephones that he utilizes. Based on my training and experience, it is common for a drug trafficker to utilize more than one telephone. Often, large scale drug traffickers utilize one phone for their customers, one phone for the source of supply, and a third as an everyday telephone. This commonly is done so that if a customer is arrested by law enforcement and

cooperates against their supplier they can only provide one telephone number. This allows the identity of the source of supply to remain unknown.

(4) During the period from on or about December 22, 2008, through on or about February 12, 2009, TARGET CELLPHONE #1 made or received 226 calls with telephone number (410) 687-3114, subscribed to and utilized by TARGET SUBJECT DEITRA DAVENPORT. The most recent such call occurred on February 12, 2009. In addition, during the period from on or about December 22, 2008, through on or about February 9, 2009, TARGET CELLPHONE #1 made or received 85 calls with telephone number (410) 402-3236, subscribed to and utilized by TARGET SUBJECT DEITRA DAVENPORT. The most recent such call occurred on or about February 9, 2009. According to corrections officials at the Maryland Correctional Training Center, DAVENPORT has been described by cooperating BGF inmates as a drug courier for ERIC BROWN. The cooperating individuals stated that DAVENPORT would conduct "drops" of drugs and the collection of drug proceeds with individuals who were smuggling drugs into the prison system in Hagerstown. This activity occurred while BROWN was incarcerated in Hagerstown. During recent recorded prison conversations between TARGET SUBJECTS THOMAS BAILEY and ERIC BROWN, it was learned that DEITRA DAVENPORT, referred to as "Sister D," is

responsible for the distribution and collection of proceeds stemming from the sale of the "Black Book."

(5) During the period from on or about December 25, 2008, through on or about February 5, 2009, TARGET CELLPHONE #1 made or received four calls with telephone number (443) 310-9570, with no subscriber information available but utilized by TARGET SUBJECT RAY OLIVIS, a/k/a RONNIE HARGROVE, a/k/a UNCLE RAY, a/k/a UNC, a/k/a RAY RAY. The most recent such call occurred on February 5, 2009. During recent months, corrections officers at the WCI had the opportunity to interview a cooperating inmate who is an active BGF member. The cooperating inmate, identified above as CS5, stated that OLIVIS is a high-ranking member and one of the founders of the BGF in Maryland. As indicated above, OLIVIS is currently incarcerated at the Maryland Training Center in Baltimore. As more fully described above, CS5 advised that OLIVIS is coordinating activities throughout the Maryland prison system by utilizing cellular telephone (443) 310-9570. CS5 stated that two other high-ranking BGF members assisting OLIVIS are ERIC BROWN and GENE LNU. Currently, ERIC BROWN is utilizing cellular telephone (410) 206-6980, TARGET CELLPHONE #1, and GENE LNU is utilizing cellular telephone (443) 980-6157, to further the activities of BGF.

(6) During the period from on or about

December 23, 2008, through on or about February 11, 2009, TARGET CELLPHONE #1 made or received 25 calls with telephone number (443) 980-6157, subscribed to Mark Campbell, 13 Primrose Court, Parkville, Maryland, and utilized by TARGET SUBJECT GENE LNU. The most recent such call occurred on February 11, 2009. As indicated above, CS5 has identified GENE LNU as a BGF leader and has identified (443) 980-6157 as a number used by GENE LNU in furtherance of BGF activities.

(7) During the period from on or about December 23, 2008, through on or about February 7, 2009, TARGET CELLPHONE #1 made or received 116 calls from approximately 15 separate telephone numbers subscribed to the Maryland Department of Corrections. The most recent such call occurred on February 7, 2009. During at least two of these calls, on December 25, 2008 and January 6, 2009, TARGET SUBJECT THOMAS BAILEY, who is incarcerated at NBCI, made contact with TARGET SUBJECT ERIC BROWN over TARGET CELLPHONE #1. Those calls were recorded over the prison recording system and reflected on the pen register for TARGET CELLPHONE #1.

(8) During the period between on or about January 30, 2009 and on or about February 7, 2009, TARGET CELLPHONE #1 made or received approximately 15 calls to or from telephone numbers assigned to the Maryland Department of

Corrections at 7943 Brockbridge Road, Jessup, Maryland. On February 7, 2009, TARGET CELLPHONE #1 made and/or received one call from (410) 799-9286, assigned to the Maryland Correctional Institute for Women in Jessup, Maryland. A review of the Maryland prison phone system revealed that TARGET CELLPHONE #1 is listed on the inmate calling list for SEDRENA FINLEY under the name "Eric." A review of DEA databases revealed that FINLEY was arrested in October 2003 while in the possession of two kilograms of cocaine and 15 ecstasy tablets. On May 17, 2004, FINLEY pled guilty to charges arising from that offense and was sentenced to 10 years in prison. According to corrections officials, FINLEY has been housed at the Maryland Correctional Institute for Women in Jessup, Maryland.

**TARGET CELLPHONE #2**

73. The DEA and Baltimore Police obtained a pen register on TARGET CELLPHONE #2 beginning on or about January 7, 2009, which remains active. Based on an analysis of the pen register and toll records for TARGET CELLPHONE #2, I have learned the following:

a. During the period from on or about January 7, 2009 through on or about February 17, 2009, TARGET CELLPHONE #2 made and received approximately 1,996 calls, an average of 49 calls per day. The vast majority of these calls, approximately

1,661, were under one minute. Based on my training and experience, this unusually high volume of incoming and outgoing calls, along with their brief duration, is consistent with telephone use by narcotics traffickers.

b. TARGET CELLPHONE #2 made calls to, and received calls from, telephone numbers that are known to be associated with or involved in narcotics-trafficking, including calls to and from other TARGET SUBJECTS, as specified below:

(1) During the period between on or about January 14, 2009 and on or about January 22, 2009, TARGET CELLPHONE #2 made or received approximately 23 calls to or from telephone number (213) 346-9480, subscribed to the L.A. County Sheriff's Department, 441 Bauchet Street, Los Angeles, California, which is believed to be an inmate-accessible telephone in a correctional facility in Los Angeles County (this same number was contacted by TARGET CELLPHONE #1 (see above)). The most recent such call occurred on or about January 22, 2009. Law enforcement has learned that BGF was established in the prison system in California. As a result, I believe, based upon my training and experience, that FITZGERALD is attempting to contact other members of BGF who are currently incarcerated in Los Angeles, California. Furthermore, law enforcement has learned that telephone number (213) 346-9480 has been in contact

with target numbers in 14 DEA investigations. These separate investigations, in part, have involved the distribution of kilogram quantities of cocaine and large quantities of marijuana. One of the most recent investigations involves TARGET SUBJECT AUSTIN ROBERTS. A review of toll records for ROBERTS's telephone has revealed contact with that same number, (213) 346-9480.

(2) As indicated above, on or about January 8, 2009, TARGET CELLPHONE #2 made or received approximately one call to or from telephone number (443) 414-0627, subscribed to Dwayne Flowers at 2119 Homewood Avenue, Baltimore, Maryland and utilized by TARGET SUBJECT AUSTIN ROBERTS (this same number was contacted by TARGET CELLPHONE #1 (see above)). As more fully described above, ROBERTS has been identified as a drug partner of FITZGERALD and as an active member of BGF. DEA agents identified 2417 E. Fayette Street, Baltimore, Maryland as a residence frequented by ROBERTS. Utilities for that residence are in the name of TARGET SUBJECT ANGELA JOHNSON. A review of the pen register for TARGET CELLPHONE #2 revealed contact to telephone number (443) 413-1179, subscribed to ANGELA JOHNSON at 2417 E. Fayette Street and believed to be the replacement cellphone for (443) 414-0627, beginning on January 8, 2009, the day ROBERTS stopped using (443) 414-0627, and continuing as recently as January 11, 2009.

(3) During the period from on or about January 11, 2009 through on or about January 25, 2009, TARGET CELLPHONE #2 made or received at least four calls from four separate telephone numbers subscribed to the Maryland Department of Corrections. The most recent such call occurred on or about January 25, 2009. Based on previous conversations between TARGET SUBJECT THOMAS BAILEY, who is incarcerated at NBCI and TARGET SUBJECT GREGORY FITZGERALD, law enforcement believes that the two are still in contact for the purpose of smuggling drugs into the prison. For instance, as more fully described above, on December 28, 2008, BAILEY, utilizing a recorded prison phone in NBCI, made contact with TARGET SUBJECT GREGORY FITZGERALD over TARGET CELLPHONE #2 to discuss smuggling drugs into the prison.

(4) During the period from on or about January 8, 2009, through on or about February 12, 2009, TARGET CELLPHONE #2 made or received 72 calls with telephone number (443) 255-7497, subscribed to by TARGET SUBJECT ANTWAN PEAKS at 2102 Maryland Avenue, Apartment 1R, Baltimore, Maryland. The most recent such call occurred on or about February 12, 2009. According to confidential sources assisting corrections officers inside of the Department of Corrections, PEAKS has been identified as an active member of BGF who is currently incarcerated. An inquiry into PEAKS's criminal history revealed

convictions for three separate counts of possession with intent to distribute a controlled substance, robbery with a deadly weapon, and three counts of possession of a controlled substance. PEAKS was arrested on October 22, 2008 and is currently pending possession of a controlled substance charges in the state of Maryland.

(5) On or about January 17, 2009, TARGET CELLPHONE #2 made or received one call with telephone number (410) 302-9866, subscribed to Raymond Robinson, 707 Belgian Avenue, Baltimore, Maryland and utilized by TARGET SUBJECT RAINBOW WILLIAMS. As more fully described above, WILLIAMS has been identified as a drug trafficker, an underling of TARGET SUBJECT GREGORY FITZGERALD, and a loyal follower of ERIC BROWN and BGF.[16]

---

16 As noted above, on or about January 23, 2009, FITZGERALD was arrested for violations of the narcotics laws. On January 24, 2009, FITZGERALD was released on $500,000 bail. On or about January 27, 2009, FITZGERALD requested that Sprint/Nextel change the telephone number for TARGET CELLPHONE #2 from (410) 361-0114 to a new number, and Sprint/Nextel assigned TARGET CELLPHONE #2 the call number (410) 361-0046. The IMSI number of that phone remained the same. Based on my training and experience in drug-trafficking investigations, I know that drug traffickers frequently change their cellular telephone numbers to evade law enforcement detection and/or to interfere with law enforcement investigations. A review of the pen register data indicates that the old call number assigned to TARGET CELLPHONE #2 and the new call number assigned to TARGET CELLPHONE #2 are in contact with common numbers. For instance, as indicated above, the old and new call numbers for TARGET CELLPHONE #2 made or received a total of 72 calls to or from telephone number (443) 255-7497,

**COMMON CALLS: TARGET CELLPHONES #1 AND #2**

74. As noted above, TARGET CELLPHONE #1 and TARGET CELLPHONE #2 have contact with some of the same numbers. A review of the pen registers on both lines conducted on or about February 10, 2009 revealed that TARGET CELLPHONE #1 and TARGET CELLPHONE #2 contact 10 numbers in common. TARGET CELLPHONE #1, however, contacts 392 numbers other than the 10 in common with TARGET CELLPHONE #2. Likewise, TARGET CELLPHONE #2 contacts 176 numbers other than the 10 in common with TARGET CELLPHONE #1. Further, a review of the approved calling lists supplied by corrections officials shows that TARGET CELLPHONE #1 is listed as an approved contact number for TARGET SUBJECTS MALIK RAHEEM, JOHNATHAN BRAVERMAN, THOMAS BAILEY, MARK WILLIAMS, and SEDRENA WILLIAMS, while TARGET CELLPHONE #2 is listed as an approved contact number for TARGET SUBJECTS ANTHONY BRUCE, ERNEST RILEY, THOMAS BAILEY, MICHAEL ROSS, and ANTWAN PEAKS. Based upon my training and experience, I am aware that BGF utilizes a military-style rank structure and a compartmentalized hierarchy, which permits only certain members to speak with the command structure. Accordingly, it is my opinion that the interception of both TARGET CELLPHONE #1 and TARGET CELLPHONE #2 are necessary to reveal fully the scope of the conspiracy.

---

subscribed to by TARGET SUBJECT 76ANTWAN PEAKS.

## II. ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED OR APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A NEED FOR THE INTERCEPTION OF COMMUNICATIONS OVER THE TARGET CELLPHONES

75. I am not aware of any other investigations targeting the activities of this group of BGF leaders and members in the Baltimore area. The purpose of this joint federal-local investigation is to identify, locate, and arrest the leaders and members of BGF. In addition, it is the purpose of this investigation to identify the organization's suppliers and the means by which the organization obtains and receives narcotics, and to determine how the organization processes and launders narcotics proceeds. Interception of wire communications over the TARGET CELLPHONES will provide valuable evidence against the TARGET SUBJECTS. It is only through the interception of such communications that the agents expect to identify fully the targets who have been partially identified thus far, and fully realize the objectives of this investigation. As indicated below, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives:

**Confidential Informants**

a. As indicated above, this investigation has usefully employed confidential informants. Each of these

confidential informants continues to provide information regarding BGF on a limited basis. None of these informants are in a position to make controlled purchases of narcotics from FITZGERALD or other higher-level members of the organization. While some of these sources have been able to speak to and meet with some of the TARGET SUBJECTS, including ERIC BROWN and GREGORY FITZGERALD, these informants would not be available to testify at trial because of significant safety risks to themselves and their families. Moreover, these informants have not met or identified all of the TARGET SUBJECTS. Further, because this organization is spread throughout the United States I do not expect the informants to meet all of the targets of this investigation, and I believe that the interception is required to identify and locate members of the organization whom the informants will never meet. Moreover, based on my training and experience, I know that the highly compartmentalized manner in which large-scale narcotics traffickers do business makes it impossible for any single source to learn the identities and roles of all of the persons engaged in a drug-dealing operation. For instance, the informants have no contact with FITZGERALD's sources of supply; the informants do not know the manner in which FITZGERALD obtains the organization's narcotics; all of the locations where the organization cuts and packages its narcotics

for street-level sales; the location(s) where the organization stores its narcotics before having it delivered to customers; or the location(s) where the organization stores its drug proceeds.

**Undercover Officers**

b. The use of Undercover Officers (UC) is also not a useful technique in this investigation. UCs can at most make small purchases from downstream customers of the organization, not from FITZGERALD or other higher-level members of the organization. This is based partly on the fact that the majority of the customers are BGF members or BGF affiliates. As a result, the use of undercover agents is not likely to provide further access to members of the organization, and it does not appear that these UC's could penetrate the organization beyond merely purchasing drugs at the street level. Even if a CS could make and introduction to members of the organization, based on my training and experience, narcotics traffickers are generally reluctant to speak freely with individuals outside the organization specifically with non BGF members. I therefore do not expect these undercover agents, if used, to have any contact with the TARGET SUBJECTS beyond those that will be had by the informants. In any event, given the apparent violent nature of the organization at issue, I believe that any attempted infiltration of the TARGET SUBJECTS' operations by an undercover

agent would present extreme and unacceptable dangers to the life of the undercover agent.

**Physical Surveillance**

c. Physical surveillance of some activities of the TARGET SUBJECTS has been possible. Law enforcement officers have attempted surveillance of the TARGET SUBJECTS on countless occasions, most recently in January 2009. However, the ability of law enforcement officers to conduct such surveillance has been extremely limited because the TARGET SUBJECTS have proven to be extremely surveillance-conscious and the fact that TARGET SUBJECT ERIC BROWN is incarcerated. In regards to TARGET SUBJECT GREGORY FITZGERALD, law enforcement officers have been forced to terminate surveillance on several occasions because one or more of the TARGET SUBJECTS drove their vehicle in such a reckless manner that the continued attempt to follow the TARGET SUBJECT could have put the officers and citizens in harms way. Specifically, on January 29, 2009, surveillance was conducted on TARGET SUBJECT FITZGERALD. During the course of that surveillance FITZGERALD drove his vehicle in "rush hour" traffic at a speed well over the posted speed limit. In doing so, FITZGERALD crossed over two separate multi-lane intersections causing agents to terminate the surveillance for their safety and the safety of the citizens. In addition, based on the fact that

the organization is spread throughout the country it would be more difficult to conduct physical surveillance of their activities. It is likely that the TARGET SUBJECTS will only become more surveillance-conscious in the future. This surveillance consciousness has complicated efforts to locate and identify the TARGET SUBJECTS. Physical surveillance is therefore unlikely to succeed in furthering the goals of this investigation. If the intensity of existing surveillance were to be increased, and if the subjects of this investigation became further alerted to the existence of such surveillance, the result might be the temporary cessation of their illegal activities or a change in their instrumentalities or methods at a critical point in the investigation. As noted above, the information that can be obtained from the interceptions for which authorization is sought herein will help law enforcement agents to determine the identities of the subjects involved and to track their activities, thereby enhancing the prospects for fruitful physical surveillance. In addition, with the knowledge provided beforehand by these interceptions that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, thus minimizing the risks of discovery inherent in following subjects or remaining at target locations for long periods of time. Finally, increasing

the intensity of physical surveillance will increase the likelihood that the TARGET SUBJECTS will become aware of this investigation, thereby jeopardizing the lives of the informants. This concern over the well-being of confidential informants is particularly acute in this case, given the violent nature of the organization at issue.

**Telephone Toll Records/Pen Registers**

d. Telephone toll records are being used in this investigation but have provided and will continue to provide only limited information. These records do not enable law enforcement officers to identify with certainty the persons involved in the conversations or the significance of the communications in the context of ongoing narcotics trafficking activity. In the current climate of obtaining cellular telephones, companies are allowing persons to purchase cellular telephones with or without providing accurate subscriber, billing or user information. It is a common practice for drug traffickers to purchase a cellular telephone in the name of a nominee or through a company that sells cellular telephones which can be activated without having to provide a name or address for the user. For example in the month of January 2009, I purchased a cellular telephone for operational purposes in an ongoing investigation. In fact, the phone I purchased was an AT&T Pay As You Go phone. I was able to

activate the cellular telephone over a landline without providing any subscriber or user information thereby allowing the telephone to be used without identifying the user. With this ongoing practice by the cellular telephone companies it has become extremely difficult to verify the users of cellular telephones in wire related drug investigations. At best, toll and pen register data shows contact between two communication devices. Without the content of the conversations, I cannot definitively say who is using the particular communication device. Finally, some of the TARGET SUBJECTS in this investigation are incarcerated. And despite the inmates' jail phone system's supposed capability of disconnecting callers, who make third-party calls, the TARGET SUBJECTS continually speak to each other through the use of a third party outside the institution. This use of a third party, like an operator, prevents the pen register from accurately indicating, which communication devices are actually connected rendering the use of pen register and toll data almost useless.

**Grand Jury/Interviews of Witnesses**

e. Use of a federal grand jury does not appear to be a promising method of investigation. Witnesses who could provide additional relevant evidence to a grand jury have not been identified, and, even if identified, would themselves be participants in the narcotics-trafficking activities under

investigation. Such individuals would face prosecution themselves, and it is unlikely therefore that any of them would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony. Immunizing them could thwart the public policy that they be held accountable for their crimes. The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation. For similar reasons, conducting interviews at this point in the investigation would not be successful in obtaining evidence of the criminal activities under investigation. Only the individuals who participate in the criminal conversations or transactions are knowledgeable of their contents, making these individuals subjects of this investigation. It has been my experience, and the experience of other agents and law enforcement officers involved in this investigation, that interviews with individuals who are involved in the sale and distribution of narcotics are not productive. These individuals do not wish to disclose their own criminal activity, and do not wish to implicate others, due to fear for their own safety, and/or a loyalty to other subjects of this investigation. Interviews and grand jury subpoenas seem particularly inappropriate in this case, which involves a violent

organization whose members are extremely unlikely to incriminate each other and in some cases already serving significant prison sentences.

**Search Warrants**

f. Search warrants have, to date, not proven to be a viable option at this stage of the investigation. Among other things, investigators have been unsuccessful in developing sufficient, fresh probable cause for search warrants at locations used by the organization. It is only through the interception sought herein that law enforcement officers will be able to learn the timing of narcotics deliveries, the location(s) where the narcotics are stored, and the identities of all of the individuals responsible for delivering, processing, and packaging the narcotics for retail sale. In addition, it is only through the requested interception that law enforcement officers will be able to determine how the proceeds of this narcotics-trafficking activity are laundered or otherwise transferred to FITZGERALD and BROWN or others in his organization. Finally, search warrants would not in any event reveal the names or identities of other high-ranking members of the organization who are as yet unidentified. Members not present at the particular location during the execution of any search warrant would have a viable

defense against prosecution, and the mere execution of the warrant would disclose the investigation.

**Arrests/Seizures**

g. To date, FITZGERALD has been arrested on discrete drug charges, and BROWN is incarcerated at MTC but neither has cooperated with law enforcement regarding the larger organization. Law enforcement has been unable to develop sufficient evidence to charge any other members of the organization with narcotics-trafficking or other offenses and, even so, arrests of members of the organization are unlikely to yield sufficient evidence to charge the TARGET SUBJECTS or other higher-ranking members through the development of cooperating witnesses or otherwise. The wiretap will provide the command and control conversations necessary to effectively dismantle the entire operation by demonstrating the conspiratorial aspect of this organization.

**Trash Runs**

h. I am aware that a usually effective investigative technique is to pull the trash from a suspected stash location or house and ascertain whether any contraband has been discarded, which could lead to probable cause to search the suspected location. In this investigation, however, trash runs will not meet the objectives of the investigation. First, the

trash run would supply probable cause to search only the location. Without arresting all the members of the organization inside the premises with the narcotics, several members of the organization could claim that they were completely unaware of the nature and/or use of the location. Further, as noted above, the members of this organization are extremely surveillance conscious and may be alerted by a trash pull at any particular location. Additionally, as noted above TARGET SUBJECT ERIC BROWN is incarcerated at MTC. TARGET SUBJECT GREGORY FITZGERALD resides in a large apartment complex which utilizes dumpsters for trash removal. Only on the occasion that surveillance would be in a position to observe FITZGERALD place his trash into a dumpster would a trash run yield any evidence in the ongoing criminal enterprise. On several occasions during the months of December 2008 and January 2009 stationary surveillance has been conducted at the residence of FITZGERALD which has yielded negative results.

**MINIMIZATION**

76. As stated earlier, this case is being investigated by the DEA and the BPD. It is anticipated that during the period of interception, all monitoring will be performed by Special Agents of the DEA and officers from the BPD and will be supervised by Special Agents of the DEA.

77. All monitoring of wire communications over the TARGET CELLPHONES will be minimized in accordance with Chapter 119 of Title 18, United States Code.

78. The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of wire and oral communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges. In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that no TARGET SUBJECTS or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If an interception is minimized, monitoring agents shall spot check to ensure that the conversation has not turned to criminal matters.

79. It is requested that the order provide that, if necessary, translators be authorized to assist in conducting this electronic surveillance and to receive disclosure of intercepted communications. It may be necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications. All such translators will be under contract to the DEA and will be directly supervised by the DEA and deputized law enforcement officers of the BPD. It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

**AUTHORIZATION REQUEST**

80. Based on the foregoing, it is my opinion that the interception of communications occurring over the TARGET CELLPHONES, as specified above, is essential to uncover the full scope of the illegal activity described herein. Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not

terminate when the sought communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier. The 30-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days from the date of this Court's Order.

81. In addition, for the reasons set forth above, there are specific and articulable facts showing that there are reasonable grounds to believe that cell-site location information is relevant and material to this ongoing criminal investigation. Therefore, pursuant to 18 U.S.C. §§ 2703(c) and (d) and 3121 et seq., it is requested that the Court's Order also direct AT&T and Sprint/Nextel to provide the DEA with originating and terminating cell-site location information, i.e., cell-site information concerning the physical location of antenna towers associated with the beginning and termination of calls to and from the TARGET CELLPHONES. This information is being sought only for the TARGET CELLPHONES.

82. It is further requested, pursuant to Federal Rule of Criminal Procedure 41, that the Court issue an Order directing AT&T and Sprint/Nextel to assist agents of the DEA by providing all information, facilities and technical assistance needed to

ascertain the physical location of the TARGET CELLPHONES, including but not limited to data indicating the specific latitude and longitude of (or other precise location information concerning) the TARGET CELLPHONES (the "Requested Location Information"),[17] for a period of thirty (30) days. As explained in more detail in the Affidavit, there is probable cause to believe that the location of the TARGET CELLPHONES at times determined by investigators will constitute or lead to evidence of the SUBJECT OFFENSES. In light of the above, the government requests that this Court direct AT&T and Sprint/Nextel to disclose the Requested Location Information concerning the TARGET CELLPHONES, and to initiate a signal to determine the location of the TARGET CELLPHONES on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of the TARGET CELLPHONES, at any

17 Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the TARGET CELLPHONES at the start and end of any call. In requesting cell site information, the government does not concede that such cell site records - routinely retained by wireless carriers as business records - may only be obtained via a warrant issued on probable cause. See In re Application, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (authorizing prospective acquisition of cell-site records under combined authority of 18 U.S.C. 2703(d) & 3121 et seq.).

time of day or night, owing to the potential need to locate the TARGET CELLPHONES outside of daytime hours. It is further requested that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of 30 days after the termination of the authorized period for acquisition of the Requested Location Information.

83. It is also requested, pursuant to 18 U.S.C. §§ 2703(c) and (d), that the Court issue an Order directing that AT&T and Sprint/Nextel and any other telecommunications-related carrier provide the DEA with subscriber information (published, nonpublished or unlisted) and billing information, including the names, addresses, and customer service records of the subscribers, for any numbers dialed and pulsed from and to the TARGET CELLPHONES during the period for which interception is authorized. The investigation described above is continuing, and there exist specific and articulable facts showing that there are reasonable grounds to believe that the information being sought is relevant and material to the ongoing investigation. For the reasons set forth above, that information is needed to help identify other TARGET SUBJECTS and others involved in the distribution of narcotics by the BGF organization.

84. Pursuant to the provisions of Title 18, United States Code, Sections 2518(4), it is requested that it be ordered that AT&T and Sprint/Nextel, the ultimate service provider for TARGET CELLPHONE #1 and TARGET CELLPHONE #2, respectively, and any other service providers, furnish the technical assistance necessary to accomplish the interception (including the interception of communications occurring while the TARGET CELLPHONES are in Direct Connect/Dispatch Services mode) unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all dial digits -- including all incoming and outgoing calls -- pen register information, and audio interception capability whether the cellular telephone is in roaming mode or otherwise). The assistance of this provider is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

85. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

Detective William Nickoles
Detective, Baltimore Police Department
Task Force Officer, DEA

Sworn to before me this 20 day of February, 2009 at 9:45 a.m. hours.

UNITED STATES DISTRICT JUDGE

2/20/09

By Deputy



W0504