**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR CONTINUED AUTHORIZATION TO INTERCEPT WIRE COMMUNICATION OCCURRING OVER THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 691-7845 [formerly (410) 245-2435] AND BEARING IMSI #310410216356569 | * * * * * * * * | SEALED<br>Misc. No. 09-40 |

**************

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR CONTINUED AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS**

WILLIAM NICKOLES, a Detective with the Baltimore Police Department and a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, states:

**INTRODUCTION**

1. I am an "investigative or law enforcement officer[s] ... of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am a Detective with the Baltimore Police Department and have been so employed since 1992. I have been deputized as a Task Force Officer with the DEA for approximately

nine (9) years. I am currently assigned to the DEA's Special Investigations Group (DEA SIG), which investigates large-scale narcotics trafficking organizations in the Baltimore area. During my time as a law enforcement officer, I have participated in numerous investigations of unlawful drug distribution involving the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, narcotics proceeds, and narcotics paraphernalia. I have reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and money laundering. I have examined records consisting in part of buyers and seller's lists, and pay/owe ledgers. I have interviewed drug dealers, users and confidential informants and have discussed with them the lifestyles, appearance and habits of drug dealers and users. Through training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which narcotics traffickers use

telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

3. I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications occurring over the cellular telephone assigned call number **(443) 691-7845** [formerly (410-245-2435][1] and bearing international mobile subscriber identity ("IMSI") #310410216356569 ("TARGET CELLPHONE #1"), subscribed to Deitra Davenport at 5637 Utrecht Rd, Baltimore, Maryland and used by ERIC BROWN, a/k/a "Dee Brown," a/k/a "E," a/k/a "EB," with service provided by AT&T[2] (hereinafter "TARGET CELLPHONE")

4. There is probable cause that the TARGET SUBJECTS and others known and unknown are committing the following offenses enumerated in 18 U.S.C. § 2516:

---

1 On March 19, 2009, the call number assigned to TARGET CELLPHONE #1 was changed at the request of the subscriber, to (443) 691-7845, the IMSI# remained the same.

2 The original authorization to intercept wire communication was for a cellular telephone assigned call number **(410) 206-6980**. On February 23, 2009, it was learned that on February 13, 2009, the cellular telephone assigned call number **(410) 206-6980** had been changed to **(410) 245-2435**, the IMSI# remained the same.

a. 18 U.S.C. § 1962 (RICO) by conducting the affairs of an "enterprise," as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact, although not a legal entity, to wit, the named interceptees and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity consisting of acts involving murder, in violation of Maryland Code, Criminal Law §§ 2-202, 2-204, and 2-205 and the Common Law of Maryland punishable pursuant to Maryland Code, Criminal Law §§ 1-201, 1-202; extortion, in violation of Maryland Code, Criminal Law § 3-701; and the violations of federal law set forth in (b) and (c) below;

b. 21 U.S.C. §§ 841 and 846 (narcotics trafficking); and

c. 21 U.S.C. § 843 (use of communication facility); and

d. 18 U.S.C. § 1959 (violent crimes in aid of racketeering).[3]

5. I respectfully submit that there is probable cause to believe that these offenses have been committed, are being

---

3 Although not a predicate offense under 18 U.S.C. § 2516, there is probable cause to believe that the subjects of this investigation have aided and abetted and are aiding and abetting those substantive offenses, in violation of 18 U.S.C. § 2.

committed, and will continue to be committed by persons who are the subjects of this investigation, including, among others: KEVIN GLASSCHO, a/k/a "KG," ERIC BROWN, a/k/a "Dee Brown," a/k/a "E," a/k/a "EB," GREGORY FITZGERALD, a/k/a "Joe," THOMAS BAILEY, a/k/a "Fat Face," a/k/a "Corey," RAY OLIVIS, a/k/a "Ronnie Hargrove," a/k/a "Uncle Ray," a/k/a "Unc," a/k/a "Ray Ray," RAINBOW WILLIAMS, AUSTIN ROBERTS, a/k/a "Yellow," HASSAN WASHINGTON, ANTHONY BRUCE, a/k/a "Silk," a/k/a "Soldier," KEVIN DUDLEY, a/k/a "Kev-Bo," DARYL MOORE, a/k/a "Nutty Bar," ROBERT NEDD, a/k/a "Pizza," GENE LNU, DEITRA DAVENPORT, a/k/a "Sister D," KIM MCINTOSH, a/k/a "Bonita Kim," RANDY TERRY, RICH MCDONALD, REGGIE KING, a/k/a "Lord Shabazz," RODNEY RUSSELL, RODNEY LEE-EL, SHAWN WYCHE, MALIK RAHEEM, TYRONE ISSAC POWELL, CURTIS LNU, a/k/a "Curt," TYSHAWNA LNU, DEMETRE COUSER, ASHLEY SCARROW, a/k/a "Ashley Sparrow," ANGELA JOHNSON, ALFRED JOHNSON, a/k/a "Tater," MARK WILLIAMS, SEDRENA WILLIAMS, ERNEST RILEY, MICHAEL ROSS, ANTWAN PEAKS, JOHNATHAN BRAVERMAN, SEDRENA FINLEY, TAKEVIA SMITH a/k/a "Kiki," BRIDGET ALSTON SMITH, MARLOW BATES, FNU LNU, a/k/a "Crazy," FNU RHODES, JOE EDISON, a/k/a "Outlaw," MELVIN WILLIAMS, a/k/a "Little Melvin," MARVIN GARDNER, EVERETT GLASSCHO, MAKIDA TATE, JAMES HOLMES, a/k/a "Shakey," TOMEKA HARRIS, MUSSHEETAH HABEEBULLAH, FNU LNU, a/k/a "Zack," FNU LNU, a/k/a "Randolph," FNU LNU, a/k/a "Pig," FNU LUN, a/k/a "Gotti," FNU LNU, a/k/a "Big

Head Charlie," a/k/a "Chuck," FNU LNU, a/k/a "Bones," FNU LNU, "Jersey," and others as yet unidentified (the "TARGET SUBJECTS"). The requested Order is sought for a period of time until the requested interceptions fully reveal the identity of and manner in which the TARGET SUBJECTS engage in the above-described offenses, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518(5). Pursuant to Section 2518(5) of Title 18, United States Code, it is further requested that the 30-day period be measured from the date of this Court's Order.

6. The instant investigation is being conducted by the DEA and the Baltimore Police Department (BPD). I have personally participated in this investigation and make this affidavit based on my personal participation in this investigation and based on reports made to me by other law enforcement agents, as well as confidential informants discussed in more detail below. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom

other law enforcement officers or I have spoken or whose reports I have read and reviewed. Such statements are reported in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

7. As more fully described in Section II of this affidavit, in developing the evidence needed to prosecute the above-described federal offenses, normal investigative procedures have either been tried to no avail, reasonably appear unlikely to meet with success if tried, or are too dangerous to employ.

8. Because this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching the conclusion that orders should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications.

**SUBJECTS AND OFFENSES**

9. Based upon my knowledge of the facts and circumstances of the present investigation, it is alleged that

there is probable cause to believe that the TARGET SUBJECTS and others as yet unknown, have committed, are committing, and will continue to commit the following offenses enumerated in 18 U.S.C. § 2516:

a. 18 U.S.C. § 1962 (RICO) by conducting the affairs of an "enterprise," as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact, although not a legal entity, to wit, the named interceptees and others, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity consisting of acts involving murder, in violation of Maryland Code, Criminal Law §§ 2-202, 2-204, and 2-205 and the Common Law of Maryland punishable pursuant to Maryland Code, Criminal Law §§ 1-201, 1-202; extortion, in violation of Maryland Code, Criminal Law § 3-701; and the violations of federal law set forth in (b) and (c) below;

b. 21 U.S.C. §§ 841 and 846 (narcotics trafficking); and

c. 21 U.S.C. § 843 (use of communication facility); and

d. 18 U.S.C. § 1959 (violent crimes in aid of racketeering).[4]

**THE DESIGNATED CELLULAR TELEPHONES**

10. There is probable cause to believe that the TARGET CELLPHONE will be used during the period of interception applied for herein by the TARGET SUBJECTS and others as yet unknown, in order to accomplish, to discuss, and to commit the offenses described above.

11. There is probable cause to believe that these communications will reveal: (i) the nature, extent and methods of operation of the racketeering and narcotics trafficking activities of the TARGET SUBJECTS and others as yet unknown or unidentified; (ii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators and participants in their illegal activities, including the sources of supply of the controlled substances, as well as the distributors and purchasers of such controlled substances; (iii) the quantities and types of controlled substances involved in

4 As mentioned above, although not a predicate offense under 18 U.S.C. § 2516, there is also probable cause to believe that the subjects of this investigation have aided and abetted and are aiding and abetting those substantive offenses, in violation of 18 U.S.C. § 2.

this conspiracy; (iv) the degree of participation and roles of all co-conspirators in this conspiracy; (v) the addresses and telephone numbers of all participants, so that the location of any criminal activity related to or resulting from this conspiracy to distribute controlled substances can be determined; (vi) all details about the manner of shipment or movement of controlled substances; (vii) methods of eluding law enforcement detection; (viii) the nature and scope of the drug activity; (ix) the locations of contraband and of items used in furtherance of those activities, including the location of all "stash" houses at which these controlled substances are stored; (x) the location and source of resources used to finance this illegal activity, and the location, movement and disposition of proceeds from this illicit drug activity; (xi) the times, dates, and locations of meetings at which persons involved in this conspiracy pick up drugs, exchange money, and meet to discuss the progress of the drug trafficking operation; (xii) the existence and locations of records of the drug trafficking operation; (xiii) the identification of communication devices or telephone instruments used by the TARGET SUBJECTS and others yet unknown, to further their illegal activities; and (xiv) other evidence necessary for the successful prosecution of the above-described participants and others as yet unknown. In addition, these wire

communications are expected to constitute admissible evidence of the commission of the offenses described above.

12. I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack. The cellular telephone system divides the Baltimore metropolitan area into many small coverage areas, which are called "cells." As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed. The service provider for this phone is considered a personal communication service provider (PCS). It is requested that the authorization apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers of the TARGET CELLPHONE, and to any other IMSI numbers accessed through the telephone numbers of the TARGET CELLPHONE within the 30-day period.

13. In connection with the telecommunication companies which provide service for the TARGET CELLPHONE, all interceptions

over the TARGET CELLPHONE will automatically be routed to Baltimore, Maryland, regardless of where the telephone calls are placed to or from. During the requested electronic surveillance, all monitoring will be performed in Baltimore, Maryland, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including Special Agents of the DEA, officers of the BPD, and government employees or individuals operating under a contract with the Government, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

14. Because of the mobility of portable cellular telephones -- which are mobile interception devices -- authorization is requested pursuant to Title 18, United States Code, Section 2518(3) for authorization to intercept communications both within the District of Maryland, and, in the event the TARGET CELLPHONE are transferred outside the territorial jurisdiction of this Court, in any other jurisdiction within the United States. In addition, it is requested that background conversations in the vicinity of the TARGET CELLPHONE while they are off the hook or otherwise in use, also be permitted to be intercepted.

**PRIOR APPLICATIONS**

15. A check of wire and electronic surveillance files maintained by the DEA, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Immigration and Customs Enforcement, and the BPD was completed on or about March 19, 2009. Based on these reviews, I have been informed that there are no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS or over the TARGET CELLPHONES, except as described below.

a. On February 20, 2009, the Honorable J. Frederick Motz, United States District Judge, signed an Order pursuant to Title 18, United States Code, Section 2518, authorizing the Government to intercept wire communications occurring over (a) the cellular telephone assigned call number **(410) 206-6980** and bearing international mobile subscriber identity ("IMSI") #310410216356569 ("TARGET CELLPHONE #1"), subscribed to Deitra Davenport , 5637 Utrecht Road, Baltimore, Maryland, and used by Eric Brown, a/k/a "Dee Brown", a/k/a "E", a/k/a "EB", with service provided by AT&T, and (b) the cellular telephone assigned call number **(410) 361-0046** and bearing IMSI #316010011580887 ("TARGET CELLPHONE #2"), subscribed to Charlene Pearson at 3 Norham Ct Apt I, Baltimore, Maryland, and used by Gregory Fitzgerald, a/k/a "Joe," with service provided by

Sprint/Nextel, including through the use of Sprint/Nextel's Direct Connect/Dispatch Services. On February 23, 2009, it was learned that on February 13, 2009, the call number assigned to TARGET CELLPHONE #1 had been changed to **(410) 245-2435** and that the call number assigned to TARGET CELLPHONE #2 had been changed to **(410) 361-0110**. Accordingly, on February 23, 2009 and February 24, 2009, Judge Motz signed Amended Orders authorizing the interception of wire communications occurring over TARGET CELLPHONE #1 and TARGET CELLPHONE #2 and listing the new call numbers assigned to those cellphones. Interception over TARGET CELLPHONE #1 began on February 23, 2009, and interception over TARGET CELLPHONE #2 began on February 24, 2009. Interception over TARGET CELLPHONE #1 remains active, but interception over TARGET CELLPHONE #2 was terminated on March 3, 2009. Wire communications involving some of the TARGET SUBJECTS have been intercepted pursuant to these Orders.

b. On March 10, 2009, the Honorable J. Frederick Motz, United States District Judge, signed an Order pursuant to Title 18, United States Code, Section 2518, authorizing the Government to intercept wire communications occurring over the cellular telephone assigned call number **(410) 336-0375** and bearing international mobile subscriber identity ("IMSI") #310410186013066 ("TARGET CELLPHONE #3"), subscribed to Raymond

Williams, 123 Main Street, Baltimore, Maryland 21222 and used by RAINBOW WILLIAMS, with service provided by AT&T. Interception pursuant to that Order commenced on March 10, 2009 and remains active. Wire communication involving some of the TARGET SUBJECTS have been intercepted, pursuant to that Order.

c. On March 13, 2009, the Honorable J. Frederick Motz, United States District Judge, signed an Order pursuant to Title 18, United States Code, Section 2518, authorizing the interception and recording of wire communications occurring over the cellular telephone assigned call number **(443) 255-4288** and bearing international mobile subscriber identity ("IMSI") #310410130470002 ("TARGET CELLPHONE #4"), subscribed to Frank Oliver, 264 N. Hilton Street, Baltimore, Maryland and utilized by KEVIN GLASSCHO, a/k/a "KG", with service provided by AT&T, the cellular telephone assigned call number **(443) 452-0505** and Push to Talk number 165*493*2643 and bearing IMSI #316010160765307 ("TARGET CELLPHONE #5"), subscribed to Keon Ball, 4422 Park Heights Ave, Baltimore, Maryland 21215 and utilized by KEVIN GLASSCHO, a/k/a "KG", with service provided by Sprint/Nextel, including through the use of Sprint/Nextel's Direct Connect/Dispatch Services, and the cellular telephone assigned call number **(443) 653-9728** and bearing IMSI #310260872288340 ("TARGET CELLPHONE #6"), subscribed to Nelson Abugo Best

Ambulance, 9411 Philadelphia Rd, Baltimore, Maryland 21237 and utilized by KEVIN GLASSCHO, a/k/a "KG", with service provided by T-Mobile. Interception pursuant to that Order commenced on March 13, 2009, on TARGET CELLPHONES #'s 4 and 5 and remains active. Wire communication involving some of the TARGET SUBJECTS have been intercepted, pursuant to that Order. On March 13, 2009, law enforcement was advised by the provider that service for TARGET CELLPHONE #6 was terminated for alleged fraud on March 11, 2009. As a result, the Order for TARGET CELLPHONE #6 was not executed.

## I. THERE IS PROBABLE CAUSE TO BELIEVE THAT THE TARGET SUBJECTS AND OTHERS AS YET UNKNOWN, WILL USE THE TARGET CELLPHONES IN FURTHERANCE OF THE DESIGNATED CRIMES

### A. Overview

16. As set forth in further detail below and in the Affidavit of WILLIAM NICKOLES in support of the authorizations to intercept wire communications occurring over TARGET CELLPHONE #1 and wire communications occurring over TARGET CELLPHONES #2, dated February 20, 2009 ("the Nickoles Affidavit"), which is attached to this application as Exhibit 3 and incorporated herein by reference, since September 2008 DEA SIG has been conducting an investigation of the "Black Guerilla Family" (BGF), a violent gang that operates in prison facilities and major cities throughout the United States, including in Baltimore, Maryland. BGF is believed to be attempting to take over the illegal drug

trade at multiple locations in Baltimore, Maryland and is committing drug-related acts of violence and extortion schemes as part of its efforts to expand its influence from inside the prison walls to the streets of Baltimore. As more fully described below, some of the identified leaders and members of BGF in Maryland include the following:

a. ERIC BROWN, a/k/a "Dee Brown," a/k/a "E," has been identified as one of the leaders of BGF who is in command of day-to-day operations in the State of Maryland. BROWN is currently incarcerated at the Maryland Training Center (MTC) in Baltimore, Maryland. BROWN has a 1992 conviction for possession with intent to distribute a controlled substance and two 1990 convictions for unlawful manufacture of controlled substances.

b. GREGORY FITZGERALD, a/k/a "Joe," has been identified as one of the leaders of BGF who is responsible for coordinating drug shipments in Maryland. FITZGERALD has a 1989 conviction for murder; convictions in 1986 and 1988 for handgun violations; and a 1985 conviction for possession of a controlled substance. He also was arrested in January 2009 for possession with intent to distribute a controlled substance, which is pending. FITZGERALD is presently on a $500,000 bail for that charge. According to the reports from this arrest, on January 23, 2009, Fitzgerald was observed conducting a drug transaction

and was a passenger in a vehicle that was stopped, and found to contain approximately thirteen ounces of suspected cocaine.

c. THOMAS BAILEY, a/k/a "Fat Face," a/k/a "Corey," has been identified as one of the leaders of BGF, who is incarcerated and responsible for the day-to-day operations inside of North Branch Correctional Institution (NBCI) in Cumberland, Maryland. BAILEY has a 1997 conviction for possession with intent to distribute a controlled substance; a 1998 conviction for murder; and a 1999 conviction for assault.

d. RAY OLIVIS, a/k/a "Ronnie Hargrove," a/k/a "Uncle Ray," a/k/a "Unc," a/k/a "Ray Ray," has been identified as one of the founding members and leaders of the BGF movement in Maryland. OLIVIS is currently incarcerated at MTC in Baltimore, Maryland and is serving a five year sentence. OLIVIS has a 1979 conviction for assault, a 1987 conviction for robbery with a deadly weapon, a 1990 conviction for felony theft, a 2001 conviction for burglary, a 2004 conviction for possession with intent to distribute a controlled substance, and a 2007 conviction for being a felon in possession of a firearm.

e. RAINBOW WILLIAMS has been identified as one of the leaders of BGF, who handles the day-to-day drug distribution network and works directly for Fitzgerald. WILLIAMS has a 1998 conviction for murder.

f. AUSTIN ROBERTS, a/k/a "Yellow," has been identified as one of the leaders of BGF who assists Fitzgerald coordinating drug shipments in Maryland. ROBERTS has a 1992 conviction for assault, battery, and resisting arrest; a 1993 conviction for possession of controlled substances; a 1993 conviction for possession of marijuana; and a 1994 conviction f felony possession of cocaine.

g. HASSAN WASHINGTON has been identified as an individual capable of recruiting individuals to smuggle drugs into NBCI for BGF, and Bailey, in particular.

h. ANTHONY BRUCE, a/k/a "Silk," a/k/a "Soldier," has been identified as a high ranking member of BGF, who is als incarcerated at NBCI. BRUCE has a 1987 conviction for handgun possession and two 1987 convictions for robbery with a deadly weapon.

i. KEVIN GLASSCHO, a/k/a "KG," has been identified as a BGF member and major Baltimore drug distributo GLASSCHO has a 1981 conviction for second-degree murder, a 199 conviction for possession with intent to distribute a controll substance; a 1993 conviction for possession of a handgun, and a 1993 conviction for failure to appear.

B. <u>USE OF THE TARGET CELLPHONES IN FURTHERANCE OF NARCOTICS TRANSACTIONS AND MONEY LAUNDERING BY THE REEVES ORGANIZATION</u>

February 23, 2009

20. On February 23, 2009, at approximately 9:44 pm and 9:46 pm BROWN made out-going calls to 1-800-473-3636, assigned to the Money Pac Hotline, which is part of the Green Dot Financial Network. During the 9:44 pm call, BROWN added $50.00 to the account number ending in 2087. During the 9:46 pm call, BROWN added $50.00 to the account number ending with the numbers 2135. Based on their training and experience and other information developed during this investigation, including information from cooperative sources, law enforcement agents believe that BROWN and other BGF members are laundering illegal proceeds gained from the sale of controlled substances, the sale of contraband including tobacco, and the extortion of non BGF prisoners inside of the correctional facilities by using Green Dot debit cards.

21. On February 23, 2009, at approximately 9:48 pm, BROWN placed an outgoing call to (443) 597-8806 with an unknown subscriber, utilized by JESSE LNU. When the call connected, BROWN asked, "May I speak to Jesse?" JESSE responded, "This is her." BROWN continued, "How you doing, this EB Jesse. Uh, Tay wanted to buy some books or something." JESSE responded, "Yeah what do you need that, what do you need that Green Dot number?" BROWN answered, "Yeah if that what he want, if that's how he wants to do it?" JESSE responded, "I guess, he told me to get a

Green Dot for twenty five dollars. Is that what you need?" BROWN continued, "That's how we'll do it then." JESSE then provided BROWN account number 9190 9909 7411 7177 407 which BROWN acknowledged. BROWN then asked, "Where the books go now? Where do I mail them to?" JESSE told BROWN to mail the books to DOC number 278 512 under the name Dante Smith. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, in this conversation, BROWN was obtaining payment through the use of a Green Dot debit card for selling copies of the "Black Book," a BGF manual, to DOC inmate Dante Smith.

<u>February 24, 2009</u>

22. On February 24, 2009, at approximately 3:12 pm, BROWN made an outgoing call to DEITRA DAVENPORT at telephone number (410) 402-3392 with an unknown subscriber. During the call, BROWN told DAVENPORT, "Give five of them cans to RAINBOW and give him three hundred dollars too." DAVENPORT asked, "Do what?" BROWN continued, "Give RAINBOW the five cans today and give him three hundred dollars too." DAVENPORT responded, "Um huh." BROWN then said, "He should have three hundred dollars. That's what I was getting at when I was asking you, what about the money, don't he owe some money for them books. Don't he?" DAVENPORT went on to explain that she believed that RAINBOW

currently owed money for thirty books. BROWN then explained that he would investigate. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, in this conversation, BROWN was instructing DAVENPORT to deliver "five cans", which law enforcement believe to contain contraband and three hundred dollars to RAINBOW WILLIAMS. The "five cans", which on occasion contain tobacco, would be delivered to WILLIAMS for the purpose of having him arrange for the items to be smuggled into the prison where BROWN is currently being housed. The three hundred dollars referenced is believed by law enforcement to be payment that was to be provided to an unidentified corrections officer who would be responsible for smuggling the contraband into the prison facility. During the course of this investigation law enforcement has learned from prison officials, confidential sources, and cooperating inmates that there are correctional officers working in the Maryland prison system that are assisting inmates with the smuggling of illegal contraband into the different prisons. Some of these items include tobacco, weapons, and controlled substances including heroin and ecstasy.

23. On February 24, 2009, at approximately 5:19 pm, BROWN received an incoming call from DEITRA DAVENPORT at (410) 402-3392. After the two greet each other, DAVENPORT said, "I

need you to call RAINBOW and see where he, where I need to meet him at." BROWN asked, "You can't catch him?" DAVENPORT answered, "I don't have his number." At this time BROWN then placed a three way call to (410) 336-0375, believed to be utilized by RAINBOW WILLIAMS. The three way call went unanswered. BROWN then returned to his conversation with DAVENPORT and said, "Just go ahead and lay back, he just got to come see you." DAVENPORT then said, "Alright." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that this communication was a follow up to BROWN and DAVENPORT's earlier conversation regarding the "five cans" and the "three hundred dollars." DAVENPORT was inquiring about when and where she should meet WILLIAMS to make the delivery of the contraband.

24. On February 24, 2009, at approximately 9:14 pm, BROWN placed an outgoing call to DEITRA DAVENPORT at (410) 402-3392. During the conversation BROWN asked, "So how far are you away from him?" DAVENPORT answered, "We supposed to be meeting down, right here on Harford Road and Hamilton. But I don't see him yet." BROWN then said, "Let me call him." BROWN then placed an outgoing call, which went unanswered to (410) 336-0375, utilized by RAINBOW WILLIAMS. BROWN then returned to his call with DAVENPORT and asked, "You there and he ain't there?"

DAVENPORT answered, "No I don't see him." BROWN then said, "Alright just roll out then." DAVENPORT responded, "What?" BROWN continued, "Yeah, just roll out I'll deal with his ass some other time. I, I don't like shit like that. I don't like shit like that, having you out there like that." DAVENPORT continued, "He said ten minutes." BROWN continued, "He just fucked up. He ain't even answering his phone." DAVENPORT asked, "You wanna call him again before I go all the way back home?" BROWN answered, "Yeah, I'll call him again." BROWN then attempted a three way call with WILLIAMS which went unanswered. BROWN then said, "Yeah go ahead, roll out D." BROWN then received an incoming call from WILLIAMS. BROWN then conducted a three way call with himself, DAVENPORT and WILLIAMS. BROWN said, "D." WILLIAMS responded out of turn, "Yeah." BROWN explained, "Yeah, yeah she on there Bow." WILLIAMS responded, "You there already?" DAVENPORT responded, "You said ten minutes." WILLIAMS continued, "All right, I'm almost there. I'm almost there, I'm coming right down the street now." DAVENPORT explained, "Alright I'm going to pull into this Wachovia." WILLIAMS responded, "All right." The three way conversation with WILLIAMS then concluded. BROWN, however, continued to stay on the phone with DAVENPORT as if he was making sure she was safe. Based on their training and experience and other information developed during this

investigation, law enforcement agents believe that in this conversation, WILLIAMS was meeting with DAVENPORT, at the direction of BROWN for the purpose of receiving the five cans of contraband that BROWN wanted smuggled into the prison.

25. On February 24, 2009, at approximately 10:52 pm, BROWN placed an outgoing call to (443) 449-9240, utilized by correctional officer TAKEVIA SMITH a/k/a "Kiki." BROWN asked, "What's up with the big controversy concerning you?" SMITH asked, "What controversy?" BROWN continued, "You, you telling on some girl." SMITH responded, "Ain't nobody telling...." BROWN continued, "I'm just asking you what's up with it, that's all." SMITH continued, "Nothing, Emmanuel and I talked about some Little Earl and the nigger Ski told him that shit and we all pulled each other up and they never told him no shit like that. Cause Little Earl was standing there when the shit happened. Poe my witness on that. I ain't never tell nobody no shit like that. They always got my name in something like that. They don't like me in that kitchen." BROWN then asked SMITH who SMITH had last had sex with in the kitchen. SMITH said that she had not had sex with anyone in the kitchen. SMITH went on to explain that unidentified persons had spread the rumor that she had been fired from her job. SMITH explained that they were obviously wrong because she was still employed. SMITH said, "It take a lot to

bring me up on the smallest shit, I got the Union behind me." BROWN then asked SMITH is she was alright and wished her a Happy Birthday." The call then disconnected. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that in this conversation, BROWN was asking SMITH whether or not she had provided information to other correctional officers regarding an unidentified inmate who was violating prison regulations. BROWN was also questioning SMITH about non-regulation activities that she may be involved in while working in the prison. SMITH stated that although she might have committed small violations in the institution, she was not worried about her job because she had the "Union" behind her and it would be difficult for her to be fired.

26. On February 24, 2009, at approximately 10:58 pm, BROWN received an incoming call from (443) 449-9240, utilized by correctional officer TAKEVIA SMITH a/k/a "Kiki". During the conversation SMITH said, "Yeah, ain't nothing going on with me. They just always got my name in some bullshit. Ask Earl I ain't start that one." BROWN responded, "I heard that. But I'm just saying." SMITH continued, "I just hope he don't even say nothing to me. Just stop keep telling people little shit about me. Like cause they come right back and tell me like, yeah why Emmanuel

said you ratted on me. How can I rat on you like, even if oh I caught you all….Make your mind up. If that the case you a rat cause you ratting on one. What the fuck. Cause these niggers in there got it all fucked up, like leave me alone." BROWN then asked if she has been all right. SMITH said, "Yeah, I be alright every day. I don't lose no sleep over that bull crap." BROWN then asked, "When you gonna take care of me?" SMITH responded, "Uh, see last week I was off of work." BROWN responded, "Oh yeah." SMITH explained that BROWN needed to keep in contact with her. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that in the initial conversation, BROWN was inquiring whether or not SMITH had been providing information regarding unidentified inmates to other correctional officers, which she denied. When BROWN asked, "When you gonna take care of me?" BROWN was referring to SMITH smuggling illegal contraband into the prison facility for BROWN. SMITH explained that BROWN needed to keep in contact with her in order to arrange that type of transaction.

27. On February 24, 2009, at approximately 11:27 pm, BROWN placed an outgoing call to correctional officer TAKEVIA SMITH a/k/a "Kiki" at (443) 449-9240. During the conversation BROWN and SMITH discussed provocative photographs of SMITH which

SMITH had sent to BROWN via text message. Later in the conversation BROWN asked, "What if it's like I came over there and picked something up from somebody too though right." SMITH responded, "Right, well they let you in the back of the kitchen. Like I don't know I just be on my shit. I be like, I'm very sneaky so like I get them in and I get them out. You see what I'm saying?" BROWN responded, Yeah." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that in the initial conversation, SMITH was acknowledging that she was currently engaged in prostitution inside of the correctional facility. This is in part based on information recently obtained from corrections officials and cooperating witnesses who have personal knowledge of SMITH's criminal activity. According to at least one cooperating witness, SMITH obtains money in exchange for sex in the prison.

<u>February 25, 2009</u>

28. On February 25, 2009, at approximately 12:18 am, BROWN placed an outgoing call to (410) 868-4246, subscribed to Capitol First, 9050 Iron Horse Lane Apt 318, Pikesville, Maryland and utilized by an unidentified female known only as "CRAZY." During the conversation the unidentified female explained that she had heard through the media about a recent drug seizure. The

unidentified female explained that the police had seen "Murphy" and another gentleman leaving Murphy's house with two white bags which were thrown away in a trash can. The police then recovered the white bags and found that they contained cocaine residue. The police were then able to obtain a search warrant and arrest Murphy. BROWN requested a copy of the article so that he could include it in the newsletter that he writes while in prison. The unidentified female stated that she would send him that article along with some others related to the police. The unidentified female said that one of the articles that she had sent to BROWN reported that the police and other law enforcement officials had recently polled prisoners regarding who they thought were the most violent gang members currently incarcerated. As the conversation continued BROWN received an incoming call from (410) 336-0375, utilized by RAINBOW WILLIAMS. Upon answering the phone BROWN asked, "What's up?" WILLIAMS responded, "It's done." BROWN continued, "My man. I appreciate it. Hey you know what, what happened again though." WILLIAMS asked, "What?" BROWN continued, "Forgot to uh, get the uh...." WILLIAMS immediately responded, "I forgot. But you know what? I put the cans in the trunk and the bottle sitting right there." BROWN asked, "You did what?" WILLIAMS continued, "I said, I said I gave her the cans and the pills sitting right there in the box." BROWN said,

"That's all right cause I'd rather you get, get with Rhodes and give Rhodes the pills then the same guard anyway." WILLIAMS responded, "Oh all right, they was together too. Just let me know what else to do bro, that's all." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that in the initial conversation, BROWN is discussing obtaining news articles related to recent arrests, which BROWN plans to publish in a prison newsletter in order to educate prisoners, specifically BGF members, about how to avoid making similar mistakes and, thereby, avoid getting arrested by law enforcement. During the call waiting conversation, law enforcement believes that WILLIAMS was confirming that he had delivered the "five cans," believed to be illegal contraband, to an unidentified corrections officer who was to smuggle the items into the prison for BROWN. When BROWN inquired about the "pills," which are believed by law enforcement to be controlled substances, WILLIAMS stated that he had forgotten about them. BROWN explained that this was fine, for the present, because he wanted a different corrections officer, named Rhodes, to handle the smuggling of the "pills" into the prison for him. WILLIAMS advised that the corrections officer he met was with Rhodes when he made the delivery of the "five cans."

February 26, 2009

29. On February 26, 2009, at approximately 10:56 pm, BROWN placed an outgoing call to DEITRA DAVENPORT at (410) 687-3114. During the conversation BROWN asked DAVENPORT, "What you doing this weekend?" DAVENPORT responded, "Um, why you ask me that?" BROWN continued, "Because I wanted you to do something." DAVENPORT asked, "What you want me to do?" BROWN said, "Go to the firing range." DAVENPORT asked, "Why?" BROWN continued, "Bust that gun for a minute. You ain't been out there in a while." As the conversation continued, BROWN received an incoming call from (410) 242-6954 with an unknown subscriber and utilized by an individual known only as BONES. BONES told BROWN, "I got fifty books right. That's basically left over. Um, I can run the cover for them and all that. But um, you know next week I go and see my PO. So I don't know how that's gonna go. I'm trying to see if you want to snatch them or if you just, you know what I mean? Cause I don't got nothing to do with them. You know what I mean? Like I ain't charging you for them or nothing like that. You feel me?" BROWN asked, "Alright, what you want for them?" BROWN and BONES then agreed on a price of one hundred dollars for the remaining books (a reference to the Black Book). BROWN explained that "D" would be ready for him with the money whenever BONES could deliver the books. BROWN then gave BONES "D's" contact number of (410) 402-3392. BROWN then asked, "Hey

BONES how many books have I bought so far?" BONES explained, "The first run was two hundred, this last run was two hundred and then I think you got like two runs in between or you may got three runs in between for a hundred. So they would be seven hundred easy, right there." BROWN explained, "I counted nine hundred." BONES responded, "Nine hundred, it's possible." As the conversation regarding the Black Book continued, BROWN placed BONES, DAVENPORT and himself on a three way call. All three then discussed the time frame in which the Black Book had been first published and distributed. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that in the initial part of this conversation, BROWN was instructing DAVENPORT to go to a firearms range in order to improve her proficiency with a weapon she has in her possession. When BONES called BROWN, the conversation changed and it was ultimately learned that BROWN had sold approximately seven hundred to nine hundred copies of the Black Book, the operating manual for the Black Guerilla Family. Based on these sales, law enforcement agents believe that the membership of BGF may have grown to as many as nine hundred additional members.

<u>February 27, 2009</u>

30. On February 27, 2009, at approximately 12:18 am,

BROWN placed an outgoing call to BRIDGET ALSTON SMITH at (443) 677-9511. According to corrections officials, SMITH runs a Recreation Program inside of the DOC through the Baltimore City Public Schools. During the conversation SMITH and BROWN discussed a recent speaking event at MTC attended by Tyrone Powers. SMITH said that Powers had told her that he (Powers) liked the (BGF) security team that was used for the event. BROWN stated, "We was hoping that we could get some help from him on that. Some pointers from him, you know." SMITH responded, Yeah, he'll give them to you." SMITH said that the team had worked together better then the "Nation" and continued to compliment their work. As the conversation continued, BROWN said, "I didn't get that medicine from you neither." SMITH responded, "Shoot, I'll bring it Monday." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that in the initial conversation, BROWN was being complimented by SMITH on the use of BGF members as a security team when Tyrone Powers spoke at an event at the prison in the past week. SMITH said that the BGF security team appeared to be more proficient than the "Nation", referring to the Nation of Islam. When BROWN advised Smith that he had not received the "medicine" from SMITH it is believed that BROWN was referring to a controlled substance. SMITH did advise that she

would bring the "medicine" on Monday when she reported to work.

February 28, 2009

31. On February 28, 2009, at approximately 5:11 pm, BROWN placed an outgoing call to (443) 622-2581, subscribed to Tyshelle Gary, 115 Oak Moore Ct., Bel Air, Maryland, and utilized by an unidentified female correctional officer. During the conversation the unidentified female said, "I told you I had got caught with my cellphone. But I ain't never, I ain't never tell nobody. Like I ain't never say nothing to nobody and Lieutenant Taylor didn't either. So it's like, it's forgot about but the thing about it, everybody know. So like Blackman, you know she got suspended for five days when they caught her with her cellphone. So they gonna have to do something to them because they gonna look at it like, Blackman gonna be looking at it like, well damn I got suspended for five days and they gonna let them off with a hand shake. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that BROWN has a close relationship with yet another female corrections officer. Based on BROWN'S inappropriate relationship with other identified corrections employees, it is believed that BROWN can rely on multiple people to smuggle illegal contraband into the prison facility.

32. On February 28, 2009, at approximately 6:35 pm,

BROWN placed an outgoing call to (410) 302-6383 subscribed to Robert Jones, 17330 Preston Rd, Dallas, Texas and utilized by an unidentified incarcerated male. During the conversation the unidentified male asked, "They ain't got no rec tonight?" BROWN responded, "Oh, I don't know." The unidentified male continued, "I'm trying to go man." BROWN asked, "What happened last night?" The unidentified male answered, "Uh, his finger got slammed in the door. I'm trying to go tonight though man." BROWN asked, "Ain't nothing happen last night?" The unidentified male responded, "Nah, his fingers got slammed in the door. Shit was fucked up." BROWN continued, "Uh, I heard that." The unidentified male then said, "Alright." BROWN ended, "Alright." Based on their training and experience, law enforcement believes that during this communication the unidentified male was advising BROWN that he was unable to complete a violent act against a separate unidentified individual. Specifically, when the unidentified male said, "I'm trying to go man" that he was advising that he was ready to commit an unspecified act of violence on behalf of BROWN.

33. On February 28, 2009, at approximately 8:55 pm, BROWN received an incoming call from (443) 980-6157, subscribed to Mark Campbell, 13 Primrose Ct, Parkville, Maryland and utilized by an unidentified male. During the conversation the

unidentified male said, "JERSEY just called me and said he needs your number, but I didn't give it to him. But uh, here go his number so you can holler at him. He said he really needs to talk to you. He got a new phone." The unidentified male then provided BROWN with JERSEY's telephone number, (443) 676-4944. Based on their training and experience, law enforcement believes that during this conversation it was learned that associates close to BROWN keep BROWN's contact number from being discovered by persons outside BROWN's inner circle.

34. On February 28, 2009, at approximately 8:58 pm, BROWN placed an out-going call to (443) 676-4944 with an unknown subscriber, utilized by JERSEY. During the conversation BROWN asked, "What's up?" JERSEY responded, "Oh, I been trying to a, I aint, I really didn't want to talk over the phone E. I was trying to see you in person. But you know they got me on cell restriction." BROWN responded, "Oh you on cell restriction?" JERSEY continued, "Yeah, but you know they brought me a ticket [institutional infraction notificaton] for that phone. I was trying to uh, holler at you in person. Straight up." BROWN responded, "Alright, I'll see you tomorrow then." Based on their training and experience, law enforcement believes that during this communication JERSEY wants to discuss criminal activity with BROWN. However, JERSEY does not want to speak to BROWN over the

telephone in order to minimize the chance that the will be overheard by law enforcement.

March 1, 2009

35. On March 1, 2009, at approximately 12:38 pm, BROWN received an incoming call from (410) 402-3392, utilized by DEITRA DAVENPORT. During the conversation BROWN asked, "Did you ever send them books to MRDCC?" DAVENPORT responded, "No I didn't send them yet. I'll send them tomorrow." Based on their training and experience, law enforcement believes that BROWN is having DAVENPORT send copies of the Black Book to inmates housed at MRDCC, a correctional facility in Baltimore, Maryland. The purpose of sending these books is to gain additional members in the BGF movement.

36. On March 1, 2009, at approximately 12:45 pm, BROWN received an incoming call from (443) 520-2121, utilized by MARLOW BATES. During the conversation BATES asked, "Did you ever get your sweat suit and your tenners?" BROWN responded, "Nah." BATES asked, "Why it's hard getting them in?" BROWN responded, "I got knocked off trying to get the tenners in the visiting room." BATES commented, "Oh you did! Who, who knocked, you off?" BROWN answered, "A little African girl." BATES said, "You know when I did that last time, you know when I did that, you supposed to, you supposed to go in there with your shoe laces

like unloose, where as though you ain't gotta fuck with it." BROWN said, "I did, I did, it was RAINBOW fucked that up." BATES asked, "Oh what he had to untie, he had to bend down to untie them?" BROWN responded, "No he had them untied. But he had them untied to the point that you could see that shoe lace, like hanging. That just look like a dead give-away." BATES said, "I was wondering if you get that shit on there now." BATES went on the explain that he will be going to court the next day and that he wants BROWN to keep his phone on so that BATES could contact BROWN from court and update him on BATE's situation. Based on their training and experience, law enforcement believes that BATES had supplied RAINBOW WILLIAMS with a pair of shoes which had an illegal substance hidden in the shoes. WILLIAMS in turn, according to BROWN, wore the shoes into the prison during a visit with BROWN and was attempting to pass them off to BROWN. Due to the way WILLIAMS had the shoes tied a female guard was able to stop the attempted delivery. It has been learned from corrections officials that during visits with inmates, individuals often attempt to swap shoes which contain controlled substances with the inmate they are visiting.

37. On March 1, 2009, at approximately 1:28 pm, BROWN received an incoming call from (443) 562-2960 utilized by JOE EDISON a/k/a OUTLAW. During the conversation EDISON asked, "How

do you know if your Green Dot account is froze?" BROWN then received a call waiting call from (443) 452-0505, utilized by "KG" a/k/a KEVIN GLASSCHO. BROWN then switched over to speak with GLASSCHO. Shortly after "KG" identified himself and the two greeted each other the call dropped. BROWN then switched back to his conversation with EDISON. EDISON continued, "When you go to use the card, it won't let you use the card. Like to go buy something." BROWN added, "Or take money off it." EDISON said, "Yeah, cause my sister wanted to get some money today, they wouldn't let her do it." BROWN explained, "They gonna contact you." BROWN then received a call waiting call again from GLASSCHO over (443) 452-0505. GLASSCHO explained, "Man you got a main line number that you ain't gotta never worry about losing me. You called me on it before. The two five, five number." BROWN responded, "I got about four numbers on you." GLASSCHO advised, "Yeah, but man, a lot of times you got to understand, I got to do, I got to change the numbers." BROWN said, "I know, I know." GLASSCHO continued, "But you got a main line number that you know what I mean, don't nobody have in them joints, but except you, my brother, and, and Joe. You know what I'm saying?" BROWN responded, "Yeah." GLASSCHO said, "Man I swear to god, I can't believe this E." Without GLASSCHO saying what he was referring to, BROWN acknowledged what GLASSCHO was talking about.

GLASSCHO continued, "I can't believe it. Because man I been in that, every time I go in that mother fucker they take me through hell getting in there. So how in the fuck nigger gonna get in there and do what he gotta do and get out of there? I don't understand that." The call then experiences interference at which time GLASSCHO said he would call back from the "main line" number. BROWN then switches back to his conversation with EDISON. BROWN explained that with the Green Dot cards a representative will call and explain why the account is frozen. The two then end their conversation as BROWN answers a call waiting call again from KEVIN GLASSCHO over (443) 255-4288 subscribed to Frank Oliver, 264 N Hilton St, Baltimore, Maryland. GLASSCHO explained that BROWN can remember the main line because it is a Cingular telephone. BROWN said he recognized this number because when his phone rang "KG" popped up. GLASSCHO continued with their original conversation. GLASSCHO said, "Every time I come in there man, that mother fucking Friday ain't letting nobody in that bitch. Unless you sign in and, and, and show your ID and he not buzzing you in. If a mother fucker you come to see don't buzz you in, he not gonna buzz you in. Because Archie done came down there a few times cussing, my man you know who the man is why you doing this and that." GLASSCHO continued discussing some events that have occurred involving Archie. GLASSCHO went

on to explain that he has been conducting his own investigation regarding the death of Archie. GLASSCHO explained that the cameras in the building did not work and the sign-in book was missing. Ultimately, GLASOCOE explained, "Whoever it is man, he got to go. He definitely getting a (unintelligible). I ain't even worrying about that. I just want to find the right one." BROWN advised, "Man, a lot of people mad about that boy." The call then disconnected. Based on their training and experience, law enforcement believe that during the conversation between BROWN and EDISON the two were discussing the use of Green Dot debit cards which are commonly used by inmates for the purpose of laundering illegally gained money. During the conversation between BROWN and GLASSCHO, the two were discussing the fact that the type of business engaged in by GLASSCHO, believed to be drug trafficking, requires him to frequently change his telephone number. As the conversation continued GLASSCHO and BROWN begin discussing the recent murder of an associate named "Archie." A review of recent homicides in Baltimore revealed the open murder of Frederick Jeffrey Archer who was found dead on February 26, 2009, in an assisted living facility stabbed and bludgeoned to death with a brick. During this conversation GLASSCHO advised that when the murderer of Archie is found, that GLASSCHO will handle the punishment.

38. On March 1, 2009, at approximately 8:37 pm, BROWN placed an outgoing call to DEITRA DAVENPORT, at (410) 687-3114. During the conversation, BROWN told DAVENPORT that KEVIN GLASSCHO had him on the phone for twenty-four minutes talking about how old-man "Archie" got killed. BROWN said, "Somebody run in his house and beat him with a brick. When they find out who did it, I know they going to torture his ass. That whole west Baltimore love old man Archie boy. Shit just not just west Baltimore." Based on their training and experience, law enforcement believe that during the part of this conversation BROWN was explaining that KEVIN GLASSCHO had just talked with him about the murder of "old man Archie." BROWN explained that "Archie" was loved by so many people that when the identity of the murderer is discovered "they" are going to torture that person or persons.

<u>March 3, 2009</u>

39. On March 3, 2009, at approximately 4:37 pm, ERIC BROWN placed an outgoing call to (410) 402-3392 with an unknown subscriber and utilized by DEITRA DAVENPORT. During the conversation, DAVENPORT said, "Oh I ain't never send you that guy um, mail, Nutty Buddy, Nutty Buddy. Isn't his name Nutty Buddy?" BROWN responded, "Nutty Bar." (a reference to TARGET SUBJECT DARYL MOORE." DAVENPORT continued, "He want you to call his

mother and give her the phone number before the tenth. So he can put it on his list." BROWN asked, "Give her my phone number?" DAVENPORT answered, "On his phone list, yeah." BROWN said, "Shit, just call her and give it to her D. You read my mail again?" DAVENPORT answered, "Uh, uh. It wasn't really no mail. It was just a short note. What you mean I read your mail again? I don't read your mail. Only sometimes it fall open." BROWN responded, "Oh, ok. I understand now. So actually it fell open again." DAVENPORT continued, "Because, nah, uh because it don't be addressed to you. It be addressed to the Black Book. So, I got to skim over it." BROWN responded, "Oh yeah, right, right." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that BROWN was authorizing DAVENPORT to give his telephone number to DARYL MOORE, through a third party. This was to be done so that BROWN and MOORE can discuss the ongoing BGF movement. In regards to DAVENPORT reading BROWN'S mail, BROWN seemed upset that she would read his mail. This is in part because BROWN and other BGF members occasionally send messages through the mail regarding confidential BGF operations.

40. On March 3, 2009, at approximately 10:24 pm, BROWN received an incoming call from (443) 449-9240, subscribed to and utilized by corrections officer Takevia Smith. During the

conversation SMITH said, "Just cause I don't work over there no more, don't mean you all got to stop calling me." BROWN talked about how he has been sick recently. SMITH continued, "I'm stress free now. That damn job was stressing me out." BROWN asked why she was stressed with her job. Smith said, "Because they was stressing me out and I, I had went there last week. I took off my bag and they was stressing me out. The big boss called me back, but they didn't find anything. I left." SMITH went on to explain that she wants to be an "RN." SMITH explained, "That job be cool while it lasted. But that shit like having a McDonald's job, I got to break the law to get money." SMITH continued, "Before I even got caught up in some old bull shit. Getting knocked off or mother fuckers keep on spreading rumors, I'd rather quit." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that SMITH, now a former corrections officer, was advising BROWN that she had quit her job before she was arrested smuggling illegal contraband into the prison facility.

<u>March 4, 2009</u>

41. On March 4, 2009, at approximately 1:10 am, BROWN received an incoming call from (443) 562-3787, utilized by "Pig." This call went to voicemail. PIG left the message, "Oh, this Pig

yo. This my new number man. I switched my number. One of these stupid ass niggers man had my name in their phone. So, I switched my number. This my new number yo." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, PIG was advising BROWN that he had a new telephone number. PIG explained that he had changed his number because one of his associates placed his number into their phone contact list, which may have become compromised. Investigators believe that law enforcement may have seized this phone from the unidentified associate of PIG, which resulted in PIG changing his telephone number. PIG ultimately changed his number to avoid being identified by law enforcement.

<u>March 7, 2009</u>

42. On March 7, 2009, at approximately 3:33 pm, BROWN placed an outgoing call to (410) 868-4246, subscribed to Capital First and utilized by TOMEKA HARRIS. Law enforcement officials have learned that TOMEKA HARRIS is currently pending federal fraud charges stemming from a February 6, 2009, arrest by the United States Secret Service. During the conversation, HARRIS explains that she loves BROWN, but because of her relationship with Vernon, (known to law enforcement as VERNON HARRIS) she and BROWN may not be able to continue their relationship. HARRIS

said that because BROWN had previously informed her that BGF members are forbidden to have a relationship with another BGF members' female counterpart there may end up being problems between TOMEKA HARRIS, VERNON HARRIS and BROWN. BROWN explained, "I know how to get around it though. You got to help me, that's all I'm saying. You follow what I'm saying? You know what I'm doing. I know what I'm doing." TOMEKA responded, "I'm glad you know, I don't." BROWN said, "I'll fill you in a little more when you come down here, alright. I know how he gonna carry it." TOMEKA continued, "His homeboy just called me this morning on some stupid shit. Like, he called me like, Vernon just called him and then the homeboy called me. Just like, you know he love you more than anything in this world. But I'll make sure you ok out here. He's gonna go crazy. All of this stuff like we still together. I'm tired." BROWN responded, "I got, I got something for him. I got something for all of that. I got something for all that." TOMEKA asked, "What is it?" BROWN answered, "I'll tell you when you come down. I, I mean I ain't got nothing for that but I got something in my mind I want to roll around and bounce off you. TOMEKA responded, "Huh?" BROWN continued, "I got something in my mind I want to bounce off you. So the first chance you get um, Wednesday is the first visit. Can you come down Wednesday?" TOMEKA advised that she would come to see BROWN

on Wednesday. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, BROWN and TOMEKA HARRIS have an ongoing relationship. TOMEKA HARRIS also has a relationship with VERNON HARRIS, who is also incarcerated. The problem with having the two relationships is that both BROWN and HARRIS are BGF members. BROWN had previously explained that BGF members can't have a relationship with the same woman because that is a violation of the BGF code. Ultimately, BROWN explained that he had something in mind to deal with this problem which goes against the BGF code. BROWN advised that he did not want to speak over the telephone regarding the solution for this relationship problem that he wanted to talk to TOMEKA in person. It is believed by law enforcement that BROWN may be planning some type of violent act against VERNON HARRIS, which would handle the current relationship issue.

March 8, 2009

43. On March 8, 2009, at approximately 12:36 am, BROWN received an incoming call from (410) 868-4246, utilized by TOMEKA HARRIS. During the conversation, BROWN explained that in regards to the "young man", a reference to VERNON HARRIS he will need to get himself a bottle of Moet. BROWN said he is going to say, "Brother, that woman that you is grabbing on, she's mine. From

the bottom of her feet to the top of her head and because of that and I know you didn't know, I know you didn't know. But because you grind her, I'm going to do this. I'm going to take that Moet bottle and smash him across the top of his god damn head with it." As the conversation continued BROWN again, as if talking to VERNON HARRIS said, "I'm gonna take this bottle and I'm going to crack you across your god damn head with it and your gonna go out and I'm gonna beat your, I'm gonna beat the living shit out of you when you out." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, BROWN was explaining to TOMEKA that if the opportunity presents itself he will violently assault, VERNON HARRIS, a fellow BGF member.

44. On March 8, 2009, at approximately 1:21 am, BROWN received an incoming call from (443) 742-3874, utilized by MELVIN GILBERT. During the conversation GILBERT says, "Man I need you in a big way man." BROWN asked, "What's going on?" GILBERT replied, "I need the joint, I need the (unintelligible). I need, I need the (unintelligible). You know the phone." BROWN responded, "Man, I thought you got that man." GILBERT replied, "You didn't send it over, did you?" BROWN answered, "I told PIG to take it." GILBERT then instructed BROWN to hold on. GILBERT continued, "Yeah, uh man he didn't get nothing over here. He

said she'll holler at me. Man look man, if, if you all have a way man that I can get somebody, I can get my lady to go, go get grab the mother fucker tomorrow and then get it to somebody. But I got a way, just tell me what to do." BROWN responded, "Nah, nah, nah they, the problem is the way. Yeah shit, it ain't, it ain't, it ain't none of that. None of that ain't the problem. The problem is the way like damn." GILBERT responded, "Oh." BROWN continued, "They got our ass boy, they shut this mother fucker down. You hear me? They shut this mother fucker down and now they come to get every, everyone that's in this mother fucker." GILBERT responded, "God damn." BROWN continued, "Let me tell you, if something don't come up, if they, if we don't open a hole up by the end of this month it probably don't be no more than about twenty phones left in this mother fucker. I'm telling you. They're tearing our ass up MELVIN." GILBERT advised, "Yeah, they heavy over here too. But over here they ain't fucking with you, they just knocking these mother fuckers off." BROWN continued, "We just, we just trying to find us a way right now." BROWN went on to explain that he was recently expecting four new phones to come in, but when they arrived one was missing. BROWN said that he believed that the missing phone had been delivered, to GILBERT. GILBERT explained that he never received the phone. As the conversation continued GILBERT asked,

"You know the big titty mother fucker who used to work in MCIJ. She used to work for us though." BROWN asked, "What's her name?" GILBERT answered, "Simmons." BROWN acknowledged that he knows Simmons. GILBERT then said, "Man, holler at that bitch for us. She over here and she working, but she's staying away from me." GILBERT explained that Simmons is doing things for other prisoners who are "low budget" when in fact she should be working for GILBERT. BROWN went on to further identify Simmons as a Sergeant, who had one time worked at MTC in the kitchen. GILBERT went on to reference another unidentified female corrections officer that he believes is smuggling items into the facility where he is being housed. As the conversation continued, GILBERT explained that he knows an unidentified corrections officer in DOC that is pregnant by GILBERT, who is providing information regarding other inmates. GILBERT explained that the unidentified corrections officer recently was threatened by an unidentified inmate. The unidentified corrections officer relayed to GILBERT that she was in fear for her safety. GILBERT told her, "Don't you ever call me and tell me, like you're worried about another mother fucker. Them niggers be bluffing. I said I'm not a bluffer. I said, I'm the one that you gotta worry about." The conversation continued with the two discussing different inmates and the offers the government is offering for GILBERT and his co-

defendants in their death penalty case. GILBERT then explained that the government had given a plea offer to his rap buddy that has dreads and offered him fifteen years. GILBERT explained, "You know me and him rap buddies, did a murder together. They tell him to take fifteen years." GILBERT explained that his rap buddy turned down the fifteen years for the federal murder. GILBERT said that he believes that the government is frustrated because no one wants to take their plea offers. He continued by saying that MIAMI was offered thirty years, which he declined. GILBERT said that when you are charged with ordering a murder, you have more responsibility than the individual who committed the murder. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, GILBERT, who is a defendant in a federal death penalty case is asking for BROWN'S assistance in obtaining a cellular telephone in prison. The two discussed that even though the both have corrupt corrections officers they deal with, there has been a heightened security presence with is affecting their smuggling operation. Additionally, GILBERT made an admission to having committed a murder with an individual with whom the government had recently offered a fifteen year sentence.

45. On March 8, 2009, at approximately 12:44 pm, BROWN placed an outgoing call to (410) 499-8933, with an unknown

subscriber and utilized by an unidentified female correctional employee. During the conversation BROWN asked, "You gonna uh, bring me some of them pills today?" The unidentified corrections employee answered, "No, I ain't got no bottle. I gotta find a bottle. You know I ain't even got no (unintelligible). I got to find one of them too." BROWN advised, "You supposed to had all that done, because today is supposed to be the day you supposed to do that. It's always, it's easier on the weekends all the time." The unidentified female corrections employee asked, "How, how am I supposed to have it done and I have no car. What, get it done how? Everything I need to get done, has to be put on hold. I have to wait to do everything. I have to wait on (unintelligible). I didn't have it done, cause I don't have a car to get it done." BROWN said, "I'll have to bring you a bottle myself then. I'm a bring you a bottle myself then." The unidentified corrections employee said, "Ok bring me a bottle and then what? I don't have a pocket book. I gotta get to the store to find a clear pocket book." BROWN continued, "This is a god damn shame. Every time I need something done I gotta go through a whole bunch of bull shit to get it done." The conversation then ended. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, BROWN was attempting to have illegal

controlled substances smuggled into the prison for him through the help of an unidentified corrections employee.

46. On March 8, 2009, at approximately 9:00 pm, BROWN received an incoming call from (410) 530-7154, with an unknown subscriber and utilized by MUSSHEERAH HABEEBULLAH, a female correctional officer at MCI-J. During the conversation, BROWN and HABEEBULLAH talk at length about different inmates that the two have had interaction. As the conversation continued HABEEBULLAH made reference to an individual that is currently at the Pen. HABEEBULLAH said, "He probably not used to the Pen cause he know it so wide open. He ain't really used to that kind of environment and I think they said down there he was like on the top. Like he was the only one who was doing stuff. But you know down there, there are so many people who doing shit, you know it's impossible, it's impossible to be the only one. It's impossible, it's impossible." BROWN responded, "Right, right, everybody going to get their thing on." HABEEBULLAH continued, "Yeah, it's, it's too many people and like down there, they said it's like the girl Williams and the girl, I guess the dummies are messing with, it, all they got is two of them. Or like one on each shift that be really making moves. (Unintelligible), now you got like seven, eight people. Soon it's the whole damn shift." BROWN responded, "Right, right, right, right."

HABEEBULLAH said, "Where is it possible for you to take over. You know what I'm saying? You ain't, you might make out and make a couple dollars that you can get in. I was, I was telling him that before he went down there. I was like, you can probably get it in cause you know Frank used to get it in and he used to make, you know what I'm saying? I know a lot of people be getting it in but you ain't gonna be on top like you was down there, cause it's too many horses. Too many ways." BROWN explained, "Yeah, ain't nobody going to be the only game in town." HABEEBULLAH continued, "Not that, he was down there but not at this new spot. There's a new sheriff in town. That's impossible. You see down there, you know the um, comrades wasn't really functioning like that, like they wasn't really, you know what I'm saying." BROWN went on to say, "They ain't just gonna let a mother fucker take over. If you ain't gonna, if you the only mother fucker ain't making moves there's going to be a problem." HABEEBULLAH continued, "There's a whole different caliber of dudes in there. You know what I'm saying." BROWN responded, "Yeah, it ain't gonna sit right with people." HABEEBULLAH went on to explain that she had recently provided an inmate identified as "Baby" with a battery for the inmates phone and within two weeks it was seized. HABEEBULLAH stated, "It's so tight down there like I said, well I ain't gonna be able to do no, a battery that's

small, I can, I can get that in. A charger yeah, a phone I don't trust that." HABEEBULLAH went on to explain that "Baby" had asked for BROWN'S number. She said that maybe someone else gave him a phone since she knows that "Baby" wouldn't call from the "blue phone." As the conversation continued HABEEBULLAH discussed other corrections officials who are smuggling items into inmates. HABEEBULLAH identified the corrupt correctional officers as JAMES, STEPHENS, BRANDON, and EDMONDS. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, HABEEBULLAH is a correctional officer who smuggles illegal items into the correctional facilities for BROWN and other inmates. According to HABEEBULLAH corrections officers JAMES, STEPHENS, BRANDON, and EDMONDS are also smuggling illegal items into the corrections facilities. A review of prison employee records identified two of the above referenced CO's as Sharnette EDMONDS, and Danielle STEPHENS.

March 9, 2009

47. On March 9, 2009, at approximately 4:12 pm BROWN received an incoming call from (410) 499-8933, with an unknown subscriber and utilized by an unidentified female correctional employee. During the conversation BROWN asked, "You gonna call me and tell me when you gonna get me them pills, cause I need

them?" The unidentified female responded, "Ok, I'm going to work on that today." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, BROWN was again requesting the unidentified corrections employee smuggle him in some "pills", a controlled substance.

March 10, 2009

48. On March 10, 2009, at approximately 7:56 pm, BROWN placed an outgoing call to (410) 404-1185, subscribed to Patsy A Whitener, 4626 Walther Ave, Baltimore, Maryland and utilized by BIG HEAD CHARLIE. During the initial part of the conversation, BROWN and BIG HEAD CHARLIE a/k/a CHUCK discuss BROWN'S son and his recent release from prison and being on probation. CHARLIE asked how BROWN'S son was doing since being released. BROWN explained, "I, I, I, think, what I know is though CHARLIE is he got enough sense not to go around that way and for me that's a lot. Because, I'd been right back around there. You understand what I'm saying? Me and you shit, probation, oh boy we got away but shit we pimping before the week is out. You know what I mean?" CHARLIE responded, "Right, right, right." BROWN explained, "I remember the first time I got locked up. I had to stay in there, mother fucker four weeks, right. The bail was ten thousand, took a week for them to get the nine hundred dollars

together. Yeah, when I come home, I remember when I come home I get dropped off at the top of the hill. I come down the hill, I run right into a sale. Hold on, I grabbed the money and went right in David's house and got the shit. You understand what I'm saying?" Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, BROWN was explaining that he hopes that his son resists violating the law so he will not have to return to prison. BROWN explained that he cannot avoid violating the law, BROWN even described that on one occasion after being released on bail, BROWN immediately began selling drugs. BROWN has shown that even while incarcerated he continues to violate the narcotics laws.

March 11, 2009

49. On March 11, 2009, at approximately 10:32 pm, BROWN received an incoming call from (410) 530-7154 subscribed to Hybrid Customer (Prepaid), 17330 Preston Road, Dallas, Texas and utilized by correctional officer, MUSSHEERAH HABEEBULLAH. During the conversation HABEEBULLAH, who at the time was utilized a second telephone, left a message, "AB call me when you get this." HABEEBULLAH then turned to speak with BROWN and said, "She ain't answering the phone." BROWN responded, "Man I know." HABEEBULLAH said, "You know she got in service." BROWN Let me

make sure I got the right number, eight two five, nine oh seven three." HABEEBULLAH said, "Let me see, cause I know she um, I got both of the numbers, let me see what the other one is. It's um, yeah, eight two five, nine oh seven three." BROWN asked, "Four, four three, right?" HABEEBULLAH answered, "Yeah. I know she said she had in service so she, so she get off at seven, you know three o'clock." BROWN asked, "She get off at three?" HABEEBULLAH said, "Yeah, you know she got in service in the morning so she works from seven to three tomorrow." BROWN responded, "Oh shit, well what about tonight?" HABEEBULLAH went on to explain that this unidentified corrections officer is probably sleeping, since she has to awaken early in the morning for her in service training. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, in this portion of the conversation BROWN was utilizing corrections officer HABEEBULLAH to contact a second unidentified corrections officer for the purpose of having illegal contraband smuggled into the prison facility for BROWN.

<u>March 12, 2009</u>

50. On March 12, 2009, at approximately 4:04 pm, BROWN received an incoming call from (443) 562-3787, with an unknown subscriber and utilized by PIG. During the conversation PIG

said, "Yo, what's up this PIG. Hey uh, Baby Brother trying to holler at you yo, about something." BROWN responded, "Alright." PIG said, "Yeah he trying, I didn't know if you wanted me to give him the number. He, he needed somebody to talk to man." BROWN asked, 'What, what is it about?" PIG replied, "Nothing, he just, I don't know, he, he's beefing. I guess he want to ask you something. I don't know." BROWN then responded in an angry manner, "Damn, what is it that he want man before he get on my phone man?" PIG answered, "I don't, I don't know what he want. I'll ask him." BROWN responded, "Well alright, yeah ask him what he want." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, Baby Brother has a disagreement with an unknown person and wants guidance from BGF leader BROWN before deciding how to handle the problem. PIG doesn't know specifically what the disagreement is regarding. Based on the fact that BGF is compartmentalized and BROWN is a high ranking member, he doesn't want PIG to provide his telephone number to other members of BGF unless BROWN approves the release.

51. On March 12, 2009, at approximately 9:28 pm, BROWN received an incoming call from (443) 759-7080, subscribed to Carlette Foster, 1421 E Federal Street, Baltimore, Maryland and utilized by ERICA. During the conversation ERICA explained that

a client at her place of work attempted to rape her today. ERICA explained that she only made an incident report at her place of business, but did not report the incident to the police. BROWN advised her to call the police. At approximately 9:36 pm, BROWN received a second call from ERICA regarding the attempted rape. ERICA advised that she would be filing a report with her supervisor regarding the incident the following day.

52. On March 12, 2009, at approximately 9:38 pm, BROWN received an incoming call from (410) 949-6549, with an unknown subscriber and utilized by an unidentified male who is believed to be incarcerated. During the conversation the male asked, "Do anybody be working over here that be coming outside. Check and see who the outside workers is yo. Cause I got a, I got, I got a way, I just need somebody that will be able to, that would be able to uh pick some bikes [contraband] up for me." BROWN responded, "Alright." The unidentified male responded, "Just check and then just ah, I'll just call you tomorrow and you just let me know what it is." BROWN said, "Alright that's what's up." The unidentified male continued, "Hey see what they want man." Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, the unidentified male was advising BROWN that he had come up with a new way of smuggling illegal contraband into

the prison facility. The only information the unidentified male needed from BROWN was which corrections officers he knows work in and outside of the prison and how much they would charge to smuggle the items into the prison.

53. On March 12, 2009, at approximately 9:54 pm, BROWN placed an outgoing call to (443) 610-2656, with an unknown subscriber and utilized by an unidentified male, who acknowledged during their greeting as a BGF member. During the conversation BROWN explained, "Man somebody tried to rape my daughter today." The unidentified male asked, "Where at?" BROWN explained, "Out at the spot." The male asked, "Out here?" BROWN responded, "Yeah." The male explained that he had not heard about the rape. The male explained that he would call his supervisor and "get on top of that right now." The unidentified male said, "You already know I ain't having that at all." BROWN asked the male to find out what happened and for the male to call him back. BROWN went on to explain that the suspect of the rape is one of his daughter ERICA'S clients, named Clarence. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, BROWN telephoned a BGF member, later identified as GOTTI, who he knows works with his daughter ERICA regarding the attempted rape. BROWN requested that the BGF member, GOTTI, find out the

circumstances surrounding the attempted rape.

54. On March 12, 2009, at approximately 10:05 pm, BROWN received an incoming call from (443) 610-2656, with an unknown subscriber and utilized by GOTTI. This call was a follow up from the request BROWN had made of GOTTI to find out the circumstances of the attempted rape of ERICA. At the initiation of the conversation GOTTI connected a three way call with an individual who he says works with ERICA. GOTTI said, "Man, yo gonna tell you what's what right. But yo, he given you the all access to the green light. Yo a patient here, you know what I mean? But you do it how you do it. Green light on his ass. But Tay, about to tell you what's going on." BROWN responded, "Ok." TAY then said, "Alright look when, when I came in here right she was, she was sitting in the kitchen. So she was like DONTAE I gotta talk to you right. So I was like all right what's up? So she was like Terrance tried to touch me." DONTAE continued to detail what ERICA had told him in regards to the attempted rape. DONTAE explained that Clarence was in the unidentified location where ERICA works for raping a fifteen year old girl. GOTTI then explained, "I'm a tell, I'm gonna tell you now, you know what I mean? Yo, yo's sick. That's the reason why he in there right. But at the same time like, like I just told TAY, TAY what I tell you yo? He did it to the wrong little girl. Right, he don't

know who that little girl belong to." DONTAE said, "It is what it is but like I said I wish I would have came in this door a little sooner. Then I could of did whatever I wanted to do. But you know what I mean? By me already done jacked one of them up." GOTTI went on, "Yo had an investigation on him before. But this the business right here you feel me. Yo, and we'll set it up. We'll give you all access, bring cheese, cause yo get independent time and shit. You know what I'm saying? We'll send yo out on an independent time. You'll have time to set it up to get his head smashed while he go on independent time. We kicking him out of that house anyway. You feel me? It's a matter of weeks before he be gone out that house anyway. Bust his shit, and he getting out the house anyway. Yo, that's what it is man." BROWN advised, "I'm just going to slow roll walk it because she done made a issue of it all ready." GOTTI continued, "It, it, it don't even matter, when he on his independent time, they know he out there and he subjected to do anything. So that won't even come back to you. Independent time mean, he can get on a bus, go downtown got to, got to where ever you want to go at long as you hit me back." DONTAE explained, "All, all the nigger gotta do is smack his brains out and rip his pockets out his pants, like he got robbed. Fuck him." GOTTI agreed, "Right, that's it. That's it yo." BROWN said, "No that's alright. It's all right." GOTTI

responded, "Nah, that ain't alright. That ain't alright." BROWN continued, "Yeah, yeah, yeah, yeah I know, I know, but you know, some things, everything got to be done in time man. Got to be done in accordance with time man. You understand what I'm saying?" GOTTI responded, "No it's not. That's not us yo." BROWN responded, "No it ain't." BROWN advised that he will handle things himself. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that, BROWN has two BGF members, DONTAE and GOTTI, who work with his daughter ERICA who are willing to orchestrate a violent act against the person who attempted to rape ERICA. BROWN advised that he will handle things and that nothing should happen to the suspect, Clarence, because ERICA had already drawn to much attention to the incident. Because of the added attention BROWN does not want anything to come back on him or any BGF members if they went forward with an attack on Clarence.

March 13, 2009

55. On March 13, 2009, at approximately 6:42 pm, BROWN placed an outgoing call to (443) 980-1230, with an unknown subscriber and utilized by RANDOLPH. Upon the telephone being answered BROWN asked to speak with RANDOLPH. During the conversation RANDOLPH explained, "We just had some bad luck man.

Yeah, we just had some bad luck." BROWN asked, "What's that?" RANDOLPH continued, "We was in the car, yeah and they pulled us over right. You know we gonna do something, but the coon that was setting the whole degree up, he's the rat. He set all us up." BROWN asked, "Q there?" RANDOLPH answered, "Yeah Q had the burner [gun] on him and he had just gotten out of the car." BROWN exclaimed, "Damn." RANDOLPH said, "Yep, just happened, just happened." BROWN responded, "God damn." RANDOLPH continued, "Just happened E. Just lucky I ain't carry that thing. I said, I said leave it Ock. You, you good with (unintelligible)." BROWN then yelled in the background for UNC, a/k/a RAY OLIVIS. RANDOLPH said, "I'm glad I ain't have, sh, oh." BROWN responded, "Man, ain't no bull shit man, that's the last thing you need boy." RANDOLPH continued, "Especially Q man. Oh man." BROWN then told UNC that he had someone on the phone that wanted to speak with him. OLIVIS, who identified himself as RAY RAY, then used BROWN'S cellular telephone to speak with RANDOLPH. RANDOLPH then handed his phone to ZACK. ZACK said to UNC, "Rats out here now yo. You got to be so careful man. We just all most went to the Penitentiary for the rest of our life, me, Rudy, (unintelligible)." UNC asked, "For what?" ZACK explained, "Yeah, we were going straight do it tonight and we figured afterwards that (unintelligible) was a rat. He was on

the phone the whole time. All of us, all of us don't want to say nothing but (unintelligible). We got to talking, now his cellphones off." UNC responded, "Right, right, right." ZACK continued, "But the nigger, nigger man!" UNC said, "Good god all mighty." ZACK continued, "I got to go and give her the bad news right, man I think this dudes a rat." UNC advised, "Man you all got to be safe. You all stay, be safe man. You all, I'm the only mother fucker with some (unintelligible) in here left, so all got to really be safe man. You know whatever you do man. You know?" ZACK continued, "Two dudes, you know Pudgy right." Which UNC advised that he did. UNC stated he could hardly hear the conversation and may have to call back on his phone. UNC asked, "Pudgy right?" ZACK answered, "Right, he's responsible for my little brother's death." UNC asked, "You talking about that red bitch Pudgy?" ZACK answered, "Yes, he set it up." UNC responded, "Oh yeah." ZACK continued, "Yeah with Calvin. Then he was telling dudes instead (unintelligible)." UNC asked, "You talking about your little brother Zack, the little one right?" ZACK answered, "Yeah (unintelligible)." UNC explained that he didn't even know about the death. ZACK said, "He said both of them on court side right. I need some torpedoes [weapons]. I'm gonna take care of him. I'm gonna take care of him. I got, I'm

gonna take something in there to him.[5] Find out who it is and what they need. Tell me where they gonna be (unintelligible)." UNC advised, "Alright Bear, I'm all ready on top of that man." ZACK continued, "I want them to let them know (unintelligible)." UNC asked, "Why you and Rudy ain't been got in touch with me about that man?" ZACK advised, "They just got locked up about three weeks ago." UNC said, "Ok." ZACK continued, "Have them sent over there. I wanted to deal with it myself. Dig what I'm saying? But my mother was so fucked up she didn't want me to, you know. Listen man, niggers got to (unintelligible)." UNC advised that they did not need to talk about the situation any longer. UNC said, "Man you all, you should have been in contact. I, I ask Calvin about you and Rudy every time I talk to him. Man, he said he be seeing you all." ZACK advised, "That shit just been rough man. Me and shorty been getting, trying to make something happen man." As the conversation continued UNC said, "All right let me figure out a way for that man. Let me figure out a way myself. You know what I mean?" ZACK said, "To get, find out who on court side and think about how we can work this with June." UNC responded, "Ok, all right, all right." ZACK

5 Law enforcement had not fully identified ZACK, his deceased brother or ZACK's intended victim(s). However, if identified, law enforcement will notify the appropriate authorities and take precautionary measures to protect the unidentified and intended victim.

returned to speaking about his arrest and said, "There's no probable cause, I asked them, I kept asking them why he stop the car. He never would answer. They let me and Rudy go. The rat mother fucker supposed to had a warrant." UNC said, "Alright, we need to know here he at. I'll be on top of all of it." UNC advised that he would call ZACK back from his phone since he was having trouble hearing everything that was being said. As the conversation came towards an end a separate male got on BROWN'S telephone and spoke briefly with ZACK. At the conclusion of their conversation the unidentified male said, "Look I got take care of something with, I got to take care of something with UNCLE RAY. So, I'm a give ah, the General uh, the phone." BROWN then returns to the telephone, has a brief conversation and then ends the call. Based on their training and experience and other information developed during this investigation, law enforcement agents believe that in the initial portion of the conversation ZACK, RANDOLPH, Q and RUDY were on their way to murder an unidentified person when they were stopped by the police. It appears that Q and RANDOLPH were arrested for a handgun violation. Based on the circumstances surrounding the arrest RANDOLPH and ZACK believe they were set up by an informant. Because of this belief, RANDOLPH has asked for the assistance of BROWN and OLIVIS in retaliating against this unidentified

informant. As the conversation continued, ZACK explained to OLVIS, who was now using BROWN'S phone that his brother had been murdered recently. ZACK said that the persons who had set up his brother's murder were incarcerated recently for unspecified charges. Based on the arrest, ZACK asked OLIVIS to find out where they were being housed and if OLIVIS can find a way to retaliate against them. Law enforcement believes that the retaliation for both incidents may result in death. As the conversation came to and end an unidentified inmate, using BROWN'S telephone, revealed that BROWN is a high ranking BGF member, specifically by identifying BROWN as the General.

## II. ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED OR APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A NEED FOR THE INTERCEPTION OF COMMUNICATIONS OVER THE TARGET CELLPHONES

56. I am not aware of any other investigations targeting the activities of this group of BGF leaders and members in the Baltimore area. The purpose of this joint federal-local investigation is to identify, locate, and arrest the leaders and members of BGF. In addition, it is the purpose of this investigation to identify the organization's suppliers and the means by which the organization obtains and receives narcotics, and to determine how the organization processes and launders narcotics proceeds. Interception of wire communications over the TARGET CELLPHONE has already provided valuable evidence against

the TARGET SUBJECTS, but not to the extent necessary to meet these goals. It is only through the continued interception of such communications that the agents expect to identify fully the targets who have been partially identified thus far, and fully realize the objectives of this investigation. As indicated below, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives:

**Electronic Surveillance**

a. As described above, this investigation has usefully employed the interception of wire communications between certain TARGET SUBJECTS pursuant to the ongoing wiretap on TARGET CELLPHONES #1, #3, #4, & #5. Electronic surveillance of CELLPHONES #1, #3, #4, & #5 has enabled agents to confirm the involvement of a number of TARGET SUBJECTS and to intercept conversations that are believed to relate to racketeering enterprises being conducted by BGF including, but not limited to, narcotics transactions and money laundering involving both incarcerated and non-incarcerated members. However, the information gained to date from electronic surveillance of TARGET CELLPHONES #1, #3, #4, & #5 have not yet enabled us to achieve many of the other goals of the investigation. Continued interception of wire communications over TARGET CELLPHONE #1 is

essential to achieve the goals of this investigation, including the identification of all members of the conspiracy, the methods employed by the organization to smuggle drug and other contraband into prison facilities, the identities of corrupt prison officials, and the organizations methods of retaliating against other rival organizations and members.

**Confidential Informants**

b. As indicated in the Nickoles' Affidavit, this investigation has usefully employed confidential informants. Each of these confidential informants continues to provide information regarding BGF on a limited basis. None of these informants are in a position to make controlled purchases of narcotics from any higher-level members of the organization. While some of these sources have been able to speak to and meet with some of the TARGET SUBJECTS, including ERIC BROWN, these informants would not be available to testify at trial because of significant safety risks to themselves and their families. Moreover, these informants have not met or identified all of the TARGET SUBJECTS. Further, because this organization is spread throughout the United States I do not expect the informants to meet all of the targets of this investigation, and I believe that the interception is required to identify and locate members of the organization whom the informants will never meet. Moreover,

based on my training and experience, I know that the highly compartmentalized manner in which large-scale narcotics traffickers do business makes it impossible for any single source to learn the identities and roles of all of the persons engaged in a drug-dealing operation. Moreover, as noted above, the TARGET SUBJECTS have corrupt jail guards provide information and contraband to them. Any effort to introduce a confidential source in a position to provide additional information about the incarcerated TARGET SUBJECTS would, based upon my experience, present an unacceptable risk to the safety of the source and the integrity of the investigation. Finally, as illustrated by several recent intercepted conversations, BGF members have no qualms concerning violent retaliation against perceived threats to their organization.

**Undercover Officers**

c. The use of Undercover Officers (UC) is also not a useful technique in this investigation. UCs can at most make small purchases from downstream customers of the organization, and generally only from those TARGET SUBJECTS not incarcerated. This is based partly on the fact that the majority of the customers are BGF members or BGF affiliates, but also because small purchases from individual members of the organization will not assist law enforcement in dismantling the

methods BGF uses to control prison facilities in the State of Maryland. As a result, the use of UCs is not likely to provide further access to members of the organization, and it does not appear that these UC's could penetrate the organization. As noted above, the introduction of a CS is, based on my training and experience, too dangerous an investigative method to employ, the introduction of a law enforcement officer into a prison facility by a CS is even more dangerous. I further believe that, even if employed, an undercover agents would have limited, if any, contact with high-ranking members, of the organization because of the compartmentalized nature of the organization. Further, given the presence of corrupt jail guards, the UC would have to be treated the same as any other inmate, subjecting the UC to the dangers of a prison setting for the slight possibility of direct contact with a high-ranking BGF member

**Physical Surveillance**

d. As noted in the Nickoles' Affidavit, physical surveillance of some activities of the TARGET SUBJECTS has been possible. Law enforcement officers have attempted surveillance of the TARGET SUBJECTS on countless occasions, most recently in January 2009. However, the ability of law enforcement officers to conduct such surveillance has been extremely limited because the TARGET SUBJECTS have proven surveillance-conscious and the

fact that TARGET SUBJECT ERIC BROWN is incarcerated. Further, law enforcement, must because of the presence of corrupt jail officials, carefully instruct their contacts in the prison system to not arouse suspicion. Any increased law enforcement activity, or unusual patterns of behavior by correctional officials working with law enforcement could tip a corrupt jail guard of this investigation and lead that guard to notify incarcerated TARGET SUBJECTS. For instance, on March 18, 2009 law enforcement provided information to their contacts in the correctional system that a jail guard, Terry Robe, was trying to smuggle a cellphone into the facility. Robe was searched, the cellphone was discovered and Robe was fired. This incident then started a flurry of conversations concerning the incident between TARGET CELLPHONE #1 and other jail guard, and led BROWN to change is telephone number, but not his IMSI#. To continue to accomplish surveillance and proactive law enforcement activity, law enforcement must notify prison officials, without revealing the wire intercepts, to conduct the any search in manner as not to raise the suspicion of other jail guards. Likewise, any increased surveillance of non-incarcerated individuals attempting to smuggle items into the jail, could present the same problem. Physical surveillance is therefore unlikely to succeed in furthering the goals of this investigation. If the intensity of

existing surveillance were to be increased, and if the subjects of this investigation became further alerted to the existence of such surveillance, the result might be the temporary cessation of their illegal activities or a change in their instrumentalities or methods at a critical point in the investigation. As noted above, the information obtained from the interceptions for which authorization is sought herein will assist law enforcement in determining the identities of the subjects involved and to track their activities, thereby enhancing the prospects for fruitful physical surveillance. In addition, these intercepts will identify a particular guard or individual attempting to smuggle contraband, and permit law enforcement to establish physical surveillance or notify prison official in advance, thus minimizing the risks of discovery inherent in following subjects or remaining at target locations for long periods of time.

**Telephone Toll Records/Pen Registers**

e. Telephone toll records are being used in this investigation but have provided and will continue to provide only limited information. These records do not enable law enforcement officers to identify with certainty the persons involved in the conversations or the significance of the communications in the context of ongoing narcotics trafficking activity. In the current climate of obtaining cellular telephones, companies are

allowing persons to purchase cellular telephones with or without providing accurate subscriber, billing or user information. It is a common practice for drug traffickers to purchase a cellular telephone in the name of a nominee or through a company that sells cellular telephones which can be activated without having to provide a name or address for the user. For example in the month of January 2009, I purchased a cellular telephone for operational purposes in an ongoing investigation. In fact, the phone I purchased was an AT&T Pay As You Go phone. I was able to activate the cellular telephone over a landline without providing any subscriber or user information thereby allowing the telephone to be used without identifying the user. With this ongoing practice by the cellular telephone companies it has become extremely difficult to verify the users of cellular telephones in wire related drug investigations. At best, toll and pen register data shows contact between two communication devices. Further, many of these devices are purchased on the outside of the prison, and smuggled to TARGET SUBJECTS already incarcerated. As a result, the communication device is not registered in the inmate's name because mere possession of the cellphone is against the institutions' rules. Without the content of the conversations, I cannot definitively say who is using the particular communication device. Finally, some of the TARGET

SUBJECTS in this investigation are incarcerated. And despite the inmates' jail phone system's supposed capability of disconnecting callers, who make third-party calls, the TARGET SUBJECTS continually speak to each other through the use of a third party outside the institution. This use of a third party, like an operator, prevents the pen register from accurately indicating, which communication devices are actually connected rendering the use of pen register and toll data almost useless.

**Grand Jury/Interviews of Witnesses**

f. Use of a federal grand jury does not appear to be a promising method of investigation. Witnesses who could provide additional relevant evidence to a grand jury have not been identified, and, even if identified, would themselves be participants in the narcotics-trafficking activities under investigation. Such individuals would face prosecution themselves, and it is unlikely therefore that any of them would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony. Immunizing them could thwart the public policy that they be held accountable for their crimes. The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation.

g. For similar reasons, conducting interviews at this point in the investigation would not be successful in obtaining evidence of the criminal activities under investigation. Only the individuals who participate in the criminal conversations or transactions are knowledgeable of their contents, making these individuals subjects of this investigation. It has been my experience, and the experience of other agents and law enforcement officers involved in this investigation, that interviews with individuals who are involved in the sale and distribution of narcotics are not productive. These individuals do not wish to disclose their own criminal activity, and do not wish to implicate others, due to fear for their own safety, and/or a loyalty to other subjects of this investigation. Interviews and grand jury subpoenas seem particularly inappropriate in this case, which involves a violent organization whose members are extremely unlikely to incriminate each other.

**Search Warrants**

h. Search warrants have, to date, not proven to be a viable option at this stage of the investigation. Among other things, investigators have been unsuccessful in developing sufficient, fresh probable cause for search warrants at locations used by the organization. It is only through the interception

sought herein that law enforcement officers will be able to learn the timing of narcotics deliveries, the location(s) where narcotics are stored, and the identities of all of the individuals responsible for delivering, processing, and packaging the narcotics for retail sale. In addition, it is only through the requested interception that law enforcement officers will be able to determine how the proceeds of this narcotics-trafficking activity are laundered or otherwise transferred to FITZGERALD and BROWN or others in his organization. Finally, search warrants would not in any event reveal the names or identities of other high-ranking members of the organization who are as yet unidentified. Members not present at the particular location during the execution of any search warrant would have a viable defense against prosecution, and the mere execution of the warrant would disclose the investigation. Finally, as noted above, any unusual effort of prison officials, to conduct searches of the incarcerated TARGET SUBJECTS jail cells, would arouse suspicion. To date, law enforcement has intercepted conversations between TARGET SUBJECTS discussing searches conducted by jail officials, and any concerted effort by law enforcement to target incarcerated BGF members could be met with suspicion by the TARGET SUBJECTS.

**Arrests/Seizures**

i. BROWN is incarcerated at MTC. Law enforcement has been unable to develop sufficient evidence to charge any other members of the organization with narcotics-trafficking or other offenses and, even so, arrests of members of the organization are unlikely to yield sufficient evidence to charge the TARGET SUBJECTS or other higher-ranking members through the development of cooperating witnesses or otherwise. The wiretap will provide the command and control conversations necessary to effectively dismantle the entire operation by demonstrating the conspiratorial aspect of this organization. As noted above, law enforcement must pick and choose carefully the individuals that are targeted for smuggling items to BROWN or other BGF members. The presence of corrupt jail guards complicates any effort focused on the jail smuggling aspects of this investigation.

**Trash Runs**

j. Finally, I am aware that a usually effective investigative technique is to pull the trash from a suspected stash location or house and ascertain whether any contraband has been discarded, which could lead to probable cause to search the suspected location. In this investigation, however, trash runs will not meet the objectives of the investigation. TARGET SUBJECT ERIC BROWN is incarcerated at MTC, so frankly the need to develop probable cause to search is cell does not exist. BROWN,

however, would likely only have a very small quantity, if any, contraband in his cell. This insignificant quantity, by itself, could not possibly assist law enforcement in dismantling the entire organization and its efforts to smuggle contraband into and control prison facilities throughout the state. At best, it would provide either an institutional infraction for BROWN and at worst a prosecution of him for simple possession of a controlled substance, neither of which meet the goals and objectives of this organization.

## MINIMIZATION

57. As stated earlier, this case is being investigated by the DEA and the BPD. It is anticipated that during the period of interception, all monitoring will be performed by Special Agents of the DEA and officers from the BPD and will be supervised by Special Agents of the DEA.

58. All monitoring of wire communications over the TARGET CELLPHONE #1 will be minimized in accordance with Chapter 119 of Title 18, United States Code.

59. The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they should take to avoid

infringing upon any attorney-client privilege or other recognized privileges. In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that no TARGET SUBJECTS or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If an interception is minimized, monitoring agents shall spot check to ensure that the conversation has not turned to criminal matters.

60. It is requested that the order provide that, if necessary, translators be authorized to assist in conducting this electronic surveillance and to receive disclosure of intercepted communications. It may be necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications. All such translators will be under contract to the DEA and will be directly supervised by the DEA and deputized law enforcement

officers of the BPD. It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

**AUTHORIZATION REQUEST**

61. Based on the foregoing, it is my opinion that the interception of communications occurring over the TARGET CELLPHONE #1, as specified above, is essential to uncover the full scope of the illegal activity described herein. Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier. The 30-day period shall be measured from the of this Court's Order.

62. In addition, for the reasons set forth above, there are specific and articulable facts showing that there are reasonable grounds to believe that cell-site location information

is relevant and material to this ongoing criminal investigation. Therefore, pursuant to 18 U.S.C. §§ 2703(c) and (d) and 3121 et seq., it is requested that the Court's Order also direct AT&T to provide the DEA with originating and terminating cell-site location information, i.e., cell-site information concerning the physical location of antenna towers associated with the beginning and termination of calls to and from the TARGET CELLPHONE #1. This information is being sought only for the TARGET CELLPHONE #1.

63. It is further requested, pursuant to Federal Rule of Criminal Procedure 41, that the Court issue an Order directing AT&T assist agents of the DEA by providing all information, facilities and technical assistance needed to ascertain the physical location of the TARGET CELLPHONE, including but not limited to data indicating the specific latitude and longitude of (or other precise location information concerning) the TARGET CELLPHONE (the "Requested Location Information"),[6] for a period of thirty (30) days. As explained in more detail in the Affidavit,

---

6 Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the TARGET CELLPHONES at the start and end of any call. In requesting cell site information, the government does not concede that such cell site records - routinely retained by wireless carriers as business records - may only be obtained via a warrant issued on probable cause. See In re Application, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (authorizing prospective acquisition of cell-site records under combined authority of 18 U.S.C. 2703(d) & 3121 et seq.).

there is probable cause to believe that the location of the TARGET CELLPHONE #1 at times determined by investigators will constitute or lead to evidence of the SUBJECT OFFENSES. In light of the above, the government requests that this Court direct AT&T to disclose the Requested Location Information concerning TARGET CELLPHONE #1, and to initiate a signal to determine the location of TARGET CELLPHONE #1 on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of TARGET CELLPHONE #1, at any time of day or night, owing to the potential need to locate the TARGET CELLPHONE #1 outside of daytime hours. It is further requested that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of 30 days after the termination of the authorized period for acquisition of the Requested Location Information.

64. It is also requested, pursuant to 18 U.S.C. §§ 2703(c) and (d), that the Court issue an Order directing that AT&T and any other telecommunications-related carrier provide the

DEA with subscriber information (published, nonpublished or unlisted) and billing information, including the names, addresses, and customer service records of the subscribers, for any numbers dialed and pulsed from and to TARGET CELLPHONE #1 during the period for which interception is authorized. The investigation described above is continuing, and there exist specific and articulable facts showing that there are reasonable grounds to believe that the information being sought is relevant and material to the ongoing investigation. For the reasons set forth above, that information is needed to help identify other TARGET SUBJECTS and others involved in the distribution of narcotics by the BGF organization.

65. Pursuant to the provisions of Title 18, United States Code, Sections 2518(4), it is requested that it be ordered that AT&T, the ultimate service provider for TARGET CELLPHONE #1, and any other service providers, furnish the technical assistance necessary to accomplish the interception (including the interception of communications occurring while TARGET CELLPHONE #1 is in Direct Connect/Dispatch Services mode) unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all dial digits -- including all incoming and outgoing calls -- pen register information, and audio

interception capability whether the cellular telephone is in roaming mode or otherwise). The assistance of this provider is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

66. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

Detective William Nickoles
Detective, Baltimore Police Department
Task Force Officer, DEA

Sworn to before me this 24 day of March 2009 at 10:00 hours.

UNITED STATES DISTRICT JUDGE

I hereby attest and certify on March 24, 2009 that the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody
FELICIA C. CANNON
CLERK, U. S. DISTRICT COURT
DISTRICT OF MARYLAND
By Agnes M. Pinney Deputy



W0410