09-1351 JKB
through Attachment L

**United States v. Eric Brown, et al.**
**United States v. Kevin Glasscho, et al.**
**Index for Search Warrant Affidavit**


I. Background .......... 4

II. Electronic Surveillance of BGF .......... 5

III. The Indictments .......... 8

IV. The BGF Criminal Enterprise .......... 9

A. Overview .......... 9

B. Structure/Overall Operations of BGF .......... 12

C. BGF Code of Conduct .......... 14

D. Drug-Trafficking/Drug Smuggling .......... 19

E. Extortion/Financial Transactions .......... 30

F. Acts of Violence .......... 32

V. Search Warrants for SUBJECT PREMISES#1-5 .......... 38

A. Deitra Davenport/SUBJECT PREMISES #1 .......... 38/Attachment A

B. Rainbow Williams/SUBJECT PREMISES #2 .......... 40/Attachment B

C. Tomeka Harris/SUBJECT PREMISES #3 .......... 47/Attachment C

D. Terry Robe/SUBJECT PREMISES #4 .......... 52/Attachment D

E. Musheerah Habeebullah/SUBJECT PREMISES #5 .......... 56/Attachment E

VI. The Glasscho Drug Organization .......... 60

VII. Search Warrants for SUBJECT PREMISES#6-12 .......... 71

A. Kevin Glasscho/SUBJECT PREMISES #6 .......... 71/Attachment F

B. Kevin Glasscho/Cassandra Adams/SUBJECT PREMISES #7 .. 72/Attachment G


SCANNED

C. Calvin Robinson/SUBJECT PREMISES #8 . . . . . . . . . . . . . . . . 75/Attachment H

D. Darnell Holmes, a/k/a "Moe"/SUBJECT PREMISES #9 . . . . . . . 78/Attachment I

E. Lakia Hatchett/SUBJECT PREMISES #10 . . . . . . . . . . . . . . . . . . 84/Attachment J

F. Darryl Taylor/SUBJECT PREMISES #11 . . . . . . . . . . . . . . . . . . . 87/Attachment K

G. Tyrone Dow/SUBJECT PREMISES #12 . . . . . . . . . . . . . . . . . . . 90/Attachment L

VIII. Request for Authorization for Nighttime Execution . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

IX. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **IN THE MATTER OF THE SEARCH OF CERTAIN SPECIFIED PREMISES** | ) ) ) | **Misc. No. 09-_____** |

**SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**

WILLIAM NICKOLES, a Detective with the Baltimore Police Department and a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states:

1. I am a Detective with the Baltimore Police Department and have been so employed since 1992. I have been deputized as a Task Force Officer with the DEA for approximately nine (9) years. I am currently assigned to the DEA's Special Investigations Group (DEA SIG), which investigates large-scale narcotics trafficking organizations in the Baltimore area. During my time as a law enforcement officer, I have participated in numerous investigations of unlawful drug distribution and investigations of violent gangs, including the use of confidential informants and cooperating witnesses, undercover transactions, physical and electronic surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, narcotics proceeds, and narcotics paraphernalia. I have reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and gang activity. I have interviewed drug dealers, users and confidential informants and have discussed with them the lifestyles, appearance and habits of drug dealers and users. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed; the methods of payment for such drugs; the possession and use of firearms in connection with the trafficking of such drugs; and the manner in which

narcotics traffickers store and conceal the proceeds of their illegal activities.

2. This affidavit is being submitted in support of an application for search warrants for the premises set forth below:

THE PREMISES KNOWN AND DESCRIBED AS 5637 UTRECHT ROAD, BALTIMORE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #1"). SUBJECT PREMISES #1 is a residence of Deitra Davenport.

THE PREMISES KNOWN AND DESCRIBED AS 1113 EAST BELVEDERE AVENUE, APARTMENT C, BALTIMORE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #2"). SUBJECT PREMISES #2 is a residence of Rainbow Williams.

THE PREMISES KNOWN AND DESCRIBED AS 600 S. HIGHLAND AVENUE, APARTMENT A, BALTIMORE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #3"). SUBJECT PREMISES #3 is a residence of Tomeka Harris.

THE PREMISES KNOWN AND DESCRIBED AS 420 WOODLAKE COURT # C, GLEN BURNIE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #4"). SUBJECT PREMISES #4 is a residence of Terry Robe.

THE PREMISES KNOWN AND DESCRIBED AS 15 HIAWATHA COURT, OWINGS MILLS, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #5"). SUBJECT PREMISES #5 is a residence of Musheerah Habeebullah.

THE PREMISES KNOWN AND DESCRIBED AS 4001 DUVALL AVENUE, FLOOR 2, BALTIMORE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #6"). SUBJECT PREMISES #6 is a residence used by Kevin Glasscho.

THE PREMISES KNOWN AND DESCRIBED AS 1909 FOREST PARK AVENUE, APT. S3, GWYNN OAK, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #7"). SUBJECT PREMISES #7 is a residence of Kevin Glasscho and Cassandra Adams.

THE PREMISES KNOWN AND DESCRIBED AS 1102 N. MOUNT STREET, BALTIMORE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #8"). SUBJECT PREMISES #8 is a residence of Calvin Robinson.

THE PREMISES KNOWN AND DESCRIBED AS 3908 NORFOLK AVENUE, BALTIMORE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #9"). SUBJECT PREMISES #9 is a residence of Darnell Holmes, a/k/a "Moe."

THE PREMISES KNOWN AND DESCRIBED AS 2735 ST. PAUL STREET, APARTMENT 1, BALTIMORE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #10"). SUBJECT PREMISES #10 is a residence of Lakia Hatchett.

THE PREMISES KNOWN AND DESCRIBED AS 448 TUBMAN COURT, BALTIMORE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #11"). SUBJECT PREMISES #11 is a residence of Darryl Taylor.

THE PREMISES KNOWN AND DESCRIBED AS 5 WOODBRIAR COURT, APARTMENT C, BALTIMORE, MARYLAND AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #12"). SUBJECT PREMISES #12 is a residence of Tyrone Dow.

3. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that BGF is engaged in an ongoing and continued pattern of violations of federal law and that there is presently concealed in the premises set forth above (collectively "the SUBJECT PREMISES") the items set forth in the respective attachments hereto, all of which constitute evidence, fruits, and instrumentalities of, inter alia, violations of 18 U.S.C. § 1962, which prohibits participation in a racketeering conspiracy; 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking; and 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering.

4. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for warrants to search the premises set forth above, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I

believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this Affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals. All conversations and statements described in this Affidavit are related in substance and in part unless otherwise indicated.

## I. Background

5. Since September 2008, DEA's Special Investigations Group (DEA SIG) has been conducting an investigation of the "Black Guerilla Family" (BGF), a violent gang that operates in prison facilities and major cities throughout the United States, including in Baltimore, Maryland. The investigation has involved, among other things:

a. physical surveillance in multiple locations, including the locations of the SUBJECT PREMISES;

b. debriefings of multiple confidential informants ("CSs");[1]

c. seizures of narcotics and narcotics proceeds and other contraband;

d. review of monitored telephone calls over prison telephones; and

e. electronic surveillance of approximately eight cellphones used by BGF members and leaders and their associates.

6. As more fully described below, the evidence obtained through these and other means has established that BGF is a violent gang that is engaged in drug-trafficking, extortion, and acts of violence in Baltimore City and elsewhere.

---

[1] The reliability of each of the CSs is discussed below.

## II. Electronic Surveillance of BGF

7. On February 20, 2009, the Honorable J. Frederick Motz, United States District Judge, signed an Order pursuant to Title 18, United States Code, Section 2518, authorizing the Government to intercept wire communications occurring over (a) the cellular telephone assigned call number **(410) 206-6980** and bearing international mobile subscriber identity ("IMSI") #310410216356569 ("TARGET CELLPHONE #1"), subscribed to Deitra Davenport, 5637 Utrecht Road, Baltimore, Maryland, and used by Eric Brown, a/k/a "Dee Brown," a/k/a "E," a/k/a "EB," with service provided by AT&T, and (b) the cellular telephone assigned call number **(410) 361-0046** and bearing IMSI #316010011580887 ("TARGET CELLPHONE #2"), subscribed to Charlene Pearson at 3 Norham Ct Apt I, Baltimore, Maryland, and used by Gregory Fitzgerald, a/k/a "Joe," with service provided by Sprint/Nextel, including through the use of Sprint/Nextel's Direct Connect/Dispatch Services. On February 23, 2009, it was learned that on February 13, 2009, the call number assigned to TARGET CELLPHONE #1 had been changed to **(410) 245-2435** and that the call number assigned to TARGET CELLPHONE #2 had been changed to **(410) 361-0110**. Accordingly, on February 23, 2009 and February 24, 2009, Judge Motz signed Amended Orders authorizing the interception of wire communications occurring over TARGET CELLPHONE #1 and TARGET CELLPHONE #2 and listing the new call numbers assigned to those cellphones. Interception over TARGET CELLPHONE #1 began on February 23, 2009, and interception over TARGET CELLPHONE #2 began on February 24, 2009. Interception over TARGET CELLPHONE #1 remains active, but interception over TARGET CELLPHONE #2 was terminated on March 3, 2009. Wire communications involving some of the TARGET SUBJECTS have been intercepted pursuant to these Orders.

8. On March 10, 2009, the Honorable J. Frederick Motz, United States District Judge, signed an Order pursuant to Title 18, United States Code, Section 2518, authorizing the Government to intercept wire communications occurring over the cellular telephone assigned call number **(410) 336-0375** and bearing international mobile subscriber identity ("IMSI") #310410186013066 ("TARGET CELLPHONE #3"), subscribed to Raymond Williams, 123 Main Street, Baltimore, Maryland 21222 and used by Rainbow Williams, with service provided by AT&T. Interception pursuant to that Order commenced on March 10, 2009 and remains active. Wire communication involving some of the TARGET SUBJECTS have been intercepted, pursuant to that Order.

9. On March 13, 2009, the Honorable J. Frederick Motz, United States District Judge, signed an Order pursuant to Title 18, United States Code, Section 2518, authorizing the interception and recording of wire communications occurring over the cellular telephone assigned call number **(443) 255-4288** and bearing international mobile subscriber identity ("IMSI") #310410130470002 ("TARGET CELLPHONE #4"), subscribed to Frank Oliver, 264 N. Hilton Street, Baltimore, Maryland and utilized by Kevin Glasscho, a/k/a "KG," with service provided by AT&T, the cellular telephone assigned call number **(443) 452-0505** and Push to Talk number 165*493*2643 and bearing IMSI #316010160765307 ("TARGET CELLPHONE #5"), subscribed to Keon Ball, 4422 Park Heights Ave, Baltimore, Maryland 21215 and utilized by Kevin Glasscho, a/k/a "KG," with service provided by Sprint/Nextel, including through the use of Sprint/Nextel's Direct Connect/Dispatch Services, and the cellular telephone assigned call number **(443) 653-9728** and bearing IMSI #310260872288340 ("TARGET CELLPHONE #6"), subscribed to Nelson Abugo Best Ambulance, 9411 Philadelphia Rd, Baltimore, Maryland 21237 and utilized by Kevin Glasscho,

a/k/a "KG," with service provided by T-Mobile. Interception pursuant to that Order commenced on March 13, 2009, on TARGET CELLPHONES #'s 4 and 5. Wire communication involving some of the TARGET SUBJECTS have been intercepted, pursuant to that Order. On March 13, 2009, law enforcement was advised by the provider that service for TARGET CELLPHONE #6 was terminated for alleged fraud on March 11, 2009. As a result, the Order for TARGET CELLPHONE #6 was not executed. On April 2, 2009, interception over TARGET CELLPHONE #5 was terminated, but the interception of TARGET CELLPHONE #4 remains active.

10. On March 27, 2009, the Honorable Wanda K. Heard, Judge of Circuit Court for Baltimore City, signed an Order pursuant to Maryland Courts and Judicial Proceedings Article, Section 10-408, authorizing the interception and recording of wire communications occurring over the cellular telephone assigned call number **(410) 294-4839** and bearing international mobile subscriber identity ("IMSI") #310410130470002 ("STATE LINE A"), subscribed to Antonio Guevara, 987 Potee, Baltimore, Maryland 21225 and utilized by Tyrone Dow, a/k/a "Flavor," with service provided by AT&T. Interception pursuant to that Order commenced on March 27, 2009 and remains active. Wire communication involving some of the TARGET SUBJECTS have been intercepted, pursuant to that Order.

11. On March 31, 2009, the Honorable Wanda K. Heard, Judge of Circuit Court for Baltimore City, signed an Order pursuant to Maryland Courts and Judicial Proceedings Article, Section 10-408, authorizing the interception and recording of wire communications occurring over the cellular telephone assigned call number **(443) 683-4573** and bearing international mobile subscriber identity ("IMSI") #310410130470002 ("STATE LINE B"), Antonio Guevara, 987 Potee, Baltimore, Maryland 21225 and utilized by Tyrone Dow, a/k/a "Flavor," subscribed to Darryl

Chetam, 4410 Park Heights Avenue, Baltimore, Maryland with service provided by T-Mobile. Interception pursuant to that Order commenced on March 31, 2009 and remains active. Wire communication involving some of the TARGET SUBJECTS have been intercepted, pursuant to that Order.

12. Pursuant to these wiretaps, other law enforcement agents and I intercepted hundreds of calls in which BGF members made arrangements for narcotics transactions and discussed acts of violence. Other agents and I also intercepted numerous calls between Glasscho and his suppliers and customers in which Glasscho made arrangements to receive and distribute quantities of heroin.[2]

## III. The Indictments

13. On April 8, 2009, a Federal Grand Jury sitting in the District of Maryland returned separate Indictments charging a total of 25 BGF members and associates with drug-trafficking and other offenses. Specifically, one Indictment (the "Brown Indictment") charged Eric Brown and thirteen others, including Deitra Davenport, Rainbow Williams, Marlow Bates, and current or former corrections employees Terry Robe, Asia Burrus, Musheerah Habeebullah, and Takevia Smith, with participating in a conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846; the same indictment also charges Randolph Edison, Roosevelt Drummond, and Zachary Norman with involvement in the drug conspiracy, but

---

[2] Based on my training and experience, I know that narcotics traffickers often use codes when speaking on the telephone about their illegal activities, and, specifically, often speak in code about narcotics, quantities of narcotics, payments for narcotics, and the proceeds of narcotics-related transactions. Where I have described those conversations in this affidavit, I have done so only in substance and in part. Based on my training and experience and other investigation in this case, including other intercepted calls, I have included my interpretation of these calls in brackets and at the end of the summary of each call.

with also participating in a Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951. A second Indictment (the "Glasscho Indictment") charges Kevin Glasscho and 10 others, including Cassandra Adams, Tyrone Dow, Calvin Robinson, Avon Freeman, James Huntley, Darnell Holmes, a/k/a "Moe," Darryl Taylor, Joe Taylor-Bey, a/k/a "Joe Taylor," Darien Scipio, a/k/a "Reds," and Lakia Hatchett, with participating in a conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846. All of the offenses charged in these Indictments were committed in furtherance of, or were committed by members of, the BGF racketeering enterprise. Copies of those Indictments, which have been filed under seal, are attached hereto.

## IV. The BGF Criminal Enterprise

### A. Overview

14. As more fully described below, BGF is attempting to take over the illegal drug trade at multiple locations in Baltimore, Maryland and is committing drug-related acts of violence and extortion schemes as part of its efforts to expand its influence from inside the prison walls to the streets of Baltimore. The evidence obtained to date has established that BGF is active in numerous prison facilities in Maryland, including, among others, North Branch Correctional Institution (NBCI), Western Correctional Institution (WCI), Eastern Correctional Institution (ECI), Roxbury Correctional Institution (RCI), Maryland Correctional Institution – Jessup (MCIJ), Maryland Correctional Institution – Hagerstown (MCIH), Baltimore City Correctional Center (BCCC), and Metropolitan Transition Center (MTC), and that the leaders and members of BGF in Maryland include the following, among others:

a. Eric Brown, a/k/a "Dee Brown," a/k/a "E," has been identified as one

of the leaders of BGF in the State of Maryland. Brown is currently incarcerated at the Maryland Transition Center (MTC) in Baltimore, Maryland. Brown has a 1992 conviction for possession with intent to distribute a controlled substance and two 1990 convictions for unlawful manufacture of controlled substances.

b. Ray Olivis, a/k/a "Uncle Ray," a/k/a "Unc," is one of the founding members and leaders of the BGF movement in Maryland. Olivis was until recently incarcerated at MTC but is now at the Baltimore City Correctional Center. Olivis has a 1979 conviction for assault, a 1987 conviction for robbery with a deadly weapon, a 1990 conviction for felony theft, a 2001 conviction for burglary, a 2004 conviction for possession with intent to distribute a controlled substance, and a 2007 conviction for being a felon in possession of a firearm.

c. Deitra Davenport is Brown's wife who assists with the smuggling of contraband into facilities and is a corporate officer of "DeeDat Publishing," which is the publishing company that produces the "Black Book," a purported BGF manual described *infra*.

d. Rainbow Williams, who has been identified as one of the leaders of BGF, is a lieutenant who handles the day-to-day drug distribution network and is also involved in the smuggling of contraband into correctional facilities. Williams has a 1998 conviction for murder.

e. Tomeka Harris is a member of BGF who is involved in financial operations of the gang and is also an owner of Club 410.

f. Marlow Bates is a BGF member who is involved in the smuggling of contraband into correctional facilities.

g. Randolph Edison, a/k/a "Uncle Rudy," is a BGF leader who is involved in acts of violence committed on behalf of the gang.

h. Roosevelt Drummond, a/k/a "June," is a BGF member who is involved in acts of violence committed on behalf of the gang.

i. Zachary Norman, a/k/a "Zack," is a BGF member who is involved in acts of violence committed on behalf of the gang.

j. Terry Robe, Asia Burrus, Musheerah Habeebullah, and Takevia Smith, among others, are corrections personnel recruited by BGF to assist in the smuggling of contraband to incarcerated members of BGF, who in turn sell those items for the financial gain of the enterprise.

k. Thomas Bailey, Robert Nedd, a/k/a "Pizza," and Daryl Moore, a/k/a "Nutty Bar," are among other BGF leaders in Maryland prisons.

15. As more fully described below, BGF member Kevin Glasscho, a/k/a "KG," is a BGF member who operates a heroin-trafficking organization that distributes heroin in the Baltimore area and smuggles heroin into BGF members and others in Maryland prisons. Glasscho has a 1981 conviction for second-degree murder, a 1993 conviction for possession with intent to distribute a controlled substance; a 1993 conviction for possession of a handgun, and a 1993 conviction for failure to appear. Other members of Glasscho's organization include the following, among others:

a. Cassandra Adams, an individual Glasscho claims is his wife, who assists him in counting and structuring deposits of drug money;

b. Darnell Holmes, a/k/a "Moe," who operates one of Glasscho's stash houses and assists in the daily operation of his drug trafficking organization;

c. Tyrone Dow, who is Glasscho's source of supply of controlled substances; and

d. Darryl Taylor, who assists Glasscho in smuggling controlled substances to inmates in correctional facilities.

**B. Structure/Overall Operations of BGF**

16. During a series of debriefings in late 2008 and early 2009, a reliable confidential informant (CS1)[3] who is a member of BGF advised investigators that BGF is a nationwide prison gang with a presence in every correctional institution in the country. CS1 related that he/she has been in various prisons throughout the country and at each institution there has been a faction of BGF. CS1 related that BGF is violent both inside and outside prison, but that historically BGF has not been well-organized outside of prison. CS1 stated that currently, BGF is attempting to change this within Baltimore, Maryland by becoming more organized and effective on the streets.

17. CS1 explained that within the prisons, BGF has a group of individuals who are in leadership roles/positions of authority and that this leadership group is known as the "Supreme Bush." All members who are not in the Supreme Bush are considered "members" of the Bush or Mansion. The only place Bush members hold rank is within the correctional system; once a Bush member is back out on the streets, he or she is considered a regular BGF member.

18. CS1 identified BGF leaders at multiple Maryland prisons, including Eric Brown, who is incarcerated at MTC and who is coordinating and organizing BGF's activities on the streets of Baltimore. CS1 reported that Brown has a cellphone inside the prison, which Brown uses to

3 CS1 is cooperating in hopes of receiving a reduced sentence. Information provided by CS1 to date has consistently proven reliable and has been corroborated by independent investigation.

communicate with BGF members outside of the prison. As described below, a court-authorized wiretap was later installed on Brown's cellphone, identified herein as TARGET CELLPHONE #1.

19. During a series of debriefings over the past several months, a confidential informant (CS5)[4] who is an incarcerated and a BGF member identified "Uncle Ray" or "Ray Ray" – later identified as Ray Olivis – is a high-ranking member and one of the founders of BGF in Maryland. CS5 reported that "Uncle Ray," who is incarcerated at MTC, is coordinating BGF operations throughout the Maryland correctional system by utilizing a contraband cellphone bearing call number (443) 310-9570. That cellphone number has been corroborated by intercepted jail calls. CS5 identified Eric Brown as a high-ranking BGF member who is assisting "Uncle Ray" in coordinating BGF operations. CS5 identified TARGET CELLPHONE #1 as the cellphone number for Eric Brown, which Brown is using to conduct BGF business. According to corrections officials Ray Olivis is scheduled to be released from prison in December 2009. As more fully described below, the information provided by CS5 has been corroborated by, among other things, numerous intercepted calls involving Brown, Olivis, and other BGF members.

20. Multiple confidential sources described herein have told law enforcement that BGF members often refer to each other as "comrades."

21. On April 13, 2009, a BGF meeting was held at Druid Hill Park in Baltimore, Maryland, near the Maryland Zoo. At least approximately 100 BGF members were in attendance, including Rainbow Williams, who was one of the leaders. After observing what they deemed to be suspicious activity, Baltimore Police officers responded to the vicinity of the meeting. Upon

---

[4] CS5 has been cooperating with law enforcement for the past several months and has been compensated for the information provided. The information provided by CS5 has proven reliable and has been corroborated by independent investigation.

observing the police, the BGF members quickly dispersed on foot and in vehicles. Officers recovered, among other things, one firearm, multiple copies of the Black Book, BGF t-shirts emblazoned with the slogan, "Revolution is the Only Solution," and a document listing BGF members who have violated BGF rules and the sanctions imposed on each for those violations. Following this incident, calls were intercepted over the wiretaps in which Eric Brown chastised Rainbow Williams for holding the meeting in such a manner as to draw the attention of law enforcement. Brown stated in a scolding manner, "I been tellin' you and tellin' you, and you ain't listenin'." In reference to being stopped by the police, Brown added, "Ain't nothin' good about that, yo."

C. **BGF Code of Conduct**

22. CS1 and another reliable confidential informant (CS6)[5] both advised that BGF members are required to learn and abide by a code of conduct for the gang, and that BGF members are periodically tested on their knowledgeof the gang's history and rules. Members who fail to demonstrate adequate familiarity with the gang's history and rules are "sanctioned," or beaten.

23. CS1 reported that Eric Brown had recently published "The Black Book – Empowering Black Families and Communities" (hereinafter the "Black Book"). According to CS1, Brown is purportedly distributing the book in order to disseminate BGF doctrine, but that the Black Book is a ploy by Brown to make BGF in Maryland appear to be a legitimate organization and not involved in criminal activity, whereas CS1 advised that Brown is a drug trafficker and that BGF funds its operations primarily by selling drugs.

---

[5] CS6 has pled guilty to federal charges and is cooperating in the hopes of receiving a reduced sentence. The information provided by CS6 has consistently proven reliable and has been corroborated by independent investigation.

24. CS1 stated that Brown is making money from the publishing of the Black Book and that all of Brown's money is handled by Brown's wife or girlfriend, Deitra Davenport, who is also involved with BGF operations.

25. In January 2009, a reliable confidential informant (CS2)[6] reported that Eric Brown recently wrote a book called "The Black Book – Empowering Black Families and Communities." Although Brown is the author of the book, the author is listed as "La Eusi Jamaa (The Black Family)."

26. Law enforcement has obtained a copy of the Black Book, whose author is listed as "La Eusi Jamaa (The Black Family)." The Black Book was reportedly published by "DeeDat Publishing Company" trading as Harambee Jamaa Inc., which, is owned or operated by Deitra Davenport. The corporate officers listed for Harambee Jamaa Inc. are Eric Brown, president, and Deitra Davenport, secretary. An order form in the book indicates that the price is $15 for "prisoners" and $20 for "non-inmates."

27. Pursuant to monitoring of recorded jail calls and electronic surveillance conducted during this investigation, numerous calls were intercepted in which Eric Brown and other BGF members discussed the publication and distribution of the Black Book, the structure of BGF, and internal discipline of BGF members.

a. For instance, on or about November 18, 2008, an outgoing call was placed from a recorded telephone line at NBCI to (410) 365-8152. Tyshawna LNU answered and arranged a three-way call between Thomas Bailey at NBCI and Eric Brown at MTC. Bailey and

---

6 CS2 who has not been promised or provided with any monetary or other form of compensation for the information provided. Information provided by CS2 to date has consistently proven reliable and has been corroborated by independent investigation.

Brown greeted each other, and Brown explained that he was currently on the other line with "Comrade Doc" from Roxbury [an apparent reference to a BGF member at Roxbury Correctional Institution]. Brown then put the three of them together on a conference call. Bailey explained that he had gotten Brown's telephone number from Joe [a reference to Gregory Fitzgerald]. Brown asked, "What's happening man?" Bailey answered, "Man, ain't nothing man. Rustling man, trying to get this together [a reference to his on-going efforts to advance BGF within NBCI], man. You know what I mean? Goodness gracious, you put a burden on me, man." Bailey went on to explain that "Pizza" [a reference to Robert Nedd] is in population now and is doing a lot of crazy stuff. Bailey stated, "I need some political recourse with this dude, man. I'm trying to work with him [a reference to Bailey attempting to persuade Robert Nedd to follow the BGF protocols] without ramming him [a reference to harming Robert Nedd for his failure to comply], right?" Brown responded, "Right, right, right, he hard, ain't he man?" Bailey said, "He got this utopia thing man, which don't exist." Brown asked, "You get a copy of the book [a reference to the Black Book]?" Bailey answered, "Nah." Brown went on, "Well we gotta mail you one tonight then. I'm going to tell the misses [a reference to Deitra Davenport, Brown's wife] to take one to work tomorrow and mail you one tomorrow." Brown stated, "Man it don't get better than you and you know, you and that crew, man. I mentioned you uh, in, in the book [a reference to the Black Book]. You understand what I'm saying? I mentioned the struggle [a reference to BGF's continued efforts against the establishment]. You know what I mean? You know, I'm just so proud of you, man, and Nutty [a reference to Daryl Moore, a/k/a "Nutty Bar"], man, and how you built me up. It carries me and how much I learned from you all. You know what I mean?" Bailey responded, "Yeah, yeah." Brown continued, "I just think how much I learned from you. How sharp you is. Because you got

that guerrilla thing on lock, a lot of people don't get to know about your brains. You understand what I'm saying?" Bailey responded, "Right, right, right." Bailey went on to explain that Joe [a reference to Gregory Fitzgerald] was out there with "Man," light skinned man. Bailey said, "Joe put a whole lot of foot work in for me, man. You know what I mean?" Brown responded, "Yeah, yeah of course, of course man. Cause when he used to travel with that kind of cake [a reference to a large amount of drug proceeds] right. I'm keeping records. You understand what I'm saying?"

b. Later in the conversation, Brown and Bailey discussed BGF's future plans. Brown said, "Listen, man, we on the verge of big things, man." Bailey explained, "Alright man, uh you know what I mean? You already know man, I'm a solid soldier. Whatever you need, whatever you need me to do man, I'm there, man." Brown explained, "OK, this positive movement that we are embarking upon now, right, is moving at a rapid pace, right. It's happening on almost every location [all prisons and other locations where BGF is active]." Bailey explained that they needed to be brought up to speed. Brown stated, "Revolution is the only solution brother." Bailey made it known that whatever direction Brown says it is going is fine because right now Brown has the reins [is the leader of BGF in Maryland]. Brown went on to explain that the book [Black Book] is full of lessons and study guides [lessons and related materials to help new members learn the history and ways of BGF] to which Bailey replied, "Alright, I'm waiting on it man." Brown went on to explain that the study guides are used to teach the lessons and that Brown will have a book sent to Bailey personally. The book sent to Bailey will have something the others do not have, which is the test along with the answer keys. Brown stated that each section should be taught as a class and that this is happening everywhere [all prisons and other locations where BGF is active]. Brown said he does not want anyone to get left behind.

c. On February 26, 2009, at approximately 10:56 pm, Brown placed an outgoing call to Deitra Davenport. During the conversation Brown told Davenport, "I wanted you to do something." Davenport asked, "What you want me to do?" Brown said, "Go to the firing range." Davenport asked, "Why?" Brown continued, "Bust that gun for a minute. You ain't been out there in a while." As the conversation continued, Brown received an incoming call from (410) 242-6954 with an unknown subscriber and utilized by an individual known only as "Bones." Bones told Brown, "I got 50 books [a reference to the Black Book], right. That's basically left over. Um, I can run the cover for them and all that. But um, you know next week I go and see my PO [an apparent reference to a parole or probation officer]. So I don't know how that's gonna go. I'm trying to see if you want to snatch them or if you just, you know what I mean? Cause I don't got nothing to do with them. You know what I mean? Like I ain't charging you for them or nothing like that. You feel me?" Brown asked, "Alright, what you want for them?" Brown and Bones then agreed on a price of $100 for the remaining books. Brown explained that "D" [a reference to Deitra Davenport] would be ready for him with the money whenever Bones could deliver the books. Brown said that he would give Bones Davenport's contact number. Brown then asked, "Hey, Bones, how many books have I bought so far?" Bones explained, "The first run was 200, this last run was 200 and then I think you got like two runs in between or you may got three runs in between for a hundred. So they would be 700 easy, right there." Brown explained, "I counted 900." Bones responded, "900, it's possible." As the conversation regarding the Black Book continued, Brown connected Bones and Davenport on a three-way call. All three then discussed the time frame in which the Black Book had been first published and distributed. Based on my training and experience and other information developed during this investigation, I believe that in the initial part of this

conversation, Brown was instructing Davenport to go to a firearms range in order to improve her skills with a firearm she has in her possession, consistent with BGF rules requiring female members to be proficient with firearms. When Bones called Brown, they discussed the publication and dissemination of at least 700-900 copies of the Black Book.

### D. Drug-Trafficking/Drug Smuggling

28. CS1 stated that drug trafficking both inside and outside of prison is the primary means by which BGF makes money and is a significant part of BGF's activities on the streets of Baltimore. CS1 explained that BGF will sell any drugs, but primarily cocaine and heroin. According to CS1, Brown is coordinating sales of cocaine and heroin on the streets of Baltimore from inside of prison. CS1 said that Brown's key lieutenants on the streets for drug-trafficking activities include Rainbow Williams, Gregory Fitzgerald, a/k/a "Joe," and Austin Roberts, a/k/a "Yellow."

29. CS2 advised that multiple prison guards and other employees of the Maryland Department of Corrections are assisting BGF members in smuggling contraband – including drugs, tobacco, cellphones, and weapons – into prison facilities in Baltimore.

30. Pursuant to monitoring of recorded jail calls and electronic surveillance conducted during this investigation, agents and officers intercepted numerous calls in which Eric Brown and other BGF members discussed and arranged narcotics transactions.

a. For instance, on or about November 18, 2008, an outgoing call was placed from a recorded telephone line at NBCI to (410) 365-8152. Tyshawna LNU answered and arranged a three-way call between Thomas Bailey at NBCI and Eric Brown at MTC. During that conversation, Bailey told Brown, "Right now man, I'm short of a girl. I need, you know, I need

somebody to work the post office for me and carry some mail [smuggle drugs and/or other contraband to Bailey at NBCI]." Brown responded, "Right, right." Bailey asked, "You got somebody with that type of interest?" Brown stated, "Okay, okay, okay, okay, I'll get on top of that, I'll get on top of that. That's not a problem." Brown then explained that he does not want Bailey to get mad if he makes a bad pick when he gets the girl. Bailey stated, "I can't afford that right now. I'm in a tough situation." Brown assured him, "I understand, I understand. I'm going to help you as much as I can." Brown explained that he would look around for a trustworthy friend. Bailey said, "It's a gamble anyway. You know what I mean?" Bailey even explained that his mother had offered to be the girl [courier] coming to the prison but that he had declined the offer. Later in the conversation Brown asked, "What is it you need me to do for you personally?" Bailey answered, "I need a girl [female courier], man. I need the girl." Brown responded, "Is that it?" Bailey answered, "That's it." Brown confirmed, "You sure?" Bailey explained, "Right now I need the girl. That's the most important thing man. You know what I mean?" Brown assured Bailey, "OK, so what I'll do, I'll get on top of the girl." As the conversation came to an end, Brown made it clear that Bailey needed to keep in constant contact with Brown. Bailey stated, "I need the girl, man. Once I get the girl, man, everything, everything." Brown acknowledged his problem, "Man I've been in that situation before man. I know where you're coming from, then everything will fall into place. I got you, man." Based on my training and experience and on other information developed during this investigation, including other intercepted calls, I believe that in this call, Brown and Bailey are discussing the problems associated with finding a female courier to smuggle drugs into correctional facilities. Brown also assures Bailey that once a satisfactory method of smuggling drugs into the facility is accomplished, Bailey's situation will improve.

b. On February 24, 2009, at approximately 3:12 pm, Brown made an outgoing call to Deitra Davenport. During the call, Brown told Davenport, "Give five of them cans to Rainbow and give him $300 too." Davenport asked, "Do what?" Brown continued, "Give Rainbow the five cans today and give him $300 too." Davenport responded, "Um huh." Brown then said, "He should have $300. That's what I was getting at when I was asking you, what about the money, don't he owe some money for them books [a reference to the Black Book]. Don't he?" Davenport went on to explain that she believed that Williams currently owed money for 30 books. Brown then explained that he would investigate. Based on my training and experience and other information developed during this investigation, I believe that, in this conversation, Brown was instructing Davenport to deliver "five cans," which I believe to contain contraband and $300 to Rainbow Williams. The "five cans," which on occasion contain tobacco, would be delivered to Williams for the purpose of having him arrange for the items to be smuggled into the prison where Brown is currently being housed. The $300 referenced is believed by law enforcement to be payment that was to be provided to an unidentified corrections officer who would be responsible for smuggling the contraband into the prison facility. During the course of this investigation law enforcement has learned from prison officials, confidential sources, and cooperating inmates that there are correctional officers working in the Maryland prison system that are assisting inmates with the smuggling of illegal contraband into the different prisons. Some of these items include tobacco, weapons, and controlled substances including heroin and ecstasy.

c. On February 24, 2009, at approximately 5:19 pm, Brown received an incoming call from Deitra Davenport. After the two greeted each other Davenport said, "I need you to call Rainbow and see where he, where I need to meet him at." Brown asked, "You can't catch

him?" Davenport answered, "I don't have his number." At this time Brown then placed a three-way call to Rainbow Williams. The three-way call went unanswered. Brown then returned to his conversation with Davenport and said, "Just go ahead and lay back, he just got to come see you." Davenport then said, "Alright." Based on my training and experience and other information developed during this investigation, I believe that this communication was a follow up to Brown and Davenport's earlier conversation regarding the "five cans" and the "$300." Davenport was inquiring about when and where she should meet Williams to make the delivery of the contraband.

d. On February 24, 2009, at approximately 9:14 pm, Brown placed an outgoing call to Deitra Davenport. During the conversation Brown asked, "So how far are you away from him?" Davenport answered, "We supposed to be meeting down, right here on Harford Road and Hamilton. But I don't see him yet." Brown then said, "Let me call him." Brown then placed an outgoing call to (410) 336-0375, utilized by Rainbow Williams, which went unanswered. Brown then returned to his call with Davenport and asked, "You there and he ain't there?" Davenport answered, "No I don't see him." Brown then said, "Alright just roll out then." Davenport responded, "What?" Brown continued, "Yeah, just roll out I'll deal with his ass some other time. I, I don't like shit like that. I don't like shit like that, having you out there like that." Davenport continued, "He said ten minutes." Brown continued, "He just fucked up. He ain't even answering his phone." Davenport asked, "You wanna call him again before I go all the way back home?" Brown answered, "Yeah, I'll call him again." Brown then attempted a three way call with Williams which went unanswered. Brown then said, "Yeah go ahead, roll out D." Brown then received an incoming call from Williams. Brown then conducted a three-way call with himself, Davenport and Williams. Brown said, "D." Williams responded out of turn, "Yeah." Brown explained, "Yeah,

yeah she on there, Bow." Williams responded, "You there already?" Davenport responded, "You said ten minutes." Williams continued, "Alright, I'm almost there. I'm almost there, I'm coming right down the street now." Davenport explained, "Alright I'm going to pull into this Wachovia." Williams responded, "Alright." The three-way conversation with Williams then concluded. Brown, however, continued to stay on the phone with Davenport as if he was making sure she was safe. Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that in this conversation, Williams was meeting with Davenport, at the direction of Brown for the purpose of receiving the five cans of contraband that Brown wanted smuggled into the prison.

e. On March 1, 2009, at approximately 12:45 pm, Brown received an incoming call from (443) 520-2121, utilized by Marlow Bates. During the conversation Bates asked, "Did you ever get your sweat suit and your tenners?" Brown responded, "Nah." Bates asked, "Why it's hard getting them in?" Brown responded, "I got knocked off trying to get the tenners in the visiting room." Bates commented, "Oh you did! Who, who knocked, you off?" Brown answered, "A little African girl." Bates said, "You know when I did that last time, you know when I did that, you supposed to, you supposed to go in there with your shoe laces like unloose, where as though you ain't gotta fuck with it." Brown said, "I did, I did, it was Rainbow fucked that up." Bates asked, "Oh what he had to untie, he had to bend down to untie them?" Brown responded, "No he had them untied. But he had them untied to the point that you could see that shoe lace, like hanging. That just look like a dead give-away." Bates said, "I was wondering if you get that shit on there now." Bates went on the explain that he will be going to court the next day and that he wants Brown to keep his phone on so that Bates could contact Brown from court and update him on Bates's

situation. Based on my training and experience, I believe that Bates had supplied Rainbow Williams with a pair of shoes which had an illegal substance hidden in the shoes. Williams in turn, according to Brown, wore the shoes into the prison during a visit with Brown and was attempting to pass them off to Brown. Due to the way Williams had the shoes tied a female guard was able to stop the attempted delivery. Other law enforcement agents and I have learned from corrections officials that during visits with inmates, individuals often attempt to swap shoes which contain controlled substances with the inmate they are visiting.

f. On March 8, 2009, at approximately 1:21 am, Brown received an incoming call from (443) 742-3874, utilized by Melvin Gilbert, a heroin-trafficker who is currently incarcerated at the Maryland Correctional Adjustment Center (MCAC) pending trial on federal drug conspiracy and witness-murder charges. During the conversation, Gilbert said, "Man I need you in a big way man." Brown asked, "What's going on?" Gilbert replied, "I need the joint, I need the (unintelligible). I need, I need the (unintelligible). You know, the phone." Brown responded, "Man, I thought you got that man." Gilbert replied, "You didn't send it over, did you?" Brown answered, "I told Pig to take it." Gilbert then instructed Brown to hold on. Gilbert continued, "Yeah, uh man he didn't get nothing over here. He said she'll holler at me. Man look man, if, if you all have a way man that I can get somebody, I can get my lady to go, go get grab the motherfucker tomorrow and then get it to somebody. But I got a way, just tell me what to do." Brown responded, "Nah, nah, nah they, the problem is the way. Yeah shit, it ain't, it ain't, it ain't none of that. None of that ain't the problem. The problem is the way, like damn." Gilbert responded, "Oh." Brown continued, "They got our ass boy, they shut this motherfucker down. You hear me? They shut this motherfucker down and now they come to get every, everyone that's in this motherfucker." Gilbert responded,

"God damn." Brown continued, "Let me tell you, if something don't come up, if they, if we don't open a hole up by the end of this month it probably don't be no more than about twenty phones left in this motherfucker. I'm telling you. They're tearing our ass up, Melvin." Gilbert advised, "Yeah, they heavy over here too [a reference to MCAC]. But over here they ain't fucking with you, they just knocking these motherfuckers off." Brown continued, "We just, we just trying to find us a way right now." Brown went on to explain that he was recently expecting four new phones to come in, but when they arrived one was missing. Brown said that he believed that the missing phone had been delivered to Gilbert. Gilbert explained that he never received the phone. As the conversation continued, Gilbert asked, "You know the big titty motherfucker who used to work in MCIJ. She used to work for us though." Brown asked, "What's her name?" Gilbert answered, "Simmons." Brown acknowledged that he knows Simmons. Gilbert then said, "Man, holler at that bitch for us. She over here and she working, but she's staying away from me." Gilbert explained that Simmons was doing things for other prisoners who are "low budget" when in fact she should be working for Gilbert. Brown went on to further identify Simmons as a Sergeant, who had at one time worked in the kitchen at MTC. Gilbert went on to reference another unidentified female corrections officer, who he believes is smuggling items into MCAC. As the conversation continued, Gilbert mentioned another corrections officer who is pregnant with his child and who is believed to be providing information regarding other inmates. Gilbert explained that this corrections officer recently was threatened by an unidentified inmate. This corrections officer told Gilbert that she was in fear for her safety, but Gilbert said he told her, "'Don't you ever call me and tell me, like you're worried about another motherfucker. Them niggers be bluffing.' I said, 'I'm not a bluffer.' I said, 'I'm the one that you gotta worry about.'" Based on my training and experience and other information

developed during this investigation, I believe that in this conversation, Gilbert was asking for Brown's assistance in obtaining a cellular telephone in prison. The two discussed the fact that even though they both have corrupt corrections officers working for them, there has been a heightened security presence which is affecting their smuggling operation.

g. On or about April 4, 2009, Eric Brown was intercepted during two lengthy phone conversations with a BGF member identified as "Kiru" a/k/a "Cabo." During these calls, Brown and the other BGF member discussed a recent theft of 18 grams of heroin that had been smuggled into a prison facility secreted inside of a cellphone. During these conversations, Brown and the other BGF member discussed efforts to identify the individuals responsible for the theft of the heroin and to recover the stolen heroin. Brown told the other BGF member that he was going to conduct an investigation into the theft and attempt to purchase some of the stolen heroin using "fake money," an apparent reference to a Green Dot card. Intercepted calls revealed that the individual believed to be responsible for the theft was assaulted by other BGF members in the prison and that ultimately Brown was able to recover approximately 2.5 grams of the stolen heroin and a cellphone.

31. Pursuant to the electronic surveillance conducted during this investigation, numerous calls were intercepted with prison guards or other employees in which Eric Brown or Rainbow Williams discussed smuggling contraband to BGF members in prison facilities.

a. For instance, on February 24, 2009, at approximately 10:52 pm, Brown placed an outgoing call to (443) 449-9240, utilized by corrections employee Takevia Smith a/k/a "Kiki." Brown asked, "What's up with the big controversy concerning you?" Smith asked, "What controversy?" Brown continued, "You, you telling on some girl." Smith responded, "Ain't nobody

telling…." Brown continued, "I'm just asking you what's up with it, that's all." Smith continued, "Nothing, Emmanuel and I talked about some Little Earl and the nigger Ski told him that shit and we all pulled each other up and they never told him no shit like that. Cause Little Earl was standing there when the shit happened. Poe my witness on that. I ain't never tell nobody no shit like that. They always got my name in something like that. They don't like me in that kitchen." Brown then asked Smith who Smith had last had sex with in the kitchen. Smith said that she had not had sex with anyone in the kitchen. Smith went on to explain that unidentified persons had spread the rumor that she had been fired from her job. Smith explained that they were obviously wrong because she was still employed. Smith said, "It take a lot to bring me up on the smallest shit, I got the Union behind me." Brown then asked Smith if she was alright and wished her a happy birthday. The call then disconnected. Based on my training and experience and other information developed during this investigation, I believe that in this conversation, Brown was asking Smith whether or not she had provided information to other correctional officers regarding an unidentified inmate who was violating prison regulations. Brown was also questioning Smith about non-regulation activities that she was involved in while working in the prison. Smith stated that although she might have committed small violations in the institution, she was not worried about her job because she had the "Union" behind her and it would be difficult for her to be fired.

b. On February 24, 2009, at approximately 10:58 pm, Brown received an incoming call from corrections employee Takevia Smith, a/k/a "Kiki." During the conversation Smith said, "Yeah, ain't nothing going on with me. They just always got my name in some bullshit. Ask Earl I ain't start that one." Brown responded, "I heard that. But I'm just saying." Smith continued, "I just hope he don't even say nothing to me. Just stop keep telling people little shit about

me. Like cause they come right back and tell me like, yeah why Emmanuel said you ratted on me. How can I rat on you like, even if oh I caught you all....Make your mind up. If that the case you a rat cause you ratting on one. What the fuck. Cause these niggers in there got it all fucked up, like leave me alone." Brown then asked if she has been alright. Smith said, "Yeah, I be alright every day. I don't loose no sleep over that bull crap." Brown then asked, "When you gonna take care of me?" Smith responded, "Uh, see last week I was off of work." Brown responded, "Oh yeah." Smith explained that Brown needed to keep in contact with her. Based on my training and experience and other information developed during this investigation, I believe that in the initial conversation, Brown was inquiring whether or not Smith had been providing information regarding unidentified inmates to other correctional officers, which she denied. When Brown asked, "When you gonna take care of me?" Brown was referring to Smith smuggling illegal contraband into the prison facility for Brown. Smith explained that Brown needed to keep in contact with her in order to arrange that type of transaction.

c. On February 24, 2009, at approximately 11:27 pm, Brown placed an outgoing call to corrections employee Takevia Smith, a/k/a "Kiki." During the conversation, Brown and Smith discussed provocative photographs of Smith which Smith had sent to Brown via text message. Later in the conversation Brown asked, "What if it's like I came over there and picked something up from somebody too though right." Smith responded, "Right, well they let you in the back of the kitchen. Like I don't know I just be on my shit. I be like, I'm very sneaky so like I get them in and I get them out. You see what I'm saying?" Brown responded, "Yeah." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Smith was acknowledging that she was engaged in prostitution inside

of the correctional facility. This is in part based on information recently obtained from corrections officials and confidential sources who have personal knowledge of Smith's criminal activity. According to at least one confidential source, Smith obtains money in exchange for sex in the prison.

d. On March 3, 2009, at approximately 10:24 pm, Brown received an incoming call from Takevia Smith, a/k/a "Kiki." During the conversation Smith said, "Just cause I don't work over there no more, don't mean you all got to stop calling me." Brown talked about how he has been sick recently. Smith continued, "I'm stress free now. That damn job was stressing me out." Brown asked why she was stressed with her job. Smith said, "Because they was stressing me out and I, I had went there last week. I took off my bag and they was stressing me out. The big boss called me back, but they didn't find anything. I left." Smith went on to explain that she wants to be a nurse. Smith explained, "That job [the prison job] be cool while it lasted. But that shit like having a McDonald's job, I got to break the law to get money." Smith continued, "Before I even got caught up in some old bull shit. Getting knocked off or motherfuckers keep on spreading rumors, I'd rather quit." Based on my training and experience and other information developed during this investigation, I believe that Smith, who had recently resigned from her position at the prison following a search of her person as she entered the facility, was advising Brown that she had quit her job before she was arrested smuggling illegal contraband into the facility.

e. Some other examples of such calls involving particular corrections employees are discussed *infra* in the sections relating to those individuals.

32. During a series of calls intercepted in April 2009, Eric Brown discussed with Deitra Davenport and others the fact that he and other BGF members were smuggling champagne and Grey Goose vodka into MTC. Brown attempted to get lobster into the facility but ultimately was

able to smuggle in only "salmon with shrimp" and "crab imperial." Brown asked Davenport to smuggle a "good cigar" into the facility so he could enjoy a "good cigar" while he was drinking.

E. **Extortion/Financial Transactions**

33. CS1 stated that BGF is extremely violent, both inside and outside prison facilities, and is responsible for numerous crimes of violence and related crimes, including robbery, extortion, and murder for hire.

34. CS2 further advised that several guards with the Department of Corrections are assisting BGF members with an extortion scheme under which BGF offers "protection" while in jail to newly arrested persons who are not BGF members. In exchange for this "protection," an arrested person is required to pay money to BGF. Specifically, BGF supplies the person to be protected with a credit card number of a prepaid credit card (sometimes referred to as a "Green Dot" card), and the person to be protected is required to have family members or friends place money onto the card when periodically directed to do so by BGF. The credit card is often held by one of the corrections officers who are assisting BGF or by BGF members on the street. The credit card is then used to pay for items for BGF members. If the newly arrested inmate does not agree to pay for the "protection," then he or she is targeted for violent crimes while in prison.

35. Pursuant to the electronic surveillance conducted during this investigation, numerous calls were intercepted in which Eric Brown and other BGF members discussed financial transactions involving the use of "Green Dot" cards.

a. For instance, on February 23, 2009, at approximately 9:44 pm and 9:46 pm Brown made outgoing calls to 1-800-473-3636, assigned to the Money Pac Hotline, which is part of the Green Dot Financial Network. During the 9:44 pm call, Brown added $50.00 to the

account number ending in 2087. During the 9:46 pm call, Brown added $50.00 to the account number ending with the numbers 2135. Based on my training and experience and other information developed during this investigation, I believe that Brown and other BGF members are laundering illegal proceeds gained from the sale of controlled substances, the sale of contraband including tobacco, and the extortion of non BGF prisoners inside of the correctional facilities by using Green Dot debit cards.

b. On February 23, 2009, at approximately 9:48 pm, Brown placed an outgoing call to (443) 597-8806 with an unknown subscriber, utilized by Jesse LNU. When the call connected, Brown asked, "May I speak to Jesse?" Jesse responded, "This is her." Brown continued, "How you doing, this EB, Jesse. Uh, Tay wanted to buy some books or something." Jesse responded, "Yeah what do you need that, what do you need that Green Dot number?" Brown answered, "Yeah if that what he want, if that's how he wants to do it?" Jesse responded, "I guess, he told me to get a Green Dot for $25. Is that what you need?" Brown continued, "That's how we'll do it then." Jesse then provided Brown account number 9190 9909 7411 7177 407, which Brown acknowledged. Brown then asked, "Where the books go now? Where do I mail them to?" Jesse told Brown to mail the books to DOC number 278 512 under the name Dante Smith. Based on my training and experience and other information developed during this investigation, I believe that, in this conversation, Brown was obtaining payment through the use of a Green Dot debit card for selling copies of the Black Book to DOC inmate Dante Smith.

c. On March 1, 2009, at approximately 1:28 pm, Brown received an incoming call from BGF member Joe Edison, a/k/a "Outlaw." During the conversation Edison asked, "How do you know if your Green Dot account is froze?" Edison continued, "When you go

to use the card, it won't let you use the card. Like to go buy something." Brown added, "Or take money off it." Edison said, "Yeah, cause my sister wanted to get some money today, they wouldn't let her do it." Brown explained, "They gonna contact you." Based on my training and experience, I believe that during the conversation between Brown and Edison the two were discussing the use of Green Dot debit cards which are commonly used by inmates for the purpose of laundering illegal proceeds.

F. **Acts of Violence**

36. CS1 stated that BGF is extremely violent, both inside and outside prison facilities, and is responsible for numerous crimes of violence and related crimes, including robbery, extortion, and murder for hire. CS1 explained that BGF employs "Death Angels" or hitmen to carry out murders on its behalf. CS1 related that only certain people know the identity of each "Death Angel." CS1 advised that BGF will employ others to act as hitmen who may or may not be "Death Angels." According to CS1, there are enough violent members of BGF to carry out murders. CS1 identified Joe Fitzgerald, later identified as Gregory Fitzgerald, a/k/a "Joe," a BGF member who was recently released from prison, as someone who has killed people in the past – including multiple stabbings on behalf of BGF while in prison. CS1 advised that Rainbow Williams is also an extremely violent BGF member. According to CS1, Williams has committed multiple murders, including numerous assaults/stabbings while in prison. CS1 stated that both Fitzgerald and Williams are loyal to, and take orders from, Brown.

37. Pursuant to the electronic surveillance conducted during this investigation, numerous calls were intercepted in which Eric Brown and other BGF members discussed acts of violence committed or to be committed on behalf of BGF.

a. Based on a review of law enforcement records and discussions with other law enforcement officers, I have learned that on March 13, 2009, BGF members Randolph Edison, a/k/a "Uncle Rudy," Zachary Norman, and Roosevelt Drummond, a/k/a "June," were stopped in a vehicle. Drummond was in possession of a firearm at the time of the stop. Officers recovered handcuffs, rubber gloves, and a mask. Drummond was taken into custody, but Edison and Norman were released. Later that day, at approximately 6:42 pm, Brown placed an outgoing call to Edison at (443) 980-1230. During the conversation Edison explained, "We just had some bad luck man. Yeah, we just had some bad luck." Brown asked, "What's that?" Edison continued, "We was in the car, yeah and they pulled us over, right. You know we gonna do something, but the coon that was setting the whole degree up, he's the rat. He set all us up." Brown asked, "Q [a reference to Roosevelt Drummond] there?" Edison answered, "Yeah Q [Drummond] had the burner [a reference to a firearm] on him and he had just gotten out of the car." Brown exclaimed, "Damn." Edison said, "Yep, just happened, just happened." Brown responded, "God damn." Edison continued, "Just happened E. Just lucky I ain't carry that thing. I said, I said leave it Ock. You, you good with (unintelligible)." Brown then yelled in the background for "Unc," a reference to Ray Olivis. Edison said, "I'm glad I ain't have, sh, oh." Brown responded, "Man, ain't no bull shit man, that's the last thing you need boy." Edison continued, "Especially Q man. Oh man." Brown then told Olivis that he had someone on the phone that wanted to speak with him. Olivis then used Brown's cellular telephone to speak with Edison. Edison then handed his phone to Zachary Norman. Norman said to Olivis, "Rats out here now yo. You got to be so careful man. We just almost went to the Penitentiary for the rest of our life, me, Rudy, (unintelligible)." Olivis asked, "For what?" Norman explained, "Yeah, we were going straight do it tonight and we figured afterwards that (unintelligible)

was a rat. He was on the phone the whole time. All of us, all of us don't want to say nothing but (unintelligible). We got to talking, now his cellphone's off." Olivis responded, "Right, right, right." Norman continued, "But the nigger, nigger man!" Olivis said, "Good god all mighty." Norman continued, "I got to go and give her the bad news right, man I think this dude's a rat." Olivis advised, "Man you all got to be safe. You all stay, be safe man. You all, I'm the only motherfucker with some (unintelligible) in here left, so all got to really be safe man. You know whatever you do man. You know?" Later in the conversation, Norman said, "There's no probable cause, I asked them, I kept asking them why he stop the car. He never would answer. They let me and Rudy go. The rat motherfucker supposed to had a warrant." Olivis said, "Alright, we need to know here he at. I'll be on top of all of it." Based on my training and experience and other information developed during this investigation, I believe that Edison and Norman were reporting to Brown and Olivis about their encounter with police while en route to commit a drug-related armed robbery, and that Norman and Olivis were discussing possible retaliation against a suspected informant.

b. During this same conversation, Norman asked Olivis, "...You know Pudgy, right?" Olivis asked, "Pudgy, right?" Norman answered, "Right, he's responsible for my little brother's death." Olivis asked, "You talking about that red bitch Pudgy?" Norman answered, "Yes, he set it up." Olivis responded, "Oh yeah." Norman continued, "Yeah with Calvin. Then he was telling dudes instead (unintelligible)." Olivis asked, "You talking about your little brother, Zack, the little one, right?" Norman answered, "Yeah (unintelligible)." Olivis explained that he did not even know about the death. Norman said, "He said both of them on court side [an apparent reference to a pretrial detention area], right. I need some torpedoes. I'm gonna take care of him. I'm gonna take care of him. I got, I'm gonna take something in there to him. Find out who it is and

what they need. Tell me where they gonna be (unintelligible)." Olivis advised, "Alright Bear, I'm already on top of that man." Norman continued, "I want them to let them know (unintelligible)." Olivis asked, "Why you and Rudy ain't been got in touch with me about that man?" Norman advised, "They just got locked up about three weeks ago." Olivis said, "Okay." Norman continued, "Have them sent over there. I wanted to deal with it myself. Dig what I'm saying? But my mother was so fucked up she didn't want me to, you know. Listen man, niggers got to (unintelligible)." Olivis advised that they did not need to talk about the situation any longer. Olivis said, "Man you all, you should have been in contact. I, I ask Calvin about you and Rudy every time I talk to him. Man, he said he be seeing you all." Norman advised, "That shit just been rough man. Me and shorty been getting, trying to make something happen man." As the conversation continued Olivis said, "Alright let me figure out a way for that man. Let me figure out a way myself. You know what I mean?" Norman said, "To get, find out who on court side and think about how we can work this with June [a reference to Drummond]." Olivis responded, "Okay, alright, alright." Based on my training and experience and other information developed during this investigation, I believe that Norman and Olivis were discussing plans to murder an inmate suspected of being responsible for the murder of Norman's brother.

c. Toward the end of this call, an unidentified male got on the telephone and spoke briefly with Norman. At the conclusion of their conversation the unidentified male said, "Look I got take care of something with, I got to take care of something with Uncle Ray [a reference to Olivis]. So, I'm a give ah, the General [a reference to Brown] uh, the phone." Brown then returned to the telephone, had a brief conversation and then ended the call.

d. On April 1, 2009, Nathaniel King was stabbed to death at the

Baltimore City Detention Center. According to corrections officials the suspect for the murder is Kelly Toomer, who is incarcerated at the Baltimore City Detention Center pending a murder trial. On April 4, 2009, at approximately 12:24 pm, Rainbow Williams placed an outgoing call to (443) 869-7063, utilized by inmate Lance Walker, who was recently sentenced to 40 years imprisonment on federal drug charges and who is pending a murder trial in state court. During the conversation Walker advised that he had some bad news. Walker said, "I'm hearing, you already know about our little homey with the dreads, man. That shit ain't right. Shit ain't right man. We sitting here right now like really fucked up about this shit man." Williams advised, "And brother that ain't even the worst part, man." Walker asked, "What's wrong now?" Williams said, "Nigger used my name [claimed to have been authorized by Williams to commit the murder], man." Walker responded, "That's crazy." Williams continued, "Anybody that know me know man, not that. Is you serious?" Walker advised, "Niggers been rapped about that and that shit was under the table. Like I ain't understand. You ain't even got to say, that's crazy man. That's feds, man that ain't even right. That's what I'm saying yo, shit's fucked up. Niggers ain't, man shit's fucked up." As the conversation continued, Williams advised, "With my head slammed on the chopping block , yo [a reference to Williams' being punished if he had ordered a murder without proper authorization from BGF leadership]. My thing is even if I did, you feel me?" Walker advised, "You all niggers know I go to trial um, the thirteenth yo. Monday I'm supposed to go down here and start this shit man." Williams asked, "Monday, what time?" Walker responded, "Nine o'clock, Mitchell Courthouse. I don't know what room. You know that shit be down there up on the thing. But April the thirteenth we supposed to kick it off. So I need ya"ll support. You know what I'm saying?" Williams responded, "Right, I'll be down there man, I'll be down there man." As the conversation continued

a BGF member identified as "Big Spike" utilized Williams' cellular telephone to speak with Walker. "Big Spike" advised that he is currently selling drugs. "Big Spike" said, "Shit a little, I mean it's up and down right now but yo, shit is, it's been way better. You feel me?" "Big Spike" then advised that he also would be at the trial for Walker on April 13. Based on my training and experience and other information developed during this investigation, I believe that Williams has been identified as the person responsible for ordering the murder of Nathaniel King. Williams, however, advised that he had taken no part in that murder but because he is believed to have ordered the murder he may feel some type of retribution for not having the murder authorized by higher ranking members of BGF. Later in the conversation Williams and "Big Spike" advised that they both would be at the trial that Walker is facing on April 13. It is believed that the purpose of the two appearing at Walker's trial is to intimidate witnesses and potential jurors.

e. On April 5, 2009, at approximately 11:14 am, Williams received an incoming call from an unidentified male inmate. During the conversation the inmate advised, "Man you won't believe this one. The brother done used your name again on, on a, on the CoCo situation." Williams asked, "On what situation?" The inmate answered, "CoCo." Williams asked, "CoCo who?" The inmate answered, "CoCo that's over the jail. The one that's uh, beefing with uh D cousin Will. You know anything about that situation?" Williams answered, "Nah." The inmate continued, "Alright well he told the, he told the brothers over there that the directive [order to commit an act of violence] came straight from E [a reference to Eric Brown] to you and you sent it in to the jail to them. To go ahead and green light on ... [approve an act of violence against] the boy CoCo." Williams responded, "Are you serious?" The inmate responded, "Man I'm, hold up I got them on the other line, hold on, hold on." No connection with the third caller was able to be

accomplished. At approximately 11:17 am, Williams placed a return call to the unidentified inmate. The unidentified inmate then conferenced in several other callers, including Ray Olivis and other BGF members, including "Killer" and "Hot Rod." During the ensuing call, Olivis essentially conducted a conference among BGF members and commanders. Among other things, Olivis and the others discussed how day-to-day operations of BGF are to be conducted, violations of the articles of the BGF movement, and sanctions that have been and should be ordered against those who violate BGF rules.

## V. <u>Search Warrants for SUBJECT PREMISES#1-5</u>

### A. Deitra Davenport/SUBJECT PREMISES #1

38. Based on evidence developed during this investigation, including information provided by confidential sources and calls intercepted during wiretaps, I have learned that Deitra Davenport, the "wife" of Eric Brown, is a BGF member who assists Brown in running the gang's operations. As more fully described above, calls intercepted over the wiretaps in this investigation indicate that Davenport is smuggling drugs and other contraband to Brown in prison. In addition, information provided by confidential sources and intercepted calls indicate that Davenport is the publisher of the Black Book and is assisting Brown and BGF in disseminating the Black Book to other BGF members, including in prisons.

39. The residence at 5637 UTRECHT ROAD, BALTIMORE, MARYLAND, identified herein as SUBJECT PREMISES #1, is the residence of Deitra Davenport. Based on a review of records maintained by the Maryland Department of Assessments and Taxation, I have learned that SUBJECT PREMISES #1 is listed to Deitra Davenport. In addition, based on a review of records maintained by Baltimore Gas and Electric ("BG&E"), I have learned that the BG&E

account for SUBJECT PREMISES #1 is in the name of Deitra Davenport. As recently as March 27, 2009, law enforcement officers have surveilled Deitra Davenport entering and exiting this location.

40. SUBJECT PREMISES #1 is a two story half brick red row home with the top half of the residence being siding. There is a white front door and a white storm door. The numbers 5 6 3 7 are written in form stone to the left of the door and on the mailbox post that is to the right of the front porch steps in the front yard.

41. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of gang members and individuals involved in drug-trafficking, as set forth in Exhibit 1 and Exhibit 2, which are incorporated herein by reference.

42. Based upon the foregoing and on my training, experience, and participation in narcotics and gang investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #1 the items set forth in Attachment A, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 18 U.S.C. § 1962, which prohibits participation in a racketeering conspiracy; 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking; and 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering.

**B. Rainbow Williams/SUBJECT PREMISES #2**

43. Based on evidence developed during this investigation, including information provided by confidential sources and calls intercepted during wiretaps, I have learned that Rainbow Williams is a BGF member who assists Brown in running the gang's operations. As more fully described above, calls intercepted over the wiretaps in this investigation indicate that Williams participates in smuggling drugs and other contraband to Brown in prison and in discussions about acts of violence committed by the gang.

44. In addition to the calls summarized above, numerous other calls were intercepted during this investigation in which Williams and others arranged drug transactions on behalf of BGF, discussed acts of violence to be committed on behalf of BGF, and conducted other BGF business.

a. For instance, on March 15, 2009, at approximately 8:03 pm, Williams received an incoming call from (443) 388-4235, subscribed to Stephen Dorsey, 210 Guilford Ave, Baltimore, Maryland 21202, and utilized by a male identified as Moe. During the conversation Moe said, "Call Dre and tell him to leave them boys alone. Let them have they meeting." Williams responded, "Alright, alright, alright, alright, alright, alright we'll do." Moe asked, "You got Kareem number, you got Kareem number?" Williams answered, "Yeah I got it." Moe continued, "Call Kareem, cause that's what I was ready to see if you were gonna call and ask him what's going on." Williams responded, "Alright." Moe responded, "Alright then call, then call me back." At approximately 8:07 pm, WIILIAMS placed an outgoing call to (443) 388-4235, utilized by Moe. As the call was connected Williams was actively speaking with an unidentified BGF member over a separate telephone which was on speaker through the use of the push to talk feature on the phone.

The unidentified male was telling Williams that he has been arguing with other BGF members about them not attending BGF meetings. Williams explained, "Alright, this what we gonna do. Tomorrow you, (unintelligible), all you all man, we gonna sit down man. We just gonna get this shit out of the way man. Me and Devon ain't got time to be doing (unintelligible). I mean we got other crews. See what I'm saying. We got a lot of people to plug man and we can't keep focusing on what's going on in West Baltimore because brothers don't like each other." The unidentified male responded, "I ain't even fighting. You feel me? I ain't gonna have no nigger saying fuck me, you feel me." The unidentified male continued to explain that he is not going to continue to have problems with these unnamed BGF members. Williams explained that he understands the unidentified male's point of view. Williams said, "Alright man, tomorrow man I'll be over there man. After I go see my PO man I'm coming straight over there man." The unidentified male continued on about how he is having an ongoing argument with BGF members, specifically Dre. Williams explained, "Alright man, I'll be over there tomorrow man. I'm, I'm getting tired of this shit man. As soon as I get from Guilford man I'm, I'll be over there man. Get the cat Gotti, let him tell Kareem to bring his ass there, Slim Dog, all of them, man." The unidentified male said, "If not I'm ready to call the comrade [BGF member] right now." Williams then ended the conversation with the unidentified male and began speaking with Moe. Williams and Moe went on to discuss the current problems with some BGF members. Moe said that he told another member, "You tell Dre, you know, he know the consequences behind whatever he do." Later in the conversation Moe explained, "If a brother ain't registered man and he ain't doing what he supposed to do by us and by law then he ain't no brother. How can you say you a brother, cause he come to one meeting." Williams responded, "Right, right, right." Moe continued, "Come on now, you got people out there on the front line." Williams

responded, "Ain't no question." Williams explained that when Moe has a break tomorrow they will go and handle the problem with some of the BGF members. Moe explained that they all need to just get along. If a BGF member comes to one of the meetings and isn't paying "dues," and interrupts the meeting then he should not be attending the meetings. Moe explained, "Whatever going on at the meeting, that's what's going on in the meeting. We ain't gonna sit there and be a probation officer for them." Based on my training and experience and other information developed during this investigation, I believe that currently there is an ongoing feud between different members of BGF who are operating on the streets of Baltimore. As a result of this feud Williams has decided that he needs to hold a meeting with the feuding BGF members in an attempt to settle the dispute. These calls corroborate that Williams is a high-ranking leader in the BGF organization.

b. On March 21, 2009, at approximately 12:03 pm, Rainbow Williams placed an outgoing call to Marlow Bates. During the conversation Bates advised that he wanted to come see Williams that day and see what has been going on. Williams stated that he tried calling Bates last week. Bates said, "Man I ain't see you calling me yo. Everybody thought they called me yo. By me chilling, I was chilling last week. A little disgusted about something there yo. My phone, I'm like, I'm just waiting on a phone call on my other phone. So I really was like in the crib for real." Bates went on to explain that recently a close BGF "comrade" of Bates was disrespected by an unidentified person. Bates explained that he wanted to talk to Williams in person about that situation. Williams and Bates both agreed that BGF members and affiliates should not be arguing or fighting with each other. Bates said, "Like they know me, like, like Rainbow they know me, before, before I took, you know what I mean? When I had that oatmeal, they know how I like, they know me though, like, come on man, just cause we, we good brothers now man like, that don't, that

don't give you no borders to play with no of us. You feel me?" Williams responded, "Right, right." Bates continued, "Come on man, my niggers, I'm a keep them in check. They comrades [BGF members] but they still, they, they still my niggers too. So, you know what I mean? They ain't gonna jump without, without my, you know what I mean!" Bates explained that, "Jim Dog is wrong. He called him a bitch." Bates explained, "My man wanted to holler at you and shit. Another good comrade [BGF member], a good brother for real. And yo a straight fool with it right. I, I, I been chilling yo. I don't be with none of that dumb ass shit. You know what I be chasing for real. So, I was a little knuckle head when I was a juvey man, but you no what I mean, I ain't with that shit right now. I ain't with that shit no more. So I just be, you already know what type shit I be on. I be on my fall back shit for real." At approximately 6:39 pm, Williams placed an outgoing call to Bates. During the conversation Bates advised, "Uh, man I didn't forget you Rainbow. I'm getting ready to come over there in a little bit yo. I was just running around. You know how it be sometimes. Alright, I'm a bring, I'm a have somebody that don't have a car ride with me too, yo. If that's cool? He a good dude. If you know he with me, he a good dude." Williams responded, "Alright man, I'll let that slide brother." Based on my training and experience and other information developed during this investigation, I believe that Bates has a close BGF associate who is planning to retaliate against an unidentified person who disrespected him. Bates described the associate as a "straight fool with it," a reference to the male being armed with a weapon with the intent to cause harm to people. Williams advised that he would speak with Bates regarding the situation. Williams later advised that Bates could bring an unidentified person with him to meet with Williams so they could discuss how they should respond to the BGF member being disrespected.

c. On March 22, 2009, at approximately 1:34 pm, Williams placed an

outgoing call to (410) 370-6042, with an unknown subscriber and utilized by Dacron Hobbs, an inmate in the Maryland correctional system. During the conversation Hobbs started discussing an inmate named Tavon who was incarcerated and may have provided information to law enforcement. Hobbs stated that he and "Scales" were in the cut together when they received word from the "comrades" [BGF members] at MCIJ that the unknown person had cooperated with law enforcement. Hobbs said that the suspected cooperator ultimately was transferred to MCIJ around the same time that Hobbs was transferred there. Hobbs said that while at MCIJ he began having a sexual relationship with the correctional officer who was in charge of his tier. This unidentified female corrections officer told Hobbs that the cooperator had told her he was not safe and asked to go into segregation. Williams then attempted to conduct a three-way conversation with a separate inmate who was "putting the investigation out." Williams then completed a three-way call with an inmate identified as Black. Hobbs again described the situation regarding the inmate who is a suspected cooperator. Williams, Hobbs and Black discussed the potential cooperator and how he should be handled. They also discussed the BGF movement inside different correctional facilities, including ECI. Based on my training and experience and other information developed during this investigation, I believe that Williams, Hobbs and Black were discussing whether an unidentified inmate was cooperating and, if so, how BGF should retaliate against the inmate.

d. On March 22, 2009, at approximately 3:20 pm, Williams placed an outgoing call to (443) 413-3911, with an unknown subscriber and utilized by Lance Walker. During the conversation Walker asked, "Man, who the fuck is this nigger Greazy, yo? Greazy!" Williams asked, "Greazy?" Walker continued, "Yeah, he supposed to have just came home. Talking about there's a green light on ["hit" out on] me." Williams said, "I don't know that nigger." Walker

continued, "I know he be with Five and them. That's all I know." Williams responded, "Oh he do? Oh, okay." Walker continued, "He just came home Tuesday. He seen somebody and told them there supposed to be a green light on me. They, waiting for me to go with the feds and to get back over the jail and niggers supposed to (unintelligible)." Williams responded, "Oh, okay so that's see if we can't find out who Greazy is." Walker responded, "Right." Williams continued, "See why we can't make a green light on him." Walker said, "Thank you, that's what I'm saying, black man." Williams continued, "What the fuck is he talking about. I don't know them niggers." Based on my training and experience and other information developed during this investigation, I believe that Williams is going to place a hit on "Greazy" in response to "Greazy"'s having placed a hit on Walker.

e. On March 25, 2009, at approximately 1:17 pm, Williams received an incoming call from (410) 868-4246, utilized by Tomeka Harris. During the conversation Harris advised Williams, "You know they transferred Unc [a reference to Ray Olivis]? They transferred Unc out of the jail last night." Williams asked, "Where, where they send him at?" Harris said that the location where he was sent had some C's in the name of the jail. Williams then realized that Olivis had been sent to BCCC. Williams stated that Olivis would be fine, because "over there you can get things done faster, quicker, better." Based on my training and experience and other information developed during this investigation, I believe that Harris was advising Williams that Olivis had been transferred to BCCC the previous night. Williams reassured Harris that Olivis was now in a better location to further BGF operations, including the distribution of drugs inside of the prison.

f. On April 9, 2009, at approximately 1:01 pm, Williams placed an outgoing

call to (443) 938-2462, utilized by Jimmy LNU. After the two greeted each other Williams advised, "I need three man." Jimmy responded, "Three?" Williams answered, "Yeah." Jimmy asked, "You said three?" Williams responded, "Yeah." Jimmy advised, "Alright I'm getting ready to call my little cousin and tell him to bring me over that shit now." Williams responded, "Alright, alright." Jimmy advised, "I'll hit you back. It'll take 20 minutes yo." Williams advised that he had some other things he had to take care of first then the two could meet later. Jimmy advised Williams to call when he was ready to meet him. Based on my training and experience and other information developed during this investigation, I believe that Williams was asking Jimmy to supply him with a quantity of drugs.

45. The residence at 1113 EAST BELVEDERE AVENUE, APARTMENT C, BALTIMORE, MARYLAND, identified herein as SUBJECT PREMISES #2, is the residence of Rainbow Williams. During multiple intercepted telephone calls, Rainbow Williams provided the address of SUBJECT PREMISES #2 as his address. In addition, records maintained by the Maryland Division of Parole and Probation and by the Maryland Motor Vehicle Administration (MVA) list SUBJECT PREMISES #2 as the residence of Rainbow Williams. As recently as March 6, 2009, law enforcement officers have surveilled Williams leaving the apartment building of SUBJECT PREMISES #2.

46. SUBJECT PREMISES #2 is a three story form stone residence with a black storm door and black front door. The numbers 1 1 0 2 are in brass on the front door.

47. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of gang members and individuals involved in drug-

trafficking, as set forth in Exhibit 1 and Exhibit 2, which are incorporated herein by reference.

48. Based upon the foregoing and on my training, experience, and participation in narcotics and gang investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #2 the items set forth in Attachment B, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 18 U.S.C. § 1962, which prohibits participation in a racketeering conspiracy; 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking; and 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering.

**C. Tomeka Harris/SUBJECT PREMISES #3**

49. Based on evidence developed during this investigation, including calls intercepted during wiretaps, I have learned that Tomeka Harris is a close associate of Eric Brown and Rainbow Williams and a BGF member who assists Brown and Williams in running the gang's operations. Harris is the wife of BGF member Vernon Harris, who is incarcerated at ECI, although intercepted calls indicate that Harris is romantically involved with Brown as well. Calls intercepted over the wiretaps in this investigation indicate that Harris engages in financial transactions involving "Green Dot" cards on behalf of BGF members. Intercepted calls also indicate that Harris assists in smuggling contraband to Brown in prison and relays information among BGF members.

a. For instance, on March 5, 2009, at approximately 12:39 am, Eric Brown received an incoming call from (410) 868-4246, subscribed to Capital First, 9050 Iron Horse La, Apt 318, Pikesville, Maryland and utilized by Tomeka Harris. During the conversation, Harris explained

to Brown why her nightclub, Club 410, is in the process of being shut down by the city of Baltimore. According to Harris, Baltimore Police have documented three shootings, one handgun arrest, and an assault associated with Club 410. Brown explained that Harris should deliver the police paperwork to her lawyer. Brown then advised that his friends "the McCabe Boys" had frequented the club. As the conversation continued, Harris discussed how, through her job, she is able to establish different fraudulent corporations for some of her associates. Based on my training and experience and other information developed during this investigation, I know that BGF members, including Rainbow Williams, frequent Club 410, which is owned and/or operated by Harris. In addition, I believe that Harris was telling Brown that one of her other business ventures is establishing bogus corporations for close associates so that they can obtain loans from banks in order to purchase high priced items such as vehicles.

b. On March 7, 2009, at approximately 3:33 pm, Eric Brown placed an outgoing call to (410) 868-4246, subscribed to Capital First and utilized by Tomeka Harris. During the conversation, Harris explained that she loves Brown, but because of her relationship with Vernon [known to law enforcement as Vernon Harris], she and Brown may not be able to continue their relationship. Harris said that because Brown had previously informed her that BGF members are forbidden to have a relationship with another BGF member's female companion, there may end up being problems among Tomeka Harris, Vernon Harris, and Brown. Brown explained, "I know how to get around it though. You got to help me, that's all I'm saying. You follow what I'm saying? You know what I'm doing. I know what I'm doing." Harris responded, "I'm glad you know, I don't." Brown said, "I'll fill you in a little more when you come down here, alright. I know how he gonna carry it." Harris continued, "His homeboy just called me this morning on some stupid shit. Like,

he called me like, Vernon just called him and then the homeboy called me. Just like, you know he love you more than anything in this world. But I'll make sure you okay out here. He's gonna go crazy. All of this stuff like we still together. I'm tired." Brown responded, "I got, I got something for him. I got something for all of that. I got something for all that." Harris asked, "What is it?" Brown answered, "I'll tell you when you come down. I, I mean I ain't got nothing for that but I got something in my mind I want to roll around and bounce off you. Harris responded, "Huh?" Brown continued, "I got something in my mind I want to bounce off you. So the first chance you get um, Wednesday is the first visit. Can you come down Wednesday?" Harris advised that she would come to see Brown on Wednesday. Based on my training and experience and other information developed during this investigation, I believe that Brown and Tomeka Harris have an ongoing relationship. Tomeka Harris also has a relationship with BGF member Vernon Harris, who is also incarcerated. Harris and Brown had discussed the fact that BGF members cannot have a relationship with the same woman because that is a violation of the BGF code. Ultimately, Brown explained that he had something in mind to deal with this problem, which goes against the BGF code. Brown advised that he did not want to speak over the telephone regarding the solution for this relationship problem and that he wanted to talk to Harris in person. It is believed by law enforcement that Brown may be planning some type of violent act against Vernon Harris, which would address the current relationship issue.

c. On March 8, 2009, at approximately 12:36 am, Eric Brown received an incoming call from (410) 868-4246, utilized by Tomeka Harris. During the conversation, Brown explained that in regards to the "young man," a reference to Vernon Harris, he will need to get himself a bottle of Moet. Brown said he is going to say, "Brother, that woman that you is grabbing

on, she's mine. From the bottom of her feet to the top of her head and because of that and I know you didn't know, I know you didn't know. But because you grind her, I'm going to do this. I'm going to take that Moet bottle and smash him across the top of his god damn head with it." As the conversation continued Brown again, as if talking to Vernon Harris said, "I'm gonna take this bottle and I'm going to crack you across your god damn head with it and you're gonna go out and I'm gonna beat your, I'm gonna beat the living shit out of you when you out." Based on my training and experience and other information developed during this investigation, I believe that Brown was explaining to Tomeka Harris that if the opportunity presents itself he will assault fellow BGF member Vernon Harris.

d. On March 24, 2009, at approximately 1:59 am, Eric Brown placed an outgoing call to (410) 868-4246 subscribed to Capitol First and utilized by Tomeka Harris. During the conversation Brown stated, "Every light on in this motherfucker." Harris asked, "Why you still on the phone then?" Brown said that the "comrades" [BGF members] are looking out for him. Based on my training and experience and other information developed during this investigation, I believe that by openly talking on a cellular telephone and the fact he has "comrades" watching out for him, Brown is indicating that he believes he has control over the activities that occur in the facility where he is being housed.

e. On March 24, 2009, at approximately 9:50 am, Eric Brown received an incoming call from (410) 868-4246, utilized by Tomeka Harris. During the conversation Brown asked, "What you driving?" Harris responded, "Um, my van." Brown asked, "What color?" Harris advised, "Gold." Brown then told an unidentified person in the background, "A gold van." Brown then asked, "Where you at?" Harris answered, "On Fayette Street, I'll be there." Brown asked, "Oh

you know where she at?" Harris answered, "Yeah, she told me to meet her, she told me to meet her a block over the street behind um, Greenmount and Eager. So, I'll be there." Brown advised, "I'm trying to hang in, but I got to be to work at 10 too." Based on my training and experience and other information developed during this investigation, I believe that Brown was having an unidentified correctional officer meet with Harris to obtain illegal contraband which was to be smuggled into the prison for Brown. The area of Greenmount Avenue and Eager Street is approximately one block from the prison.

50. Based on discussions with other law enforcement officers, I have learned that Harris was arrested on February 6, 2009 on federal fraud charges. She is currently on pretrial release while those charges are pending.

51. The residence at 600 S. HIGHLAND AVENUE, APARTMENT A, BALTIMORE, MARYLAND, identified herein as SUBJECT PREMISES #3, is the residence of Tomeka Harris. The cellular telephone used by Tomeka Harris, and with which she has been intercepted during wiretaps, is subscribed to "Capital First" at 600 South Highland Avenue, Baltimore, Maryland. I have learned that "Capital First" is a business name that has been used by Tomeka Harris. In addition, on March 13, 2009, Rainbow Williams was observed entering and exiting the apartment building of SUBJECT PREMISES #3 and then proceeding to the door of Apartment A. On that same date, Williams received a parking ticket while he was parked in front of the apartment building of SUBJECT PREMISES #3.

52. SUBJECT PREMISES #3 is a two story red brick building. The glass door with gold frame plaque is on the north east side of the building. The number 6 0 0 A is on the right side of the door. Once you enter the glass door apartment A is the dark brown door on the right.

53. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of gang members and individuals involved in drug-trafficking, as set forth in Exhibit 1 and Exhibit 2, which are incorporated herein by reference.

54. Based upon the foregoing and on my training, experience, and participation in narcotics and gang investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #3 the items set forth in Attachment C, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 18 U.S.C. § 1962, which prohibits participation in a racketeering conspiracy; 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking; and 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering.

**D. Terry Robe/SUBJECT PREMISES #4**

55. Based on evidence developed during this investigation, including information provided by confidential sources and calls intercepted during wiretaps, I have learned that Terry Robe was a corrections officer who assisted in smuggling drugs and other contraband to Eric Brown at MTC. Numerous calls were intercepted during this investigation in which Robe discussed the smuggling of contraband and in which BGF members discussed Robe's participation in such activity.

a. For instance, on February 25, 2009, at approximately 12:22 am, Eric Brown received an incoming call from Rainbow Williams. Upon answering the phone Brown asked, "What's up?" Williams responded, "It's done." Brown continued, "My man. I appreciate it. Hey you know what, what happened again though." Williams asked, "What?" Brown continued, "Forgot to uh, get the uh...." Williams immediately responded, "I forgot. But you know what? I put the cans in the trunk and the bottle sitting right there." Brown asked, "You did what?" Williams continued, "I said, I said I gave her the cans and the pills sitting right there in the box." Brown said, "That's alright cause I'd rather you get, get with Robe [a reference to Terry Robe] and give Robe the pills than the same guard anyway." Williams responded, "Oh, alright, they [Robe and another guard] was together too. Just let me know what else to do bro, that's all." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Williams was confirming that he had delivered the "five cans," believed to be tobacco, to an unidentified corrections officer who was to smuggle the items into the prison for Brown. When Brown inquired about the "pills," which are believed by law enforcement to be controlled substances, specifically ecstasy, Williams stated that he had forgotten about them. Brown explained that this was fine, because he wanted a different corrections officer, Terry Robe, to handle the smuggling of the "pills" into the prison for him. Williams advised that the corrections officer to whom he had delivered the five cans had been with Robe at the time of the delivery.

b. On February 27, 2009, at approximately 1:53 pm, Eric Brown placed an outgoing call to (410) 499-8933, utilized by Terry Robe. During the conversation Robe advised, "I wanted to call and tell you that I used, I used up some money off the card." Brown asked, "All of it?" Robe answered, "Yes, every penny. I had to pull two sixty to give to the mechanic." Based on

my training and experience and other information developed during this investigation, I believe that in this call, Robe was telling Brown that she had used all of the money from a Green Dot card to which Brown had been adding money gained from drug and contraband sales inside of the prison.

c. On March 8, 2009, at approximately 12:44 pm, Eric Brown placed an outgoing call to (410) 499-8933, utilized by Terry Robe. During the conversation Brown asked, "You gonna uh, bring me some of them pills today?" Robe answered, "No, I ain't got no bottle. I gotta find a bottle. You know I ain't even got no (unintelligible). I got to find one of them too." Brown advised, "You supposed to had all that done, because today is supposed to be the day you supposed to do that. It's always, it's easier on the weekends all the time." Robe asked, "How, how am I supposed to have it done and I have no car. What, get it done how? Everything I need to get done, has to be put on hold. I have to wait to do everything. I have to wait on (unintelligible). I didn't have it done, cause I don't have a car to get it done." Brown said, "I'll have to bring you a bottle myself then. I'm a bring you a bottle myself then." Robe said, "Okay, bring me a bottle and then what? I don't have a pocket book. I gotta get to the store to find a clear pocket book." Brown continued, "This is a god damn shame. Every time I need something done I gotta go through a whole bunch of bull shit to get it done." Based on my training and experience and other information developed during this investigation, I believe that Brown was attempting to have Robe smuggle controlled substances into the prison for him. Brown was expressing frustration that Robe was not ready to smuggle the drugs in at that time, because it was easier to smuggle contraband into the prison on the weekend. Robe was explaining that she needed a prescription pill bottle and a clear purse to smuggle in the drugs. Based on my training and experience, and on conversations with corrections officials, I believe that Robe was planning to use a prescription pill bottle and a clear

purse for the smuggling operation because other prison guards would be less likely to search her or otherwise detect that she was smuggling the drugs into the prison for an inmate.

d. On March 9, 2009, at approximately 4:12 pm, Eric Brown received an incoming call from (410) 499-8933, utilized by Terry Robe. During the conversation Brown asked, "You gonna call me and tell me when you gonna get me them pills, cause I need them?" Robe responded, "Okay, I'm going to work on that today." Based on my training and experience and other information developed during this investigation, I believe that Brown and Robe were again discussing plans for Robe to smuggle a controlled substance into Brown at MTC.

56. I have learned that Terry Robe was recently fired from her position as a corrections officer after she was caught attempting to smuggle a cellular phone into MTC for Eric Brown.

57. The residence at 420 WOODLAKE COURT # C, GLEN BURNIE, MARYLAND, identified herein as SUBJECT PREMISES #4, is the residence of Terry Robe. BG&E records indicate that the account at SUBJECT PREMISES #4 is in the name of Terry Robe. In addition, Maryland MVA records list SUBJECT PREMISES #4 as the residence of Terry Robe. Based on information obtained by subpoena from the management company of the apartment complex for SUBJECT PREMISES #4, I have learned that Terry Robe is the lessee of SUBJECT PREMISES #4. As recently as April 2, 2009, law enforcement officers surveilled Robe exiting and re-entering the apartment building of SUBJECT PREMISES #4.

58. SUBJECT PREMISES #4 is a three story brick apartment building with a glass front door with the numbers 4 2 0 displayed on the building to the right of the door. Apartment C has a grayish metal door with a silver knocker and the letter C is affixed to it.

59. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of gang members and individuals involved in drug-trafficking, as set forth in Exhibit 1 and Exhibit 2, which are incorporated herein by reference.

60. Based upon the foregoing and on my training, experience, and participation in narcotics and gang investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #4 the items set forth in Attachment D, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 18 U.S.C. § 1962, which prohibits participation in a racketeering conspiracy; 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking; and 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering.

**E. Musheerah Habeebullah/SUBJECT PREMISES #5**

61. Based on evidence developed during this investigation, including calls intercepted during wiretaps, I have learned that Musheerah Habeebullah is a corrections officer at MCIJ who assists Eric Brown and BGF in the smuggling of contraband into correctional facilities. Numerous calls were intercepted during this investigation in which Habeebullah discussed the smuggling of contraband for BGF.

a. For instance, on March 8, 2009, at approximately 9:00 pm, Eric Brown received an incoming call from (410) 530-7154, utilized by Musheerah Habeebullah. During the conversation, Brown and Habeebullah talked at length about different inmates with whom the two

have had interaction. As the conversation continued, Habeebullah made reference to an individual who is currently at "the Pen," a reference to a Maryland prison facility. Habeebullah said, "He probably not used to the Pen cause he know it so wide open. He ain't really used to that kind of environment and I think they said down there he was like on the top. Like he was the only one who was doing stuff. But you know down there, there are so many people who doing shit [smuggling and selling contraband], you know it's impossible, it's impossible to be the only one. It's impossible, it's impossible." Brown responded, "Right, right, everybody going to get their thing on [make money by selling contraband]." Habeebullah continued, "Yeah, it's, it's too many people and like down there, they said it's like the girl Williams and the girl, I guess the dummies are messing with, it, all they got is two of them. Or like one [corrections officer] on each shift that be really making moves [smuggling contraband in for inmates]. (Unintelligible), now you got like seven, eight people [corrections officers smuggling contraband for inmates]. Soon it's the whole damn shift." Brown responded, "Right, right, right, right." Habeebullah said, "Where is it possible for you to take over. You know what I'm saying? You ain't, you might make out and make a couple dollars that you can get in. I was, I was telling him that before he went down there. I was like, you can probably get it in [smuggle contraband] cause you know Frank used to get it in [smuggle contraband] and he used to make, you know what I'm saying? I know a lot of people be getting it in [smuggling contraband] but you ain't gonna be on top [making as much money] like you was down there, cause it's too many horses [people participating in smuggling]. Too many ways." Brown explained, "Yeah, ain't nobody going to be the only game in town." Habeebullah continued, "Not that, he was down there but not at this new spot. There's a new sheriff in town. That's impossible. You see down there, you know the um, comrades [BGF members] wasn't really functioning like that, like they wasn't really,

you know what I'm saying." Brown went on to say, "They ain't just gonna let a motherfucker take over. If you ain't gonna, if you the only motherfucker ain't making moves [smuggling contraband] there's going to be a problem." Habeebullah continued, "There's a whole different caliber of dudes in there. You know what I'm saying." Brown responded, "Yeah, it ain't gonna sit right with people." Habeebullah went on to explain that she had recently provided an inmate identified as "Baby" with a battery for the inmate's phone and within two weeks it was seized. Habeebullah stated, "It's so tight down there like I said, well I ain't gonna be able to do no, a battery that's small, I can, I can get that in. A charger, yeah, a phone I don't trust that." Habeebullah went on to explain that "Baby" had asked for Brown's number. She said that maybe someone else gave him a phone since she knows that "Baby" would not call from the "blue phone" [an apparent reference to the recorded prison phones]. As the conversation continued Habeebullah discussed other corrections officials who are smuggling items into inmates and identified four of the corrupt corrections officers by name. Based on my training and experience and other information developed during this investigation, I believe that Habeebullah is smuggling illegal items into correctional facilities for Brown and other inmates.

b. On March 11, 2009, at approximately 10:32 pm, Brown received an incoming call from (410) 530-7154, utilized by Musheerah Habeebullah. During the conversation Habeebullah, who at the time was utilizing a second telephone, left a message, "AB [an apparent reference to corrections officer and co-defendant Asia Burruss], call me when you get this." Habeebullah then turned to speak with Brown and said, "She ain't answering the phone." Brown responded, "Man, I know." Habeebullah said, "You know she got inservice." Habeebullah said, "Let me see, cause I know she um, I got both of the numbers, let me see what the other one is. It's

um, yeah, eight two five, nine oh seven three." Brown asked, "Four, four three, right?" Habeebullah answered, "Yeah. I know she said she had inservice so she, so she get off at seven, you know three o'clock." Brown asked, "She get off at three?" Habeebullah said, "Yeah, you know she got inservice in the morning so she works from seven to three tomorrow." Brown responded, "Oh shit, well what about tonight?" Habeebullah went on to explain that this corrections officer [Burruss] is probably sleeping, since she has to awaken early in the morning for her inservice training. Based on my training and experience and other information developed during this investigation, I believe that in this portion of the conversation Brown was utilizing corrections officer Habeebullah to contact a second corrections officer, co-defendant Asia Burruss, for the purpose of having illegal contraband smuggled into the prison facility for Brown.

62. The residence at 15 HIAWATHA COURT, OWINGS MILLS, MARYLAND, identified herein as SUBJECT PREMISES #5, is the residence of Musheerah Habeebullah. Although Maryland MVA records list 5430 Price Avenue, Baltimore, Maryland, as Habeebullah's address, law enforcement has learned that that address is the residence of Habeebullah's sister. During surveillance at 5430 Price Avenue, law enforcement officers used a ruse to speak with the resident at that address, who was Habeebullah's sister. Habeebullah's sister indicated that Habeebullah lived in Owings Mills and described the location, which law enforcement recognized as SUBJECT PREMISES #5. Surveillance was then conducted at SUBJECT PREMISES #5 and as recently as April 8, 2009, Habeebullah was surveilled exiting the residence in her corrections officer uniform. She then entered a 1996 Oldsmobile which is registered to the Price Avenue address. In addition, BG&E records indicate that the account at SUBJECT PREMISES #5 is in the name of Musheerah Habeebullah, and a check of law enforcement databases also indicates that

SUBJECT PREMISES #5 is listed as Habeebullah's residence.

63. SUBJECT PREMISES #5 is a two story row house with tan aluminum siding. The residence has a light brown front door with the numbers 1 5 over top of the front door in black. There is a black mail box to the left of the front door attached to the house.

64. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of gang members and individuals involved in drug-trafficking, as set forth in Exhibit 1 and Exhibit 2, which are incorporated herein by reference.

65. Based upon the foregoing and on my training, experience, and participation in narcotics and gang investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #5 the items set forth in Attachment E, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 18 U.S.C. § 1962, which prohibits participation in a racketeering conspiracy; 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking; and 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering.

## VI. <u>The Glasscho Drug Organization</u>

66. Based on intercepted wiretap calls and information provided by confidential sources, I have learned that BGF member Kevin Glasscho operates a drug-trafficking organization that distributes multi-kilogram quantities of heroin in the Baltimore area and surrounding areas.

67. CS1 advised law enforcement that Kevin Glasscho is a major Baltimore drug

trafficker. CS1 further stated that Glasscho sold large amounts of heroin while Glasscho was incarcerated in the Maryland Correctional System. CS1 specified that while in prison, Glasscho was not interested in obtaining small amounts of heroin. Department of Corrections records corroborate that Glasscho is listed as having special alerts in prison, specifically as being a part of a threat group, the BGF.

68. Pursuant to the electronic surveillance conducted during this investigation, numerous calls were intercepted in which Kevin Glasscho and other members of his organization discussed and arranged narcotics transactions, including transactions in which drugs were smuggled into prison facilities. The following are just a few examples of such calls. Other such calls are summarized *infra*, in the sections relating to specific members of Glasscho's organization.

a. On March 1, 2009, at approximately 1:28 pm, a call was intercepted between Eric Brown and Kevin Glasscho. During that conversation, Glasscho told Brown, "Man you got a main line number that you ain't gotta never worry about losing me. You called me on it before. The two five, five number." Brown responded, "I got about four numbers on you." Glasscho advised, "Yeah, but man, a lot of times you got to understand, I got to do, I got to change the numbers." Brown said, "I know, I know." Glasscho continued, "But you got a main line number that you know what I mean, don't nobody have in them joints, but except you, my brother, and, and Joe. You know what I'm saying?" Brown responded, "Yeah." Based on my training and experience, I believe that during the conversation between Brown and Glasscho, the two were discussing the fact that Glasscho has multiple telephone numbers and changes his telephone numbers frequently, which is common among drug dealers.

b. On March 14, 2009, at approximately 8:47 am, Glasscho received

an incoming call from (213) 346-9480, subscribed to the LA County Sheriffs Department, Los Angeles, California, and assigned to the Maryland Correctional Institution at Hagerstown. Upon receiving the telephone call the caller identified himself as Joe Taylor-Bey. During the conversation Glasscho and Taylor-Bey discuss the smuggling of drugs, provided by Glasscho, into the Hagerstown prison facility. Glasscho said, "Let me say this Joe, let me say this. Man, I mean, I mean, cause I'm getting, I'm getting the impression that uh, that uh, you uh, you avoiding you know, the part time work." Taylor-Bey said, "I don't understand what you mean." Glasscho continued, "I mean the person (unintelligible) as far as her acknowledgement of that." Taylor-Bey responded, "Oh, oh check this out. I thought that, I though I been told you that. She don't want no parts of that and she don't have to have, you know she don't have to be involved in that, right. And like I say see, it's a situation where...The last time we talked about it all she asked me was, Joe just be careful. I said I'm gonna be careful with it. You know what I mean? Yo, that's just so, I respected the fact that she don't want no parts of it. You see what I'm saying. So it, so it's a situation where I definitely didn't, didn't want her to know that her truck was involved." Glasscho responded, "Oh, okay, okay, yeah, yeah, yeah, yeah, yeah, yeah." Taylor-Bey continued, "You see what I'm saying... Yeah I don't keep it all the way away from her but I definitely do not want her to know that that truck was involved." Glasscho stated he understood what Taylor-Bey meant by wanting to keep things away from his female companion. Taylor-Bey explained that his female companion knows what he does and advised, "Because you know god damn well I don't work for Sparrows Point. You know what I mean? We just don't talk about it." Glasscho advised that he understands what Taylor-Bey means. Based on my training and experience and other information developed during this investigation, I believe that Glasscho is responsible for supplying drugs which are being smuggled into the

Hagerstown prison for Taylor-Bey and others. Glasscho was reassuring himself that Taylor-Bey was still going to actively be involved in the smuggling process as well as the distribution inside of the prison facility. In turn, Taylor-Bey advised that was his job when stating, "Because you know god damn well I don't work for Sparrows Point."

c. On March 15, 2009, at approximately 8:52 am, Glasscho received an incoming call from (213) 346-9480, subscribed to the LA County Sheriffs Department, Los Angeles, California, and assigned to the Maryland Correctional Institution at Hagerstown and utilized during this call by Joe Taylor-Bey. During the conversation Glasscho asked, "What color was the joint?" Taylor-Bey answered, "It was more a beige, like beige." Glasscho responded, "The sock man, the sock." Taylor-Bey answered, "Oh, oh, oh, oh, oh uh purple or blue all the way down." Glasscho responded, "Alright, alright, alright I thought he might have changed the joint when I gave it to him." TAYOR-BEY said, "No, no, uh, uh, nah, nah. I know what it was see, that needs to be sifted. That's the only way, it's got to be." Glasscho said, "Nah, but you know what happened. What happened was this. I uh, I uh, I always get it to that point, right. So I won't have to do it. You see what I'm saying? Always get it to that point. So, so it shouldn't have been, maybe because it was been wrapped tight for the last two or three weeks, I don't know." Taylor-Bey said, "Yeah see, nah see, I'm going to teach you something else about light dope and heavy dope. Yeah that's what that was, it was heavy. Because you know how many I got out, out of three?" Glasscho asked, "How many? Outta what?" Taylor-Bey answered, "Thirty eight out of three. Cause you know I do weight. I be selling weight." The conversation continued at length regarding the smuggling and distribution of heroin involving Glasscho and Taylor-Bey inside of the Hagerstown correctional facility. Based on my training and experience and other information developed during this investigation, I believe that

Glasscho has an ongoing heroin smuggling operation involving Taylor-Bey and other inmates incarcerated in Hagerstown, Maryland.

d. On March 15, 2009, at approximately 4:28 pm, Glasscho made an outgoing call to (443) 564-7238, with an unknown subscriber and utilized by Frankie LNU, a/k/a "Nitty." During the conversation Glasscho asked, "Where you at?" Nitty answered, "On my way over the way." Glasscho responded, "Oh yeah you get ready to go back on the block huh?" Nitty answered, "Got to stay out there baby. You know what I'm saying?" Glasscho advised, "Hey yo, guess who I'm hitting off [selling drugs to] now?" Nitty asked, "Who?" Glasscho answered, "Uh, uh Kim's, Kim's husband." Nitty again asked, "Who?" Glasscho answered, "Kim husband." Nitty asked, "Kim who?" Nitty eventually realized to whom Glasscho was referring. Glasscho later explained that an individual known by the two of them may be cooperating with the police and that Nitty should avoid him. Based on my training and experience and other information developed during this investigation, I believe that Glasscho was openly advising that he is selling drugs. Nitty also openly admitted that he is selling drugs on the streets of Baltimore.

e. On March 16, 2009, at approximately 8:07 pm, Glasscho placed an outgoing call to (443) 956-7893, with an unknown subscriber and utilized by an unidentified male. During the conversation the unidentified male asked, "Hey, uh on that T-shirt man what, you know uh, you got the Obama's or you got the...?" Glasscho answered, "Man they, they correct, they just ninety cent that's all, you know. They correct." The unidentified male asked, "Where you want me to meet you at? You wanna come by the house?" Towards the end of the conversation Glasscho and the unidentified male agreed to meet at the unidentified male's home. At approximately 8:32 pm, Glasscho placed an outgoing call to (443) 956-7893, utilized by the unidentified male who had

inquired about the T-shirts. During the call Glasscho advised that he was outside of the male's home. The unidentified then male invited Glasscho to come into his home. Glasscho responded, "I thought you wanted to come out of the house and look at this?" The unidentified male responded, "Oh yeah, yeah, yeah, yeah. I got to check the tire out, ok." Based on my training and experience and other information developed during this investigation, I believe that Glasscho was advising the unidentified male that he is selling heroin for $90 per gram, based on the reference to ninety cent T-shirts. During the follow up call Glasscho had traveled to the male's home with a sample of the heroin so the unidentified male could look at its quality.

f. On March 16, 2009, at approximately 8:43 pm, Glasscho received an incoming call from Avon Freeman. During this conversation Freeman said, "I'm still sitting here waiting for this dude man." Glasscho responded, "Yeah." Freeman continued, "Yeah man that's only my little hold up. I mean I got like seven dollars up, of my money, but you know what I'm saying? It cleaned me out, it cleared me out. I'm just was waiting on him. You know what I'm saying?" Glasscho responded, "Yeah." Freeman continued, "Shit, but um, I'm a try, like I said, I'm, I'm just gonna give him...Man he down Annapolis now so I'm just giving him a hour. I fucks with him real heavy so...Just waiting on him though." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Freeman has $7,000 in his possession which is wants to put towards the purchase of a quantity of drugs from Glasscho. Before the deal can transpire Freeman is waiting on one of his drug partners to arrive from Annapolis with the rest of the money needed for the drug purchase from Glasscho.

g. On March 17, 2009, at approximately 4:54 pm, Glasscho placed an outgoing call to (443) 865-3517, utilized by Avon Freeman. During the conversation Freeman and

Glasscho arranged to meet at a UPS store in the vicinity of Benson Avenue and Sharonleigh Avenue. Investigators were conducting surveillance of Glasscho and the area of Benson Avenue in Baltimore, Maryland. During the surveillance, investigators observed Glasscho leave his residence with a female companion. Glasscho was then followed to the area of Benson Avenue near Sharonleigh Avenue. Prior to Glasscho's arrival investigators observed a 1993 GMC Safari van bearing Maryland registration 20W 543, driven by Freeman and parked near the intersection. Within a few minutes, investigators observed Glasscho arrive and park behind the GMC van. Glasscho and Freeman were observed to exit their vehicles, have a brief conversation and then conduct a hand to hand exchange. Both individuals then entered their vehicles and drove away in opposite directions. Based on my training and experience and other information developed during this investigation, I believe that during these calls and subsequent meeting/exchange Glasscho delivered drugs to Freeman.

h. On March 24, 2009, at approximately 4:40 pm, Glasscho placed an outgoing call to (443) 802-5783, utilized by Darien Scipio. During the conversation Glasscho told Scipio, "Yeah you gotta come down to the Belvedere Hotel homey." Scipio responded, "Alright, I'm gonna call you when I'm close." At approximately 5:11 pm, Scipio called Glasscho and said, "I'm outside." Based on my training and experience and other information developed during this investigation, I believe that Glasscho and Scipio were meeting in person to discuss a drug transaction. However, at approximately 5:11 pm, Glasscho received an incoming call from Scipio. When Glasscho answered the call Scipio asked, "You tell somebody to meet me?" Glasscho answered, "Nah! Why you say that?" Scipio went on to explain, "Some dude just hit my phone, talking about did I meet somebody at the Belvedere. Boy let me holler at you one second. Didn't

you just meet somebody at the Belvedere? You feel me?" Glasscho responded, "Ahh!" Scipio then spoke with two individuals in the background. Scipio then returned to the conversation and said, "KG, get the fuck away from there. They, they just told me the peoples [a reference to law enforcement] is on you. You hear what I said?" Glasscho responded, "Alright." Scipio continued, "My man just hit me, it's on the scanner [police scanner]." Glasscho responded, in an upset manner, "Alright, alright, alright." Based on my training and experience and other information developed during this investigation, I believe that agents conducting surveillance of the Glasscho and Scipio meeting were compromised during their radio transmissions. Shortly thereafter, Glasscho ceased using TARGET CELLPHONE #5 and proceeded to a cellphone store to obtain a replacement phone. However, law enforcement quickly learned the number of, and obtained wiretap authorization for, that replacement phone.

i. On March 25, 2009, at approximately 8:00 am, Glasscho received an incoming call from (443) 798-0359, utilized by Evertt Glasscho, Kevin Glasscho's father. During the conversation, Everett Glasscho informed Kevin Glasscho that he had received mail from two inmates, James Henderson, a/k/a "Hindu," and Kevin Dooley, a/k/a "Little Kebo." Glasscho explained that "Little Kebo" was his man and that "he killed, he the one that killed Aaron, Little Aaron." Based on my training and experience and other information developed during this investigation, I believe that Glasscho's father is acting as a conduit for mail being sent to and received from incarcerated BGF members. The name Kevin Dooley, a/k/a "Little Kebo," is believed to be a reference to Kevin Dudley, a high-ranking BGF member in Maryland state prison.

j. On April 2, 2009, at approximately 1:19 pm, Glasscho received an incoming call from (443) 831-7376, subscribed to Prepaid, 1 Main Street, Schenectady, New York,

and utilized by an unidentified inmate. During the conversation the unidentified inmate said, "Man I don't know what the fuck wrong with the mail system. You know, cause uh, she definitely took care of it yo." Glasscho responded, "Okay, okay. I'm just letting you know I didn't get it that's all." The unidentified inmate responded, "Yeah, yeah cause uh, that shit killed me right. Cause uh, I, cause I'm saying that I know that she took care of it." Glasscho continued, "Yeah, well I'm just saying that I didn't get it, that's all. You know well that's where she say she mailed it there. I should have got it." The unidentified male continued, "Yeah here the address, yeah no doubt and um, I sent it to four thousand one Duvall, four thousand one, well no I got it written down right here, four thousand one Duvall, Baltimore, Maryland two one two one six." Glasscho did not hear what the unidentified inmate said so he repeated the address of 4001 Duvall Avenue. Glasscho advised, "I guess, I guess ain't get it, that's all." The unidentified male advised that a female associate of his had just left from seeing the inmate. The unidentified inmate advised, "I told her as soon as she get down there to send you uh, the money for the girl, right. So, all the girl need is a hundred dollars." Glasscho asked, "A hundred dollars?" The unidentified inmate continued, "Yeah um and uh, just wrap the things up right and um, I'm a get, I'm a get this in Green Dot so you can uh, you can put it straight on your card." Glasscho responded, "Yeah, but I'm saying, you don't want me to separate it or nothing right?" The unidentified male responded, "Nah, nah, nah, nah, nah. Glasscho asked, "Keep it all just..." The unidentified inmate advised, "Yeah, just keep it the same way. Um this, this coming in through a horse [drug courier]. Um, the PoPo, right [an apparent reference to a corrections officer who is participating in the smuggling of the drugs]." Glasscho asked, "What about the tobacco and all that shit?" The unidentified male explained that he has a separate person handling the other items. Glasscho and the unidentified male went on to discuss the delivery of the

"things." The unidentified male went on to explain that his wife would get the Green Dot card, then Glasscho could access the card, and remove the money needed to pay for the "horse." Glasscho explained that he would transfer the money to his card and then deliver the money and the drugs to the unidentified person responsible for bringing the drugs to the correctional institution. The unidentified inmate told Glasscho to tell the female the items were for "T-Rock" from "Little Kevin." The unidentified inmate said that "T-Rock" is the "horse" and that the girl Glasscho was to meet is named Danielle. Based on my training and experience and other information developed during this investigation, I believe that Glasscho is supplying the unidentified male with drugs, which are being smuggled into an unidentified prison. Once in the prison, the unidentified inmate then sells the drugs and then pays off his debt for the drugs to Glasscho by sending the money through correspondence that is delivered to Kevin Glasscho at 4001 Duvall Avenue, Baltimore, Maryland, the residence of Kevin Glasscho's father, Everett Glasscho. This correspondence is believed to contain Green Dot account numbers and other forms of monetary instruments used for the payment of drugs supplied by Glasscho.

69. Pursuant to the electronic surveillance conducted during this investigation, calls were intercepted in which Kevin Glasscho and other members of his organization discussed an exchange of a firearm for drugs.

a. On April 1, 2009, at approximately 4:39 pm, Glasscho placed an outgoing call to (410) 710-5827, utilized by James Huntley. During the conversation Huntley advised, "Hey I got that set up for us for today. What's up?" Glasscho responded, "Oh yeah?" Huntley advised, "Yeah what you wanted." Glasscho asked, "What time?" Huntley answered, "When you ready." Glasscho asked, "Oh okay, that's the one we gotta go ride at?" Huntley responded, "I'll go do, I'll

do the riding and everything. You just meet me at the spot." Glasscho responded, "Right there! Uh, that might not be a good spot there." Huntley responded, "Alright pick, pick another spot." Glasscho responded, "Uh, you know which one, the one that we always go at uh, play the lotteries at." Huntley responded, "Alright we, on that lot around the corner." Glasscho responded, "Yeah, yeah. Yeah cause that spot there ah, we wearing that out. I mean we good far as with that, what we doing eating pizza. But hey." Huntley then agreed to the alternate meeting location. Huntley asked, "How much I tell you?" Glasscho answered, "You told me two fifty. Why what's up?" Huntley advised, "Cause shorty he, he talking more." Huntley then spoke with an unidentified person. Huntley then told Glasscho, "Alright well do this, do this. I'll, I'll handle it. Uh, on the thing me and you do, alright give me four of them and I, and I, I'll handle shorty." Glasscho asked, "Four of them? Alright that's what's up." Huntley advised he would call when he was on his way. At approximately 5:20 pm, Glasscho received an incoming call from (410) 710-5827, utilized by Huntley. Huntley advised, "Yo, I'm on my way. I'll be there in ten minutes yo." Glasscho advised, "Pull out, pull out in about uh, what you say seven." Huntley responded, "In ten minutes." Glasscho said, "Alright pull out in ten minutes." Huntley responded, "I'm already in, on the move. Uh we, we got that and you know we already filthy." Glasscho responded, "Yeah that's why I said pull out in ten minutes." Huntley responded, "Alright, well we can't stop we're just going." Glasscho responded, "Alright, alright, alright."

b. Later that evening, Glasscho placed an outgoing call to Huntley. During the conversation Glasscho advised, "Man uh, you can keep what I gave you man but I don't want this. That motherfucker too rusty for me. Yeah, I don't like it. I mean you can keep what I got if you find another victim, that probably want that, you know just give me three dollars and get this one

here back." Huntley asked, "You sure now, that's a good one yo, I'm telling you." Glasscho responded, "Nah, I don't like it. I don't like it. I don't want it." Huntley asked, "You want something new out of the box?" Glasscho answered, "Yeah I prefer, you know what I mean? That's close to new. That motherfucker there boy look like one of them dirty joints we used to buy a lot. You know, but I'm saying you can keep what you got. You find, find somebody else, just give me three dollars." Huntley advised, "Alright just hold it. I'll get, I'll get somebody uh, uh, uh that want one and uh, bop, bop, bop we'll do it that way." Glasscho responded, "Right, right, right." Based on my training and experience and other information developed during this investigation, I believe that Glasscho was arranging to sell Huntley four grams of heroin in exchange for a handgun. I further believe that Glasscho was dissatisfied with the handgun Huntley had given him in exchange for the four grams of heroin, because it was too old ("That motherfucker too rusty for me."). Glasscho said that he wanted a handgun that was nearly new, not an older type of handgun like those he used to purchase in years past. Glasscho instructed Huntley to keep the heroin and return "three dollars," a reference to $300, for the heroin provided by Glasscho. The dollar amount coincides with the price of approximately $80 per gram that Glasscho is charging for the heroin.

## VII. <u>Search Warrants for SUBJECT PREMISES#6-12</u>

### A. Kevin Glasscho/SUBJECT PREMISES #6

70. The residence at 4001 DUVALL AVENUE, FLOOR 2, BALTIMORE, MARYLAND, identified herein as SUBJECT PREMISES #6, is the residence of Kevin Glasscho's father, Everett Glasscho, and a residence used by Kevin Glasscho. According to records maintained by B&E, the listed subscriber for SUBJECT PREMISES #6 is Mary Glasscho, the mother of Kevin Glasscho. Maryland MVA records indicate that Kevin Glasscho has a 2005 Acura listed to the

address of SUBJECT PREMISES #6. In addition, as indicated above, intercepted calls have established that Glasscho receives mail from drug customers and fellow BGF members at SUBJECT PREMISES #6.

71. SUBJECT PREMISES #6 is a two story white single family home with a light brown wooden door and a glass storm door with the numbers 4 0 0 1 displayed in black on the dwelling to the left of the front door.

72. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of gang members and individuals involved in drug-trafficking, as set forth in Exhibit 1 and Exhibit 2, which are incorporated herein by reference.

73. Based upon the foregoing and on my training, experience, and participation in narcotics and gang investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #6 the items set forth in Attachment F, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 18 U.S.C. § 1962, which prohibits participation in a racketeering conspiracy; 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking; and 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering.

**B. Kevin Glasscho/Cassandra Adams/SUBJECT PREMISES #7**

74. Pursuant to the electronic surveillance conducted during this investigation, multiple calls were intercepted in which Kevin Glasscho's wife, Cassandra Adams, was discussed

in connection with, or was intercepted discussing, Glasscho's drug-trafficking operation and drug-related financial transactions.

a. For instance, on March 1, 2009, at approximately 1:39 pm, Eric Brown placed an outgoing call to Glasscho. During this conversation, Glasscho mentioned that he had "the misses" [an apparent reference to Cassandra Adams] "riding with me yesterday hitting motherfuckers [distributing drugs to customers]." The two of them then laughed about Glasscho's last statement. Glasscho said, "She don't be hanging out with me too tough, I'm going. You know she bring the thing up in them joints too [smuggling drugs to inmates in prisons]." Brown responded, "Yeah." Glasscho said, "Yeah, I just have her doing that too [smuggling drugs to inmates in prisons]. When they took me off the list [prison visitor list] I was sending her off to Cumberland [a Maryland prison], old jail [another Maryland prison], Roxbury [another Maryland prison], you know. Man shorty [an apparent reference to Adams] a trooper, shorty a trooper."

b. On March 18, 2009, at approximately 11:14 pm, Glasscho received an incoming call from Cassandra Adams. During the brief conversation Glasscho told Adams, "I'm making this last stop. So hurry up and get your ass home. You got some counting to do nigger." Adams responded, "Alright then." Based on my training and experience and other information developed during this investigation, I believe that Glasscho wanted his wife to go home so she could help him count the drug proceeds from the night's transactions.

c. On March 21, 2009, at approximately 4:11 pm, Glasscho placed an outgoing call to Cassandra Adams. During the conversation Glasscho advised, "I got to put you down with something that me and Car Wash was talking about too. So it's, it's, it's extremely good that you did what you did. That's what I was telling him, let my wife do it. She said man good. You

can't, you can't go over nine [an apparent reference to $9,000]." Cassandra responded, "Yeah, yeah, yeah, yeah. Over ten [an apparent reference to $10,000]." Glasscho continued, "Well they say ten [an apparent reference to $10,000] but to be on the safe side, nine [an apparent reference to $9,000]. Then I told him what you bringing home, that fifty. He said oh yeah she can account for hers." As the conversation continued Cassandra said, "This is what I'm gonna do. Only gotta put one more in, in one of them to make it nine [an apparent reference to $9,000], right." The two then continued discussing how much money can be placed into a bank account before the authorities start to investigate where the money is coming from. Based on my training and experience and other information developed during this investigation, I believe that Adams and Glasscho are structuring deposits of drug money into bank accounts to avoid detection by law enforcement.

75. The residence at 1909 FOREST PARK AVENUE, APT. S3, GWYNN OAK, MARYLAND, identified herein as SUBJECT PREMISES #7, is a residence of Kevin Glasscho and Cassandra Adams. BG&E records indicate that the account for SUBJECT PREMISES #7 is listed to Cassandra Adams, the wife of Kevin Glasscho. Maryland MVA records list the address of SUBJECT PREMISES #7 as the residence of Cassandra Adams. On numerous occasions, law enforcement officers have surveilled both Glasscho's and Adams's vehicles parked in the parking lot of the apartment building for SUBJECT PREMISES #7. Law enforcement officers have also surveilled Glasscho and Adams exiting that apartment building on multiple occasions. In addition, as more fully described below, law enforcement officers intercepted calls in which Dow and Glasscho agreed to meet at Glasscho's house, and law enforcement thereafter surveilled Dow arriving at SUBJECT PREMISES #7 carrying a bag containing what is believed to be multiple kilograms of heroin.

76. SUBJECT PREMISES #7 is a two story apartment building with a glass front door with the numbers 1 9 0 9 in white. Apartment S3 is a light blue door and S 3 appears in white above the eye hole in the center of the door.

77. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of gang members and individuals involved in drug-trafficking, as set forth in Exhibit 1 and Exhibit 2, which are incorporated herein by reference.

78. Based upon the foregoing and on my training, experience, and participation in narcotics and gang investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #7 the items set forth in Attachment G, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 18 U.S.C. § 1962, which prohibits participation in a racketeering conspiracy; 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking; and 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering.

**C. Calvin Robinson/SUBJECT PREMISES #8**

79. Based on evidence developed during this investigation, including calls intercepted during wiretaps, I have learned that Calvin Robinson is a wholesale customer of Kevin Glasscho's who distributes large quantities of heroin to customers in the Baltimore area. Numerous calls were intercepted during this investigation in which Robinson and Glasscho discussed and arranged narcotics transactions.

a. For instance, on March 18, 2009, at approximately 10:50 pm, Glasscho received an incoming call from (443) 271-4779, utilized by Calvin Robinson. During the conversation Robinson asked, "You still out and about?" Glasscho advised, "Yeah, yeah, yeah I'm floating around." Robinson responded, "Alright you wanna um scoot past, I got most of that. You know what I mean? But you got to try to get that to me as early, as soon as you can." Glasscho responded, "Alright, alright, alright...I'm, I'm a bring that too." Robinson asked, "Okay, everything is still dry like it was?" Glasscho answered, "It's the same, it's the same thing." Based on my training and experience and other information developed during this investigation, I believe that Robinson is bringing drug proceeds he owed to Glasscho from a previous drug transaction. When Glasscho said, "I'm a bring that too," he was advising that he would be providing an additional quantity of drugs on consignment to Robinson when they meet. When Robinson asked if it was "dry like it was," he was inquiring about the quality of the drugs, and Glasscho replied that it was "the same thing," a reference to the same quality as the prior shipment.

b. On March 20, 2009, at approximately 6:59 am, Glasscho placed an outgoing call to (443) 271-4779, utilized by Calvin Robinson. During the conversation Glasscho asked, "You wanted a whole dollar or the half?" Robinson answered, "Uh, it don't matter. You can bring me the um, bring it to me in two half's." Glasscho went on to explain that it would less work for him if he gave Robinson the "whole dollar." Robinson ultimately agreed and the two planned to meet after Robinson finished taking a shower. Based on my training and experience and other information developed during this investigation, I believe that Glasscho was planning on selling a large quantity of drugs to Robinson and was not going to break the drugs down into two separate packages.

c. On March 20, 2009, at approximately 11:33 am, Glasscho placed an outgoing call to (443) 271-4779, utilized by Calvin Robinson. * WN During the conversation Glasscho advised, "I got a seven point nine on that." Robinson responded, "Okay, so you say damn near a eight." Glasscho continued, "Yeah, yeah, yeah it's a keeper." Robinson asked if the drugs were from the same supplier. Glasscho responded, "Nah, nah, nah this ain't the same dude. This another one here, yeah this another one here. I got a couple of dudes, but this another one here. I just grabbed a couple of them just to hold. Waiting on it, for the dude. You know what I'm saying? I said I just grabbed a couple of them just to hold the wait for the other dude. You know what I'm saying?" Robinson responded, "Yeah, yeah, yeah." Glasscho advised, "But uh, if you don't want it, give it back, that's all." Based on my training and experience and other information developed during this investigation, I believe that Glasscho was explaining that the drugs he had sold earlier to Robinson were from one of his many suppliers. Glasscho attempted to reassure Robinson that the product was of good quality and if Robinson did not want the drugs, he could return them to Glasscho.

80. The residence at 1102 N. MOUNT STREET, BALTIMORE, MARYLAND, identified herein as SUBJECT PREMISES #8, is the residence of Calvin Robinson. Based on a review of records maintained by the Maryland Department of Assessments and Taxation, I have learned that SUBJECT PREMISES #8 is listed to Calvin R. Robinson. In addition, BG&E records indicate that the account at SUBJECT PREMISES #8 is in the name of Calvin R. Robinson. On March 23, 2009, law enforcement officers surveilled a black Mercedes SUV and a white Ford pick-up truck, both registered to Calvin R. Robinson at SUBJECT PREMISES #8, parked at that location. On March 30, 2009, law enforcement officers surveilled Robinson entering and exiting those

WN * During the course of the investigation, the user of 77 this cellphone was positively identified as Calvin Robinson based on surveillance of multiple meetings with Glasscho and a review of photographs obtained by law enforcement. WN

vehicles and then entering SUBJECT PREMISES #8.

81. SUBJECT PREMISES #8 is a three story form stone residence. It has a black storm door and black front door. The numbers 1 1 0 2 are in brass on the front door.

82. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of individuals involved in drug-trafficking, as set forth in Exhibit 2, which is incorporated herein by reference.

83. Based upon the foregoing and on my training, experience, and participation in narcotics investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #8 the items set forth in Attachment H, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; and 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking.

**D. Darnell Holmes, a/k/a "Moe"/SUBJECT PREMISES #9**

84. Based on evidence developed during this investigation, including calls intercepted during wiretaps, I have learned that Darnell Holmes, a/k/a "Moe," helps operate a stash house at SUBJECT PREMISES #9 for Glasscho and delivers drugs to Glasscho for distribution to customers and that Holmes also sells drugs to his own customers. Numerous calls were intercepted during this investigation in which Holmes and Glasscho discussed the status of and arranged for deliveries of narcotics.

a. For instance, on March 14, 2009, at approximately 12:06 am, Glasscho placed an outgoing call to (410) 818-7432, subscribed to Melessa Cox, 3309 Piedmont Avenue, Baltimore, Maryland and utilized by Darnell Holmes, a/k/a "Moe." *@ WJN During the conversation Glasscho asked, "You gotta work tomorrow?" Holmes responded, "Yeah, I'll probably leave out the house like eight thirty, nine o'clock, somewhere around in there." Glasscho advised, "Alright, I gotta see you around seven o'clock." Holmes responded, "Alright." Based on my training and experience and other information developed during this investigation, I believe that Glasscho and Holmes were arranging a drug related meeting.

b. On March 14, 2009, at approximately 6:44 am, Glasscho placed an outgoing call to Holmes. During the brief conversation Glasscho advised that he would meet Holmes at around seven thirty. Based on my training and experience and other information developed during this investigation, I believe that this call was a follow up to the previous call relating to the drug meeting scheduled by Glasscho. At approximately 7:36 am, Glasscho placed a follow up call to Holmes. Glasscho said, "Let me know what that book sound like when you do touch it, hear." Holmes answered, "Alright." Based on my training and experience and other information developed during this investigation, I believe that the three above-referenced calls with Holmes related to arrangements for a meeting and the subsequent delivery of a quantity of drugs. I believe that when Glasscho asked, "Let me know what that book sound like when you touch it," Glasscho was asking Holmes to report back to him regarding the quality of the drugs he had just delivered to Holmes.

c. On March 14, 2009, at approximately 3:51 pm, Glasscho received an incoming call from Holmes. During the conversation Holmes asked, "Hey man I might need to hold



* During the course of the investigation, the user of this cellphone was positively identified as Darnell Holmes based on surveillance of a drug transaction during which Holmes was using this cellphone and a review of photographs obtained by law enforcement. WJN

something, if you might can get a hold of something right. Yeah I mean, yeah I might need to talk to you about something you know." Glasscho advised, "Yeah I'm, I'm on my way out Security if you want to come out in the mall and holler at me." The two then agreed to meet in person at Mondawmin Mall instead of Security Mall. Based on my training and experience and other information developed during this investigation, I believe that Holmes wanted to meet with Glasscho to discuss obtaining a quantity of drugs from Glasscho.

d. On March 16, 2009, at approximately 4:10 pm, Glasscho placed an outgoing call to Holmes. During the call Glasscho asked, "You doing anything?" Holmes answered, "Nope, but one, one of them, one of them, yeah I did one." Glasscho responded, "Okay, so you basically still got three whole, three whole fifty cents right?" Holmes answered, "Yeah just about." Glasscho asked, "So you got two of them still together." Holmes answered, "Yeah." Glasscho advised, "Alright call me when you get in the house." Based on my training and experience and other information developed during this investigation, I believe that this call related to Glasscho's early morning conversation with Holmes on March 14, 2009. During the March 14, 2009, conversation Glasscho arranged to meet with Holmes. A short time after that call Glasscho called and said, "Let me know what that book sound like when you do touch it" which is believed to be a reference to the quality of the drugs Glasscho delivered to Holmes. This conversation on March 16, 2009, was a follow up, with Glasscho asking Holmes, "You doing anything?" Based on information developed during this investigation, including other intercepted calls, I believe that Holmes is in the process of selling the drugs that Glasscho had provided to him on March 14, 2009.

85. March 17, 2009, at approximately 4:32 pm, Glasscho placed an outgoing call to Holmes. During the conversation Glasscho asked, "You do anything last night?"

Holmes answered, "Um, I did two, three, yeah three of them I think. Two or three." Glasscho asked, All together?" Holmes responded, "Yeah. I got, I gotta go holler at somebody about one of them. But yeah everything straight though." Glasscho responded, "Yeah, alright I'll give you a call." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Glasscho was inquiring whether Holmes had had any drug sales the previous night. Holmes replied that he had made two or three drug sales.

a. On March 17, 2009, at approximately 8:28 pm, Glasscho placed an outgoing call to Holmes. During the conversation Glasscho asked when Holmes was leaving for work in the morning. Holmes advised he would leave around nine o'clock. Glasscho said, "I'll give you a holler if I need you, you hear." Holmes responded, "Alright." Glasscho later asked, "You do anything today?" Holmes answered, "I got three out, three, three of them. You want that?" Glasscho answered, "Nah, nah I get it to you, I get it from you tomorrow or something." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Holmes is helping Glasscho distribute drugs as well as providing his residence as a storage location for the drugs.

b. On March 18, 2009, at approximately 7:23 am, Glasscho placed an outgoing call to Holmes. During the conversation Glasscho explained he was at the Acura dealer located at 6559 Baltimore National Pike and wanted Holmes to bring him "two ten cents." Holmes agreed to meet Glasscho at the dealership and bring him the "two ten cents." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Holmes was delivering a quantity of drugs to Glasscho so he could in turn deliver the items to a drug customer.

c. On March 18, 2009, at approximately 8:39 pm, Glasscho placed an outgoing call to Holmes. Glasscho told Holmes, "I might be calling you in about an hour. I might need it, need, need uh fifty cent." Holmes responded, "Alright." Glasscho asked, "You do anything today?" Holmes answered, "No I ain't do nothing." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Glasscho was advising Holmes that in approximately one hour he may need to meet Holmes and pick up a quantity of drugs. Additionally, during the call Glasscho had inquired whether Holmes had made any drug sales during the day.

d. On March 18, 2009, at approximately 10:52 pm, Glasscho placed an outgoing call to Holmes. Glasscho called and said, "I need that other one too." Holmes asked, "Now?" Glasscho responded, "Yeah, yeah I'll call you when I'm on my way. But uh, put that on the uh, what's a name, make sure that's a fifty cent." Holmes responded, "Alright." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Glasscho was advising Holmes that he needed Holmes to weigh out a quantity of drugs because Glasscho needed to come pick up the drugs for a sale.

e. On March 18, 2009, at approximately 11:09 pm, Glasscho called Holmes and advised, "I'm coming to you now, Moe. I'm trying to get all this shit out of the way man. I'm trying to get all this shit out of the way so I can get my ass in the house." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Glasscho was advising Holmes that he was finishing one drug transaction and was going to be on his way to pick up the other quantity of drugs from Holmes.

f. On March 20, 2009, at approximately 12:59 pm, Glasscho placed an

outgoing call to Holmes. During the conversation Glasscho asked, "You say that's a seven huh?" Holmes answered, "Yeah, I give this a seven and a half but boy it went up some a little. Yeah I give it like about seven, eight, something like that. It's straight though." Glasscho asked, "So it's, it's a keeper then, huh?" Holmes answered, "Oh yeah, definitely it's a keeper." Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that Holmes had tested the quality of the new shipment of drugs obtained by Glasscho and was reporting to Glasscho that the drugs were of high quality ("I give it like about seven, eight ... definitely it's a keeper").

86. The residence at 3908 NORFOLK AVENUE, BALTIMORE, MARYLAND, identified herein as SUBJECT PREMISES #9, is the residence of Darnell Holmes. Based on a review of records maintained by the Maryland Department of Assessments and Taxation and BG&E, I have learned that SUBJECT PREMISES #9 is listed to Edith M. Holmes. Maryland MVA records list SUBJECT PREMISES #9 as the residence of Darnell Holmes. As recently as April 1, 2009, law enforcement officers surveilled Holmes come out of SUBJECT PREMISES #9 and get into Kevin Glasscho's vehicle. Surveillance ultimately observed Holmes exit Glasscho's vehicle and re-enter SUBJECT PREMISES #9.

87. SUBJECT PREMISES #9 is a two story brick home (duplex). There is white trim on the front and tan siding on the upper level of the home. The home has a white storm door and a wood door behind that. The numbers 3 9 0 8 are above the front door.

88. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of individuals involved in drug-trafficking, as set forth in

Exhibit 2, which is incorporated herein by reference.

89. Based upon the foregoing and on my training, experience, and participation in narcotics investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #9 the items set forth in Attachment I, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; and 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking.

**E. Lakia Hatchett/SUBJECT PREMISES #10**

90. Based on evidence developed during this investigation, including calls intercepted during wiretaps, I have learned that Lakia Hatchett obtains drugs from Glasscho on behalf of one of her associates and acts as a go-between for messages between Glasscho and one of his customers.

a. For instance, on March 19, 2009, at approximately 5:07 pm, Glasscho received an incoming call from (410) 807-6792, subscribed to Roger Harris, Catonsville, Maryland and utilized by an unidentified male. During the conversation Glasscho asked, "Man where you been at?" The unidentified male responded, "Man, man long story man. Motherfucking, minor little set-backs man." Glasscho advised, "Comes with this game boy." Glasscho went on to explain that he had been calling the male and his female companion but was not able to reach the unidentified male. Glasscho explained that he was just going to move on. The unidentified male asked, "What time you think you could hook up with her?" Glasscho answered, "What time she ready? What she was trying, what she was trying to do?" The unidentified male answered, "Um, get 20 of them."

Glasscho responded, "Alright, is she ready now?" The unidentified male answered, "Yeah. Is it the same thing or something?" Glasscho responded, "Same thing, same thing. I'm a um, when I get it in my hand I'm gonna call her. Is she ready? Her phone still on?" The unidentified male responded, "Yeah she ready now." Glasscho advised, "Alright, when I get it in my hand I'm gonna call her." Based on my training and experience and other information developed during this investigation, I believe that the unidentified male was arranging for a female associate, later identified as Lakia Hatchett, to purchase a quantity of drugs from Glasscho and was inquiring about the quality of the drugs ("Is it the same thing or something?").

b. On March 19, 2009, Glasscho placed an outgoing call to (410) 713-6729, with an unknown subscriber and utilized by Lakia Hatchett. During the conversation, Hatchett advised, "Hey could you call him real quick, cause he on the other line. Call him and um, he gonna call me back." Glasscho responded, "Alright." At approximately 5:15 pm, Glasscho placed an outgoing call to (410) 807-6792, utilized by the unidentified male. During the conversation the unidentified male asked, "You call her?" Glasscho answered, "Yeah she told me to call you real quick and then he gonna call me back." The unidentified male responded, "Well I mean she, she's ready, cause I, I'm talking to her, she just clicked over and hung up." Glasscho reiterated that Hatchett had instructed Glasscho to call the unidentified male back. The unidentified male explained, "Nah, it's what I told you. You know what I mean? But I didn't know how long you was gonna take." Glasscho responded, "Nah, I should be there bout, I'm a call her, I'm a call her back man, let her know I'll be there in about 20 minutes." At approximately 5:16 pm, Glasscho placed an outgoing call to (410) 713-6729, utilized by Hatchett. Glasscho advised, "I should be there about 20 minutes. You, you, you be ready?" Hatchett responded, "Yeah, I'll be ready." At approximately

5:35 pm, Glasscho placed an outgoing call to (410) 713-6729, utilized by Hatchett. Hatchett advised, "I'm two minutes away, I'm coming down now." At approximately 5:40 pm, Glasscho was observed meeting with Hatchett on the BP gas station parking lot located at Howard Street and 23rd Street. Agents observed Glasscho exit his vehicle, approach Hatchett, and drop a white in color object directly into Hatchett's purse. Hatchett then left the location. Within a few minutes, law enforcement officers surveilled Hatchett's vehicle parked directly in front of 2735 ST. PAUL STREET, the apartment building for SUBJECT PREMISES #10. Based on my training and experience and other information developed during this investigation, I believe that Glasscho delivered a quantity of drugs to Hatchett at the direction of the unidentified male and that Hatchett took the drugs directly to her residence.

91. The residence at 2735 ST. PAUL STREET, APARTMENT 1, BALTIMORE, MARYLAND, identified herein as SUBJECT PREMISES #10, is the residence of Lakia Hatchett. Based on a review of records maintained by BG&E, I have learned that the account for SUBJECT PREMISES #10 is listed to Kim S. Van Dyke. However, law enforcement has determined that Kim Van Dyke is not in fact a resident at SUBJECT PREMISES #10. Moreover, Lakia Hatchett is the listed customer for the BG&E account at 730 McCabe Avenue, Baltimore, Maryland, but the bill for that account is sent to Hatchett at 2735 Saint Paul Street, Apartment 1, Baltimore, Maryland, the address of SUBJECT PREMISES #10. Based on a search of law enforcement databases, I have learned that 730 McCabe Avenue, Baltimore, Maryland and SUBJECT PREMISES#10 are both listed as addresses for Hatchett. Hatchett's vehicle has been surveilled parked in front of SUBJECT PREMISES #10, and Hatchett has been surveilled entering and exiting that premises. In addition, law enforcement officers have observed Hatchett's name on the mailbox of SUBJECT PREMISES

#10.

92. SUBJECT PREMISES #10 is a three story brown and red brick row home. There is a brown wood front door with the numbers 2 7 3 5 in black and gold. Apartment 1 is entered through a white door.

93. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of individuals involved in drug-trafficking, as set forth in Exhibit 2, which is incorporated herein by reference.

94. Based upon the foregoing and on my training, experience, and participation in narcotics investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #10 the items set forth in Attachment J, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; and 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking.

**F. Darryl Taylor/SUBJECT PREMISES #11**

95. Based on evidence developed during this investigation, including calls intercepted during wiretaps, I have learned that Darryl Taylor obtains heroin from Kevin Glasscho and smuggles the heroin to BGF members and other inmates in Maryland prisons. Multiple calls were intercepted during this investigation in which Taylor and Glasscho discussed drug smuggling activities and arranged drug transactions.

a. For instance, on March 14, 2009, at approximately 4:00 pm, Glasscho

received an incoming call from (410) 710-8620, subscribed to and utilized by Darryl Taylor. Upon answering the telephone Taylor advised, "Hey everything good alright." Glasscho responded, "My man, my man. You didn't have no problems getting it in?" Taylor answered, "No uh, uh." Glasscho asked, "Yeah, see did you talk to talk to him about how you feel comfortable coming? Did you talk to him about the way you feel comfortable coming in?" Taylor answered, "Well you know what I mean, it, it was like, no I didn't." Taylor advised, "Yeah, look man I, I, I did right but uh, I told him. I'm like man I have to you know, get some practice in for that man. Cause I ain't, you know I ain't never, I ain't, I ain't never had to utilize nothing like that." Glasscho asked, "What you uh, what he want you to carry it between your cheeks?" Taylor answered, "Yeah." Glasscho responded, "Yeah that's how I do it. I carry it between my cheeks." Taylor advised, "Right I understand that right. But I ain't, I ain't, you know I ain't, I ain't never, I ain't never did it that way right. But like I told him, I will have to you know, uh, uh, uh, being you know uh, uh, get home and get some practice. You know what I mean? That way I'm, I'm, I'm familiar with it and comfortable." Glasscho said, "Yeah, carrying it between your cheeks is the best way though man." Taylor responded, "That's what he said." Glasscho continued, "Yeah they can never, he, he ain't lying about that. He ain't lying about that. That's how I do it." Taylor said, "Right, yeah he told me." Glasscho went on in detail on exactly how carries the item into the facility and how it is removed and passed to the inmate without being detected by corrections officials. Based on my training and experience and other information developed during this investigation, including other intercepted calls, I believe that in this call, Glasscho and Taylor were discussing a transaction in which Glasscho supplied drugs to Taylor, who in turn smuggled the drugs into a prison facility, believed to be located in Hagerstown, by body-carrying the drugs into the facility, which Glasscho

indicated is the method he uses as well.

96. The residence at 448 TUBMAN COURT, BALTIMORE, MARYLAND, identified herein as SUBJECT PREMISES #11, is the residence of Darryl Taylor. Based on a review of Maryland MVA records, I have learned that SUBJECT PREMISES #11 is listed as the residence for Darryl Taylor. The cellphone on which Taylor was intercepted is subscribed to him at the address of SUBJECT PREMISES #11. Law enforcement databases also list Darryl Taylor's residence as SUBJECT PREMISES #11. During a visit to WCI in Cumberland, Maryland, Taylor was stopped entering the prison. At that time, he provided DOC officials with a Maryland driver's license reflecting an address of 448 Tubman Court, Baltimore, Maryland, the address of SUBJECT PREMISES #11. On April 7, 2009, a uniformed officer knocked on the door of SUBJECT PREMISES #11. At that time, Taylor answered the door and was positively identified by the officer. Taylor advised the officer that he resides at SUBJECT PREMISES #11 with his grandmother.

97. SUBJECT PREMISES #11 is a two story red brick residence. The residence has a red metal door with the metal screen door attached. The numbers 4 4 8 are above the door.

98. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of individuals involved in drug-trafficking, as set forth in Exhibit 2, which is incorporated herein by reference.

99. Based upon the foregoing and on my training, experience, and participation in narcotics investigations, I respectfully submit that there is probable cause to believe that there will be found in SUBJECT PREMISES #11 the items set forth in Attachment K, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 21 U.S.C. §§ 841 and 846, which

prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; and 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking.

**G. Tyrone Dow/SUBJECT PREMISES #12**

100. Based on evidence developed during this investigation, including calls intercepted during wiretaps, I have learned that Tyrone Dow is one of Glasscho's heroin suppliers who distributes large quantities of heroin to Glasscho and other heroin distributors. Numerous calls were intercepted during this investigation in which Dow and Glasscho discussed and arranged drug transactions.

a. For instance, on March 18, 2009, at approximately 9:57 pm, Glasscho received an incoming call from (443) 563-4012, subscribed to Andrew Brown, PO Box 54988, Irvine, California, and utilized by "KK." When Glasscho answered the call, Tyrone Dow was heard talking in the background. Glasscho told KK, "We was just sitting here talking about you." KK responded, "Oh yeah. Who that, Flav [a reference to Dow]?" Glasscho answered, "Yeah." KK said that he had recently tried to reach Dow at the "shop." As the conversation progressed KK said, "Yeah man I gotta go up there, I gotta come up there man, you know." Glasscho responded, "Yeah we was just asking when you was coming up." KK continued, "Yeah that's what I'm saying. I, I gotta come up there. I'll probably come in two weeks and shit. You know what I'm saying? I needed to talk to him and shit to see what, you know." Glasscho responded, "Yeah. Here he go, hold on." Dow then used Glasscho's telephone to speak with KK. Dow asked, "When you coming in town?" KK answered, "Um, I'll be, I'm saying first, I was kind a fucked up. Kind of feeling fucked up man. I said if it ain't really worth it man I ain't coming up there. I'm just crazy, shit is

crazy. You know what I'm saying?" Dow responded, "Yeah." KK asked, "What you think, I should come up there? Like cause you know the spring break and Easter break and shit is like in two weeks. What you think I should come up?" Dow answered, "Yeah come on and hang out, just to hang out with us." KK responded, "Yeah, yeah." KK said he had tried recently reaching Dow at the shop was told he wasn't there. Dow said, "Yeah, come on up man. Um, um Cuzzo probably be through by the time you come up. That's all I'll be waiting on." KK responded, "Yeah, yeah. What's, what's up with Edo, he chilling man?" Dow answered, "Yeah he's chilling. I just left him not too long ago." KK said, "Oh yeah cause I didn't know his number, I didn't know your number, I just wanted to say good looking out. I, I couldn't get in touch with nobody." Dow responded, "Well you know I got you man. That's what I be trying to explain, I got you no matter what." KK said, "Yeah that's why I was calling around. I called, I been calling it ever since. You know what I'm saying? I was like damn I sure appreciate, you know what I'm saying?" Dow continued, "Yeah it's no matter what. You my man, it ain't, it ain't just about that. You know what I mean?" KK responded, "Yeah, yeah man that's what's up man. Hell yeah I appreciate that man, you know." Dow continued, "Yeah you my man. But uh, I'm a try to do something before you come. But um, come on up." KK responded, "Alright, alright man." Dow told KK that he could even just come up and hang out and that Dow would pay KK's travel expenses. KK responded to that offer, "Alright man that's what's up man, hell yeah." Dow continued, "But I'm gonna do something before, cause that, you said in about two weeks right?" KK answered, "Yeah, yeah you know the um, you know the Easter, Easter like the first week, it's like gonna be around that Easter time. You know the little Easter break." Dow said, "Alright cause I'm, I'm hoping he come through before then. But even if he don't, I, I'll pay your way up." KK responded, "Alright my man, my man." Glasscho then returned to speak with KK and

said, "I'm gonna give him this number, I'm gonna give him this number. This the Boost joint right?" KK answered, "Yeah, yeah." Based on my training and experience and other information developed during this investigation, I believe that KK is an out-of-state supplier of drugs. KK has been trying to reach Dow to determine whether or not KK should send a shipment of drugs to Maryland. Dow advised that he and his associates are currently obtaining their drugs from Cuzzo, but that KK should send a shipment. Dow advised, "Um, um Cuzzo probably be through by the time you come up. That's all I'll be waiting on." Additionally it is believed that Dow provided information to KK regarding what I believe to be a drug shipment that was seized by law enforcement. KK appears to have been avoiding sending any drugs to Maryland until he was reassured that someone there would be capable of distributing a large quantity. Ultimately, Dow said that even if KK did not send any drugs at this time, he would pay for KK to come to Maryland to "hang out" with Dow and his drug associates.

b. On March 21, 2009, at approximately 9:09 am, Glasscho placed an outgoing call to (410) 294-4839, utilized by Dow. Glasscho advised that he had to work from ten until six o'clock in the evening. Glasscho asked, "Do you feel like riding out there?" Dow answered, "Yeah, yeah I'll ride out." Glasscho responded, "My man, my man, my man, my man. Give me a call when you get out." Based on my training and experience and other information developed during this investigation, I believe that Glasscho wanted to have a drug related meeting with Dow in person at his place of employment.

c. On March 21, 2009, at approximately 2:08 pm, Glasscho placed an outgoing call to (410) 294-4839, utilized by Dow. During the conversation Glasscho asked, "What time you gonna try to slide out here?" Dow answered, "I'll be there in the next forty minutes."

Glasscho advised that he was on his lunch break and would be returning to work at 2:45 pm. Dow advised, "Alright, I'll be there. I'm gonna leave in five minutes then." Glasscho responded, "Yeah I'd like, I'd like to see you before I get off my lunch break. You know what I'm saying? Try to be here about two thirty or something like that. Get here about two thirty or twenty of." Dow responded, "Okay." Glasscho responded, "Alright, come on." At approximately 2:40 pm, Glasscho placed an outgoing call to (410) 294-4839, utilized by Dow. During the brief conversation Dow advised that he was at Glasscho's place of employment. Glasscho then said he was coming to meet Dow. Based on my training and experience and other information developed during this investigation, I believe that Glasscho wanted Dow to meet him at his place of employment so Glasscho could deliver the proceeds from a drug sale he had conducted earlier.

d. On March 28, 2009, at approximately 5:09 pm, Dow received an incoming call from (443) 799-9143 with an unknown subscriber and utilized by an unidentified male. During the brief conversation Dow advised, "I'll be calling you in about an hour. Why don't you be down there in about an hour." The unidentified male asked, "But is you already cool?" Dow answered, "Nah, 'bout, 'bout an hour." The unidentified male explained that he was going to "go across town" but would stay in the area until seven o'clock. Based on my training and experience and other information developed during this investigation, I believe that the unidentified male is attempting to purchase a quantity of drugs from Dow. When the unidentified male asked, "But is you already cool?" and Dow answered, "Nah, 'bout, 'bout an hour," the unidentified male was inquiring whether Dow was prepared to sell the unidentified male the quantity of drugs.

e. On March 30, 2009, at approximately 1:18 pm, Dow placed an outgoing call to (443) 622-1345, with an unknown subscriber and utilized by an unidentified male.

Dow asked, "You know uh, Twin?" The unidentified male answered, "Uh Twin, I know the twins out of Sandtown that write numbers." Dow continued, "Nah, this Twin he was going down there hollering at um, your man down there, across the street from the market." The unidentified male responded, "Yeah, yeah." Dow continued, "But I'm out of town. Is it alright if I give him your number?" The unidentified male answered, "Yeah, absolutely." Dow continued, "Alright, okay I'm gonna give him your number." Based on my training and experience and other information developed during this investigation, I believe that Dow was referring a drug customer to the unidentified male. The unidentified male is believed to be a source of supply for a type of drug that Dow currently does not have in his possession.

f. On April 7, 2009, at approximately 3:03 pm, Dow placed an outgoing call to Glasscho. During the conversation Glasscho asked where Dow currently was located. Dow advised, "I ain't gonna be able to get there till four, four thirty." Glasscho responded, "You won't be able to get to the house till four thirty?" Dow continued, "Yeah, I, I might could make it by four. Between four and four thirty." Glasscho responded, "I need to see you as soon as you can man." Dow advised, "Alright, okay." Based on my training and experience and other information developed during this investigation, I believe that Glasscho needed to meet with Dow as soon as possible to obtain a new supply of drugs. During the course of this and other communications, law enforcement agents were conducting surveillance of Glasscho. At approximately 3:59 pm, Dow received an incoming call from Glasscho. During the conversation, Dow advised, "Meet you in fifteen minutes." At approximately 4:15 pm, agents observed Dow arrive at Glasscho's residence, SUBJECT PREMISES #7. Upon exiting his vehicle Dow was observed to remove a brown paper bag from the passenger compartment of the vehicle. Agents were able to see that the brown bag was

weighted down and took the shape of several rectangular items, believed to be kilograms of heroin. Dow then entered Glasscho's residence, departing a short time later. Not long after Dow departed Glasscho's residence, Glasscho began calling several of his identified drug customers – including, among others, Calvin Robinson – indicating that he had drugs available for sale.

g. On April 10, 2009, at approximately 9:04 am, Dow placed an outgoing call to Glasscho. During the conversation Dow asked, "What time you say you got to be to work?" Glasscho answered, "Two o'clock. Come meet me at the house, come meet me at the house." Dow responded, "Alright." Glasscho asked, "You on your way?" Dow responded, "No, I'm a be about forty minutes." At approximately 11:27 am, Dow received an incoming call from Glasscho. During the brief conversation Dow advised, "I'll be at the house in about twenty minutes or you gonna be at your house?" Glasscho answered, "Nah, you got to be at my house man. Cause I got to, I got to move." Dow responded, "I'm on my way. I'll be there in twenty minutes." Based on my training and experience and other information developed during this investigation, I believe that Glasscho needed to meet with Dow in person to have a drug-related meeting, which is believed to be payment of a drug debt. During this time period agents were conducting surveillance at 5 Woodbriar Court, Baltimore, Maryland, the residence of Tyrone Dow. At approximately 11:40 am, agents observed Dow walking down the steps from the second floor apartments located at 5 Woodbriar Court, Baltimore, Maryland. Dow then entered his vehicle and drove out of the area. A short time later Dow advised Glasscho, "I'm coming up the hill," a reference to an area near Glasscho's residence.

101. The residence at 5 WOODBRIAR COURT, APARTMENT C, BALTIMORE, MARYLAND, identified herein as SUBJECT PREMISES #12, is a residence used by Tyrone Dow.

Based on a review of BG&E records, I have learned that the utilities account for SUBJECT PREMISES #12 is in the name of "Barry Lewis." Lewis lists his home phone number as (443) 803-1329 and his business phone number as (410) 528-9299. However, a search of public record databases has revealed that Lewis currently utilizes 3900 Fordleigh Road, Apartment A, Baltimore, Maryland 21215 and 36126 Force Lane, Baltimore, Maryland 21215 as his residences and does not list SUBJECT PREMISES #12 as his residence. Lewis's listed business phone number of (410) 528-9299 is subscribed to Belvedere Detailers located at 1014 Lovegrove Street, Baltimore, Maryland. A search of public record databases has revealed that Tyrone Dow is the owner of Belvedere Detailers and that the contact number for the business is (410) 528-9299, the same number listed by Lewis as his work number. In addition, ~~as indicated above~~, on multiple occasions Dow was surveilled entering or exiting the apartment building of SUBJECT PREMISES #12 to go to a drug-related meeting with Glasscho as recently as April 10, 2009.

102. SUBJECT PREMISES #12 is a three story apartment building with a brick exterior, with the number 5 in white, centered above the common entranceway door. Apartment C has a tan steel door with a gold metal door-knocker on the center of the door, with the letter C on the knocker.

103. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know that certain items are commonly maintained at the residences of individuals involved in drug-trafficking, as set forth in Exhibit 2, which is incorporated herein by reference.

104. Based upon the foregoing and on my training, experience, and participation in narcotics investigations, I respectfully submit that there is probable cause to believe that there will

be found in SUBJECT PREMISES #12 the items set forth in Attachment L, which constitute evidence, fruits and/or instrumentalities of violations of, *inter alia*, 21 U.S.C. §§ 841 and 846, which prohibits the distribution and possession with intent to distribute controlled substances, and conspiracy to commit those offenses; and 21 U.S.C. § 843, which prohibits the use of a communication facility in furtherance of drug-trafficking.

## VIII. Request for Authorization for Nighttime Execution

105. Based on the information contained in this affidavit, including information regarding gang membership, acts of violence, and the presence of narcotics and firearms, which I know based on my training and experience are frequently found in premises controlled by drug traffickers, I respectfully submit that there is probable cause to believe that grounds exist for the service of the search warrants for SUBJECT PREMISES #6-12 at any time of the day or night. Accordingly, pursuant to 21 U.S.C. § 879, I respectfully request that law enforcement officers be authorized to serve the search warrants for SUBJECT PREMISES #6-12 at any time of the day or night.

## IX. Conclusion

106. Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT PREMISES the items set forth in the respective attachments hereto, which constitute evidence, fruits, and instrumentalities of, inter alia, the aforementioned violations of federal laws.

107. Given the confidential nature of this continuing investigation, I respectfully request that this affidavit and all of the papers submitted herewith be maintained under seal until otherwise ordered by this Court, except that two (2) certified copies shall be provided to the United

09-1551 JKB

States Attorney's Office.

WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for each of the SUBJECT PREMISES and authorize the search and seizure of the items described in the respective attachments hereto.

WILLIAM NICKOLES
Detective, Baltimore Police Department
Task Force Officer, DEA

Sworn to before me this
14 day of April, 2009.

UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MARYLAND

# BROWN INDICTMENT

MCH

JTW/CJF/JMW
USAO2008R00860

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** WDQ-09-0183 |
| | * | |
| **v.** | * | **(Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, 21 U.S.C. § 846; Conspiracy to Interfere with Commerce by Robbery, 18 U.S.C. § 1951; Possession of a Firearm in Furtherance of a Crime of Violence, 18 U.S.C. § 924(c); Aiding and Abetting, 18 U.S.C. § 2)** |
| **ERIC BROWN,**<br>**a/k/a "Dee Brown,"**<br>**a/k/a "E,"**<br>**a/k/a "EB,"**<br>**RAY OLIVIS,**<br>**a/k/a "Ronnie Hargrove,"**<br>**a/k/a "Uncle Ray,"**<br>**a/k/a "Unc,"**<br>**a/k/a "Ray Ray,"**<br>**DEITRA DAVENPORT,**<br>**a/k/a "Sister D,"**<br>**RAINBOW WILLIAMS,**<br>**TOMEKA HARRIS,**<br>**a/k/a "Tamika Harris,"**<br>**a/k/a "Andrea Huff,"**<br>**MARLOW BATES,**<br>**RANDOLPH EDISON,**<br>**a/k/a "Uncle Rudy,"**<br>**ROOSEVELT DRUMMOND,**<br>**a/k/a "June,"**<br>**a/k/a "Q,"**<br>**ZACHARY NORMAN,**<br>**a/k/a "Zack,"**<br>**KEVIN GLASSCHO,**<br>**a/k/a "KG,"**<br>**TAKEVIA SMITH,**<br>**a/k/a "Kiki,"**<br>**TERRY ROBE,**<br>**ASIA BURRUS, and**<br>**MUSHEERAH HABEEBULLAH,** | * | **FILED UNDER SEAL** |
| **Defendants** | * | |

*******

**INDICTMENT**

**COUNT ONE**

The Grand Jury for the District of Maryland charges that:

**Introduction**

1. At all times relevant to this Indictment, the "Black Guerrilla Family," or "BGF," was a gang active in prisons throughout the United States, including in Maryland.

2. At all times relevant to this Indictment, BGF factions existed in numerous prison facilities in Maryland, including, among others, North Branch Correctional Institution, Western Correctional Institution, Eastern Correctional Institution, Roxbury Correctional Institution, Maryland Correctional Institution – Jessup, Maryland Correctional Institution – Hagerstown, Baltimore City Correctional Center, and Metropolitan Transition Center.

3. At all times relevant to this Indictment, BGF expanded from prison facilities to the streets of Baltimore City and elsewhere.

4. At all times relevant to this Indictment, BGF leaders, collectively known as the "Supreme Bush," directed the activities of BGF members both in and out of prison.

5. At all times relevant to this Indictment, BGF members were required to follow a code of conduct and to become familiar with the history and teachings of BGF.

6. At all times relevant to this Indictment, members of BGF frequently engaged in criminal activity, including, but not limited to, drug-trafficking, extortion, robberies, assaults, and murder.

7. At all times relevant to this Indictment, members of BGF recruited employees of prison facilities, including corrections officers, to assist BGF and its members by smuggling drugs

and other contraband into prison facilities.

**Manner and Means of the Conspiracy**

8. Among the manner and means by which the defendants and others conducted and participated in the conduct of the conspiracy were the following:

a. BGF members distributed controlled substances, including heroin and 3,4-methylenedioxymethamphetamine, commonly known as "Ecstasy," to customers in the Baltimore area.

b. BGF members and associates smuggled controlled substances, including heroin and 3,4-methylenedioxymethamphetamine, commonly known as "Ecstasy," tobacco, and other contraband to incarcerated BGF members for distribution within the prison facilities.

c. Corrections officers and other employees, including **TAKEVIA SMITH, a/k/a "Kiki," TERRY ROBE, ASIA BURRUS,** and **MUSHEERAH HABEEBULLAH,** and others, assisted incarcerated BGF members in smuggling drugs and other contraband into prison facilities, often in exchange for money and/or other compensation.

d. BGF members used violence and the threat of violence to coerce incarcerated persons to pay protection money to BGF.

e. BGF members committed and caused to be committed acts of violence in furtherance of the gang's activities, including robberies of drug dealers and assaults against others, including rival gang members and individuals suspected of cooperating with law enforcement.

f. BGF members used contraband cellular telephones in prison facilities to notify one another about gang members who were arrested or incarcerated; to discuss police

interactions with gang members; and to share with one another the identities of individuals who may be cooperating with law enforcement and propose actions to be taken against those individuals.

g. BGF members and associates conducted counter-surveillance of law enforcement officers in an attempt to prevent law enforcement officers from detecting their illegal activities.

**The Conspiracy**

9. From at least in or about 2008 through in or about April 2009, in the District of Maryland, the defendants,

**ERIC BROWN,**
**a/k/a "Dee Brown,"**
**a/k/a "E,"**
**a/k/a "EB,"**
**RAY OLIVIS,**
**a/k/a "Ronnie Hargrove,"**
**a/k/a "Uncle Ray,"**
**a/k/a "Unc,"**
**a/k/a "Ray Ray,"**
**DEITRA DAVENPORT,**
**a/k/a "Sister D,"**
**RAINBOW WILLIAMS,**
**TOMEKA HARRIS,**
**a/k/a "Tamika Harris,"**
**a/k/a "Andrea Huff,"**
**MARLOW BATES,**
**RANDOLPH EDISON,**
**a/k/a "Uncle Rudy,"**
**ROOSEVELT DRUMMOND,**
**a/k/a "June,"**
**a/k/a "Q,"**
**ZACHARY NORMAN,**
**a/k/a "Zack,"**
**KEVIN GLASSCHO,**
**a/k/a "KG,"**
**TAKEVIA SMITH,**
**a/k/a "Kiki,"**

**TERRY ROBE,**
**ASIA BURRUS, and**
**MUSHEERAH HABEEBULLAH,**

did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury to distribute and possess with intent to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and a quantity of a mixture or substance containing a detectable amount of 3,4-methylenedioxymethamphetamine (MDMA), commonly known as "Ecstasy," a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

21 U.S.C. § 846

**COUNT TWO**

The Grand Jury for the District of Maryland further charges that:

On or about March 13, 2009, in the District of Maryland, the defendants,

**RANDOLPH EDISON,**
**a/k/a "Uncle Rudy,"**
**ROOSEVELT DRUMMOND,**
**a/k/a "June,"**
**a/k/a "Q," and**
**ZACHARY NORMAN,**
**a/k/a "Zack,"**

did knowingly and willfully combine, conspire, confederate, and agree with each other to obstruct, delay, and affect commerce and the movement of an article and commodity in commerce by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), by the unlawful taking of narcotics proceeds from the person and presence of victims.

18 U.S.C. § 1951

**COUNT THREE**

The Grand Jury for the District of Maryland further charges that:

On or about March 13, 2009, in the District of Maryland, the defendants,

**RANDOLPH EDISON,**
**a/k/a "Uncle Rudy,"**
**ROOSEVELT DRUMMOND,**
**a/k/a "June,"**
**a/k/a "Q," and**
**ZACHARY NORMAN,**
**a/k/a "Zack,"**

did knowingly possess a firearm in furtherance of a drug-trafficking crime for which they may be prosecuted in a court of the United States, to wit, conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, as set forth in Count One of this Indictment, and a crime of violence for which they may be prosecuted in a court of the United States, to wit, conspiracy to interfere with commerce by robbery, in violation of Title 18, United States Code, Section 1951, as set forth in Count Two of this Indictment.

18 U.S.C. § 924(c)
18 U.S.C. § 2

Rod J. Rosenstein
Rod J. Rosenstein
United States Attorney

A TRUE BILL:

Sharon K Cooper
Foreperson

8 APR 2009
Date

# GLASSCHO INDICTMENT

MCt!

JTW/CJF/JMW
USAO2009R00294

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** WDQ-09-0184 |
| | * | |
| **v.** | * | **(Conspiracy to Distribute Heroin, 21 U.S.C. § 846)** |
| | * | |
| **KEVIN GLASSCHO,** | * | |
| **a/k/a "KG,"** | * | |
| **TYRONE DOW,** | * | |
| **a/k/a "Flavor,"** | * | **FILED UNDER SEAL** |
| **CALVIN ROBINSON,** | * | |
| **AVON FREEMAN,** | * | |
| **JAMES HUNTLEY,** | * | |
| **DARRYL DAWAYNE TAYLOR,** | * | |
| **JOE TAYLOR-BEY,** | * | |
| **a/k/a "Joe Taylor,"** | * | |
| **DARNELL ANGELO HOLMES,** | * | |
| **a/k/a "Moe,"** | * | |
| **DARIEN LARENZ SCIPIO,** | * | |
| **a/k/a "Reds,"** | * | |
| **LAKIA HATCHETT, and** | * | |
| **CASSANDRA ADAMS,** | * | |
| | * | |
| **Defendants** | * | |

**INDICTMENT**

**COUNT ONE**

The Grand Jury for the District of Maryland charges that:

From at least in or about 2008 through in or about April 2009, in the District of Maryland and elsewhere, the Defendants,

**KEVIN GLASSCHO,**
**a/k/a "KG,"**
**TYRONE DOW,**
**a/k/a "Flavor,"**
**CALVIN ROBINSON,**
**AVON FREEMAN,**

**JAMES HUNTLEY,**
**DARRYL DAWAYNE TAYLOR,**
**JOE TAYLOR-BEY,**
**a/k/a "Joe Taylor,"**
**DARNELL ANGELO HOLMES,**
**a/k/a "Moe,"**
**DARIEN LARENZ SCIPIO,**
**a/k/a "Reds,"**
**LAKIA HATCHETT, and**
**CASSANDRA ADAMS,**

did knowingly and intentionally combine, conspire, confederate and agree with each other and with others known and unknown to the Grand Jury to distribute and possess with intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A).

21 U.S.C. § 846

Rod J. Rosenstein
Rod J. Rosenstein
United States Attorney

A TRUE BILL:

Shaun K Cooper
Foreperson

Date: 8 Apr 2009

# EXHIBIT 1

**Exhibit # 1**

1. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know the following:

   a. Gang members will often maintain and/or possess a roll call where they list the gang name and then list the members' names below. Roll call lists often include dollar amounts that signify and track dues payments made by gang members at meetings. They may also list the names of allies and rival gangs. Dues are used to help certain gang members who are incarcerated for acts of violence and/or drug trafficking post bail or obtain an attorney. They are also used to purchase weapons or as a "tithe" to higher-ranking gang members.

   b. Gangs use graffiti to mark their territory and graffiti can be used to disrespect or make threats against rival gangs, by crossing out the rival gang's graffiti, or "tag," and placing their own "tag." "Tagging" is an activity where the participants and/or gang adopt a unique written nickname known as a "tag." Gang members "tag" on public or private property and will often include the gang name in order to show the gang's area of control and their personal affiliation with the gang. The writing of the "tags" results in the crime of destruction of property. "Taggers" often write their friends'/fellow gang members' names in tagging scrapbooks. They also record their "tags" in these books and will cut out newspaper articles on graffiti and put them in their scrapbooks. They often will write their unique "tag," nickname, and/or gang name on their personal property to identify their property or to practice their tag. This personal property often includes papers, sketchbooks, bedroom walls, backpacks, and other personal items. They will sometimes try variations of their "tag" to see how it looks when done differently. Gang members often possess many items such as spray-paint and wide tip marking pens for this purpose.

   c. Gang members will often maintain photographs, video recordings, clothing, drawings, letters, notes, cards, or other correspondence which show their association and/or membership with the gang as well as their relationship to other members and associates of the gang. These videotapes and/or photographs sometimes depict the gang members committing criminal acts, admitting to the crimes, and making threats against rival gangs. The correspondence often contains directives from more senior incarcerated gang members instructing persons on the street to carry out various criminal acts and must be maintained by persons on the street as their proof that they have the authority to commit certain criminal acts. The correspondence also often includes discussions about criminal acts committed on behalf of BGF. This correspondence constitutes evidence of criminal acts committed in furtherance of the underlying criminal enterprise but also documents the gang member's association with that enterprise. Your affiant also knows that gang members in this investigation have referred to and used the Internet to contact other members. Your affiant knows that there are websites that

gang members use to establish profiles and to identify and locate other gang members.

d. Gang members keep in close contact with members of their gang as well as members of allied gangs. They often maintain phone and address lists of their associates. These lists will typically include the person's nickname or "street name" as well as their real name. Gang members have been known to use beepers, cell phones, and two-way digital radios to keep in contact with each other and to plan and advise about gang meetings. Gang members often communicate with each other through letters, particularly when they are incarcerated. Their letters sometimes detail criminal acts they have done as well as referring to other gang members and disclosing their identities and crimes they have committed.

e. Gangs, including BGF, have books or other documents that set forth the rules and/or code of conduct for members of the gang. These books are distributed to and maintained by gang members. BGF members are required to study, and are tested on their knowledge of, these materials.

f. BGF members use prepaid credit cards as a means of financing the gang's illegal activities, and often maintain such cards and documents relating to such cards.

2. Based on participation in this investigation as well as discussions with other law enforcement officers, I know that the type of documents and records described above are typically found at the residences of gang members and that such evidence assists in proving the allegiance of a particular individual to the gang. I am aware from search warrants conducted in connection with this and other gang investigations that document(s) that refer or relate to the individual's membership in the gang are often located among the individual gang member's personal belongings.

# EXHIBIT 2

**Exhibit #2**

1. Based upon my training and experience and my participation in this and other investigations, as well as my conversations with other agents, I know the following:

a. Narcotics traffickers often maintain on hand large amounts of both narcotics and currency in order to maintain and finance their on-going narcotics business, as well as paraphernalia used in the manufacture, packaging, preparation, and weighing of illegal narcotics in preparation for trafficking, and narcotics traffickers maintain these items where they have ready access to it.

b. Narcotics traffickers often maintain financial records and financial instruments related to their narcotics transactions and the profits derived from those transactions including, but not limited to, currency, bank checks, cashiers checks, Western Union receipts, money orders, stocks, bonds, precious metals, and real estate records;

c. Narcotics traffickers frequently maintain records of their narcotics transactions including, but not limited to, books, ledgers, records and other documents relating to the manufacture, transportation, possession, and distribution of controlled substances. Such documents are frequently maintained where the traffickers have ready access to them, including in their homes;

d. Narcotics traffickers commonly maintain books, records and other documents that identify and contain the names, addresses and/or telephone or pager numbers of associates in their narcotics-trafficking or money-laundering activities, including, but not limited to: address books, telephone books, rolodexes, telephones, pagers, or personal digital assistants with stored telephone information, notes reflecting telephone and pager numbers, photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film), and audiotape recordings of conversations, including those made over telephone answering machines;

e. Narcotics traffickers commonly maintain identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts;

f. Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises;

g. Narcotics traffickers commonly maintain many of the foregoing items in computer files; and

h. Narcotics traffickers commonly maintain the foregoing items inside combination or key-lock safes or strong boxes, suitcases, locked cabinets and other types of locked or closed containers, or hidden compartments, which are secreted in

locations such as the SUBJECT PREMISES, where they may maintain these items securely.

Attachment A

ITEMS TO BE SEIZED
5637 UTRECHT ROAD, BALTIMORE, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #1")

1. Correspondence, drawings, letters, cards, notes, papers, postcards, photographs and video recordings of individuals, and items of clothing documenting membership in BGF and establishing relationships between members and associates of BGF;

2. Phone and address lists; dues lists; other lists of gang members; documents or other items reflecting gang "tags"; spray-paint, wide tip marking pens, or other items used to create gang "tags";

3. Rule books, codes of conduct, or other documents setting forth the rules governing BGF and its members; pre-paid credit cards and documents relating thereto;

4. Firearms, ammunition, magazines for storing and loading ammunition, gun boxes, holsters, gun parts, shell casings, items used to clean and maintain firearms, firearms-related publications, firearms-related documents, and other indicia of gun possession;

5. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

6. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

7. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives,

movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

8. Two-way radios and police scanners;

9. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

10. Identification documents;

11. Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

12. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

13. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

Attachment B

ITEMS TO BE SEIZED
1113 EAST BELVEDERE AVENUE, APARTMENT C, BALTIMORE, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #2")

1. Correspondence, drawings, letters, cards, notes, papers, postcards, photographs and video recordings of individuals, and items of clothing documenting membership in BGF and establishing relationships between members and associates of BGF;

2. Phone and address lists; dues lists; other lists of gang members; documents or other items reflecting gang "tags"; spray-paint, wide tip marking pens, or other items used to create gang "tags";

3. Rule books, codes of conduct, or other documents setting forth the rules governing BGF and its members; pre-paid credit cards and documents relating thereto;

4. Firearms, ammunition, magazines for storing and loading ammunition, gun boxes, holsters, gun parts, shell casings, items used to clean and maintain firearms, firearms-related publications, firearms-related documents, and other indicia of gun possession;

5. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

6. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

7. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives,

movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

8. Two-way radios and police scanners;

9. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

10. Identification documents;

11. Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

12. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

13. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

## Attachment C

## ITEMS TO BE SEIZED
## 600 S. HIGHLAND AVENUE, APARTMENT A, BALTIMORE, MARYLAND
## AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #3")

1. Correspondence, drawings, letters, cards, notes, papers, postcards, photographs and video recordings of individuals, and items of clothing documenting membership in BGF and establishing relationships between members and associates of BGF;

2. Phone and address lists; dues lists; other lists of gang members; documents or other items reflecting gang "tags"; spray-paint, wide tip marking pens, or other items used to create gang "tags";

3. Rule books, codes of conduct, or other documents setting forth the rules governing BGF and its members; pre-paid credit cards and documents relating thereto;

4. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

5. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

6. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

7. Two-way radios and police scanners;

8. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

9. Identification documents;

10. Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

11. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

12. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

Attachment D

ITEMS TO BE SEIZED
420 WOODLAKE COURT # C, GLEN BURNIE, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #4")

1. Correspondence, drawings, letters, cards, notes, papers, postcards, photographs and video recordings of individuals, and items of clothing documenting membership in BGF and establishing relationships between members and associates of BGF;

2. Phone and address lists; dues lists; other lists of gang members; documents or other items reflecting gang "tags"; spray-paint, wide tip marking pens, or other items used to create gang "tags";

3. Rule books, codes of conduct, or other documents setting forth the rules governing BGF and its members; pre-paid credit cards and documents relating thereto;

4. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

5. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

6. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

7. Two-way radios and police scanners;

8. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

9. Identification documents;

10. Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

11. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

12. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

Attachment E

ITEMS TO BE SEIZED
15 HIAWATHA COURT, OWINGS MILLS, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #5")

1. Correspondence, drawings, letters, cards, notes, papers, postcards, photographs and video recordings of individuals, and items of clothing documenting membership in BGF and establishing relationships between members and associates of BGF;

2. Phone and address lists; dues lists; other lists of gang members; documents or other items reflecting gang "tags"; spray-paint, wide tip marking pens, or other items used to create gang "tags";

3. Rule books, codes of conduct, or other documents setting forth the rules governing BGF and its members; pre-paid credit cards and documents relating thereto;

4. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

5. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

6. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

7. Two-way radios and police scanners;

8. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

9. Identification documents;

10. Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

11. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

12. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

Attachment F

ITEMS TO BE SEIZED
4001 DUVALL AVENUE, FLOOR 2, BALTIMORE, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #6")

1. Correspondence, drawings, letters, cards, notes, papers, postcards, photographs and video recordings of individuals, and items of clothing documenting membership in BGF and establishing relationships between members and associates of BGF;

2. Phone and address lists; dues lists; other lists of gang members; documents or other items reflecting gang "tags"; spray-paint, wide tip marking pens, or other items used to create gang "tags";

3. Rule books, codes of conduct, or other documents setting forth the rules governing BGF and its members; pre-paid credit cards and documents relating thereto;

4. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

5. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

6. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

7. Two-way radios and police scanners;

8. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

9. Identification documents;

10. Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

11. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

12. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

Attachment G

ITEMS TO BE SEIZED
1909 FOREST PARK AVENUE, APT. S3, GWYNN OAK, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #7")

1. Correspondence, drawings, letters, cards, notes, papers, postcards, photographs and video recordings of individuals, and items of clothing documenting membership in BGF and establishing relationships between members and associates of BGF;

2. Phone and address lists; dues lists; other lists of gang members; documents or other items reflecting gang "tags"; spray-paint, wide tip marking pens, or other items used to create gang "tags";

3. Rule books, codes of conduct, or other documents setting forth the rules governing BGF and its members; pre-paid credit cards and documents relating thereto;

4. Controlled substances, as well as paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution;

5. Firearms, ammunition, magazines for storing and loading ammunition, gun boxes, holsters, gun parts, shell casings, items used to clean and maintain firearms, firearms-related publications, firearms-related documents, and other indicia of gun possession;

6. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

7. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

8. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone

numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

9. Two-way radios and police scanners;

10. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

11. Identification documents;

12. Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

13. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

14. Safes, combination or key-lock strong boxes or other secure storage containers; suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

Attachment H

ITEMS TO BE SEIZED
1102 N. MOUNT STREET, BALTIMORE, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #8")

1. Controlled substances, as well as paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution;

2. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

3. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

4. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

5. Two-way radios and police scanners;

6. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

7. Identification documents;

8. Records of travel including, but not limited to, tickets, transportation

schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

9. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

10. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

Attachment I

ITEMS TO BE SEIZED
3908 NORFOLK AVENUE, BALTIMORE, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #9")

1. Controlled substances, as well as paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution;

2. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

3. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

4. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

5. Two-way radios and police scanners;

6. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

7. Identification documents;

8. Records of travel including, but not limited to, tickets, transportation

schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

9. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

10. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

Attachment J

ITEMS TO BE SEIZED
2735 ST. PAUL STREET, APARTMENT 1, BALTIMORE, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #10")

1. Controlled substances, as well as paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution;

2. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

3. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

4. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

5. Two-way radios and police scanners;

6. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

7. Identification documents;

8. Records of travel including, but not limited to, tickets, transportation

Attachment K

ITEMS TO BE SEIZED
448 TUBMAN COURT, BALTIMORE, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #11")

1. Controlled substances, as well as paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution;

2. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

3. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

4. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

5. Two-way radios and police scanners;

6. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

7. Identification documents;

8. Records of travel including, but not limited to, tickets, transportation

schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

9. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

10. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.

Attachment L

ITEMS TO BE SEIZED
5 WOODBRIAR COURT, APARTMENT C, BALTIMORE, MARYLAND
AND ITEMS CONTAINED THEREIN ("SUBJECT PREMISES #12")

1. Controlled substances, as well as paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution;

2. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

3. Financial records and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

4. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

5. Two-way radios and police scanners;

6. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

7. Identification documents;

8. Records of travel including, but not limited to, tickets, transportation

schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

9. Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

10. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof.